# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

————————————————

Nº 06-CV-4746 (JFB) (ETB)

————————————————

ANTHONY CONTE,

Plaintiff,

VERSUS

The COUNTY OF NASSAU, the NASSAU DISTRICT ATTORNEY'S OFFICE, former Nassau County District Attorney DENIS DILLON, Nassau County District Attorney KATHERINE RICE, Assistant District Attorneys ROBERT EMMONS, PHILIP WASILAUSKY, WILLIAM WALLACE, CHRISTINA SARDO, Nassau County Special Investigator MICHAEL FALZARNO, the CITY OF NEW YORK, the NEW YORK CITY POLICE DEPARTMENT, NYPD Advocate's Office Attorney LISA BLAND, Deputy Commissioner of the NYPD ROBERT VINAL, NYPD Detective TEFTA SHASKA, LARRY GUERRA, RHODA ZWICKER AND "JOHN AND JANE DOES, 1-20," unknown individuals and officials of the Nassau County District Attorney's Office, in their individual and official capacities,

Defendants.

————————————————

MEMORANDUM AND ORDER
March 31, 2008

————————————————

JOSEPH F. BIANCO, District Judge:

*Pro se* plaintiff Anthony Conte ("Conte" or "plaintiff") brings this action against the County of Nassau (the "County"), the Nassau County District Attorney's Office (the "NCDAO"), former Nassau County District Attorney Denis Dillon ("Dillon"), Nassau County District Attorney Katherine Rice ("Rice"), Assistant District Attorneys Robert Emmons ("Emmons"), Philip Wasilausky ("Wasilausky"), William Wallace ("Wallace"), Christina Sardo ("Sardo"), Nassau County Special Investigator Michael Falzarno ("Falzarno") (collectively, the "County Defendants"), the City of New York (the "City"), the New York City Police Department ("NYPD"), NYPD Advocate's Office Attorney Lisa Bland ("Bland"), Deputy Commissioner of the NYPD Robert Vinal ("Vinal") (collectively, the "City Defendants"), NYPD Detective Tefta Shaska ("Shaska"), Larry Guerra ("Guerra"), and "John and Jane Does, 1-20," unknown individuals and employees of the NCDAO, in their individual and official capacities

(collectively, "defendants")[1], alleging false arrest, false imprisonment, malicious prosecution, municipal liability, abuse of process, conspiracy, "neglect to prevent," and defamation, pursuant to 42 U.S.C. §§ 1983, 1985, 1986 and 1988, Lanham Act violations pursuant to 15 U.S.C. § 1125(a), and various state law tort claims, all arising from the allegedly unlawful investigation and prosecution of Conte.[2]

---

[1] Plaintiff also names Rhoda Zwicker, a former NCDAO employee, as a defendant in this case. However, Zwicker is now deceased and is not being represented by counsel. As Zwicker has not been served, she is not a proper defendant in this case.

[2] The Court dismisses defendants NCDAO and the NYPD from the instant action on the well-settled grounds that these entities are "administrative arms" of the same municipal entity–the County and the City, respectively–and thus lack the capacity to be sued. *See, e.g., Caidor v. M&T Bank*, No. 5:05-CV-297, 2006 U.S. Dist. LEXIS 22980, at *6-*7 (N.D.N.Y. Mar. 27, 2006) ("'Under New York law, departments which are merely administrative arms of a municipality, do not have a legal identity separate and apart from the municipality and cannot sue or be sued.'") (quoting *Hill v. City of White Plains*, 185 F. Supp. 2d 293, 303 (S.D.N.Y. 2002)). Thus, the Court dismisses all causes of action against the NCDAO and the NYPD.

Further, with regard to the individual defendants sued in their official capacities, these claims are duplicative of the municipal liability claim lodged against the County and the City under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), discussed *infra*. *See, e.g., Tsotesi v. Bd. of Educ.*, 258 F. Supp. 2d 336, 338 n.10 (S.D.N.Y. 2003) (dismissing claims against officials sued in their official capacities where plaintiff also sued municipality) (citing *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985)). Therefore, the Court

Defendants move for a judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). For the following reasons, (1) the City Defendants' motion is granted in its entirety; (2) the motion to dismiss DA Dillon and DA Rice is granted; and (3) the remaining defendants' motions are granted in part and denied in part.

## I. Background

### A. Facts

The following facts are taken from the complaint and are not findings of fact by the Court. The Court assumes these facts to be true for the purpose of deciding this motion and construes them in the light most favorable to the plaintiff, the non-moving party.

#### 1. I Media Publication

During the summer of 1999, plaintiff conceived, created and developed a business plan for a unique media publication, and formed I Media Corporation and I Media Company (collectively, "I Media") in order to develop, publish, print, distribute, and market the publication under the trade names "American Home - TV Week Magazine" and "American Home - TV Time Magazine." (Second Am. Compl. ¶ 29-33.) The publication was a TV magazine/listings guide and shopper publication[3], and was intended to be distributed free of charge in a "saturation

---

dismisses all claims against individual defendants sued in their official capacities. For the reasons discussed *infra*, however, certain of the claims against individual defendants in their individual capacities survive defendants' motion.

[3] The inserted shopper publication was published under the trade name "Smart Shopper." (*Id.* ¶ 33.)

style" distribution system. (*Id.* ¶ 30.) Plaintiff alleges that this sort of publication did not exist in the marketplace at the time. (*Id.* ¶ 31.)

In March 2003, plaintiff commenced advertising, sales and marketing efforts. (*Id.* ¶ 32.) Through negotiation and agreements with content distributors and writers, I Media purchased weekly TV listings, content, and features, and solely developed and marketed the shopper portion of the publication. (*Id.*) In April 2003, plaintiff began to enter into home distributor agreements with individuals for exclusive routes to distribute the publications; those individuals were to be paid a set rate for each publication that they home delivered. (*Id.* ¶¶ 36-37.)

2. The Post-Dated Check

On May 1, 2003, plaintiff signed a home distributor agreement with Joseph Cutolo ("Cutolo"), which gave Cutolo exclusive rights to distribute I Media's publication in Mineola, New York. (*Id.* ¶ 38.) On June 21 2003, plaintiff entered into a verbal agreement with Cutolo (the "Cutolo Agreement") to pay Cutolo the sum of $2,500 for the possible distribution of I Media's publication on June 28, 2003, June 29, 2003, July 5, 2003, and July 6, 2003, contingent upon the publications being ready for distribution on those dates and on Cutolo actually distributing them. (*Id.* ¶ 40.) On the same date as the verbal agreement, plaintiff gave Cutolo a post-dated check dated July 5, 2003, in the amount of $2,500 for the advanced payment to Cutolo if he actually delivered the TV publication. (*Id.*) Cutolo did not distribute the publications. (*Id.*) Plaintiff asked Cutolo, by telephone and by letter dated July 1, 2003, not to deposit the post-dated check. (*Id.*)

Plaintiff alleges that Cutolo ignored plaintiff's request and, without informing the plaintiff, deposited the post-dated check. (*Id.* ¶ 41.) The check was subsequently dishonored by I Media's bank and returned unpaid to Cutolo. (*Id.*) Plaintiff immediately placed a stop payment order on that check with his bank so that Cutolo could not deposit it again. (*Id.*) Plaintiff claims that Cutolo went to the NCDAO and a NCDAO clerk named Rhoda Zwicker ("Zwicker") advised Cutolo to file a criminal complaint against plaintiff for "passing a bad check." (*Id.* ¶ 44.) Plaintiff further alleges that he subsequently went to the NCDAO and met with Zwicker, whom he alleges was "not an attorney or prosecutor." (*Id.* ¶ 45.) Plaintiff also asserts that during this meeting with Zwicker, he (1) explained the nature of his business, (2) told Zwicker that Cutolo's complaint was actually a business transaction and civil contract dispute, and (3) showed her documentation, including a copy of a letter wherein Cutolo indicated that Conte's check was post-dated, thereby making Conte exempt from prosecution.[4] (*Id.*)

Conte contends that, despite the exculpatory evidence that he provided to the NCDAO, Zwicker, without probable cause, initiated a criminal proceeding against plaintiff and obtained a warrant for his arrest. (*Id.* ¶ 47.) According to the County Defendants, and not disputed by plaintiff, Conte surrendered (at some time not indicated in parties' moving papers) based upon the

---

[4] Plaintiff also allegedly provided Zwicker with a copy of New York State Penal Law 190.05(1), and contends that this statute exempts post-dated checks from prosecution. The Court notes that the actual exemption for post-dated checks is not found directly in that statute, but in the definition section.

criminal summons for his arrest on the charge of Issuing a Bad Check in violation of New York State Penal Law Section 190.05(1). (County Defs.' Br., at 24 n.3.)

### 3. The Guerra Complaint

On December 31, 2003, *pro se* defendant Guerra signed a route distributor agreement with I Media Corporation, and defaulted in making the final balance payment of $4,500 to I Media that was due in February 2004. (Second Am. Comp ¶ 49.) Plaintiff alleges that, due to Guerra's refusal to cure the breach, plaintiff informed Guerra by letter that he was terminating I Media's agreement with Guerra and keeping money that Guerra had paid to him as liquidated damages. (*Id.*) Plaintiff further alleges that Guerra tried to pressure plaintiff with threats of criminal complaints by reporting that plaintiff was "a fraud" to the NYPD. (*Id.* ¶ 50.)

Plaintiff alleges that Guerra, in an effort to recoup his money, contacted his wife defendant Tefta Shaska, who is a New York City Police Detective. (*Id.* ¶ 52.) According to plaintiff, Shaska commenced an investigation of plaintiff and used her position as a police detective to obtain private documents about plaintiff. (*Id.*) Shaska then directed Guerra to file a complaint against plaintiff and I Media with the NCDAO because that was "where she had found that the bad check charge had originated." (*Id.* ¶ 57.)

Plaintiff contends that he did not find out that Shaska had obtained these private original documents until a hearing in April 2004 in Small Claims Court in Ronkonkoma, New York (hereinafter, the "Guerra Hearing"). (*Id.*

¶ 51.) The Guerra Hearing was brought by Guerra as a result of filing his complaint to recoup the $4,500. (*Id.*) During that hearing, Guerra provided the judge with an original folder containing the logo of I Media's printer Quebecor, which contained original copies of I Media's printing contract and its confidential credit application form. (*Id.*) The judge ultimately dismissed Guerra's claims and held in favor of the plaintiff. (*Id.*) A subsequent appeal of the claim and a request for a *de novo* trial were dismissed. (*Id.*)

### 4. Shaska's Hearing

Plaintiff contacted Quebecor because he was concerned about how Mr. Guerra obtained I Media's contract documents and confidential credit application for the Guerra Hearing. (*Id.* ¶ 52.) Plaintiff alleges that Gabriel Sauro, Quebecor's sales representative, told plaintiff that defendant Shaska contacted him from the Midtown South NYPD Precinct in New York City claiming to be an investigator with the NYPD and working with the "District Attorney's Office." (*Id.*) He further said that she demanded that those documents be mailed to her at the Midtown South Precinct of the NYPD as part of an "investigation of Anthony Conte for fraud committed by him." (*Id.*) Plaintiff further alleges that Shaska told Mr. Sauro that the plaintiff and I Media "had committed fraud" and "were illegitimate." (*Id.*) Quebecor complied with this request and mailed those documents to Shaska. (*Id.*) The plaintiff later learned that Shaska had also contacted another of I Media's contracted printers, Transcontinental, and several route distributors, and allegedly made the same false and defamatory accusations. (*Id.*)

Once the NYPD found out about Shaska's actions, they held a disciplinary hearing. (Pl.'s Exh. O.) Shaska pled guilty and was sanctioned with a loss of five vacation days for her actions. (*Id.*)

### 5. The NCDAO Investigation

Plaintiff alleges that after Cutolo's bad check incident, and during and after the time of Guerra's complaint, members of the NCDAO began a "surreptitious investigation" of him and his company, and "systematically began to contact numerous route distributors contracted with I Media in an effort to solicit complaints from them" even though there was allegedly no evidence of Conte's or I Media Corporation's commission of any criminal acts. (*Id.* ¶ 58.)[5]

Plaintiff alleges that Nassau ADA Wallace and Nassau ADA Wasilausky began disseminating accusations that plaintiff was "a crook" and "a fraud" to plaintiff's vendors and route distributors. (*Id.* ¶ 48.) Specifically, plaintiff alleges that the County defendants "repeatedly disseminated false information telling these route distributors, their spouses and others that the plaintiff was 'a fraud', 'a thief' and 'a career criminal', that the plaintiff 'had criminally passed bad checks to other route distributors' and that he had 'stolen money from numerous route distributors' and that I Media and his TV

publication were 'a non-existent scam and fraud' and that the plaintiff 'never intended to publish or distribute anything[.]'" (*Id.* ¶ 59.)

Plaintiff further alleges that Wallace and Wasilausky began to solicit complaints from the same individuals. (*Id.*) Plaintiff contends that the County Defendants conducted telephone solicitations by utilizing a telephone list stolen from I Media's offices and given to them by Guerra. (*Id.* ¶ 58; Pl.'s Exh. P.) Plaintiff alleges that the County Defendants called at least 40 route distributors, prospective route distributors, and others. (Second Am. Compl. ¶ 59.)

Plaintiff alleges that these distributors were then forwarded complaint forms to return to the NCDAO and were "advised not to talk to the plaintiff, not to do any further business with the plaintiff and I Media and not to discuss these 'confidential' matters with the plaintiff Anthony Conte or let him know that they had taken place." (*Id.* ¶ 60.)

Plaintiff alleges that, as a direct result of these defamatory allegations, plaintiff and I Media were unable to publish and distribute their TV publication, which the defendants knew and anticipated would occur, because many distributors refused to deal with the plaintiff and instead began to breach their agreements. (*Id.* ¶ 61.) Plaintiff further alleges that the publishing and distribution of I Media's TV publication are delayed indefinitely due to the severe loss of route distributors and investments made by the plaintiff. (*Id.* ¶ 62.)

Plaintiff contends that this investigation continued, despite the fact that the plaintiff

---

[5] Although plaintiff does not specify when this NCDAO investigation began, he alludes in his complaint that an investigation was initiated after Cutolo's "bad check" complaint (*see* Second Am. Compl. ¶¶ 48, 58), and that the NCDAO began disseminating false information to his distributors after Guerra's complaint (*see id.* ¶ 59).

provided Wasilausky with a letter dated May 11, 2004, advising the County that Guerra's civil complaints had been dismissed. (*Id.* ¶ 63.) Plaintiff also allegedly provided Wasilausky with the court's judgment stating that the complaint was dismissed. (*Id.*)

### 6. The Continued Prosecution

Plaintiff alleged that, during November 2004, defendant Mike Falzarno was assigned to work with and under the direction of ADAs Wallace and Wasilausky to continue their surreptitious investigation of the plaintiff and I Media's business operations in an effort to solicit more complaints. (*Id.* ¶ 67.)

Plaintiff alleges that Falzarno stopped several of I Media's distributors while they were delivering the Time publication and told these individuals that "the plaintiff and I Media had 'stolen money from numerous route distributors', that the plaintiff was 'a scam artist', that I Media and his publication TV Time were 'an elaborate fraud scheme' and that any day now 'Anthony Conte (the plaintiff) will be in handcuffs.'" (*Id.*; Pl.'s Exh. S.)[6]

Plaintiff alleges that Falzarno's tactics frightened and intimidated these route distributors. (Second Am. Compl. ¶ 67.) Plaintiff also claimed that Falzarno told these individuals that if they did not provide him with a list of names of other route distributors as well as other confidential information regarding the operation of the plaintiff's business, that they would be impeding an official investigation and would be subject to arrest. (*Id.*) Similar consequences would happen if they told plaintiff what was happening. (*Id.*)

Falzarno served the subpoena on the plaintiff at I Media's offices in Melville, New York. Plaintiff alleges that Falzarno asked to speak with the plaintiff, but refused to identify or leave his name. (*Id.* ¶ 70.) Conte said that Falzarno "maliciously grabbed the plaintiff's right hand with his and squeezed it with extreme force in an attempt to break his hand while slapping the plaintiff in the face with the subpoena that was in his left hand." (*Id.*) Plaintiff also alleged that as Falzarno left the plaintiff's office, he stated to the plaintiff "I'll get you!" (*Id.*) Plaintiff contends that he could not flex or move his right hand after the incident, that it turned black and blue, and that he was fearful that Falzarno might attempt to attack him thereafter. (*Id.*)

Plaintiff also alleges that defendants spread these defamatory and disparaging falsehoods from November of 2003 to date, including two newspaper articles appearing in Newsday in September of 2004. (*Id.* ¶ 77.) Specifically, in an article appearing in Newsday on September 14, 2005, defendant Emmons, the Chief of the Criminal Frauds Bureau of the NCDAO, stated that "we have received numerous complaints and as a result are investigating the matter" when asked about a lawsuit filed against the plaintiff and I Media alleging that they committed fraud. (*Id.* ¶ 78.)

Plaintiff further alleges that ADA Sardo insisted on prosecuting the plaintiff on the allegedly false bad check complaint filed by Mr. Cutolo in November of 2003, even though

---

[6] Two such distributors that were stopped were Paul Hoppe and Alfonso Amorrizo. (Second Am. Compl. ¶ 67.)

provided with an affidavit signed by Mr. Cutolo in June of 2005 in which Cutolo acknowledged that the check in question was post-dated, and another affidavit by Cutolo dated January 11, 2006, in which he stated his intention and desire to withdraw his complaint and not to testify for the government. (*See* Pl.'s Exh. L) Plaintiff alleges that Sardo continued to prosecute plaintiff for over eight months, which required at least sixteen court appearances before Justice Denise Sher in the Hempstead Criminal Court. (Second Am. Compl. ¶ 81.) This criminal charge was dismissed in June of 2006. Plaintiff contends that it remained on his criminal record as an open charge as of August 2006, causing the plaintiff to be embarrassed and unemployed, and to lose employment opportunities. (*Id.*)

### 7. Policy of the NCDAO

Plaintiff alleges that his criminal defense attorney, John Halton, a former NCDAO prosecutor, told him that:

> he was told by Assistant District Attorney William Wallace that the real and only reason that this criminal charge was proffered against the plaintiff and that the NASSAU DA was targeting, prosecuting and further intent on investigation, pursuing, charging and harassing the plaintiff was for no other reason but the fact that the plaintiff had pled guilty to an unrelated felony in Federal Court ten years earlier, had a criminal record and therefore was considered automatically guilty of this criminal charge and an easy target for the NASSAU DA to go after.

> [I]t was the practice, custom and policy of the NASSAU DA instituted by District Attorney Denis Dillon himself to automatically and systematically prosecute individuals with criminal records like the plaintiff against whom complaints are filed and that he could confirm this from his own personal experience of having worked for the NASSAU DA several years earlier.

> [T]he NASSAU DA was going to pursue this criminal charge and other extortive methods in an attempt to have the plaintiff agree to make settlements to individuals regardless of the fact that there was no evidence or probable cause to support any criminal charges and despite the fact that these individuals were not legally owed money by the plaintiff and/or I Media.

> [T]he NASSAU DA would pursue this vendetta against the plaintiff, despite the lack of probable cause, for the high publicity value such a case afforded District Attorney Denis Dillon who was up for re-election.

(*Id.* ¶ 47.)

Accordingly, plaintiff contends that during the course of the alleged improper investigation of him and I Media Corporation, the NCDAO deliberately defamed and slandered plaintiff publicly to business associates. (*Id.* ¶¶ 56-60, 72.) Plaintiff asserts that as a direct result of the defendants' actions, plaintiff and I Media were unable to publish and distribute "their TV publication"

because business associates broke their contractual relationships with him, which ultimately destroyed plaintiff's business. (*Id.* ¶¶ 60-62, 77.) Plaintiff also alleges that defendants' actions caused "two defamatory and derogatory newspaper articles appearing in Newsday in September of 2005" to be written about him. (*Id.* ¶¶ 77-78.)

Plaintiff also alleges that all of the defendants conspired against him by "simply ignor[ing] with deliberate indifference [to the] complete lack of evidence and probable cause that the plaintiff or I Media had committed any crime," motivated by a desire to harm plaintiff because he had previously pled guilty to a crime, and destroy his business, and "disparage and defame the plaintiff and his publishing business [] in order to obtain high profile publicity to help in District Attorney Denis Dillon's tight re-election campaign." (*Id.* ¶¶ 63, 78.)

## B.  Procedural History

On August 30, 2006, plaintiff filed the Complaint in this action. On January 4, 2007, plaintiff served defendants with his First Amended Complaint. On April 4, 2007, plaintiff served defendants with his Second Amended Complaint.

The County Defendants moved to dismiss the Second Amended Complaint on April 20, 2007. The City Defendants and Shaska moved to dismiss on August 31, 2007, and Guerra moved to dismiss on September 26, 2007. Plaintiff responded to all defendants on December 7, 2007. The County Defendants replied on December 17, 2007. The City Defendants replied on December 21, 2007. Shaska replied on December 24, 2007 and

Guerra replied on January 10, 2008. The Court has considered all submissions.[7]

## II. STANDARD OF REVIEW

Courts evaluate a motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) under the same standard as a motion pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim. *Nicholas v. Goord*, 430 F.3d 652, 658 n.8 (2d Cir. 2005).[8]

In reviewing a motion to dismiss under Rule 12(b)(6), a court must accept the factual allegations set forth in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. *See Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006); *Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 100 (2d Cir. 2005). The plaintiff must satisfy "a flexible 'plausibility' standard,

---

[7] This includes all documents and exhibits attached to plaintiff's complaint, and those attached to defendants' complaint if, as discussed *infra*, they were also attached to plaintiff's papers or incorporated by reference.

[8] County Defendants also contend in their reply brief that the complaint does not meet Rule 8's requirement of a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). The Court rejects this argument. While the complaint is long, it provides "fair notice" of the basis for plaintiff's claims. *See Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964 (2007) (citation and quotation marks omitted); *see also Shyshko v. County of Monroe*, No. 07-CV-6122, 2007 U.S. Dist. LEXIS 50554, at *7 (W.D.N.Y. July 12, 2007) (denying motion for dismissal under Rule 8 where "complaint, although lengthy, owing to the number of parties and the number of claims, is not confusing, ambiguous, vague, or unintelligible").

which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible*." *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Bell Atlantic*, 127 S. Ct. at 1969. The Court does not, therefore, require "heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Id.* at 1974.

Further, in reviewing a motion to dismiss, "the district court is normally required to look only to the allegations on the face of the complaint." *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007). Here, defendants ask the Court to consider for purposes of this motion several exhibits appended to their motion papers, including documents filed in other courts and police reports. (City Defs.' Reply, at 3.) However, with respect to non-judicial documents, the Court declines to do so. "[A] ruling on a motion for dismissal pursuant to Rule 12(b)(6) is not an occasion for the court to make findings of fact." *Roth*, 489 F.3d at 509. Short of converting this motion to a motion for summary judgment under Fed. R. Civ. P. 56, which would be premature in this case given the lack of discovery, the Court may only consider a document not appended to the complaint if the document is "incorporated in [the complaint] by reference" or is a document "upon which [the complaint] *solely* relies and . . . is *integral to the complaint*." *Id.* (quoting *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991)). Courts also "'routinely take judicial notice of documents filed in other courts . . . not for the truth of the matters asserted in

other litigation, but rather to establish the fact of such litigation and related filings.'" *Crews v. County of Nassau*, No. 06-CV-2610 (JFB), 2007 U.S. Dist. LEXIS 6572, at *5 n.2 (E.D.N.Y. Jan. 30, 2007) (quoting *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991)). However, with respect to the non-judicial documents attached to defendants' papers, defendants do not argue – and the Court does not conclude – that defendants' exhibits fall within these exceptions. Consequently, the Court will not consider such exhibits for the purposes of this motion, except for those exhibits that were also appended to plaintiff's complaint or incorporated by reference.

Moreover, as the plaintiff is appearing *pro se*, the Court shall "'construe [his complaint] broadly, and interpret [it] to raise the strongest arguments that [it] suggests.'" *Weixel v. Bd. of Educ. of the City of N.Y.*, 287 F.3d 138, 145-46 (2d Cir. 2002) (quoting *Cruz v. Gomez*, 202 F.3d 593, 597 (2d Cir. 2000)).

III. Plaintiff's Claims under Section 1983[9]

Plaintiff alleges claims for false arrest and malicious prosecution under 42 U.S.C. § 1983. Specifically, plaintiff claims that defendants did not have probable cause for arresting him for writing a bad check, and that the defendants continued to investigate and prosecute him with the ultimate purpose of shutting down his business.[10]

---

[9] While plaintiff also brings a Section 1983 claim for conspiracy, the Court considers that claim in a separate section, *infra*.

[10] Although the complaint does not state the date or details regarding Conte's actual arrest, the

To prevail on a claim under Section 1983, a plaintiff must show: (1) the deprivation of any rights, privileges, or immunities secured by the Constitution and its laws; (2) by a person acting under the color of state law. 42 U.S.C. § 1983. "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993). "Claims for false arrest or malicious prosecution, brought under § 1983 to vindicate the Fourth and Fourteenth Amendment right to be free from unreasonable seizures, are 'substantially the same' as claims for false arrest or malicious prosecution under state law." *Jocks v. Tavernier*, 316 F.3d 128, 134 (2d Cir. 2003) (quoting *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (false arrest) and citing *Conway v. Vill. of Mount Kisco*, 750 F.2d 205, 214 (2d Cir. 1984 (malicious prosecution)).

A. False Arrest and False Imprisonment

County Defendants move to dismiss the false arrest and false imprisonment claims against them on the grounds that there was probable cause for Conte's arrest. For the reasons set forth below, the Court denies defendants' motion to dismiss these causes of action.

In New York, the claim colloquially known as "false arrest" is a variant of the tort of false imprisonment, and courts use that tort to analyze an alleged Fourth Amendment violation in the Section 1983 context. *See*

*Singer v. Fulton County Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995). To prevail, a plaintiff must prove four elements: "(1) the defendant intended to confine him; (2) the plaintiff was conscious of the confinement; (3) the plaintiff did not contest the confinement; and (4) the confinement was not otherwise privileged." *Broughton v. New York*, 37 N.Y.2d 451, 456 (N.Y. 1975), *cert. denied*, 423 U.S. 929 (1975). In the instant case, only the final element is in dispute. County Defendants argue that the arrest was privileged as a matter of law because it was supported by probable cause; the Second Circuit has established that "[t]he existence of probable cause to arrest constitutes justification and 'is a complete defense to an action for false arrest'. . . ." *Jenkins v. City of New York*, 478 F.3d 76, 84 (2d Cir. 2007) (quoting *Weyant*, 101 F.3d at 852 (internal citations omitted)).

"In general, probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Weyant*, 101 F.3d at 852. Further, the "validity of an arrest does not depend upon an ultimate finding of guilt or innocence." *Peterson v. County of Nassau*, 995 F. Supp. 305, 313 (E.D.N.Y. 1998) (citing *Pierson v. Ray*, 386 U.S. 547, 555 (1967)). "Rather, the court looks only to the information that the arresting officer had at the time of the arrest." *Peterson*, 995 F. Supp at 313 (citing *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)). Under the collective knowledge doctrine, if one law enforcement officer had probable cause to arrest, cooperating law enforcement officers are deemed to have probable cause as well. *Savino v. City of New York*, 331 F.3d

County Defendants acknowledge that Conte surrendered based upon a criminal summons for his arrest on the charge of Issuing a Bad Check in violation of New York State Penal Law Section 190.05(1). (County Defs.' Br., at 24 n.3.)

63, 74 (2d Cir. 2003) ("The collective knowledge doctrine provides that, for the purpose of determining whether an arresting officer had probable cause to arrest, 'where law enforcement authorities are cooperating in an investigation, . . . the knowledge of one is presumed shared by all.'") (quoting *Illinois v. Andreas*, 463 U.S. 765, 772 n.5 (1983)). Moreover, on a motion to dismiss, the "question of whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers." *Weyant*, 101 F.3d at 852.

County Defendants argue that they had probable cause to arrest and confine Conte by relying on Cutolo's sworn complaint, the front and back of Conte's bank check, letters that Cutolo provided to the NCDAO, a letter from the Roslyn Savings Bank about the check that Conte issued to Cutolo, and Conte's home distributor agreement with Cutolo, which were appended to defendants' motion papers. (County Defs' Mem., at 25.) For the reasons set forth *supra*, however, the Court will only consider those exhibits that were also appended to plaintiffs' complaint or incorporated by reference. Of these latter exhibits, only Exhibits K and J relate substantively to the question of probable cause. Specifically, plaintiff's Exhibit K includes the sworn Information filed by Cutolo stating that plaintiff issued him a check knowing that he had insufficient funds, said the check was not post-dated, and that on the date the check was issued the account had insufficient funds. (Pl.'s Exh. K.) Furthermore, a letter by Cutolo to Conte, dated August 11, 2003, alerted plaintiff of the bounced check. (Pl.'s Exh. J.) The County Defendants argue that these exhibits demonstrate that the County Defendants had

reason to believe an alleged bad check crime occurred, especially given that the Information was corroborated by Cutolo's letter to Conte.

The Court is aware that "[a]n arresting officer advised of a crime by a person who claims to be the victim, and who has signed a complaint or information charging someone with the crime, has probable cause to effect an arrest absent circumstances that raise doubts as to the victim's veracity." *Singer*, 63 F.3d at 119. Here, however, plaintiff has alleged that he provided the County Defendants with compelling facts that called into question the veracity of Cutolo and undermined any probable cause to arrest Conte at that time for passing a bad check. In other words, plaintiff argues that defendants were put on notice, through plaintiff's correspondence with Zwicker and the documents provided to her, that there was doubt as to the alleged bad check charge. Specifically, plaintiff alleges in his complaint that plaintiff explained to Zwicker

the circumstances of Mr. Cutolo's business and contract dispute with I Media, showed Ms. Zwicker the copies of all written documentation and correspondence that pertained to the dispute . . ., explained that the check given to Mr. Cutolo, which was the subject of the complaint, was two weeks post dated when given to Mr. Cutolo on June 21 2003, that the plaintiff had instructed Mr. Cutolo on July 1, 2003 not to deposit the check thereafter.

(Second Am. Compl. ¶ 45.) Plaintiff also alleges that Zwicker knew, prior to the filing of the information against plaintiff in

November 2003, that she had a written admission from Cutolo that the check was post-dated (and therefore exempt from prosecution). (*Id.* ¶ 45.)

Based on the facts alleged above, plaintiff is urging, in substance, that the Court conclude: (1) that the County Defendants knew that there were issues surrounding Cutolo's credibility and the veracity of the false check charge and, therefore, lacked probable cause to arrest plaintiff; (2) that the absence of any probable cause is demonstrated by Cutolo's letters acknowledging that the check was post-dated and plaintiff's letter instruction to Cutolo not to deposit the check, and (3) that the defendants were motivated to arrest plaintiff because of his prior felony conviction and policy towards continued prosecution against prior felons.

The key question in the instant case on the issue of probable cause is whether there were circumstances known to the County Defendants at the time of the arrest that were sufficient to raise doubts as to Cutolo's veracity and negate probable cause (even assuming *arguendo* it existed based on the victim's initial complaint alone). Although the County defendants point to the Information filed by Cutolo and the subsequent correspondence regarding the bounced check, they are unable to point to anything in the Second Amended Complaint (or its attached exhibits) to rebut plaintiff's allegations that he provided irrefutable evidence of his innocence to the County Defendants prior to arrest that he contends clearly undermined any probable cause that existed from Cutolo's initial statement. Therefore, in this pre-discovery stage of this litigation, the material facts surrounding the

investigation and their impact on the veracity of Cutolo's complaint are in dispute.

Accordingly, after carefully reviewing the complaint and drawing all inferences in plaintiff's favor from the facts alleged therein, the Court cannot conclude at this juncture, as a matter of law, that defendants had probable cause to arrest or confine Conte. *See Mitchell v. County of Nassau*, No. CV-05-4957 (SJF) (WDW), 2007 U.S. Dist. LEXIS 38711, at *36 (E.D.N.Y. May 24, 2007) ("[P]laintiff . . . alleges that [defendant] intentionally and maliciously filed an unsubstantiated criminal complaint against her without adequate investigation together with a supporting deposition in which he urged her arrest. . . . Accordingly, at the pleadings stage, the amended complaint arguably states a claim for false arrest. . . ."); *Caidor,* 2006 U.S. Dist. LEXIS 22980, at *19 (denying motion to dismiss false arrest claim where "[i]t is . . . impossible to derive from the complaint exactly what information was available to the officers . . . at the time of Plaintiff's arrest . . . ."); *Hyde v. Caputo*, No. 98-CV-6722 (FB) (ASC), 2001 U.S. Dist. LEXIS 6253, at *8 (E.D.N.Y. May 11, 2001) ("[Plaintiff's] allegations contain a 'plausible interpretation' of events and thus 'a court *considering a motion to dismiss under Rule 12(b)(6)*' may not conclude that probable cause existed." (quoting *Posr v. Court Officer Shield #207*, 180 F.3d 409, 415 (2d Cir .1999)). Therefore, County Defendants' motion to dismiss the false arrest claim on the basis of probable cause is denied.

### B. Malicious Prosecution

County Defendants similarly argue that the Court should dismiss plaintiff's malicious prosecution claim because they had probable

cause to arrest Conte and because defendants did not act with actual malice. For the reasons set forth below, the Court disagrees and denies defendants' motion to dismiss this cause of action.

"'Because there are no federal rules of decision for adjudicating § 1983 actions that are based upon claims of malicious prosecution, [courts] are required by 42 U.S.C. § 1988 to turn to state law . . . for such rules.'" *Alicea v. City of New York*, No. 04-CV-1243, 2005 U.S. Dist. LEXIS 28129, at *17 (S.D.N.Y. Nov. 15, 2005) (quoting *Conway*, 750 F.2d at 214). "A malicious prosecution claim under New York law requires the plaintiff to prove '(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions.'" *Blake v. Race*, 487 F. Supp. 2d 187, 211 (E.D.N.Y. 2007) (quoting *Jocks*, 316 F.3d at 136) (internal quotation marks omitted). In addition to the state law elements of malicious prosecution, "[t]o sustain a § 1983 malicious prosecution claim, there must be a seizure or other 'perversion of proper legal procedures' implicating the claimant's personal liberty and privacy interests under the Fourth Amendment." *Washington v. County of Rockland*, 373 F.3d 310, 316 (2d Cir. 2004) (quoting *Singer*, 63 F.3d at 117).

In the instant case, only two elements are in dispute – probable cause and actual malice.[11] First, as discussed *supra*, the Court

is unable to determine at this juncture, as a matter of law, that the police had probable cause to arrest and confine Conte. However, even if Conte's arrest were supported by probable cause, plaintiff has alleged facts putting into question whether Conte's continued investigation and prosecution was similarly supported. As the Second Circuit has held,

> [u]nder New York law, even when probable cause is present at the time of arrest, evidence could later surface which would eliminate that probable cause. . . . In order for probable cause to dissipate, the groundless nature of the charges must be made apparent by the discovery of some intervening fact. . . . The New York Court of Appeals has noted that the failure to make a further inquiry when a reasonable person would have done so may be evidence of lack of probable cause.

*Lowth v. Town of Cheektowaga,* 82 F.3d 563, 571 (2d Cir. 1996) (citations and quotation marks omitted); *see also Korthas v. City of Auburn*, No. 5:04-CV0537, 2006 U.S. Dist. LEXIS 38745, at *15 (N.D.N.Y. June 9, 2006) ("Police officers may not purposely withhold or ignore exculpatory evidence that, if taken into account, would void probable cause . . . [A] failure to make further inquiry when a reasonable person would have done so may evidence a lack of probable cause.") (citation and quotation marks omitted). Here, plaintiff first alleges that Zwicker requested and obtained an arrest warrant against plaintiff, even though she knew the check given by

---

[11] It is undisputed that a criminal proceeding was initiated against Conte, that Conte's criminal case was ultimately dismissed in favor of the plaintiff,

and that Conte was arrested and continuously prosecuted throughout this time period.

plaintiff to Cutolo was post-dated. (Second Am. Compl. ¶ 46.) Plaintiff also alleges that defendants continued to investigate and prosecute Conte even after learning about the post-dated check. Specifically, ADAs Wallace and Wasilausky allegedly circulated and disseminated accusations and false information to numerous vendors and route distributors doing business with the plaintiff "in an effort to solicit complaints from them." (*Id.* ¶ 48.) As a result of this investigation, plaintiff alleges that he had to make almost twenty court appearances. (*Id.*) In addition, plaintiff alleged that the NCDAO continued to prosecute plaintiff during 2005 and 2006 on the false bad check complaint, which was filed in November of 2003, even though they allegedly were provided with additional sworn affidavits by Cutolo in both September 2005 and January 2006, both of which stated that the check in question was post-dated, that Cutolo no longer wanted to pursue any criminal complaint, and that he refused to be a prosecution witness. (*Id.* ¶ 81.) Plaintiff alleges that this prosecution continued for over eight months and at least 16 court appearances before Judge Denise Sher dismissed the complaint in June 2006. (*Id.*) Even if probable cause existed at the time of Conte's arrest, plaintiffs have alleged facts sufficient to call into question whether probable cause continued to exist after this arrest, given the information that the defendants allegedly had in their possession regarding the post-dated check.

Second, because the Court is unable to determine at this juncture whether Conte's prosecution was based on probable cause, the Court is also unable to determine whether defendants acted with actual malice. "In most cases, the lack of probable cause – while not dispositive – 'tends to show that the accuser did not believe in the guilt of the accused, and malice may be inferred from the lack of probable cause.'" *Lowth*, 82 F.3d at 573 (quoting *Conkey v. State*, 427 N.Y.S.2d 330, 332 (N.Y. 1980)); *see also Cunninham v. New York City*, No. 04 Civ. 10232, 2007 U.S. Dist. LEXIS 69801, at *15-*16 (S.D.N.Y. Sept. 18, 2007) (same) (quoting *Lowth*); *Mesiti v. Wegman*, 307 A.D.2d 339, 341 (N.Y. App. Div. 2003) ("[T]he jury was able to infer the existence of actual malice from the fact that there was no probable cause to initiate the proceeding.") Here, because the existence of probable cause remains in question, the existence of actual malice does as well. Moreover, plaintiff has alleged direct evidence of actual malice in addition to the circumstantial evidence of malice that could arise from the lack of probable cause. As discussed *supra*, plaintiff alleges that Falzarno attempted to break plaintiff's hand while serving a subpoena to him in April 2005 and said "I'll get you!" (Second Am. Compl. ¶ 70.) This allegation of direct evidence of actual malice also forecloses the Court from dismissing plaintiff's malicious prosecution claim at this stage of the litigation.

C. Abuse of Process

Defendants move to dismiss plaintiff's claim for abuse of process under Section 1983 on the grounds that plaintiff fails to allege that the defendants employed the criminal justice system against Conte for an objective outside the legitimate ends of the process. For the reasons set forth below, the Court disagrees with the defendants and concludes that this claim should not be dismissed at the motion to dismiss stage given the allegations in the Second Amended Complaint.

In order to establish liability for malicious abuse of process under Section 1983, a plaintiff must establish the claim's elements under state law. *See Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994). A plaintiff may assert a malicious abuse of process claim where a defendant: "(1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse [or] justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." *Savino* 331 F.3d at 76 (quoting *Cook*, 41 F.3d at 80).

In the instant case, plaintiff has alleged that defendants aimed to achieve an objective collateral to Conte's prosecution and conviction. *See Savino*, 331 F.3d at 77 ("[T]o state a claim for abuse of criminal process . . . [plaintiff] must claim that [defendants] aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution."). Specifically, plaintiff alleges that the County Defendants' "prosecution of the plaintiff . . . for the criminal act of passing a bad check knowing that the check in question was post-dated and exempt from prosecution constitutes a willful use of the legal process for a malicious purpose not justified by law." (Second Am. Compl. ¶ 210.) Conte further alleges that "[t]hese acts by the defendants . . . were motivated solely by a desire to harm plaintiff and destroy his business with deliberate indifference and no regard or concern as to the well being of the plaintiff and the continuity of his business or the investments or interests of the plaintiff's contracted route distributors and with ill-will towards the plaintiff." (*Id.* ¶ 213.)

Based upon these allegations, which are assumed to be true for purposes of a motion to dismiss, defendants' motion to dismiss is denied.

## D. First Amendment Claims

Plaintiff alleges that the County Defendants' actions "deprive[d] the plaintiff and his publishing business's [sic] right of freedom of speech and freedom of the press guaranteed to them under the First and Fourteenth Amendments of the Constitution." (Second Am. Compl. ¶¶ 83, 82-91, 95.) Defendants argue that plaintiff has not offered any evidence that NCDAO infringed upon his right to associate with his business associates or that his business associates ceased doing business with him based on NCDAO personnel actions. The Court disagrees with the County Defendants and finds that plaintiff's First Amendment claim has been adequately pled.

The Second Circuit has recently held that "'First Amendment rights may be violated by the chilling effect of governmental action that falls short of a direct prohibition against speech.'" *Zieper v. Metzinger*, 474 F.3d 60, 65 (2d Cir. 2007) (quoting *Aebisher v. Ryan*, 622 F.2d 651, 655 (2d Cir. 1980)). The First Amendment prohibits government officials from encouraging the suppression of speech in a manner which "can reasonably be interpreted as intimating that some form of punishment or adverse regulatory action will follow the failure to accede to the official's request." *Hammerhead Enters., Inc. v. Brezenoff*, 707 F.2d 33, 39 (2d Cir. 1983). In determining whether a particular request to suppress speech is constitutional, what matters is the "distinction between attempts to convince and attempts to coerce." *Okwedy v. Molinari*, 333 F.3d 339, 344 (2d Cir. 2003) (per curiam).

15

Plaintiff specifically alleges that the County Defendants

> knew and had reason to know that the false and defamatory statements that they made to numerous third parties, including the plaintiff's route distributors and vendors, of and concerning the plaintiff in his profession and of and concerning the plaintiff's operation of his publishing business were indeed false, that they would cause his route distributors and vendors to cease doing business with the plaintiff and that these acts would further deprive the plaintiff of his constitutionally protected right of freedom of speech and would permanently deprive[] the plaintiff and his publishing business of their constitutionally protected right of freedom of the press.

(Second Am. Compl. ¶ 84.)

The Court cannot, at this juncture, determine whether the defendants' alleged actions towards plaintiff's distributors and various other clients violated the First Amendment. As noted above, plaintiff alleges that the County Defendants intimidated and coerced third parties in an effort to prevent the operation of his publication business. Those allegations are sufficient to survive a motion to dismiss his First Amendment claim.

Plaintiff's argument mostly relies on *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963) in arguing that the County Defendants violated plaintiff's freedom and speech and association and freedom of the press when they performed actions under color of state law with the purpose of wrongfully stopping the circulation of the plaintiff's publications, and by denying the plaintiff of his civil rights by falsely accusing plaintiff of committing crimes and instructing the route distributors to stop doing business with the plaintiff. (Pl.'s Resp. to County, at 26.) In *Bantam*, the court granted injunctive relief in favor of paperback book publishers and their distributor, and against a legislatively created commission enacted for the purpose of investigating and recommending prosecution of those who promote obscenity. *Bantam*, 372 U.S. at 71-72. The Supreme Court held that the commission's activities were "a scheme of state censorship effectuated by extralegal sanctions; they acted as an agency not to advise but to suppress." *Id.*

Defendants attempt to distinguish *Bantam* on the grounds that the defendants in the instant action are law enforcement officers (County Defs.' Reply Br., at 5-6.) Specifically, they focus on the fact that the Bantam Court "do[es] not hold that law enforcement officers must renounce all informal contacts with persons suspected of violating valid laws prohibiting obscenity." *Bantam*, 372 U.S. at 71-72. The *Bantam* Court further held that "[w]here such consultation is genuinely undertaken with the purpose of aiding the distributor to comply with such laws and avoid prosecution under them, it need not retard the full enjoyment of First Amendment freedoms." *Id.* at 72. In the instant case, as discussed *supra*, this Court cannot yet determine based on the complaint alone whether the defendants went beyond advising the distributors of their legal rights. Looking at the complaint in a light most favorable to the plaintiff, plaintiff has alleged intentional government suppression of his publication. Moving to dismiss this First Amendment claim at this juncture, without

discovery, is premature. Plaintiff has adequately pled a First Amendment claim. Accordingly, the Court denies the County Defendants' motion to dismiss on this claim.

### E. Due Process Claims

Plaintiff alleges that defendants deprived plaintiff of his due process rights under the Fourteenth Amendment.[12] For the reasons set forth below, the Court dismisses plaintiff's due process claim.

Plaintiff specifically alleges that defendants "deprived the plaintiff of his Fifth and Fourteenth Amendment rights to protection from governmental taking of private property . . . and Due Process by spreading false information, falsely accusing, and/or falsely arresting and/or falsely and unlawfully charging the plaintiff with having committed criminal acts . . . for which there was and is no probable cause . . . ." (Second Am. Compl. ¶ 95.) Plaintiff alleges a violation of due process due to the loss of business resulting from the defendants' alleged defamation.

---

[12] Plaintiff does not distinguish between substantive and procedural due process. The defendants address plaintiff's claims as they relate to a violation of substantive due process. (*See* County Defs.' Br., at 37-38.) However, the Court notes that a "substantive due process analysis is not available where a more specific constitutional standard is directly applicable." *Hickey v. City of New York*, No. 01 Civ. 6506 (GEL), 2004 WL 2724079, at *18 (S.D.N.Y. Nov. 29, 2004) (citing *Graham v. Connor*, 490 U.S. 386, 294-395 (1989) (holding that where a particular Constitutional Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims)). Because the Fourth Amendment provides the source for a claim under Section 1983 premised upon an alleged unlawful arrest and imprisonment or an allegedly malicious prosecution, plaintiff cannot state a substantive due process claim against defendants. *See Murphy v. Lynn*, 118 F.3d 938, 944 (2d Cir. 1997); *Mayer v. City of New Rochelle*, No. 01 Civ. 4443 (MBM), 2003 WL 21222515, at *8 (S.D.N.Y. May 27, 2003) (holding that a section 1983 claim of malicious prosecution without probable cause may not be based upon a denial of due process rights, but only upon denial of Fourth Amendment rights); *cf. County of Sacramento v. Lewis*, 523 U.S. 833, 843 (1998) (holding that substantive due process analysis would be inappropriate if respondents' claim were "covered by" the Fourth Amendment). Moreover, "the touchstone of due process is protection of the individual against arbitrary action of government." *Id.* at 845 (internal quotation marks and citation omitted). A substantive due process claim is only viable where the government conduct of which the plaintiff complains "shocks the conscience[,]" "violates the decencies of civilized conduct[,]" and was "intended to injure in some way unjustifiable by any government interest[.]" *Id.* at 846, 849 (citations omitted). In the instant case, defendants' conduct alleged by the plaintiff is already covered under the Fourth Amendment protections against false arrest and malicious prosecution. Any arguments that defendants discharged their discretionary duties without legal justification in such an outrageously arbitrary way as to constitute a gross abuse of governmental authority may not be based on a denial of due process rights. Moreover, the plaintiff indicates in his Response papers that his claims focus on procedural due process. (*See* Pl.'s Resp. to County, at 25) ("[The County Defendants] made these false statements of the commission of crimes by the plaintiff without affording the plaintiff his *due process right to even a trial* to defend himself of these false allegations.") (emphasis added.)

"To formulate a claim under the Due Process Clause of the Fourteenth Amendment, a plaintiff must demonstrate that he or she possesses a constitutionally protected interest in life, liberty, or property, and that state action has deprived him or her of that interest." *Valmonte v. Bane*, 18 F.3d 992, 998 (2d Cir. 1994); *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989) ("We examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient.") (internal citations omitted).

Plaintiff's claim focuses on a loss of liberty interest because of defendants' alleged defamation. For instance, plaintiff specifically alleges that

> "[u]nder color of law, the defendants unreasonably, knowingly, deliberately and wrongfully deprived the plaintiff of his . . . Fourteenth Amendment rights *including his rights of occupational liberty (liberty to be employed in his profession and chosen occupation), liberty to pursue his occupational and associational activities, [and] liberty of contract . . . by disseminating false information concerning the plaintiff and his publishing business, falsely accusing, and/or falsely arresting and/or falsely and unlawfully charging the plaintiff with having committed criminal acts . . . for which there was no probable cause.*"

(Second Am. Compl. ¶ 105) (emphasis added.)

One of the fundamental elements of a due-process claim is the existence of a cognizable interest in liberty or property: "If the interest [a plaintiff] asserts is not of a constitutional dimension, i.e., not a protected property or liberty interest, then [his] arguments must fail." *Donato v. Plainview-Old Bethpage Cent. Sch. Dist.*, 96 F.3d 623, 629 (2d Cir. 1996). Even palpably false statements by a governmental actor will not support a § 1983 claim if the only injury is to the plaintiff's reputation. *See Paul v. Davis*, 424 U.S. 693, 712 (1976) ("[A]ny harm or injury to [a reputational] interest, even where . . . inflicted by an officer of the State, does not result in a deprivation of any 'liberty' or 'property' recognized by state or federal law[.]"); *Sadallah v. City of Utica*, 383 F.3d 34, 38 (2d Cir. 2004) ("Defamation . . . is an issue of state law, not of federal constitutional law, and therefore provides an insufficient basis to maintain a § 1983 action."). Governmental defamation is actionable only if it falls within the so-called "stigma plus" doctrine. *See Sadallah*, 383 F.3d at 38. "To prevail on a 'stigma plus' claim, a plaintiff must show (1) the utterance of a statement sufficiently derogatory to injure his or her reputation, that is capable of being proved false, and that he or she claims is false, and (2) a material state-imposed burden or state-imposed alteration of the plaintiff's status or rights." *Id*.

Even assuming *arguendo* that defendants' public statements about plaintiff, discussed above, amounted to defamation, plaintiff has failed to allege the second element of an additional state-imposed burden necessary for invoking the "stigma plus' doctrine.

The instant case is very similar to that of *Sadallah*. In *Sadallah*, the plaintiffs alleged that city administrators falsely alleged

building and health code violations, made complaints to the Health Department, and disseminated defamatory information to the press regarding plaintiffs' business, causing damage to business reputation. *Id.* at 36. Plaintiffs specifically alleged that the defendants' acts caused them damage to their business reputation and goodwill of the business, and also discouraged customers from the business. *Id.* at 38-39. However, the Second Circuit found that these harms "are not 'in addition to' the alleged defamation . . . but rather are direct 'deleterious effects' of that defamation." *Id.* at 39 (citations omitted). The Court concluded that the plaintiffs have not alleged a "plus" sufficient to sustain a "stigma plus" claim. *Id.* at 39. Here, plaintiff similarly has not satisfied such a burden. Plaintiff's allegations relate solely to the financial harm caused to his business by defendants' defamation. Nowhere in the complaint does the plaintiff allege anything about the "deprivation of a legal right or status." *Abramson v. Pataki*, 278 F.3d 93, 101, 103 (2d Cir. 2002). Because plaintiff has failed to allege a due process claim, this claim is dismissed as to the defendants.

## F. Equal Protection Claims

Defendants also move to dismiss plaintiff's constitutional claim for equal protection violations under the Fourteenth Amendment. For the reasons that follow, the Court finds that plaintiff did not sufficiently allege an equal protection claim and dismisses this claim against all defendants.

The Equal Protection Clause of the Fourteenth Amendment is "essentially a direction that all persons similarly situated be treated alike." *Latrieste Restaurant v. Vill. of Port Chester*, 188 F.3d 65, 69 (2d Cir. 1999)

(quoting *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985)). An individual not alleging invidious discrimination on the basis of membership in some group may nevertheless prevail on an equal protection claim provided he shows that (1) "[he] has been intentionally treated differently from others similarly situated" and (2) "there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000); *see also Giordano v. City of New York*, 274 F.3d 740, 743 (2d Cir. 2000).

In the instant case, the only allegation relating to an equal protection claim is that the defendants' actions "damaged the plaintiff's publishing business and led to and caused the actual destruction and taking of the plaintiff's publishing business and to the deprivation of the plaintiff's constitutional and civil rights . . . [under the Equal Protection and Due Process [clauses]." (Second Am. Compl. ¶¶ 94-95, 92-101.)

The Court realizes that a complaint need only "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests" to defeat a motion to dismiss. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002) (internal quotation marks and citation omitted); *see also Malone v. City of New York*, No. 05 Civ. 2882 (DGT), 2006 WL 2524197, at *4 (E.D.N.Y. Aug. 30, 2006) ("[D]istrict courts have applied *Swierkiewicz* to Section 1983 claims.") (citing *Dean v. N.Y. City Transit Auth.*, 297 F. Supp. 2d 549, 554 (E.D.N.Y. 2004), and *Tamayo v. City of New York*, No. 02 Civ. 8030 (HB), 2004 WL 137198, at *5 (S.D.N.Y. Jan. 27, 2004)). As the Second Circuit has observed, at the motion to dismiss stage, there is no "requirement that a plaintiff identify in [his] complaint actual

instances where others have been treated differently for the purposes of equal protection," nor must that a plaintiff "'name names' in [his] complaint" with regard to those similarly situated. *DeMuria v. Hawkes*, 328 F.3d 704, 707 (2d Cir. 2003). Instead, where, plaintiff makes no more than a "general allegation that similarly situated" persons have been treated differently, such an allegation is "sufficient, albeit barely, to meet the minimal level established by *Olech* for 'class of one' equal protection claims at the pleading stage." *Id.*; *cf. Simpson v. Town of Southampton*, No. 06-CV-6743 (JFB) (WDW), 2007 WL 1755749, at *6 (E.D.N.Y. June 15, 2007).

However, in the instant case, plaintiff has not even made cursory allegations that anyone was treated differently than he was.[13] Instead, plaintiff argues that "the County Defendants selectively prosecuted and targeted him because he had a prior criminal conviction and record and therefore violated the plaintiff's equal protection rights." (Pl.'s Resp. to County, at 27.) The only allegation in the complaint that mentions equal protection is that the County Defendants actions "damaged the plaintiff's publishing business and led to and caused the actual destruction and taking of the plaintiff's publishing business and to the deprivation of the plaintiff's constitutional and civil rights .

_____

[13] Although plaintiff argues that he was singled out because he "is certain that the NCDAO received numerous complaints concerning numerous other businesses and never investigated or prosecuted them," the Court finds that assertion is speculative and conclusory, and that the Complaint does not satisfy the argument that he was treated differently than others who are similarly situated.

. . [under] Equal Protection." (Second Am. Compl ¶¶ 94-95, 92-101.) Moreover, rather than alleging that he is the only individual being treated in this manner, plaintiff specifically alleges that other individuals with prior criminal records (who are similarly situated to him) are being treated in the same manner as plaintiff. Thus, plaintiff's own pleading eliminates any plausible "class of one" equal protection claim. While the Court is sensitive to the extremely minimal requirements for pleading such a claim, the complete absence of any alleged basis for equal protection violations, or reference to similarly situated people being treated differently, warrants the dismissal of such claims against all defendants.

## IV. MUNICIPAL LIABILITY

Defendants move to dismiss the claims of municipal liability against Nassau County and the City of New York on the grounds that these claims are merely conclusory and do not make a showing of such liability with the requisite specificity. For the reasons set forth below, the Court denies the County's motion to dismiss this claim and grants the City's motion on this claim.

The Supreme Court expressly rejected liability pursuant to a theory of *respondeat superior* for purposes of § 1983 in *Monell*. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978) ("[A] municipality cannot be held liable *solely* because it employs a tortfeasor–or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory."). Thus, "[a] municipality will not be held liable under § 1983 unless plaintiffs can demonstrate that the allegedly unconstitutional action of an individual law enforcement official was taken

pursuant to a policy or custom officially adopted and promulgated by that [municipality's] officers." *Abreu v. City of New York*, No. 04-CV-1721, 2006 U.S. Dist. LEXIS 6505, at *11 (E.D.N.Y. Feb. 22, 2006) (quotation marks omitted) (citing *Monell*, 436 U.S. at 690). "[M]unicipal liability under § 1983 attaches where – and only where – a deliberate choice to follow a course of action is made from among various alternatives" by the municipality's lawmakers. *City of Canton v. Harris*, 489 U.S. 378, 389 (1989) (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 483-84 (1986)). An individual's misconduct will not result in *respondeat superior* liability for his supervisors absent specific allegations that he acted pursuant to an official policy or custom. *Ricciuti v. N.Y. City Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991). In particular, "'the mere assertion . . . that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference.'" *Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir. 1995) (quoting *Dwares v. City of New York*, 985 F.2d 94, 100 (2d Cir. 1993)).

The Court finds, however, that plaintiff has alleged facts specific enough to make a plausible claim for municipal liability against the County. In addition to alleging that it was the "practice, custom and policy of the NASSAU DA instituted by District Attorney Denis Dillon himself to automatically and systematically prosecute individuals with criminal records like the plaintiff against whom complaints are filed" (Second Am. Compl. ¶ 47), which is more of a mere assertion than allegations of fact, plaintiff also specifically relates a conversation his attorney, John Halton, had with defendant ADA Wallace. Specifically, plaintiff alleges

that Wallace told Halton that the "real and only reason" the criminal charge was brought against plaintiff was because

> plaintiff had pled guilty to an unrelated felony in Federal Court ten years earlier, had a criminal record and therefore was considered automatically guilty of this criminal charge and an easy target for the NASSAU DA to go after and the high publicity value such a case afforded District Attorney Denis Dillon who was up for re-election.

(*Id.* ¶ 47.) Halton also allegedly vouched for such a "practice, custom and policy" based on his own experience of having worked for the NCDAO at an earlier time. Although the County Defendants argue that plaintiff did not provide an affidavit by Halton admitting to such allegations, at this motion to dismiss stage, Conte's broad allegation, in conjunction with specific corroborative allegations from Halton, provides "enough facts to state a claim to relief that is plausible on its face" and is, therefore, sufficient to avoid dismissal. *Bell Atlantic*, 127 S. Ct. at 1974. In short, given this series of allegations, in the context of the entire complaint, plaintiff's claim of municipal liability survives the County Defendants' motion to dismiss.

However, the Court does not find plaintiff has alleged enough facts to make a plausible claim for municipal liability against the City. Plaintiff alleges that "[b]oth before and after November of 2003, the defendants NYPD and CITY, have permitted, tolerated and encouraged a pattern and practice of unjustified, unreasonable, unsupervised and illegal abuses, practices, policies, customs and activities toward numerous individuals by

their detectives, investigators, prosecutors and supervisors in a manner similar to that endured by the plaintiff." (Second Am. Compl. ¶ 124.) Plaintiff specifically alleges that there is

> 1) an ongoing policy and practice of the CITY and NYPD allowing their Detectives free rein in initiating and conducting criminal investigations, with their knowledge and without documentation, objection, permission or supervision, and then denying subsequent culpability for any harm they cause; and 2) an ongoing policy and practice of the CITY and NYPD of ignoring and covering up serious complaints made to them concerning acts like these by members of the NYPD and failing to properly investigate and punish those acts at the expense of the victims and complainants.

(*Id.*) These allegations of policy and custom are merely conclusory and, unlike those allegations against the County, plaintiff has provided no additional support in the complaint other than the above-referenced conclusory statement to indicate such a custom. In fact, plaintiff acknowledges in his complaint that, when the NYPD found out about Detective Shaska's actions, they held a disciplinary hearing and she was subsequently sanctioned with a loss of five vacation days for her actions. Thus, plaintiff's complaint actually demonstrates a practice by the City of addressing such conduct by officers, rather than ignoring it.[14] Furthermore, as discussed

in the defendant City's brief, plaintiff does not allege that the City defendants were part of plaintiff's claims for unconstitutional violations stemming from his false arrest and malicious prosecution. Instead, it is clear from the complaint that plaintiff was not arrested, detained, charged, or prosecuted at any time by the City, the NYPD, or their employees. In short, the complaint is completely devoid of any allegations which show a plausible connection between any alleged policy or custom of the City and the alleged violations of plaintiff's constitutional rights by the County Defendants, along with defendants Shaska and Guerra.

Accordingly, the Court dismisses plaintiff's Section 1983 municipal liability claim as against the City.[15]

---

[14] The City Defendants also argue that contradictions in plaintiff's prior pleadings and his Notice of Claim with his current position

regarding the City also demonstrate the lack of any claim against the City Defendants. For example, the City notes that plaintiff's Notice of Claim admits that defendant Shaska was acting for personal reasons to help her husband and that the NYPD did not have jurisdiction over plaintiff or his business. The Court, however, need not address this issue because, for the reasons noted above, the Court concludes that plaintiff's current complaint (and accompanying exhibits) set forth no basis for liability against the City for the unauthorized acts of Detective Shaska with respect to the dispute her husband, defendant Guerra, was having with the plaintiff.

[15] Defendants also argue that the federal claims against County Defendants Dillon and Rice, and City Defendants Bland and Vinal must fail because plaintiff failed to allege personal involvement in the alleged deprivation of plaintiff's constitutional rights. The Court agrees. The Second Circuit has repeatedly held that, when supervisory liability is alleged, the requisite personal involvement can be demonstrated in one or more of the following manners:

## V. CONSPIRACY

(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of [plaintiff] by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir. 1995) (quoting *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir. 1986)); *accord Hayut v. State Univ. of N.Y.,* 352 F.3d 733, 753 (2d Cir. 2003). As related to Dillon and Rice, plaintiff does not allege that these supervisory defendants were personally involved in the decision related to his arrest and prosecution, nor that they had knowledge of the allegedly unlawful actions of their subordinates. Instead, plaintiff appears to have included these defendants solely because of their status as supervisors. (*See, e.g.,* Second Am. Compl. ¶¶ 87, 82-91) ("[The County maintained a] policy and custom adopted by the COUNTY and NASSAU DA of automatically and systematically discriminating against, prosecuting and harassing individuals with prior criminal records who had complaints and criminal allegations lodged against them despite the lack of evidence and probable cause . . . . [and that] policy was adopted and implemented at the specific direction of the defendant, District Attorney Denis Dillon, who set policy for COUNTY as 'final decision maker.'") Supervisory status alone is not enough to survive a motion to dismiss. *See Barrington v. Johnson,* No. 06 Civ. 2234 (SAS), 2006 U.S. Dist. LEXIS 86354, at *5 (S.D.N.Y. Nov. 27, 2006) (dismissing claims against District Attorney where

Defendants argue for dismissal of plaintiffs' conspiracy claims under 42 U.S.C. §§ 1983 and 1985 on the basis that plaintiff's claims consist of conclusory allegations that are insufficient to state a conspiracy under either section. For the reasons set forth below, the Court disagrees as to the Section 1983 conspiracy charge, but agrees with respect to the Section 1985 charge.

no personal involvement is alleged); *Calderon v. Morgenthau,* No. 04 Civ. 8905 (NRB), 2005 U.S. Dist. LEXIS 14270, at *8 (S.D.N.Y. July 15, 2005) (same). Plaintiff's allegations against Dillon and Rice are clearly aimed at their status as officials and nothing more, and therefore, do not survive a motion to dismiss.

Furthermore, as related to City Defendants Vinal and Bland, plaintiff similarly does not provide any evidence connecting these individuals to a deprivation of Conte's constitutional rights. They are not alleged to have participated in the false arrest or malicious prosecution of Conte. Their only connection to this case, if any, appears to have been that they were involved in the disciplinary hearing related to Detective Shaska and their names appeared in documents relating to that incident. Accordingly, plaintiff's federal claims against County Defendants Dillon and Rice, and City Defendants Bland and Vinal, are dismissed. As noted *infra,* although defendants also argue that plaintiff's Notice of Claim is deficient with respect to all state law claims against defendants Bland and Vinal and that such claims are time-barred, the Court need not address these issues because of the other grounds for dismissal of these defendants discussed in this Memorandum and Order.

## A. Conspiracy Pursuant to Section 1983

"In order to survive a motion to dismiss on a § 1983 conspiracy claim, the plaintiff must allege (1) an agreement between two or more state actors, (2) concerted acts to inflict an unconstitutional injury, and (3) an overt act in furtherance of the goal." *Carmody v. City of New York*, No. 05-CV8084 (HB), 2006 U.S. Dist. LEXIS 25308, at *16 (S.D.N.Y. May 11, 2006) (citing *Ciambriello v. County of Nassau*, 292 F.3d 307, 324-35 (2d Cir. 2002)). Vague and conclusory allegations that defendants have engaged in a conspiracy must be dismissed. *See Ciambriello*, 292 F.3d at 325 (dismissing conspiracy allegations where they were found "strictly conclusory"); *see also Robbins v. Cloutier*, 121 Fed. Appx. 423, 425 (2d Cir. 2005) (dismissing a Section 1983 conspiracy claim as insufficient where plaintiff merely alleged that defendants "acted in a concerted effort" to agree "not to hire [p]laintiff and to inform others not to hire plaintiff"). "A plaintiff is not required to list the place and date of defendant[']s meetings and the summary of their conversations when he pleads conspiracy, . . . but the pleadings must present facts tending to show agreement and concerted action." *Fisk v. Letterman*, 401 F. Supp. 2d 362, 376 (S.D.N.Y. 2005) (report and recommendation), *accepted by, in part, rejected by, in part*, *Fisk v. Letterman*, 401 F. Supp. 2d 362 (S.D.N.Y. 2005) (citations and quotations omitted).

In the instant case, the complaint alleges that "[a]ll defendants . . . conspired to injure the plaintiff . . . by acting in concert to disseminate false information concerning the plaintiff and his publishing business, by disseminating false information that lacked any reasonable basis or probable cause to support it or accusations made by them that the plaintiff committed a crime, and/or to charge him with a crime, and/or to arrest him." (Second Am. Compl.¶ 133.) Plaintiff further alleges that "[b]y assisting in the dissemination of false information concerning the plaintiff and his publishing business, the discriminatory false charging of plaintiff and the taking of his liberty and property interests without just compensation, all the defendants acted in concert, with deliberate indifference and with the shared purpose of denying plaintiff [his rights]." (*Id.* ¶ 137.)

Plaintiff has sufficiently alleged the elements of a Section 1983 conspiracy. Plaintiff argues that the defendants' "agreed to conspiracy was to attempt to cover up their mishandling of their investigation of the plaintiff and his business I Media by secretly agreeing to circulate false statements about the plaintiff accusing him of criminal conduct to each other, the NYPD, and the plaintiff's route distributors and vendors and other – accusations they knew at all times were false and had no basis in fact." (Pl.'s Resp. to County, at 20.) Plaintiff's Second Amended Complaint further alleges that the officers used phone lists provided by Guerra to solicit complaints against the plaintiff for further prosecution (*see* Second Am. Comp. ¶ 58), and affidavits are supplied by the plaintiff indicating that such calls were actually made (*see id.* ¶ 67; Pl.'s Exh. S).

Furthermore, plaintiff argues that all the defendants were aware of exculpatory evidence of Conte's innocence, yet continued to participate in his investigation and prosecution. (*See* Pl.'s Resp. Br., at 20) ("All the defendants knew and had reason to know at all times that the plaintiff and his company I Media defrauded neither GUERRA nor any other route distributor and yet they chose to

ignore those facts. All the defendants engaged in this conspiracy in an effort to manufacture a criminal case against the plaintiff . . . .") At this stage of the litigation, plaintiff has certainly alleged more than enough facts to survive the minimal requirements for surviving a motion to dismiss on his Section 1983 conspiracy claim. *See Bell Atlantic*, 127 S. Ct. at 1969 ("[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint.").

Defendants argue that members of a single entity, *i.e.*, alleged co-conspirators who are employed by the same institutional defendant, cannot conspire together. *See Nat'l Cong. for Puerto Rican Rights v. City of New York*, 75 F. Supp. 2d 154, 168-69 (S.D.N.Y. 1999) ("'Where the individual defendants are all employees of the institutional defendant, a claim of conspiracy will not stand.'") (quoting *Burrell v. City Univ. of N.Y.*, 995 F. Supp. 398, 414 (S.D.N.Y. 1998)). To the extent the plaintiff attempts to argue that the County Defendants conspired with one another (Second Am. Compl. ¶¶ 133, 135), or the City Defendants (and Shaska) conspired with each other (*id.* ¶ 133), those claims would fail. However, plaintiff clearly alleges that the County Defendants conspired with Shaska and Guerra, thereby removing intra-conspiracy doctrine as a reason for dismissing the claim.

Furthermore, to the extent that defendants argue that Shaska and Guerra were acting as private actors and therefore cannot be part of a Section 1983 conspiracy, the Court finds that argument to be inapposite. For a private actor to be considered acting under the color of state law for the purposes of Section 1983,

that private actor must be "'a willful participant in joint activity with the State or its agents.'" *See Ciambriello*, 292 F.3d at 324 (quoting *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 152 (1970)) (citation omitted); *see also Fiske*, 401 F. Supp. 2d at 377 ("Communications between a private and a state actor, without facts supporting a concerted effort or plan between the parties, are insufficient to make the private party a state actor."). "[A] private party who calls the police for assistance does not become a state actor unless the police were influenced in their choice of procedure or were under the control of a private party." *Fiske*, 401 F. Supp. 2d at 377; *see also Alexis v. McDonald's Rests. of Mass., Inc.*, 67 F.3d 341, 345, 352 (1st Cir. 1995) (holding that restaurant manager was not a state actor, although manager told the police officer she "would like [an unruly customer] to leave" and officer thereafter forcibly removed customer from restaurant, because there was no evidence that the officer substituted the manager's judgment for his own); *Moore v. Marketplace Rest., Inc.*, 754 F.2d 1336, 1352-53 (7th Cir. 1985) (holding, where there was no evidence of "concerted effort or plan" between a restaurant owner and police officer, owner was not a state actor simply because owner reported customers to officer and told officer where to find them and customers were subsequently arrested by police officer); *Benavidez v. Gunnell*, 722 F.2d 615, 618 (10th Cir. 1983) ("[M]ere furnishing of information to police officers does not constitute joint action under color of state law which renders a private citizen liable under § 1983."); *Johns v. Home Depot U.S.A., Inc.*, 221 F.R.D. 400, 404 (S.D.N.Y. 2004) (holding that private party who calls for police assistance is not rendered a state actor under

§ 1983 even if the call caused plaintiff's detainment).

The mere fact that Guerra filed a complaint against plaintiff would not, in itself, be enough to render Guerra as a state actor. However, the complaint also alleges, and defendants do not dispute, that Shaska is a NYPD detective, and that Guerra and Shaska also have a close personal relationship – namely, plaintiff alleges that they are married. Thus, plaintiff is alleging that Detective Shaska was under the control or influence of Guerra based upon their personal relationship and that Guerra was part of the conspiracy with the County Defendants to deprive him of his rights. Taken as a whole, plaintiff's allegations adequately plead that the County defendants conspired with Shaska and Guerra, in arresting and prosecuting plaintiff, and defaming plaintiff during the course of soliciting complaints against him. Accordingly, plaintiff's Section 1983 conspiracy claim survives the motion to dismiss.

B. Conspiracy Pursuant to Section 1985

To state a claim for conspiracy under 42 U.S.C. § 1985, the plaintiff must demonstrate that defendants: (1) engaged in a conspiracy; (2) conspired for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, or of equal privileges and immunities under the laws; (3) acted in furtherance of the conspiracy; and (4) whereby a person is either injured in his person or property or deprived of any right of a citizen of the United States. *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1087 (citing *United Bhd. of Carpenters & Joiners, Local 610 v. Scott*, 463 U.S. 825, 828-29 (1983)). Furthermore, to state a claim under § 1985(3), "there must

be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971). Plaintiff has alleged only that defendants "conspired to injure the plaintiff in his person and property . . . conspir[ed] and assist[ed] in the arrest of plaintiff without probable cause . . . conspir[ed] together to cover up the misconduct they committed . . ." (Second Am. Compl. ¶¶ 133, 134.) Plaintiff's complaint does not allege any racial or other discriminatory animus behind the alleged conspiracy. The only reason plaintiff puts forth as evidence of discrimination is that plaintiff had a criminal record. (*See* Pl.'s Resp. to County, at 21) ("The discriminatory reason and only reason that each of the defendants, including the County Defendants, had engaged in this conspiracy was that the plaintiff had years earlier pled guilty to a crime and therefore had a criminal record.") The mere fact that plaintiff was a convicted felon ten years ago does not support plaintiff's allegations of class-based discriminatory animus. Thus, plaintiff's allegations fail to support a claim of conspiracy under § 1985(3) and, accordingly, this claim is dismissed.[16]

---

[16] "Liability under § 1986, which permits an action against a person who had the 'power to prevent or aid in preventing the commission of' a wrong 'mentioned in section 1985,' but who 'neglected or refused so to do,' is dependent on the validity of a claim under § 1985." *Dwares*, 985 F.2d at 101. Therefore, as plaintiff has failed to adequately plead a Section 1985 conspiracy, plaintiff's "neglect to prevent" claim under Section 1986 is also dismissed.

## VI. Absolute Immunity[17]

County Defendants argue that the Court should dismiss plaintiff's claims against ADAs Wasilausky and Sardo (the "defendant prosecutors") on the ground of absolute immunity. For the reasons set forth below, although the defendant prosecutors are entitled to absolute immunity for non-investigatory acts, the Court cannot dismiss the claims in their entirety against the defendant prosecutors because the plaintiff has alleged investigative acts by these defendants in the complaint that would not be protected by absolute immunity.

"'It is by now well established that a state prosecuting attorney who acted within the scope of his duties in initiating and pursuing a criminal prosecution is immune from a civil suit for damages under § 1983." *Shmueli v. City of New York*, 424 F.3d 231, 236 (2d Cir. 2005) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 410, 431 (1976) (citation and quotation marks omitted)). "[D]istrict courts are encouraged to determine the availability of an absolute immunity defense at the earliest appropriate stage, and preferably before discovery. . . . This is because '[a]n absolute immunity defeats a suit at the outset, so long as the official's actions were within the scope of the immunity.'" *Deronette v. City of New York*, No. 05-CV-5275, 2007 U.S. Dist. LEXIS 21766, at *12 (E.D.N.Y. Mar. 27,

2007) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) and quoting *Imbler*, 424 U.S. at 419 n.13). However, the Second Circuit has held that in the context of a motion to dismiss under Rule 12(b)(6), "when it may not be gleaned from the complaint whether the conduct objected to was performed by the prosecutor in an advocacy or an investigatory role, the availability of absolute immunity from claims based on such conduct cannot be decided as a matter of law on a motion to dismiss." *Hill v. City of New York*, 45 F.3d 653, 663 (2d Cir. 1995).

"In determining whether absolute immunity obtains, we apply a 'functional approach,' looking to the function being performed rather than to the office or identity of the defendant." *Id.* at 660 (quoting *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993)). In applying this functional approach, the Second Circuit has held that prosecutors are entitled to absolute immunity for conduct "'intimately associated with the judicial phase of the criminal process.'" *Fielding v. Tollaksen*, No. 06-5393-cv, 2007 U.S. App. LEXIS 28939, at *3-*4 (2d Cir. Dec. 12, 2007) (quoting *Imbler*, 424 U.S. at 430); *Hill*, 45 F.3d at 661 (same). In particular, "[s]uch immunity . . . extends to 'acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State.'" *Smith v. Garretto*, 147 F.3d 91, 94 (2d Cir. 1998). On the other hand, "[w]hen a district attorney functions outside his or her role as an advocate for the People, the shield of immunity is absent. Immunity does not protect those acts a prosecutor performs in administration or investigation not undertaken in preparation for judicial proceedings." *Hill*, 45 F.3d at 661; *see also Carbajal v. County of Nassau*, 271 F. Supp. 2d 415, 421 (E.D.N.Y.

---

[17] Absolute immunity also would apply to bar liability for plaintiff's state law claims. *See, e.g., Hirschfeld v. City of New York*, 253 A.D.2d 53, 59 (N.Y. App. Ct. 1999) (dismissing claims against prosecutor for absolute immunity); *Moore v. Dormin*, 676 N.Y.S.2d 90, 91-92 (N.Y. App. Ct. 1998) (same); *Tucker v. City of New York*, 709 N.Y.S.2d 796, 797-98 (N.Y. Sup. Ct. 2000) (same).

2003) ("[W]hen a prosecutor supervises, conducts, or assists in the investigation of a crime, or gives advice as to the existence of probable cause to make a warrantless arrest-that is, when he performs functions normally associated with a police investigation-he loses his absolute protection from liability.").

The Second Circuit has noted that "[t]he line between a prosecutor's advocacy and investigating roles might sometimes be difficult to draw." *Zahrey v. Coffey*, 221 F.3d 342, 347 (2d Cir. 2000). The Court, however, may rely on certain established distinctions between these roles. For example, the Supreme Court "has identified 'evaluating evidence and interviewing witnesses' as falling on the absolute immunity side of the line, leaving 'searching for the clues and corroboration' that might lead to a recommendation for an arrest on the qualified immunity side." *Smith*, 147 F.3d at 94 (quoting *Buckley*, 509 U.S. at 273). Further, the Second Circuit has specifically identified the juncture in the criminal process before which absolute immunity may not apply: "The majority opinion in [*Buckley*] suggests that a prosecutor's conduct prior to the establishment of probable cause should be considered investigative: 'A prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested.'" *Zahrey*, 221 F.3d at 347 n.2 (quoting *Buckley*, 509 U.S. at 274); *see also Hill*, 45 F.3d at 661 ("Before any formal legal proceeding has begun and before there is probable cause to arrest, it follows that a prosecutor receives only qualified immunity for his acts."). However, the Supreme Court has also held that "a determination of probable cause does not guarantee a prosecutor absolute immunity from liability for all actions taken afterwards.

Even after that determination . . . a prosecutor may engage in 'police investigative work' that is entitled to only qualified immunity." *Buckley*, 509 U.S. at 274 n. 5; *see Zahrey*, 221 F.3d at 347 n.2 ("All members of the Court [in *Buckley*] recognized . . . that a prosecutor's conduct even after probable cause exists might be investigative."). For instance, in interpreting *Buckley*, the Second Circuit has distinguished between "preparing for the presentation of an existing case" and attempting to "furnish evidence on which a prosecution could be based," *Smith*, 147 F.3d at 94; only the former entitles a prosecutor to absolute immunity. *Id.*

Moreover, once a court determines that a prosecutor was acting as an advocate, "a defendant's motivation in performing such advocative functions as deciding to prosecute is irrelevant to the applicability of absolute immunity." *Shmueli*, 424 F.3d at 237 (quoting *Bernard v. County of Suffolk*, 356 F.3d 495, 502 (2d Cir. 2004)); *see also Kleinman v. Multnomah County*, No. 03-1723-KI, 2004 U.S. Dist. LEXIS 21466, at *18 (D. Or. Oct. 15, 2004) ("The Ninth Circuit has interpreted *Imbler* to support absolute prosecutorial immunity even when a plaintiff alleges that the prosecutor went forward with a prosecution he believed not to be supported by probable cause.").

In the instant case, plaintiff alleges conduct by the defendant prosecutors that the protection of absolute immunity does not reach. Specifically, plaintiff argues that prosecutor defendants "violated the plaintiff's civil rights during the same prior of time by their participation in these investigatory functions and activities and that they are not entitled to even qualified immunity because their actions, which continued over a period of

years, were unreasonable." (Pl.'s Resp. to County, at 8.) Absolute immunity does not protect such alleged misconduct that took place in the course of participation in and supervision of criminal investigations. *See McCray v. City of New York*, Nos. 03 Civ. 9685, 03 Civ. 9974, 03 Civ. 10080, 2007 U.S. Dist. LEXIS 90875, at *59 (S.D.N.Y. Dec. 11, 2007) ("[I]f a prosecutor acts in an investigative capacity, for example; or gives police legal advice on the propriety of investigative techniques and on whether or not probable cause exists to make an arrest . . . then absolute immunity cannot be invoked.") (citing *Buckley*, 509 U.S. at 270-71); *Thompson v. Gentz*, No. 06-CV-1743, 2007 U.S. Dist. LEXIS 29753, at *4-*5 (E.D.N.Y. Apr. 23, 2007) (vacating prior order granting absolute immunity to prosecutor in part because "prosecutor [was] not entitled to absolute immunity when supervising and interacting with law enforcement agencies in acquiring evidence that might be used in a prosecution") (citing *Barbera v. Smith*, 836 F.2d 96, 100 (2d Cir. 1987)); *Hickey v. City of New York*, 01 Civ. 6506, 2002 U.S. Dist. LEXIS 15944, at *10-*11 (S.D.N.Y. 2002) (denying absolute immunity to prosecutors because "[p]articipating in an arrest and detention clearly is not part of the traditional advocacy functions of a prosecutor. . . . And so the courts have held-denying absolute immunity for participation in illegal arrests, even when the participation was the lawyerly function of giving legal advice about the propriety of an arrest"); *Russo v. City of Hartford*, 158 F. Supp. 2d 214, 231 (D. Conn. 2001) (denying absolute immunity to prosecutors who, *inter alia*, allegedly "continued to pursue the illegal criminal investigation of the Plaintiff") (quotation marks omitted); *Amaker v. Coombe*, No. 96 Civ. 1622, 1998 U.S. Dist. LEXIS 14523, at *21 (S.D.N.Y. Sept. 16, 1998) (denying absolute immunity to prosecutor who "provide[d] legal advice to the police" during investigation); *see also Mink v. Suthers*, 482 F.3d 1244, 1260 (10th Cir. 2007) (holding that "[a]dvising police on interrogation methods or the existence of probable cause does not qualify" prosecutors for absolute immunity) (citation and quotation marks omitted); *Genzler v. Longanbach*, 410 F.3d 630, 641 (9th Cir. 2005), *cert. denied*, 2005 U.S. LEXIS 8597 (Nov. 28, 2005) (denying absolute immunity to prosecutors who were "actively directing police-type investigative actions," including witness interviews); *Kittler v. City of Chicago*, No. 03 C 6992, 2004 WL 1698997, at *7 (N.D. Ill. July 27, 2004) (denying absolute immunity to prosecutor at motion to dismiss stage because court "could not find at this juncture that there was no possibility based on the allegations that [prosecutor] did not participate in the interrogation of [plaintiff] in an investigative capacity"); *Williams v. Valtierra*, No. 00 C 5734, 2001 WL 686782, at *3 (N.D. Ill. June 18, 2001) ("[T]his court declines to hold that prosecutors can join coercive interrogations as active participants and be absolutely shielded from civil liability.").

Plaintiff alleges a variety of instances where the prosecutor defendants engaged in investigative functions that would clearly fall outside of their functions as advocates. For instance, plaintiff alleges that "Wallace, Wasilausky and Falzarno had conducted their surreptitious investigation, spying and surveillance of the plaintiff and I Media for months . . . spreading these defamatory and slander per se and disparaging falsehoods about the plaintiff and I Media during that period, before they even bothered in February of 2005 to serve the plaintiff and I Media with

a subpoena for information and records which the plaintiff subsequently fully complied with."[18] (Second Am. Compl. ¶ 69.)

In sum, although the Court is sensitive that the availability of absolute immunity should be decided at the earliest possible juncture, the Court declines to rule as a matter of law at this stage, given the allegations of investigative misconduct in the complaint, that absolute immunity shields defendant prosecutors from any alleged misconduct that took place during the investigation of Conte's bad-check charge and his business practices.[19]

---

[18] Although there are not specific investigatory acts alleged as to defendants Emmons and Sardo, plaintiff generally alleges that all of the prosecutor defendants participated in investigatory functions. Thus, for the reasons discussed above, the Court concludes, in an abundance of caution, that absolute immunity should also not be granted as to these prosecutor defendants at this juncture.

[19] The County Defendants also move to dismiss the state claims against Dillon and Rice on the grounds of absolute immunity. As discussed *supra*, plaintiff has not alleged personal involvement by either of these defendants in plaintiff's arrest or resulting investigation, other than the fact that they are supervisors and, thus, the claims against them must be dismissed on that basis also. In any event, unlike the County ADAs discussed above, there is no allegation that DA Dillon or DA Rice performed any investigative function as it related to Conte. Thus, they are protected by absolute immunity for all federal and state claims alleged against them.

The City Defendants similarly move to dismiss the state claims against Bland and Vinal on the grounds of absolute immunity. As discussed *supra*, plaintiff has not alleged personal involvement by either of these defendants in the alleged violation of plaintiff's rights and, thus, the claims against them must be dismissed. In any

## VII. QUALIFIED IMMUNITY

The County Defendants also argue that Emmons, Wallace, Wasilausky, and Falzarno are entitled to dismissal on the grounds of qualified immunity. As set forth below, the Court finds that the complaint and other documents which the Court can properly consider on this motion to dismiss do not provide a sufficient basis at this juncture for the Court to determine whether the defendants are entitled to qualified immunity. Thus, the motion to dismiss on such grounds as to these four defendants is denied without prejudice to

---

event, they would also be entitled to absolute immunity. Their only potential role, which is not even clear from the complaint, was made in the exercise of their duties in prosecuting and presiding over defendant Shaska's May 10, 2005 disciplinary hearing. (*See* Second Am. Compl. ¶ 176.) Contrary to plaintiff's contentions, plaintiff's own Exhibit O clearly shows that Bland was the prosecuting attorney during defendant Shaska's disciplinary hearing and Vinal was the Assistant Deputy Commissioner of Trials. (*See* Pl.'s Exh. O.) At best, the only allegations in the complaint relating to Bland were that she allegedly defamed Conte while acting as a prosecutor during that hearing. (Pl.'s Resp. to City, at 11-12.) Similarly, the only allegations in the complaint relating to Vinal were relating to hearing and adjudicating disciplinary charges against defendant Shaska and ultimately rendering a recommendation to the Police Commissioner about Shaska. (*Id.*) However, these allegations argued by plaintiff are not even present in the Second Amended Complaint. Moreover, unlike with the County ADAs discussed above, it is clear that these defendants are entitled to absolute immunity in connection with that activity. There are no allegations that either of them participated in the investigation of Conte. Accordingly, Bland and Vinal are entitled to absolute immunity on all federal and state claims against them.

renew such motion at the summary judgment stage.

According to the Second Circuit, government actors may be shielded from liability for civil damages if their "conduct did not violate plaintiff's clearly established rights, or if it would have been objectively reasonable for the official to believe that his conduct did not violate plaintiff's rights." *Mandell v. County of Suffolk*, 316 F.3d 368, 385 (2d Cir. 2003); *see also Fielding*, 2007 U.S. App. LEXIS 28939, at *4 ("The police officers in turn, are protected by qualified immunity if their actions do not violate clearly established law, or it was objectively reasonable for them to believe that their actions did not violate the law."). As the Second Circuit has also noted, "[t]his doctrine is said to be justified in part by the risk that the 'fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties.'" *McClellan v. Smith*, 439 F.3d 137, 147 (2d Cir. 2006) (quoting *Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999) (quotation omitted)). Thus, qualified immunity, just like absolute immunity, is not merely a defense, but rather is also "an entitlement not to stand trial or face the other burdens of litigation." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Accordingly, the availability of qualified immunity should similarly be decided by a court "at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991).

Furthermore, the Second Circuit has emphasized that "a defendant presenting an immunity defense on a Rule 12(b)(6) motion instead of a motion for summary judgment must accept the more stringent standard applicable to this procedural route."

*McKenna v. Wright*, 386 F .3d 432, 436 (2d Cir. 2004). More specifically, "[n]ot only must the facts supporting the defense appear on the face of the complaint, but, as with all Rule 12(b)(6) motions, the motion may be granted only where it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Id.* (internal citations and quotation marks omitted). In addition, in such situations, "plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense."

"The availability of the defense depends on whether a reasonable officer could have believed his action to be lawful, in light of clearly established law and the information he possessed." *Weyant*, 101 F.3d at 858 (internal quotation marks, citation, and alterations omitted). Specifically, an arresting officer is entitled to qualified immunity on claims of false arrest and malicious prosecution if either: (a) the arresting officer's belief that probable cause existed was objectively reasonable; or (b) officers of reasonable competence could disagree on whether the test for probable cause was met. *Walczyk v. Rio*, 496 F.3d 139, 163 (2d Cir. 2007). The Second Circuit has defined this standard, which is often referred to as "arguable probable cause," as follows:

Arguable probable cause exists when a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in the light of well established law. It is inevitable that law enforcement officials will in some cases reasonably

but mistakenly conclude that probable cause existed in the light of well established law. It is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials-like other officials who act in ways they believe to be lawful-should not be held personally liable.

*Cerrone v. Brown*, 246 F.3d 194, 203 (2d Cir. 2001) (quotation marks and citations omitted). In particular, the Second Circuit has recently affirmed that "'[a]rguable' probable cause should not be misunderstood to mean 'almost' probable cause . . . . If officers of reasonable competence would have to agree that the information possessed by the officer at the time of arrest did not add up to probable cause, the fact that it came close does not immunize the officer." *Jenkins*, 478 F.3d at 87. Under this standard, an arresting officer is entitled to qualified immunity, as a matter of law, only "if the undisputed facts and all permissible inferences favorable to the plaintiff show . . . that officers of reasonable competence could disagree on whether the probable cause test was met." *McClellan*, 439 F.3d at 147-48 (quoting *Robison v. Via*, 821 F.2d 913, 921 (2d Cir.1987)).

This standard of arguable probable cause also applies to qualified immunity claims by prosecutors and other government officials, as is the situation here. *See Murphy v. Neuberger*, No. 94 Civ. 7421, 1996 U.S. Dist. LEXIS 11164, at *37-*38 (S.D.N.Y. Aug. 6, 1996) (applying arguable probable cause standard to prosecutor's actions after determining that prosecutor was not entitled to absolute immunity); *Hickey*, 2002 U.S. Dist.

LEXIS 15944, at *15 ("There is no question that the right not to be arrested and subjected to lengthy involuntary detention in police custody without probable cause to support the arrest is firmly established, and any reasonable police officer, let alone prosecutor, would reasonably be expected to know that.") (internal citations omitted); *see also Coburn v. Nordeen*, 206 F. Supp. 2d 1119, 1123 (D. Kan. 2002) (applying arguable probable cause standard to determine whether prosecutor was entitled to qualified immunity).

In the instant case, plaintiff's complaint alleges various violations of his constitutional rights against the above-mentioned County defendant prosecutors, including that defendants arrested him without probable cause, prosecuted him knowing he was innocent and continued to maliciously prosecute him in order to drive away his business. The question before this Court becomes whether it was objectively reasonable for the individual County defendants to believe that probable cause existed to arrest and continuously prosecute plaintiff, or whether law enforcement officers of reasonable competence could disagree as to the existence of probable cause. Plaintiff specifically alleges that, based on the information supplied by him prior to his initial arrest, defendants were put on notice as to the falsity of Cutolo's complaint and that defendants ultimately arrested and maliciously prosecuted him without probable cause.

Although defendants dispute these allegations and argue that they are entitled to qualified immunity, there is simply insufficient information at this early stage to determine whether the conduct of the individual County Defendants in this case are

protected by qualified immunity.[20]  As a threshold matter, as noted *supra* in connection with the probable cause analysis, there is insufficient information in the complaint from which to determine what actual facts the defendants had available to them from the complainant at the time of the arrest.  *See, e.g., Bostic v. City of Binghamton*, No. 3:06-CV-540, 2006 U.S. Dist. LEXIS 73948, at *13 (N.D.N.Y. Oct. 11, 2006) ("While the facts that may be established through discovery might lead to the conclusion that the individual defendants possessed actual or arguable probable cause to arrest Plaintiff and commence his prosecution . . . that determination will have to await a summary judgment motion or trial."); *McClellan*, 439 F.3d at 148-49 (holding that "there is nothing in the present record to indicate whether 'reasonable officers would disagree' as to the propriety of [the officer's] actions" and reversing district court's grant of summary judgment); *Murphy*, 1996 U.S. Dist. LEXIS 11164, at *38 (finding that because "[i]t is unclear from the undeveloped record before the Court whether it was objectively reasonable for the defendants to believe that they had probable cause to arrest plaintiff," police officers and prosecutor were not entitled to qualified immunity"); *Hickey*, 2002 U.S. Dist. LEXIS 15944, at *16 (denying qualified immunity to police and prosecutors because "the fact-intensive question of what

the defendants knew or reasonably believed, or indeed whether there is any material dispute about that question can only be addressed on a fuller factual record, at summary judgment or trial").

Moreover, even assuming the defendants had all information available to them that had been supplied by Cutolo, the Court is still unable to conclude at this juncture that the plaintiff will be unable to prove he can overcome the defense of qualified immunity, given the other allegations in the complaint. It is possible that plaintiff, through discovery, could demonstrate the defendants were aware of certain other facts at the time of arrest–including information and physical evidence that he provided to the County defendants prior to the arrest suggesting that Cutolo's complaint was lacking in any credibility and that the check was post-dated–such that no government official of reasonable competence could believe the probable cause test was met.  Of course, it is also possible that the defendants will be able demonstrate through discovery that (1) at a minimum, arguable probable cause existed based on Cutolo's initial complaint and bounced check; and (2) nothing plaintiff told the County Defendants or the County Defendants uncovered during their own investigation undermined that arguable probable cause.

In sum, although the Court is sensitive that the qualified immunity issue should be decided at the earliest possible juncture, the facts alleged by plaintiff in the instant case do not provide a sufficient basis from which the Court can make that determination as a matter of law at the motion to dismiss stage.  *See Posr*, 180 F.3d at 416 (finding insufficient factual basis to grant motion to dismiss on

---

[20]  Defendants rely on a variety of exhibits attached to their motion papers to show that plaintiff's investigation was predicated upon numerous complaints.  However, as discussed above, the Court will only consider those exhibits that were also appended to plaintiffs' complaint, or referred to by the plaintiff, at this stage of the litigation.  Accordingly, the exhibits that do not fall under those exceptions were not considered by this Court at this motion to dismiss juncture.

qualified immunity grounds); *Caidor*, 2006 U.S. Dist. LEXIS 22980, at *53 (denying motion to dismiss on qualified immunity grounds with leave to renew because "at this juncture, the complaint provides insufficient facts to make a determination regarding this issue"); *see also Castro v. United States*, 34 F.3d 106, 112 (2d Cir.1994) ("Although a defense of qualified immunity should ordinarily be decided at the earliest possible stage in litigation . . . some limited and carefully tailored discovery may be needed before summary judgment will be appropriate.") (internal citations and quotations omitted). Accordingly, as with defendants' absolute immunity claim, the Court finds there is an insufficient basis to rule in defendants' favor as a matter of law at this stage with regard to the qualified immunity argument on the Fourth Amendment claims, or any of the other claims.

## VIII. LANHAM ACT CLAIMS

Plaintiff also alleges that defendants violated the Lanham Act because they "engaged in a deliberate and concerted campaign and scheme over a period of at least two years to use in commerce amongst plaintiff's route distributors, vendors, business associates . . . words, terms, names and combinations thereof of false and misleading descriptions of facts and false and misleading representations of fact, which caused confusion, mistake and deception as to the approval of plaintiffs' business, goods, service and commercial activities by others." (Second Am. Compl. ¶ 108.) Section 43(a) of the Lanham Act provides:

Any person who, on or in connection with any goods or services, or any

container for goods, *uses in commerce* any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which-

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person

\*\*\*

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1) (emphasis added).

The parties disagree as to whether the parties need to be competitors in order to have proper standing to assert a Lanham Act claim. However, the Court need not address this issue because it finds that plaintiff has not adequately pled a Lanham Act violation. "Section 43(a) of the Lanham Act proscribes false designations of origin or false or misleading descriptions of fact in connection with any goods in commerce that are likely to cause confusion or that misrepresent the nature, characteristics, qualities, or geographic origin of the goods." *Groden v. Random House*, 61 F.3d 1045, 1051 (2d Cir. 1995). To state a claim under the Lanham Act, a party must allege that the challenged statements are "either literally false or . . . though literally true . . . likely to mislead and confuse

consumers." *McNeil-P.C.C., Inc. v. Bristol-Myers Squibb Co.*, 938 F.2d 1544, 1549 (2d Cir. 1991).

In the instant case, plaintiff fails to state a claim upon which relief can be granted because plaintiff did not allege a false or misleading statement by defendant regarding plaintiff's product as required under the Lanham Act. Plaintiff alleges that the false information disseminated by defendants is that plaintiff is "a 'criminal', 'fraud' and a 'scam artist', that his business I Media and the publication it distributed, TV Time Magazine, were a 'fraud', a 'fraud scheme', 'illegitimate', a 'scam', a 'front for criminal activity', 'not a real business' and 'nonexistent', and that the plaintiff and I Media 'stole money from route distributers' and 'have stolen people's money.'" (Second Am. Compl. ¶ 154.) However, none of these claims can be interpreted as misleading or fraudulently misrepresenting Conte's product or trademark with that of another. Rather, these comments emphasize the nature of Conte's business and his reputation, which goes to the heart of a defamation claim, not the Lanham Act.

Moreover, although plaintiff uses the language "use[s] in commerce" in his Second Amended Complaint, that language is inconsistent with plaintiff's main assertions. Plaintiff does not allege that defendants' actions or statements were "used in commerce" as required by the statute. Instead, plaintiff alleged that they were used throughout the course of defendants' investigation of plaintiff.

In sum, plaintiff has attempted to take a defamation claim and convert it into a Lanham Act claim. Even assuming all of plaintiff's allegations to be true, there is no basis for a Lanham Act violation. Accordingly, the Lanham Act claims are dismissed.

## IX. CLAIMS AGAINST SHASKA AND GUERRA

Plaintiff also asserts similar constitutional and state law claims against defendant Shaska and *pro se* defendant Guerra. Defendants Shaska and Guerra each move individually to dismiss all claims against them on the grounds that the complaint does not adequately allege any cause of action against them. The Court disagrees.

As discussed *supra*, Shaska and Guerra are clearly alleged to be substantial participants in plaintiff's Section 1983 conspiracy claim. Specifically, plaintiff argues that Guerra, with the help of Shaska, "engaged in a scheme with the other state actor defendants to falsely accuse the plaintiff and his business of being frauds and illegitimate to their route distributors and print vendors, destroying plaintiff's business and effectively helping others under color of law to take it from him without due process." (Pl.'s Resp. to Guerra, at 5; *see also* Pl.'s Resp. to Shaska, at 5.) Plaintiff specifically alleges that Guerra, in concert with Shaska and Wallace, contacted the plaintiff's printers and route distributors and falsely told them that the plaintiff and his publishing business were frauds and crooks. He further alleges that all the defendants acted in a conspiracy to deprive him of his civil rights by agreeing to and spreading falsehoods of and concerning criminal activity engaged in by the plaintiff to his route distributors and vendors, destroying his publishing business and then conspiring to cover up and hide the civil rights violations they engaged in.

Given that Shaska and Guerra are an integral part of the alleged conspiracy, especially because Conte alleges that they acted in concert with the County Defendants to deprive him of his rights, the Court cannot conclude at this stage that the claims against them should be dismissed. Shaska and Guerra's connections to the other parties and Conte's allegations regarding the dissemination of information between all these parties, are sufficiently pled in the complaint for plaintiff's claims to survive a motion to dismiss. Accordingly, the Court will not dismiss plaintiff's claims against Shaska or Guerra.

## X. STATE LAW CLAIMS

Plaintiff also alleges a variety of state law tort claims against Emmons, Wallace, Wasilausky, Sardo, and Falzarno in their individual capacity.[21]

As an initial matter, the County Defendants move to dismiss all of plaintiff's state law tort claims for failure to comply with New York State General Municipal Law Section 50-h. General Municipal Law, Section 50-h provides, in pertinent part that:

> Wherever a notice of claim is filed against a city, . . . the city shall have the right to demand an examination of the claimant relative to the occurrence

---

[21] As discussed *supra*, all state claims against Dillon, Rice, Bland and Vinal are dismissed on the ground of absolute immunity. Therefore, the Court need not address the City Defendants' argument that plaintiff's pendent state law claims against Bland and Vinal must be dismissed for failure to file a Notice of Claim pursuant to New York General Municipal Law Sections 50-e and 50-I.

and extent of the injuries or damages for which claim is made . . .

Gen. Mun. § 50-h. Conte appeared for a 50-h hearing on June 27, 2006 without counsel. (*See* Defs.' Exh. FFF.) He failed to comply by refusing to answer questions and walked out, even though he was warned by the County Defendants that they would move to dismiss his state law claims for neglecting to participate in the hearing. (*Id.*) Conte contends that he requested at that hearing that the 50-h hearing be adjourned until he was given the opportunity to obtain and be represented by an attorney. (*Id.*) According to Conte, the County "refused to reschedule and never did reschedule a new date." (*See* Pl.'s Resp. to County, at 28.)

County Defendants argues that this refusal to participate warrants dismissal of plaintiff's state law claims, and cites to a variety of cases where a plaintiff's claims were dismissed for failure to comply with such a 50-h hearing. The Court disagrees.

Plaintiff may request an adjournment within the statutory ninety day period pursuant to GML § 50-h[5]. Viewing the record in a light most favorable to the plaintiff, the Court could find that Conte attempted to request such an adjournment at the hearing. The record in this case is unclear as to why the matter was not given a rescheduled date during later conversations and the Court will not infer that all the responsibility for scheduling such a meeting lies with the plaintiff. *See Averett v. County of Broome*, No. 2004-0697, 2007 WL 2265516, at *4 (N.Y. Sup. Ct. Aug. 7, 2007) (refusing to dismiss plaintiff's state law claims for failure to reschedule a 50-h hearing because both parties shared the responsibility

for finalizing such a date); *Kim L. v. Port Jervis City Sch. Dist.*, 40 A.D.3d 1042, 1045 (N.Y. App. Div. 2007) (finding that "scheduling matters [for purposes of a 50-h hearing] are the responsibility of the public corporation"); *Twitty v. City of New York*, 195 A.D.2d 354, 356 (N.Y. App. Div. 1993) (reversing lower court's dismissal of plaintiff's state law claims for deliberate failure to comply with 50-h because plaintiff was alleged to suffer from quadriplegia). Accordingly, at least at the motion to dismiss stage, the Court finds that plaintiff's failure to comply with GML § 50-h prior to filing his action is not fatal to any of the state law claims.[22]

## XI. Conclusion

For the foregoing reasons, the defendants' motion to dismiss is (1) granted with respect to all claims against the defendants City of New York, the New York City Police Department, the Nassau County District Attorney's Office, and individual defendants Dillon, Rice, Bland and Vinal, (2) granted as plaintiff's Section 1985 claim, Section 1986 claim, due process and equal protection claims, and the Lanham Act claims, (3) granted as to any claims brought against the individual County defendants in their official capacity (because such claims are duplicative of the *Monell* claim). The defendants' motions are denied in all other respects.

The parties are to proceed with discovery on the remaining claims against remaining defendants County of Nassau, Emmons, Wasilausky, Wallace, Sardo, Falzarno, Shaska, and Guerra – namely, the Section 1983 claims for false arrest/false imprisonment, malicious prosecution, and violations of the First Amendment, the Section 1983 conspiracy claim, the *Monell* claim, the abuse of process claim, and the state law claims – in accordance with the instructions of Magistrate Judge Boyle.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: March 31, 2008
Central Islip, NY

\* \* \*

Plaintiff Anthony Conte is *pro se*. The County Defendants are represented by Lorna B. Goodman, Esq., of the Nassau County Attorney's Office, 1 West Street, Mineola, New York 11501. The City Defendants are represented by Douglas W. Heim, Esq., Assistant Corporation Counsel of the City of New York, 100 Church Street, Room 3-153, New York, New York 10007. Defendant Tefta Shaska is represented by James M. Moschella, Esq., of Karasyk & Moschella, LLP, 225 Broadway, 32nd Floor, New York, New York 10007. Defendant Anthony Guerra is *pro se*.

---

[22] County Defendants only move to dismiss the defamation claim as it relates to Section 1983. Given that defendants do not argue for the substantive dismissal of plaintiff's state law tort claims in the present motions, including the state law defamation claim, the Court need not address such claims. Accordingly, plaintiff's state law claims survive defendants' motion to dismiss.