# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

_____

Nº 06-CV-4746 (JFB) (ETB)

_____

ANTHONY CONTE,

Plaintiff,

VERSUS

COUNTY OF NASSAU, ET AL.,

Defendants.

_____

**MEMORANDUM AND ORDER**
September 30, 2010

_____

JOSEPH F. BIANCO, District Judge:

*Pro se* plaintiff Anthony Conte ("plaintiff" or "Conte") brings this action against the County of Nassau ("the County"), Robert Emmons ("Emmons"), Philip Wasilausky ("Wasilausky"), William Wallace ("Wallace"), Christina Sardo ("Sardo"), Michael Falzarano ("Falzarano"), Tefta Shaska ("Shaska"), and Larry Guerra ("Guerra"). Plaintiff asserts federal claims under § 1983 for false arrest, malicious prosecution, abuse of process, violation of the First Amendment, conspiracy, and *Monell* liability against the County. Plaintiff also asserts various state-law claims.[1]

After a detailed review of the record and submissions of the parties, the Court grants defendants' motions for summary judgment in part and denies the motions for summary judgment in part. Specifically, the Court concludes that the County defendants are entitled to summary judgment on plaintiff's claims for malicious prosecution, violation of the First Amendment, and conspiracy under §

_____

[1] Plaintiff initially brought claims in this action against a variety of other individuals and entities, but those claims were dismissed by Memorandum and Order dated March 31, 2008. Plaintiff also asserts claims against "John and Jane Does, 1-20," but has not identified any such individuals.

1983. The Court further determines that plaintiff's federal and state-law false arrest (against defendant Wasilausky) and abuse of process (against all County defendants but Sardo) claims survive summary judgment because of disputed issues of material fact with respect to those claims. Plaintiff's *Monell* claim against the County of Nassau also survives summary judgment. The Court also concludes that defendant Sardo is entitled to summary judgment on all claims against her on grounds of absolute immunity as to the federal and state-law false arrest claims and lack of personal involvement with respect to the other claims, and defendants Emmons, Wallace, and Falzarano are entitled to summary judgment on the federal and state-law false arrest claim, because of lack of sufficient evidence of personal involvement in the investigation that led to the arrest. With respect to plaintiff's remaining state-law claims, the Court denies the County defendants and Guerra summary judgment on plaintiff's tortious interference with contractual relationships claim and grants summary judgment to defendant Shaska on that claim. Plaintiff's remaining state-law claims for defamation, injurious falsehood, and intentional infliction of emotional distress are barred by the statute of limitations as against all defendants. Finally, with respect to plaintiff's motion for summary judgment, the same disputed issues of fact that preclude summary judgment in defendants' favor on the remaining claims also preclude summary judgment in plaintiff's favor.

## I. FACTS

The Court has taken the facts set forth below from the parties' depositions, affidavits, and exhibits, and from the parties'

respective Rule 56.1 statements of facts.[2] Upon consideration of a motion for summary judgment, the Court shall construe the facts in the light most favorable to the non-moving party. *See Capobianco v. City of N.Y.*, 422 F.3d 47, 50 n.1 (2d Cir. 2001). Thus, on defendants' motions, the Court construes the evidence in the light most favorable to the plaintiff. On plaintiff's motion, the Court

---

[2] The Court notes that the parties did not all file responses to each other's Local Rule 56.1 Statements of Facts in violation of Local Civil Rule 56.1. Plaintiff also argues that the defendants did not identify the disputed issues of fact in opposition to his 56.1 statement with sufficient specificity. Generally, a party's "failure to respond or contest the facts set forth by the defendants in their Rule 56.1 statement as being undisputed constitutes an admission of those facts, and those facts are accepted as being undisputed." *Jessamy v. City of New Rochelle*, 292 F. Supp. 2d 498, 504 (S.D.N.Y. 2003) (quoting *NAS Elecs., Inc. v. Transtech Elecs. PTE Ltd.*, 262 F. Supp. 2d 134, 139 (S.D.N.Y. 2003)). However, "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (citations omitted), *abrogated on other grounds by Gross v. FBL Fin. Servs.*, 129 S. Ct. 2343, 2350 (2009); *see also Gilani v. GNOC Corp.*, No. 04 Civ. 2935 (ILG), 2006 WL 1120602, at *2 (E.D.N.Y. Apr. 26, 2006) (exercising court's discretion to overlook the parties' failure to submit statements pursuant to Local Civil Rule 56.1). Given the citations to the record in the parties' papers, the Court and the parties are able to discern the evidence upon which the parties rely to attempt to create disputed issues of fact. Therefore, in the exercise of its broad discretion, the Court will overlook the alleged failures to comply with Rule 56.1 and, furthermore, will deem admitted only those facts in the parties' Rule 56.1 statements that are supported by admissible evidence and not controverted by other admissible evidence in the record. *See Jessamy*, 292 F. Supp. 2d at 504-05.

construes the evidence in the light most favorable to defendants. Unless otherwise noted, where a party's 56.1 statement or deposition is cited, that fact is undisputed or the opposing party has pointed to no evidence in the record to contradict it.

## A. Background

In about 1999, plaintiff Anthony Conte developed and created a publishing and distribution business called I Media. (Pl.'s 56.1 ¶ 2.) I Media published "TV Week Magazine" and "TV Time Magazine," which were "free, glossy covered, full-color and full-feature, high quality TV magazines and listings guide publications that contained a centerfold inserted and attached shopper type publication or shopping catalog." (Pl.'s 1/11/10 Aff. ¶¶ 2-3.) Plaintiff developed a "route distribution system" for these publications and, in about April 2003, entered agreements with various independent contractors, "who were given the exclusive right to distribute these publications in route areas designated by zip codes." (Pl.'s 56.1 ¶ 3; Pl.'s 1/11/10 Aff. ¶ 5.)

## B. Post-Dated Check

Plaintiff signed a route distribution licensing agreement with Joseph Cutolo ("Cutolo") on May 1, 2003. (Pl.'s 56.1 ¶ 4.) On June 21, 2003, plaintiff entered a separate agreement with Cutolo to distribute publications in late June 2003. (Pl.'s 56.1 5.) That same day, plaintiff gave a check to Cutolo in the amount of $2,500 for "standby distribution." The check was post-dated to July 5, 2003, and plaintiff asked Cutolo not to deposit the check until Cutolo had completed the agreed-upon distribution services. (Pl.'s 56.1 ¶ 5; Pl.'s 1/11/10 Aff. ¶

20.) Plaintiff confirmed this arrangement in a letter to Cutolo dated June 21, 2003. (*See* Pl.'s Ex. F.) When plaintiff realized that his publication would not be ready for distribution, he called Cutolo on June 30, 2003 and requested that Cutolo not deposit the post-dated check. (Pl.'s 1/11/10 Aff. ¶ 21.) On July 1, 2003, plaintiff sent Cutolo a follow-up letter asking that he not deposit the check. (Pl.'s 1/11/10 Aff. ¶¶ 21, 23.)

Cutolo attempted to deposit the check on July 7, 2003, and the check bounced. (*Id.* ¶¶ 23-24.) When plaintiff's bank informed him of the bounced check, plaintiff disputed the check and placed a stop payment order on it. (*Id.* ¶ 23.) Cutolo again attempted to deposit the check unsuccessfully. Thereafter, Cutolo and his friend made threatening phone calls to plaintiff demanding the money in question. (*Id.* ¶¶ 25-26.) Cutolo also threatened to press charges on the bounced check. (*Id.* ¶ 25.) The parties corresponded by letter regarding the dispute. (*See* Pl.'s Exs. J, K.)

On August 11, 2003, Cutolo filed two complaints against Conte with the Nassau County District Attorney's Office ("the NCDAO"). (*See* Pl.'s 56.1 ¶ 8; Pl.'s Ex. Q.) One complaint was for misrepresentation, fraud, threats to business, and defamation. (*See* Pl.'s Ex. Q.) The second complaint was for passing a bad check. (*Id.*) Specifically, Cutolo complained that Conte had given him a bad check dated July 5, 2003 in the amount of $2,500. Cutolo stated that the check was returned for insufficient funds and, when he tried to cash it a second time, there was a stop payment order. Cutolo stated in the complaint that the check was not post-dated and that Conte did not ask him to hold it. (*Id.*) Someone in the DA's office told Cutolo that "there was a case" with respect to the bad

check complaint. (Cutolo Dep. at 57.)

By letter dated October 2, 2003, Rhoda Zwicker, an Attorney's Assistant in the Criminal Complaint Unit at the NCDAO, requested that Conte appear at the Criminal Complaint office regarding an allegation against him.[3] (Pl.'s Ex. L.) Zwicker stated in the letter that "[w]e would like to hear your side of this matter. . . . If you fail to appear . . . , we shall be obliged to decide whether to prosecute based only upon the information and evidence available to us." (*Id.*)

Conte appeared at the NCDAO and met with Zwicker in late October 2003. (Pl.'s 1/11/10 Aff. ¶¶ 29-30.) Zwicker told Conte that Cutolo had filed a bad check complaint against him. (*Id.* ¶ 30.) Conte explained his contractual relationship with Cutolo. Specifically, he told Zwicker that: (1) he gave Cutolo the check in question on June 21, 2003; (2) the check was post-dated to July 5, 2003; (3) he told Cutolo by telephone and by letter dated July 1, 2003 not to deposit the check; and (4) he was threatened by Cutolo and Cutolo's friend. (*Id.* ¶ 30.) Conte provided Zwicker with copies of Cutolo's licensing agreement and various correspondence, including the July 1, 2003 letter in which Conte asked Cutolo to refrain from depositing the post-dated check. (*Id.* ¶¶ 29-30.) Conte also brought and played for Zwicker tapes of allegedly threatening voicemails from Cutolo. (*Id.*) Zwicker did not take notes. (*Id.*) Conte made a number of

telephone calls to Zwicker about the issue, and Zwicker stated that the charges would be dropped if Conte paid Cutolo the money in question.[4] (*Id.*) Philip Wasilausky, head of the Criminal Complaint Unit, testified that Cutolo's complaint was investigated (Wasilausky Dep. at 53) and that Wasilausky "may have spoken" to Zwicker about the Conte matter. (*Id.* at 13.) Conte asserts that the tape of Cutolo's allegedly threatening messages to Conte was also sent to Wasilausky. (Pl.'s 1/11/10 Aff. ¶ 25.) Conte also asserts that Zwicker insisted that the only way the charges would be dropped would be if he paid Cutolo $2,500. (*Id.* ¶ 30.)

Cutolo does not recall whether he responded to a letter from the NCDAO asking that he contact the office. (Cutolo Dep. at 70-73, 75.) Cutolo spoke to Wasilausky at some point, though he does not recall when or what specifically was discussed. (Cutolo Dep. at 59, 64, 141.) Cutolo went to the NCDAO to sign an accusatory instrument and "believes" that he brought some paperwork, including a copy of the check at issue. (Cutolo Dep. at 145-46.) On November 18, 2003, Cutolo signed a criminal information, alleging that Conte had violated New York Penal Law § 190.05(1) with respect to the check dated July 5, 2003. (Def.'s Ex. N.)

---

[3] Although named as a defendant in this action, Zwicker is now deceased and, because she was not served, is not a proper party to this action. *See Conte v. Cnty. of Nassau*, 06-CV-4746 (JFB) (ETB), 2008 WL 905879, at *1 n.1 (E.D.N.Y. Mar. 31, 2008)

[4] It is unclear when these telephone conversations between Conte and Zwicker are alleged to have taken place. It is also unclear whether plaintiff claims to have given any information directly to Wasilausky. However, given the fact that Wasilausky testified that there was an investigation and that he was the head of the unit, and that there is other evidence that Wasilausky personally participated in the investigation (including Cutolo's testimony), a jury could draw a reasonable inference that he received the information provided by Conte.

On September 7, 2005, Conte was arraigned on the bad check charge and pled not guilty.[5] (Pl.'s Aff. ¶ 34.) Conte made several court appearances in connection with this case. (*Id.*) In or about January 2006, Conte provided documentation to defendant Christina Sardo, an assistant district attorney ("ADA") assigned to the case. (Sardo Decl. ¶¶ 3-4.) Specifically, Conte provided Sardo with documentation that, in June 2005, plaintiff had agreed to pay Cutolo $3,500 (Pl.'s Aff. ¶ 32; Pl.'s Ex. N), and that on June 17, 2005, Cutolo signed a release acknowledging receipt of a $3,500 check from Conte "as replacement in full for a post-dated check (dated July 5, 2003) issued to me by I Media Corporation on June 21, 2003 in the amount of $2,500.00 that was subsequently dishonored by I Media's bank." (Pl.'s Ex. O.) Conte also gave Sardo a copy of an affidavit signed by Cutolo on January 11, 2006. In the affidavit, Cutolo stated that he had settled the dispute with Conte and stated that:

> I have no intention or desire to pursue this matter further or to testify in this case. Additionally, since no one from the Nassau District Attorney's Office has made any effort to contact me about this case in the past four months, this affidavit shall serve as notice to the Nassau County District Attorney that I wish to withdraw my complaint

against Anthony Conte.

(Pl.s Ex. P.) Attached to the affidavit was the aforementioned release signed by Cutolo. (*See* Pl.'s Aff. ¶ 34.)

On June 12, 2006, the prosecution made a motion to dismiss the bad check charge against Conte (No. 03-24817) pursuant to New York Criminal Procedure Law § 170.40(1)(G), in which Conte's counsel joined. (*See* County Defs.' Ex. P.) The prosecutor added on the record that "the complainant in this case has been paid full restitution." The court granted the motion and dismissed the case. (*Id.*)

### C. Conte's Dealings with Guerra and Shaska

On December 30, 2003, plaintiff signed a route distribution licensing agreement with defendant Larry Guerra. (Pl.'s 56.1 ¶ 17; Pl.'s Ex. KK.) Plaintiff asserts that as part of this agreement, Guerra was to pay Conte $9,000 ($4,500 of which Guerra paid on signing). (Pl.'s 56.1 ¶ 17.) On February 4, 2004, Guerra gave Conte a third-party check from the account of Steven G. Dimonda, dated February 4, 2004, which Conte deposited in I Meida's account and which was subsequently returned to Conte as stopped payment. (Pl.'s 1/11/10 Aff. ¶ 61.) Guerra allegedly told Conte that the check had been from Guerra's partner, who had backed out of their arrangement, and Guerra told Conte that he wanted his money back. (*Id.* ¶ 62.) Conte claims that he "refused to depart from the terms of the agreement because [he] had complied with [his] part of the agreement at great expense to I Media." (*Id.*) Conte allegedly informed Guerra that he would not depart from the terms of the contract. (*See* Pl.'s Ex. NN.) On February 24, 2004, after Guerra allegedly failed to pay the balance of

---

[5] The parties do not address the gap in time between the November 2003 filing of the information and the September 2005 arraignment. Internal NCDAO memoranda indicate that an arrest warrant was issued, which remained open for some time, and, at some point, Conte was arrested. (*See* County Defs.' Exs. J, K.)

the required amount, plaintiff terminated the agreement between I Media and Guerra and stated that he would retain the $4,500 already paid as liquidated damages. (Pl.'s 56.1 ¶¶ 18, 20.)

On February 9, 2004, Guerra filed a complaint with the NCDAO alleging fraud by Conte. (Pl.'s 1/11/10 Aff. ¶ 69; Pl.'s Ex. UU.) Thereafter, Guerra remained in contact with the NCDAO, forwarding complaints from other route distributors to the office. (*See, e.g.*, Pl.'s Ex. WW.) In March 2004, Guerra filed a lawsuit against Conte in small claims court seeking the $4,500 at issue.[6] (Pl.'s Ex. PP.) Plaintiff alleges that, beginning in February 2004, Guerra repeatedly defamed him to several persons with whom plaintiff had business relationships. (*See, e.g.*, Pl.'s Ex. HH.)

At some point prior to filing a complaint with the NCDAO, Guerra attempted to speak to representatives of Quebecor, a printing company with whom plaintiff had a business relationship.[7] (Shaska Decl. ¶ 4.) Guerra's wife, Tefta Shaska, spoke on the telephone with a Quebecor representative, Gabriel

Sauro, on February 5, 2004. (*Id.* ¶¶ 3-4.) Shaska has been an NYPD detective for more than ten years. (*Id.* ¶ 2.) The parties dispute the circumstances of this telephone call. Plaintiff alleges that Shaska made defamatory statements to Sauro about plaintiff and his business. Shaska states that she was attempting to conduct "due diligence" on plaintiff's business and that, when Sauro told her about various problems that Quebecor had experienced with Conte, Shaska asked for supporting documentation, such as plaintiff's credit information.[8] (*Id.* ¶¶ 4-5.)

In April 2004, during the small claims court lawsuit, Conte saw Guerra in possession of various documentation that Conte had given Quebecor. (Pl.'s 1/11/10 Aff. ¶ 66.) Conte contacted Sauro of Quebecor and learned about the February 2004 telephone call with Shaska. (*Id.* ¶ 67.) Conte then filed a filed a complaint against Shaksa with the NYPD. As a result of a "negotiated settlement," Shaska pled guilty to two administrative charges: (1) obtaining confidential documents through unauthorized use of official functions; and (2) conducting personal business while on duty.[9] (*See* Pl.'s

---

[6] The arbitrator ultimately ruled in favor of Conte. (*See* Pl.'s Ex. QQ.)

[7] As discussed *infra* in connection with the tortious interference with contract claim, the parties dispute whether Conte had a contract with Quebecor. Plaintiff asserts that I Media had a contract with Quebecor for printing services. (See Pl.'s Aff. ¶¶ 66, 72, 83; Pl.'s Reply to Shaska Ex. E.) Garbiel Sauro states in an affidavit (attached to Shaska Affidavit) that Quebecor did not have a contract with Conte, and, by the time of the February 2004 telephone call with Shaska, Quebecor had already decided not to do business with Conte.

[8] Sauro was not deposed in this case, and an affidavit submitted by Sauro does not refer to the telephone call with Shaska. The only evidence of what transpired on the telephone call appears to be the NYPD administrative report discussed *infra*.

[9] In the "Investigating Officer's Report" accompanying the disposition of the administrative charges against Shaska, the investigating officer states: "[Shaska] informed Mr. Sauro that she and her husband were victims of a scam and that Mr. Conte was under investigation for questionable business practices. She requested that any document pertaining to Mr. Conte be faxed and provided numbers to her command and to her home. She stated that she obtained the documents

Ex. SS.)

### F. NCDAO 2004-2006 Investigation

In about February-March 2004, the NCDAO began an investigation of Conte and his business, I Media, based on several complaints from route distributors who claimed to have been defrauded.[10] (*See* Emmons Decl. ¶¶ 3-4.) ADA William Wallace oversaw the day-to-day affairs of the investigation and periodically sent reports to ADA Robert Emmons, Chief of the Criminal Frauds Bureau. (*Id.* ¶¶ 4-5; County Defs.' Exs. J, K.) Michael Falzarano, an NCDAO investigator, worked with Wallace as an investigator on the case. (*See* Falzarano Decl. ¶ 2.) As part of the investigation, the NCDAO received information from Guerra and solicited complaints from various persons. In these solicitation letters, the NCDAO stated that it was "investigating complaints" against Conte and I Media. (*See* Pl.'s Ex. VV.) Plaintiff alleges that defendants made defamatory statements about him during the investigation. (*See, e.g.*, Pl.'s 1/11/10 Aff. ¶ 85; Pl.'s Ex. III; Pl.'s Ex. KKK.)

The investigation also included the issuance of subpoenas, by the NCDAO, to subpoena I Media's and Conte's bank records

---

[10] Plaintiff alleges that the complaints were false and were brought about by the conduct of Guerra.

in April 2004. (*See* Pl.'s 1/11/10 Aff. ¶ 76; Pl.'s Ex. BBB; Pl.'s Ex. FFF; *see also* County Defs.' Ex. K.) On April 8, 2005, Falzarano served plaintiff with a subpoena. (Pl.'s 1/11/10 Aff. ¶¶ 90-97; Pl.'s Ex. LLL.) During this interaction, Falzarano allegedly grabbed Conte's hand, applying intense pressure, and stated: "I'll get you." (Pl.'s 1/11/10 Aff. ¶¶ 91-93.)

The results of the NCDAO investigation were never submitted to a grand jury. (Wallace Decl. ¶ 7.) The investigation appears to have ended in about August 2006. (County Defs.' Ex. K.)

## II. PROCEDURAL HISTORY

Plaintiff filed a complaint in this action on August 30, 2006, an amended complaint on January 4, 2007, and a second amended complaint on April 4, 2007. In the Second Amended Complaint, plaintiff asserted claims for: (1) violation of the First Amendment; (2) taking of property without due process; (3) false arrest; (4) a *Monell* claim against Nassau County; (5) a *Monell* claim against the City of New York; (6) 42 U.S.C. § 1985 conspiracy; (7) "neglect to prevent" under 42 U.S.C. § 1986; (8) violation of the Lanham Act; (9) tortious interference with contract; (10) slander; (11) libel; (12) injurious falsehoods; (13) malicious prosecution; (14) abuse of process; and (15) intentional infliction of emotional distress. By Memorandum and Order dated March 31, 2008, the Court granted in part and denied in part defendants' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. *See Conte v. Cnty. of Nassau*, No. 06-CV-4746 (JFB) (ETB), 2008 WL 905879 (E.D.N.Y.

---

in order to give them to the Nassau District Attorney's Office. In addition, she [stated] that the only reason she identified herself as a detective and member of the Department was so that Mr. Sauro could verify her identity." (Pl.'s Ex. SS, at 1.)

Mar. 31, 2008).[11] Specifically, the Court dismissed all claims against New York City and the NYPD and all claims against the individual County defendants in their official capacity. The Court also dismissed plaintiff's due process, equal protection, Lanham Act, § 1985, and § 1986 claims. The parties conducted discovery on plaintiff's remaining claims, specifically: (1) false arrest; (2) malicious prosecution; (3) abuse of process; (4) violation of the First Amendment; (5) § 1983 conspiracy; (5) *Monell* claim against Nassau County; and (6) state law claims for defamation, injurious falsehoods, tortious interference with contract, and intentional infliction of emotional distress.

Plaintiff filed a motion for summary judgment against all defendants on January 11, 2010.[12] The County defendants cross-moved for summary judgment on March 5, 2010, as did defendant Shaska.[13] Defendant Guerra moved for summary judgment on March 12, 2010. Plaintiff submitted his oppositions to defendants' motions and replies in support of his own motion on April 20, 2010. The County defendants and Shaska filed replies in support of their motions on May 7, 2010. Plaintiff filed sur-replies in opposition to defendants' motions on May 18, 2010. On August 24, 2010, plaintiff filed an amended reply affidavit. On September 8, 2010, the Court held oral argument. The Court has considered all of the parties' submissions.

## III. STANDARD OF REVIEW

The standards for summary judgment are well settled. Pursuant to Federal Rule of Civil Procedure 56(c), a court may not grant a motion for summary judgment unless "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Globecon Group, LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165, 170 (2d Cir. 2006). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (citation omitted); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

---

[11] Familiarity with that decision is presumed.

[12] Plaintiff's motion for summary judgment appears to be limited to his federal claims. Plaintiff does not refer to his state-law claims in his motion. In any event, disputed issues of fact would preclude summary judgment in plaintiff's favor on his state-law claims as well.

[13] Although the County defendants provided the notice required under Local Rule 56.2 ("Notice to *Pro Se* Litigant Who Opposes a Motion for Summary Judgment") to Conte and Guerra, it did not appear from the record that Conte, Guerra, or Shaska provided the requisite notice to Conte and Guerra respectively. Accordingly, the Court delivered notice to the *pro se* parties on August 13, 2010 and confirmed at oral argument that they understood the burdens of summary judgment and that they could submit additional evidence if they wished.

Once the moving party has met its burden, the opposing party "'must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*.'" *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (emphasis in original)). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Id.* at 247-48 (emphasis in original). Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth "'concrete particulars'" showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (quoting *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978)). Accordingly, it is insufficient for a party opposing summary judgment "'merely to assert a conclusion without supplying supporting arguments or facts.'" *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (quoting *Research Automation Corp.*, 585 F.2d at 33).

Where the plaintiff is proceeding *pro se*, the Court must "construe [the complaint] broadly, and interpret [it] to raise the strongest arguments that [it] suggest[s]." *Weixel v. Bd. of Educ. of the City of N.Y.*, 287 F.3d 138, 145-46 (2d Cir. 2002) (alterations in original) (quoting *Cruz v. Gomez*, 202 F.3d 593, 597 (2d Cir. 2000)). Though a *pro se* litigant's pleadings and other submissions are afforded wide latitude, a *pro se* party's conclusory assertions, completely unsupported by evidence, are not sufficient to defeat a motion for summary judgment. *Auguste v. N.Y. Presbyterian Med. Ctr.*, 593 F. Supp. 2d 659, 663 (S.D.N.Y. 2009) (noting, in a case with a *pro se* party, that the non-moving party "'may not rely simply on conclusory allegations or speculation to avoid summary judgment, but instead must offer evidence to show that its version of the events is not wholly fanciful.'" (quoting *Morris v. Lindau*, 196 F.3d 102, 109 (2d Cir. 1999))).

## IV. PLAINTIFF'S § 1983 CLAIMS

All of plaintiff's federal claims in this action are brought pursuant to 42 U.S.C. § 1983. Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 145 n.3 (1979). For claims under Section 1983, a plaintiff must prove that "(1) the challenged conduct was attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States." *Snider v. Dylag*, 188 F.3d 51, 53 (2d Cir. 1999) (citation omitted). For the reasons set forth below, the Court concludes that defendants are entitled to summary judgment on plaintiff's claims for malicious prosecution, violation of the First Amendment, and conspiracy. Plaintiff's false arrest claims against Wasilausky, abuse of process claims against all individual County defendants (except Sardo), and *Monell* claims against the County survive summary judgment because of

disputed issues of fact and gaps in the evidentiary record in this case.

## A. Immunity

Because the individual County defendants assert either absolute or qualified immunity as a defense to all of plaintiff's federal claims, the Court sets forth the legal standard for such a defense here before turning to plaintiff's specific claims.

### 1. Absolute Immunity

"It is by now well established that a state prosecuting attorney who acted within the scope of his duties in initiating and pursuing a criminal prosecution is immune from a civil suit for damages under § 1983." *Shmueli v. City of N.Y.*, 424 F.3d 231, 236 (2d Cir. 2005) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 410, 431 (1976)). "[D]istrict courts are encouraged to determine the availability of an absolute immunity defense at the earliest appropriate stage, and preferably before discovery. This is because '[a]n absolute immunity defeats a suit at the outset, so long as the official's actions were within the scope of the immunity.'" *Deronette v. City of N.Y.*, No. 05-CV-5275, 2007 U.S. Dist. LEXIS 21766, at *12 (E.D.N.Y. Mar. 27, 2007) (quoting *Imbler*, 424 U.S. at 419 n.13 (additional citations omitted)).

"The real distinction between whether an executive employee is entitled to absolute or qualified immunity turns on the kind of function the employee is fulfilling in performing the acts complained of." *Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010). Thus, "[t]hose acts that are 'intimately associated with the judicial phase of the criminal process' would be shielded by absolute immunity, but not 'those aspects of the prosecutor's responsibility that cast him in the role of an administrator or investigative officer rather than that of advocate.'" *Warney v. Monroe Cnty.*, 587 F.3d 113, 121 (2d Cir. 2009) (quoting *Imbler*, 424 U.S. at 430-31); *see also Hill v. City of N.Y.*, 45 F.3d 653, 661 (2d Cir. 1995) (same). In particular, "[s]uch immunity . . . extends to 'acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State.'" *Smith v. Garretto*, 147 F.3d 91, 94 (2d Cir. 1998) (quoting *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993)). On the other hand, "[w]hen a district attorney functions outside his or her role as an advocate for the People, the shield of immunity is absent. Immunity does not protect those acts a prosecutor performs in administration or investigation not undertaken in preparation for judicial proceedings." *Hill*, 45 F.3d at 661; *see also Carbajal v. Cnty. of Nassau*, 271 F. Supp. 2d 415, 421 (E.D.N.Y. 2003) ("[W]hen a prosecutor supervises, conducts, or assists in the investigation of a crime, or gives advice as to the existence of probable cause to make a warrantless arrest—that is, when he performs functions normally associated with a police investigation—he loses his absolute protection from liability." (citation omitted)). Summarizing this area of the law, the Supreme Court has recently explained:

> In the years since *Imbler*, we have held that absolute immunity applies when a prosecutor prepares to initiate a judicial proceeding, *Burns* [*v. Reed*, 500 U.S. 478, 492 (1991)], or appears in court to present evidence in support of a search warrant application, *Kalina* [*v. Fletcher*, 522 U.S. 118, 126 (1997)]. We have held that absolute immunity does not

apply when a prosecutor gives advice to police during a criminal investigation, *see Burns*, *supra*, at 496, 111 S. Ct. 1934, when the prosecutor makes statements to the press, *Buckley v. Fitzsimmons*, 509 U.S. 259, 277, 113 S. Ct. 2606, 125 L.E.2d 209 (1993), or when a prosecutor acts as a complaining witness in support of a warrant application, *Kalina*, *supra*, at 132, 118 S. Ct. 502 (Scalia, J., concurring).

*Van de Kamp v. Goldstein*, 129 S. Ct. 855, 861 (2009).

As the Second Circuit has noted, "[t]he line between a prosecutor's advocacy and investigating roles might sometimes be difficult to draw." *Zahrey v. Coffey*, 221 F.3d 342, 347 (2d Cir. 2000). The Court, however, may rely on certain established distinctions between these roles. For example, the Supreme Court "has identified 'evaluating evidence and interviewing witnesses' as falling on the absolute immunity side of the line, leaving 'searching for the clues and corroboration' that might lead to a recommendation for an arrest on the qualified immunity side." *Smith*, 147 F.3d at 94 (quoting *Buckley*, 509 U.S. at 273). Further, the Second Circuit has specifically identified the juncture in the criminal process before which absolute immunity may not apply: "The majority opinion in [*Buckley*] suggests that a prosecutor's conduct prior to the establishment of probable cause should be considered investigative: 'A prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested.'" *Zahrey*, 221 F.3d at 347 n.2 (quoting *Buckley*, 509 U.S. at 274); *see also Hill*, 45 F.3d at 661 ("Before any

formal legal proceeding has begun and before there is probable cause to arrest, it follows that a prosecutor receives only qualified immunity for his acts."). However, the Supreme Court has also held that "a determination of probable cause does not guarantee a prosecutor absolute immunity from liability for all actions taken afterwards. Even after that determination . . . a prosecutor may engage in 'police investigative work' that is entitled to only qualified immunity." *Buckley*, 509 U.S. at 274 n. 5; *see Zahrey*, 221 F.3d at 347 n.2 ("All members of the Court [in *Buckley*] recognized . . . that a prosecutor's conduct even after probable cause exists might be investigative."). For instance, in interpreting *Buckley*, the Second Circuit has distinguished between "preparing for the presentation of an existing case" and attempting to "furnish evidence on which a prosecution could be based," *Smith*, 147 F.3d at 94; only the former entitles a prosecutor to absolute immunity. *Id.*

If the Court determines that a prosecutor was acting as an advocate, and is therefore entitled to absolute immunity, "a defendant's motivation in performing such advocative functions as deciding to prosecute is irrelevant to the applicability of absolute immunity." *Shmueli*, 424 F.3d at 237 (quoting *Bernard v. Cnty. of Suffolk* , 356 F.3d 495, 502 (2d Cir. 2004)); *see also Tapp v. Champagne*, 164 F. App'x 106, 108 (2d Cir. 2006) ("Although [plaintiff] asserts that the charged prosecutors . . . conspired to prosecute him maliciously and without probable cause, his pleadings, even when viewed in the light most favorable to him, are insufficient to pierce the absolute immunity that shields a prosecutor's decision to initiate and pursue criminal charges . . . ." (citing *Bernard*, 356 F.3d at 503)).

2. Qualified Immunity

If absolute immunity does not apply, government actors may be shielded from liability for civil damages by qualified immunity, *i.e.*, if their "conduct did not violate plaintiff's clearly established rights, or if it would have been objectively reasonable for the official to believe that his conduct did not violate plaintiff's rights." *Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 385 (2d Cir. 2003); *see also Fielding v. Tollaksen*, 257 F. App'x 400, 401 (2d Cir. 2007) ("The police officers in turn, are protected by qualified immunity if their actions do not violate clearly established law, or it was objectively reasonable for them to believe that their actions did not violate the law."). As the Second Circuit has also noted, "[t]his doctrine is said to be justified in part by the risk that the 'fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties.'" *McClellan v. Smith*, 439 F.3d 137, 147 (2d Cir. 2006) (quoting *Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999) (quotation omitted)). Thus, qualified immunity, just like absolute immunity, is not merely a defense, but rather is also "an entitlement not to stand trial or face the other burdens of litigation." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Accordingly, the availability of qualified immunity should similarly be decided by a court "at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991).

"The availability of the defense depends on whether a reasonable officer could have believed his action to be lawful, in light of clearly established law and the information he possessed." *Weyant v. Okst*, 101 F.3d 845, 858 (2d Cir. 1996) (internal quotation marks, citation, and alterations omitted). In the context of false arrest and malicious prosecution claims, an arresting officer is entitled to qualified immunity if either: (a) the arresting officer's belief that probable cause existed was objectively reasonable; or (b) officers of reasonable competence could disagree on whether the test for probable cause was met. *See Walczyk v. Rio*, 496 F.3d 139, 163 (2d Cir. 2007). The Second Circuit has defined this standard, which is often referred to as "arguable probable cause," as follows:

> Arguable probable cause exists when a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in the light of well established law. It is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause existed in the light of well established law. It is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials—like other officials who act in ways they believe to be lawful—should not be held personally liable.

*Cerrone v. Brown*, 246 F.3d 194, 203 (2d Cir. 2001) (quotation marks and citations omitted). In particular, the Second Circuit has affirmed that "'[a]rguable' probable cause should not be misunderstood to mean 'almost' probable cause . . . . If officers of reasonable competence would have to agree that the information possessed by the officer at the time of arrest did not add up to probable cause, the fact that it came close does not immunize the officer." *Jenkins v. City of N.Y.*, 478 F.3d 76,

87 (2d Cir. 2007). Under this standard, an arresting officer is entitled to qualified immunity, as a matter of law, only "if the undisputed facts and all permissible inferences favorable to the plaintiff show . . . that officers of reasonable competence could disagree on whether the probable cause test was met." *McClellan*, 439 F.3d at 147-48 (quoting *Robison v. Via*, 821 F.2d 913, 921 (2d Cir. 1987)).

Although qualified immunity typically is asserted by police officers, the qualified immunity standard of arguable probable cause also applies to prosecutors in some situations. *See Murphy v. Neuberger*, No. 94 Civ. 7421, 1996 U.S. Dist. LEXIS 11164, at *37-38 (S.D.N.Y. Aug. 6, 1996) (applying arguable probable cause standard to prosecutor's actions after determining that prosecutor was not entitled to absolute immunity); *Hickey v. City of N.Y.*, No. 01-CV-6506 (GEL), 2002 U.S. Dist. LEXIS 15944, at *14-15 (S.D.N.Y. Aug. 26, 2002) ("There is no question that the right not to be arrested and subjected to lengthy involuntary detention in police custody without probable cause to support the arrest is firmly established, and any reasonable police officer, let alone prosecutor, would reasonably be expected to know that." (internal citations omitted)).

## B. False Arrest

Plaintiff alleges a claim for false arrest against all the County defendants. For the reasons set forth below, the parties' motions for summary judgment on plaintiff's false arrest claim are denied with respect to the claim against defendant Wasilausky.

### 1. Legal Standard

In New York, the claim colloquially known as "false arrest" is a variant of the tort of false imprisonment, and courts use that tort to analyze an alleged Fourth Amendment violation in the § 1983 context. *See Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995). To prevail, a plaintiff must prove four elements: "(1) the defendant intended to confine him; (2) the plaintiff was conscious of the confinement; (3) the plaintiff did not consent to the confinement; and (4) the confinement was not otherwise privileged." *Broughton v. New York*, 335 N.E.2d 310, 314 (N.Y. 1975).

### 2. Application

#### a. Personal Involvement

As a threshold matter, the Court must inquire as to the personal involvement alleged for each defendant, before determining whether a claim for false arrest may proceed against him or her.[14] To state a claim for individual liability under § 1983, "a plaintiff must demonstrate a defendant's personal involvement in the alleged [constitutional violation] in order to establish a claim against such defendant in his individual capacity." *Valenti v. Massapequa Union Free Sch. Dist.*, No. 09-CV-977 (JFB) (MLO), 2010 WL

---

[14] The Court notes that, in their papers, the County defendants treat the individual defendants collectively (except for Sardo) in addressing all of plaintiff's federal and state claims. Nonetheless, in an attempt to narrow the issues for trial, this Court has analyzed the personal involvement of defendants in determining liability under § 1983 since, to state a claim for individual liability under § 1983, a plaintiff must demonstrate a defendant's personal involvement in the alleged constitutional violations.

475203, at *8 (E.D.N.Y. Feb. 5, 2010) (citation omitted) (emphasis in original); *see Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1937 (2009) ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); *Gill v. Mooney*, 824 F.2d 192, 196 (2d Cir. 1987) ("Absent some personal involvement by [a defendant] in the allegedly unlawful conduct of his subordinates, he cannot be held liable under section 1983." (citation omitted)). "[M]ere bald assertions and conclusions of law do not suffice." *Davis v. Cnty. of Nassau*, 355 F. Supp. 2d 668, 677 (E.D.N.Y. 2005) (citation and internal quotation omitted).

Conte's allegations and evidence relating to the bad check charge[15] only indicate the personal involvement of ADAs Wasilausky, and Sardo with respect to those events. ADA Wasilausky was the head of the Criminal Complaint Unit at the time of Cutolo's complaint regarding Conte's check. Wasilausky testified at his deposition that there was an investigation and that he "may have spoken" with Zwicker about the Conte matter. (Wasilausky Dep. at 13.) Wasilausky did not recall the contents of that discussion. (*Id.*) Cutolo similarly testified that he spoke with someone in the NCDAO; however, he did not recall with whom he spoke or the details of the discussion. There is sufficient evidence on the record from which the Court may conclude that Conte's

false arrest claims sufficiently allege the personal involvement of defendant Wasilausky.

Conte also sufficiently alleges the personal involvement of ADA Sardo with respect to the bad check charge. Specifically, Sardo was the ADA who eventually prosecuted the bad check charge in 2005. Conte does not raise claims against any other defendants relating to the bad check charge.[16] Accordingly, plaintiff's claim for false arrest sufficiently alleges the personal involvement of defendants Wasilausky and Sardo, and the Court proceeds to analyze the merits of plaintiff's claim with respect to these two defendants only.

b. Immunity

As a threshold matter, the Court concludes that the County defendants are not entitled to absolute immunity for their investigative conduct with respect to the bad check charge against Conte. There is no evidence of any police involvement in this case. Instead, the NCDAO investigated Cutolo's complaint on its own before any probable cause determination and before the initiation of any criminal proceedings. As discussed above, it is well settled that when prosecutors perform such investigative functions, they are not entitled to absolute immunity. *See Buckley*, 509 U.S. at 273 ("There is a difference between the advocate's role in evaluating evidence and interviewing witnesses as he prepares for trial, on the one hand, and the detective's role in searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested, on the other hand.");

---

[15] As discussed *infra*, plaintiff's false arrest claim may only proceed with respect to the bad check charge, not with respect to the 2004-2006 investigation and the defendants involved therein.

[16] At oral argument, plaintiff only argued the liability of defendants Wasilausky and Sardo as relating to the bad check charge.

*id.* at 275-76 ("That the prosecutors later called a grand jury to consider the evidence this work produced does not retroactively transform that work from the administrative into the prosecutorial. A prosecutor may not shield his investigative work with the aegis of absolute immunity merely because, after a suspect is eventually arrested, indicted, and tried, that work may be retrospectively described as 'preparation' for a possible trial . . . ."); *Burns*, 500 U.S. at 496 (holding that advising police officers as to existence of probable cause in particular case was not protected by absolute immunity). Accordingly, defendants' motion for summary judgment on plaintiff's false arrest claim on the basis of absolute immunity is denied as relates to the investigation of Conte that led to the bad check charge. *See, e.g.*, *McCray v. City of N.Y.*, Nos. 03 Civ. 9685, 03 Civ. 9974, 03 Civ. 10080, 2007 U.S. Dist. LEXIS 90875, at *59 (S.D.N.Y. Dec. 11, 2007) ("[I]f a prosecutor acts in an investigative capacity, for example; or gives police legal advice on the propriety of investigative techniques and on whether or not probable cause exists to make an arrest . . . then absolute immunity cannot be invoked." (citing *Buckley*, 509 U.S. at 270-71); *Thompson v. Gentz*, No. 06-CV-1743, 2007 U.S. Dist. LEXIS 29753, at *4-5 (E.D.N.Y. Apr. 23, 2007)) (vacating prior order granting absolute immunity to prosecutor in part because "prosecutor [was] not entitled to absolute immunity when supervising and interacting with law enforcement agencies in acquiring evidence that might be used in a prosecution" (citing *Barbera v. Smith*, 836 F.2d 96, 100 (2d Cir. 1987))); *Hickey*, 2002 U.S. Dist. LEXIS 15944, at *10-11 (denying absolute immunity to prosecutors because "[p]articipating in an arrest and detention clearly is not part of the traditional advocacy functions of a prosecutor. . . . And so the courts have held—denying absolute immunity for participation in illegal arrests, even when the participation was the lawyerly function of giving legal advice about the propriety of an arrest"); *Russo v. City of Hartford*, 158 F. Supp. 2d 214, 231 (D. Conn. 2001) (denying absolute immunity to prosecutors who, *inter alia*, allegedly "continued to pursue the illegal criminal investigation of the Plaintiff") (quotation marks omitted); *Amaker v. Coombe*, No. 96 Civ. 1622, 1998 U.S. Dist. LEXIS 14523, at *21 (S.D.N.Y. Sept. 16, 1998) (denying absolute immunity to prosecutor who "was advising, indeed encouraging, the police to file a complaint against the plaintiff," which the court found was "similar to providing legal advice to the police" during investigation).

Thus, to the extent the County defendants argue that they are all entitled to blanket absolute immunity, the Court rejects that assertion.[17] However, defendants do specifically argue that Christina Sardo is entitled to absolute immunity for her role as prosecutor in the bad check case, and the Court agrees. Sardo was the ADA who eventually prosecuted the bad check charge in 2005. There is no evidence that she was involved in the preliminary investigation of the bad check complaint (or the wider investigation in 2004-2006). Thus, because there is no evidence that she performed anything other than a quasi-judicial prosecutorial function, defendants' motion for summary judgment on all of

_____

[17] In fact, at oral argument counsel for the County defendants conceded that qualified immunity (rather than absolute immunity) applies to the actions relevant to this case of Wallace, Emmons, Wasilausky, and Falzarano.

plaintiff's claims against Sardo is granted.[18] Accordingly, the only defendant against whom the Court analyzes the merits of the false arrest claim is defendant Wasilausky.

c. Probable Cause

Drawing all reasonable inferences in plaintiff's favor, the Court concludes that there are disputed issues of material fact that preclude summary judgment on the issue of whether there was probable cause to arrest plaintiff or whether the defendants are entitled to qualified immunity.[19]

i. Legal Standard

The Second Circuit has established that "[t]he existence of probable cause to arrest constitutes justification and 'is a complete defense to an action for false arrest,' whether that action is brought under state law or under Section 1983." *Weyant*, 101 F.3d at 852 (quoting *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994) and citing *Broughton v. State*, 335 N.E.2d 310, 315 (N.Y. 1975) (holding that, under New York law, "[j]ustification may be established by showing that the arrest was based on probable cause") and *Singer*, 63 F.3d at 118 ("There can be no federal civil rights claim for false arrest where the arresting officer had probable cause.")). In general, probable cause is established where "the arresting officer has 'knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested.'"[20] *Singer*, 63 F.3d at 119 (quoting *O'Neill v. Town of Babylon*, 986 F.2d 646, 650 (2d Cir. 1993) (citation omitted)); *see also Weyant*, 101 F.3d at 852 (citing *Dunaway v. New York*, 442 U.S. 200, 208 n.9 (1979)) (additional citations omitted). Furthermore, "[t]he validity of an arrest does

---

[18] Absolute immunity also would apply to bar liability for plaintiff's state law claims against Sardo. *See, e.g.*, *Hirschfeld v. City of N.Y.*, 686 N.Y.S.2d 367, 370-71 (App. Div. 1999) (dismissing claims against prosecutor for absolute immunity); *Moore v. Dormin*, 676 N.Y.S.2d 90, 91-92 (App. Div. 1998) (same); *Tucker v. City of N.Y.*, 709 N.Y.S.2d 796, 797-98 (Sup. Ct. 2000) (same). Thus, the Court grants defendant Sardo summary judgment on all claims against her.

[19] The Court notes that the County defendants make no arguments in their papers with respect to the other elements of plaintiff's false arrest claim. In fact, defendants argue that because they are entitled to absolute immunity, the elements of false arrest are irrelevant. (*See* County Defs.' Br. at 16.) However, as discussed above, defendants are not entitled to absolute immunity with respect to their investigative, non-prosecutorial behavior. The County defendants apparently concede that plaintiff was arrested on the bad check charge. (*See* County Defs.' Br. at 14; *see also* County Defs.' Ex. K.) Because the County defendants do not address this issue or any of the other elements of plaintiff's false arrest claim, the Court does not address them any further in this Memorandum and Order.

---

[20] In New York State, "a police officer may arrest a person for . . . [a] crime when he has reasonable cause to believe that such person has committed such crime, whether in his presence or otherwise." N.Y. Crim. Proc. Law § 140.10(1)(b). "'Reasonable cause to believe that a person has committed an offense' exists when evidence or information which appears reliable discloses facts or circumstances which are collectively of such weight and persuasiveness as to convince a person of ordinary intelligence, judgment and experience that it is reasonably likely that such offense was committed and that such person committed it." N.Y. Crim. Proc. Law § 70.10.

not depend upon an ultimate finding of guilt or innocence." *Peterson v. Cnty. of Nassau*, 995 F. Supp. 305, 313 (E.D.N.Y. 1998) (citing *Pierson v. Ray*, 386 U.S. 547, 555 (1967), *overruled on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800 (1982)). "Rather, the court looks only to the information the arresting officer had at the time of the arrest." *Id.* (citing *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)). Moreover, a determination of probable cause is based upon the "totality of the circumstances, and 'where law enforcement authorities are cooperating in an investigation . . . , the knowledge of one is presumed shared by all.'" *Calamia v. City of N.Y.*, 879 F.2d 1025, 1032 (2d Cir. 1989) (quoting *Illinois v. Andreas*, 463 U.S. 765, 771 n.5 (1983)) (additional citations omitted); *see also Bernard*, 25 F.3d at 102 (citing *Illinois v. Gates*, 462 U.S. 213, 230 (1982)). "The question of whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers, or may require a trial if the facts are in dispute." *Weyant*, 101 F.3d at 852 (citations omitted). Where an issue of probable cause is "factual in nature," it must be presented to a jury. *Moore v. Comesanas*, 32 F.3d 670, 673 (2d Cir. 1994) (citations omitted). Furthermore, an officer who merely observes or assists in an arrest, even if he is not the "arresting officer" may be liable for failing to intercede to prevent an arrest without probable cause. *See O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir. 1988) ("A law enforcement officer has an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in his presence by other officers." (citations omitted)).

With respect to an officer's basis for probable cause, it is well-established that "[w]hen information [regarding an alleged crime] is received from a putative victim or an eyewitness, probable cause exists . . . unless the circumstances raise doubt as to the person's veracity." *Curley v. Vill. of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001) (citing *Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000) and *Singer*, 63 F.3d at 119); *see also Martinez*, 202 F.3d at 634 ("We have previously held that police officers, when making a probable cause determination, are entitled to rely on the victims' allegations that a crime has been committed."); *McKinney v. George*, 726 F.2d 1183, 1187 (7th Cir. 1984) ("If policemen arrest a person on the basis of a private citizen's complaint that if true would justify the arrest, and they reasonably believe it is true, they cannot be held liable for a violation of the Constitution merely because it later turns out that the complaint was unfounded."). Moreover, "[t]he veracity of citizen complain[an]ts who are the victims of the very crime they report to the police is assumed." *Miloslavsky v. AES Eng'g Soc'y, Inc.*, 808 F. Supp. 351, 355 (S.D.N.Y. 1992) (citing *Adams v. Williams*, 407 U.S. 143, 148 (1972)), *aff'd*, 993 F.2d 1534 (2d Cir. 1993); *accord Lee v. Sandberg*, 136 F.3d 94, 103 (2d Cir. 1997) (quoting *Miloslavsky* with approval); *see also* 2 Wayne LaFave, *Search and Seizure: A Treatise On The Fourth Amendment* § 3.4(a), at 205 (4th ed. 2007) (noting that the Supreme Court has "proceeded as if veracity may be assumed when information comes from the victim of . . . criminal activity" (citing *Chambers v. Maroney*, 399 U.S. 42 (1970))).

### ii. Application

Conte was arrested for issuing a bad check under New York Penal Law § 190.05. The statute provides:

A person is guilty of issuing a bad check when . . . (a) [a]s a drawer or representative drawer, he utters a check knowing that he or his principal, as the case may be, does not have sufficient funds with the drawee to cover it, and (b) he intends or believes *at the time of utterance* that payment will be refused by the drawee upon presentation, and (c) payment is refused by the drawee upon presentation . . . .

N.Y. Penal Law § 190.05(1) (emphasis added). The statute defines "check" as "any check, draft or similar sight order for the payment of money *which is not post-dated with respect to the time of utterance*." N.Y. Penal Law § 190.00(1) (emphasis added).

Conte argues that there was not probable cause for his arrest associated with the bad check charge. In this case, Joseph Cutolo complained to the NCDAO that Conte had given him a bad check and stated in his complaint that the check was not post-dated and that Conte had not asked him to hold it. (*See* Pl.'s Ex. Q.) However, the NCDAO did not have Conte arrested at this time. Instead, the NCDAO investigated further and asked for Conte's side of the story. (*See* Pl.'s Ex. L.) Specifically, according to Conte, Conte has presented evidence that he was requested to appear at the NCDAO regarding Cutolo's allegations. (Pl.'s Ex. L.) Conte was told that the NCDAO "would like to hear" his "side of this matter." (*Id.*) Conte appeared at the NCDAO and explained his relationship with Cutolo. Conte has put forward evidence that, at that meeting at the NCDAO, he told Zwicker that he gave Cutolo the check on June 21, 2003, but the check was post-dated for July 5, 2003. Conte also presented evidence that he told Zwicker that he had

informed Cutolo by telephone and by letter not to deposit the check. (Pl.'s 1/11/10 Aff. ¶ 30.) Conte also gave the NCDAO copies of various correspondence between him and Cutolo, including the letter dated July 1, 2003, notifying Cutolo to not cash the check. (*Id.* ¶¶ 29-30.) Conte also told Zwicker that he had been threatened by Cutolo and his friend, and he played for Zwicker tapes of allegedly threatening voicemails from Cutolo. (*Id.*) The letter that Conte alleges he provided to Zwicker, if it had been sent to Cutolo, would have provided a complete defense to the alleged crime relating to the bad check, as it would have negated the requisite intent for the crime. Thus, had this letter been provided to the NCDAO, it could have undermined any alleged probable cause for the arrest and arraignment of Conte.

As the Second Circuit has held, although a police officer is generally not required to investigate an arrestee's claim of innocence, "under some circumstances, a police officer's awareness of the facts supporting a defense can eliminate probable cause." *Jocks v. Tavernier*, 316 F.3d 128, 135 (2d Cir. 2003); *see also Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) ("[A]n officer may not disregard plainly exculpatory evidence."). In this case, given the totality of the circumstances and viewing the evidence in the light most favorable to plaintiff, the Court concludes that plaintiff has raised a genuine issue of fact as to whether the circumstances were such that they raised doubt about the veracity and reliability of Cutolo's complaint. Thus, there is a genuine issue of fact as to whether defendants had probable cause to arrest Conte for the bad check. *See, e.g.*, *Harrison v. McMahon*, No. Civ. 02-CV-477 (AVC), 2004 WL 1171391, at *6-7 (D. Conn. May 24, 2004) (denying defendants' motion for summary judgment and rejecting

qualified immunity defense on plaintiff's claim for false arrest based on the alleged issuance of a bad check where the circumstances surrounding the alleged victim's complaint warranted further investigation); *see also Williams v. City of N.Y.*, No. 06-CV-6601 (NGG), 2009 WL 3254465, at *6 (E.D.N.Y. Oct. 9, 2009) ("Given [plaintiff's] claim that he had permission to be in the building, an inference that he was trespassing was not warranted without some further investigation, even in light of the possible drug-related activity the officers believed they had observed. The officers did not ask any follow-up questions or make any further effort to ascertain the facts.") (denying summary judgment on false arrest claim and holding qualified immunity inapplicable).

Given the gaps in the evidentiary record in this case and the disputed factual issues, the Court is also unable to conclude at this juncture whether the County defendants are entitled to qualified immunity on the issue of probable cause. As discussed above, Rhoda Zwicker, a clerk in the NCDAO, appears to have conducted some investigation of Cutolo's bad check complaint. However, Zwicker is currently deceased. ADA Wasilausky was the head of the Criminal Complaint Unit at the time. He testified at his deposition in this case that there was an investigation, and that he "may have spoken" with Zwicker about the Conte matter, but he does not recall what was said. (Wasilausky Dep. at 13.) Cutolo testified that he spoke with Wasilausky at some point, though he claims he does not recall when or what specifically was discussed. (Cutolo Dep. at 145-46.) Given the evidentiary record and the facts that are in dispute (including (1) whether Conte provided a document to the NCDAO prior to the arrest (that he said he sent to Cutolo) that was a complete defense to the crime charged and (2) whether Wasilausky was aware of, or investigated, this exculpatory document prior to the arrest), the Court cannot conclude that defendants had arguable probable cause to arrest plaintiff on the bad check charge. *See, e.g., McClellan*, 439 F.3d at 148-49 (holding that "there is nothing in the present record to indicate whether 'reasonable officers would disagree' as to the propriety of [the officer's] actions" and reversing district court's grant of summary judgment); *Cornett v. Brown*, No. 04-cv-0754 (DGT) (LB), 2006 WL 845568, at *12 (E.D.N.Y. Mar. 30, 2006) (denying summary judgment on qualified immunity grounds where the statement to the officer "which presumably prompted plaintiff's arrest is not in evidence" and "[o]n this record it is impossible to determine whether [the officer's] actions were reasonable"); *Houston v. N.Y. City Trans. Auth.*, No. 93 CV 1291 (FB), 1996 WL 173128, at *6 (E.D.N.Y. Apr. 10, 1996) ("The Court here, however, is unable to conclude on the available facts, which are in dispute, that [the officer] is entitled to qualified immunity as a matter of law. Because the facts surrounding [plaintiff's] arrest and subsequent prosecution have not adequately been developed, summary judgment also is inappropriate on the issue of qualified immunity.").

In sum, although the Court again recognizes that the qualified immunity issue should be decided at the earliest juncture where possible, the Court is unable to conclude whether defendant Wasilausky is entitled to qualified immunity given the disputed issues of fact and the insufficiency of the record on this issue in this particular case. Accordingly, summary judgment on plaintiff's false arrest claim is denied.

* * *

Plaintiff's motion for summary judgment on the false arrest claim is also denied. Viewing the evidence in the light most favorable to defendants, there are disputed issues of fact as to whether the defendants had probable cause, or at least arguable probable cause, to arrest plaintiff for the bad check charge. Specifically, there is evidence that: (1) the complaining witness, Cutolo, filed a complaint with the NCDAO indicating that Conte had given him a check with insufficient funds, that the check was not post-dated, and that Conte had not asked him to hold it (*see* Pl.'s Ex. Q); (2) the NCDAO conducted some kind of investigation after Zwicker spoke to Conte about the allegedly exculpatory evidence (*see* Cutolo Dep. at 70-73, 75; Wasilausky Dep. at 53); and (3) Cutolo never told the defendants that the July 5, 2003 check was post-dated (Cutolo Dep. at 68-69). Given this evidence, and drawing all reasonable inferences in defendants' favor, a rational jury could find that defendants had at least arguable probable cause to arrest Conte on the bad check charge. Accordingly, plaintiff's motion for summary judgment on his false arrest claim is denied.

### B. Malicious Prosecution

Plaintiff alleges a claim of malicious prosecution under § 1983 against the County defendants. For the reasons set forth below, the Court concludes that defendants are entitled to summary judgment on plaintiff's malicious prosecution claim.

### 1. Legal Standard

"Because there are no federal rules of decision for adjudicating § 1983 actions that are based upon claims of malicious prosecution, courts are required by 42 U.S.C. § 1988 to turn to state law for such rules." *Alicea v. City of N.Y.*, No. 04-CV-1243, 2005 U.S. Dist. LEXIS 28129, at *17 (S.D.N.Y. Nov. 15, 2005) (citation and internal quotation marks omitted). "'A malicious prosecution claim under New York law requires the plaintiff to prove (1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions.'" *Blake v. Race*, 487 F. Supp. 2d 187, 211 (E.D.N.Y. 2007) (quoting *Jocks*, 316 F.3d at 136) (internal quotation marks omitted). In addition to the state law elements of malicious prosecution, "[t]o sustain a § 1983 malicious prosecution claim, there must be a seizure or other 'perversion of proper legal procedures' implicating the claimant's personal liberty and privacy interests under the Fourth Amendment." *Washington v. Cnty. of Rockland*, 373 F.3d 310, 316 (2d Cir. 2004) (quoting *Singer*, 63 F.3d at 117). As the Second Circuit has held,

> [u]nder New York law, even when probable cause is present at the time of arrest, evidence could later surface which would eliminate that probable cause. In order for probable cause to dissipate, the groundless nature of the charges must be made apparent by the discovery of some intervening fact. The New York Court of Appeals has noted that the failure to make a further inquiry when a reasonable person would have done so may be evidence of lack of probable cause.

*Lowth v. Town of Cheektowaga,* 82 F.3d 563,

571 (2d Cir. 1996) (citations and quotation marks omitted); *see also Korthas v. City of Auburn*, No. 5:04-CV0537, 2006 U.S. Dist. LEXIS 38745, at *15 (N.D.N.Y. June 9, 2006) ("Police officers may not purposely withhold or ignore exculpatory evidence that, if taken into account, would void probable cause . . . [A] failure to make further inquiry when a reasonable person would have done so may evidence a lack of probable cause." (citation and quotation marks omitted)).

## 2. Application

### (a) Bad Check Charge

Plaintiff argues that, even if there were probable cause at the initiation of the criminal proceedings against him, any such probable cause dissipated based on the information he later provided to the County defendants.[21] Specifically, plaintiff points to

---

[21] The Court notes that the parties treat plaintiff's malicious prosecution claim as relating to the continued prosecution of the bad check charge, rather than the initiation of that charge. As discussed *supra*, absolute immunity does not apply to the preliminary NCDAO investigation. To the extent plaintiff asserts a malicious prosecution claim based on the pre-arraignment investigation, such a claim fails because the bad check charge against Conte was dismissed in the interests of justice pursuant to New York Criminal Procedure Law § 170.40. (*See* County Defs.' Ex. P.) A dismissal in the interest of justice is generally not considered a termination in plaintiff's favor for purposes of a malicious prosecution claim. *See Murphy v. Lynn*, 118 F.3d 938, 949 (2d Cir. 1997) ("[D]ismissals by the prosecution 'in the interests of justice' under N.Y. Crim. Proc. L. § 170.40, are generally considered not to be dispositions in favor of the accused." (collecting cases)); *Singer*, 63 F.3d at 118 ("As a matter of law, a dismissal in the

evidence that, after his September 2005 arraignment, he gave defendant Sardo documents indicating that the check in question was post-dated and that Cutolo, the complaining witness, no longer wished to proceed with the case. Assuming *arguendo* that there was no probable cause to continue the prosecution based on the information provided by Conte, the County defendants are protected by absolute immunity with respect to the decision to continue the ongoing prosecution. The pursuit of criminal prosecutions is within the quasi-judicial function of prosecutors, and, therefore, prosecutors are protected by absolute immunity unless they proceeded in the absence of all jurisdiction. As the Second Circuit has explained:

> In considering whether a given prosecution was clearly beyond the scope of that jurisdiction, or whether instead there was at least a colorable claim of authority, . . . we inquire whether the pertinent statutes may have authorized prosecution for the charged conduct. Once the court determines that the challenged prosecution was not clearly beyond the scope of the prosecutor's jurisdiction, the prosecutor is shielded from liability for damages for commencing and pursuing the prosecution, regardless of any allegations that his actions were undertaken with an improper state of mind or motive.

---

interest of justice cannot provide the favorable termination required as the basis for a claim of malicious prosecution." (internal quotation and alterations omitted)). Thus, plaintiff's malicious prosecution claim fails as a matter of law because he has failed to show that the proceedings terminated in his favor.

*Shmueli*, 424 F.3d at 237. As discussed above, New York Penal Law § 190.05(1) makes it a crime to issue a check with insufficient funds. Conte was charged with, and prosecuted for, issuing a bad check that was allegedly not post-dated. Plaintiff points to no evidence that Sardo, or any other defendant, acted in anything other than a prosecutorial capacity with respect to the continued prosecution of the bad check charge. Therefore, the Court concludes that defendants are absolutely immune from suit on plaintiff's malicious prosecution claim.

The Court rejects plaintiff's argument that there was no jurisdiction to prosecute the bad check charge. Moreover, whether defendants acted with malice is irrelevant. *See Shmueli*, 424 F.3d at 238 ("The allegations that the ADAs prosecuted [plaintiff] and continued with the prosecution describe only functions for which a prosecutor is normally accorded absolute immunity."); *id.* at 237-38 ("These principles are not affected by allegations that improperly motivated prosecutions were commenced or continued pursuant to a conspiracy.") Accordingly, defendants' motion for summary judgment on plaintiff's malicious prosecution claim is granted, due to absolute immunity.

(b) 2004-2006 NCDAO Investigation

To the extent plaintiff attempts to base a malicious prosecution claim on the NCDAO's 2004-2006 investigation of alleged wrongdoing by Conte apart from the bad check charge, such a claim also fails as a matter of law. Defendants concede that absolute immunity would not cover the investigation in question. (*See* County Defs.' Br. at 18-19.) However, there is no dispute that the investigation closed in August 2006 without the initiation of formal charges, court proceedings, or arrest. Thus, there was no seizure for Fourth Amendment purposes. *See Rolon v. Henneman*, 517 F.3d 140, 147 (2d Cir. 2008) ("[Plaintiff] suffered no 'seizure' within the meaning of the Fourth Amendment. He was not imprisoned or detained, and he was never the subject of a criminal prosecution." (rejecting § 1983 malicious prosecution claim); *Washington v. Cnty. of Rockland*, 373 F.3d 310, 316 (2d Cir. 2004) (rejecting § 1983 malicious prosecution claim where plaintiffs were "never taken into custody, imprisoned, physically detained or seized within the traditional meaning of the Fourth Amendment"); *see also Zahrey*, 221 F.3d at 354 ("The use of fabricated evidence, unaccompanied by [a deprivation of a liberty interest], no more impairs liberty than does the initial fabrication of evidence, unaccompanied by such consequences. For example, in [plaintiff's] case, his liberty was not impaired until, after the evidence was both fabricated and used by introducing it in evidence before the grand jury, an indictment was later returned and [plaintiff] was later arrested."); *Murphy v. Lynn*, 118 F.3d 938, 944 (2d Cir. 1997) ("[S]ince the gist of a claim for malicious prosecution is abuse of the judicial process, a plaintiff pursuing such a claim under § 1983 must show that the seizure resulted from the initiation or pendency of judicial proceedings."); *cf. Hartman v. Moore*, 547 U.S. 250, 262 n.9 (2006) ("No one here claims that simply conducting a retaliatory investigation with a view to promote a prosecution is a constitutional tort. . . . Whether the expense or other adverse consequences of a retaliatory investigation would ever justify recognizing such an investigation as a distinct

constitutional violation is not before us."). Accordingly, plaintiff's malicious prosecution claim with respect to the 2004-2006 NCDAO investigation fails as a matter of law.[22]

Moreover, a claim of malicious prosecution requires that the plaintiff prove the initiation or continuation of a criminal proceeding against plaintiff. *See Rosario v. Amalgamated Ladies' Garment Cutters' Union, Local 10, I.L.G.W.U.*, 605 F.2d 1228, 1249 (2d Cir. 1979). As previously noted, there is no dispute that the County defendants closed the investigation of Conte and I Media in August 2006 without initiating formal charges or court proceedings, or arresting of plaintiff. Accordingly, plaintiff is unable, as a matter of law, to demonstrate that criminal proceedings were initiated or continued against him. *See, e.g.*, *Phillips v. DeAngelis*, 571 F. Supp. 2d 347, 353-54 (N.D.N.Y. 2008) ("The requirement that a plaintiff show an initiation or continuation of a criminal proceeding by the defendant may be satisfied by a showing that the defendant filed formal charges and caused the plaintiff to be arraigned."); *Carson v. Lewis*, 35 F. Supp. 2d 250, 263 (E.D.N.Y. 1999) ("An indictment is the legal process commencing the prosecution when an arrest is effectuated without a warrant."); *Haughton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 717 N.Y.S.2d 156, 156-57 (App. Div. 2000) ("In any event, regardless of which set of factual

allegations is considered, it is clear that plaintiff's detention by Scotland Yard in 1992 was pursuant to valid legal process, and that defendants' act of informing the authorities that someone had been attempting to sell stolen bonds does not constitute a ground for a claim of false arrest or conspiracy to cause false arrest. In addition, because no criminal proceeding was ever commenced against plaintiff, he has no viable claim for malicious prosecution." (citation omitted)).

In sum, the County defendants' motion for summary judgment on plaintiff's malicious prosecution claim is granted with respect to the investigation surrounding the bad check charge due to the applicability of absolute immunity, and with respect to the NCDAO 2004-06 investigation because plaintiff has not identified a seizure (within the meaning of the Fourth Amendment) or initiation of criminal proceedings upon which to predicate such a claim. For the same reasons, plaintiff's motion for summary judgment on his malicious prosecution claim is denied.

### C. Abuse of Process

Plaintiff alleges an abuse of process claim against the County defendants. For the reasons set forth below, both the County defendants' and plaintiff's motions for summary judgment on this claim are denied.

### 1. Legal Standard

In order to establish liability for malicious abuse of process under § 1983, a plaintiff must establish the claim's elements under state law as well as the deprivation of a constitutional right. *See Cook v. Sheldon*, 41 F.3d 73, 79-80 (2d Cir. 1994). A plaintiff may assert a

---

[22] To the extent plaintiff claims that he was maliciously prosecuted in violation of the First Amendment, *see Singer*, 63 F.3d at 116 n.5 ("It is theoretically possible . . . for a plaintiff to premise a malicious prosecution claim on some other constitutional right."), the Court rejects such a claim for the reasons discussed *infra*.

malicious abuse of process claim where a defendant: "(1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse [or] justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." *Savino* 331 F.3d at 76 (quoting *Cook*, 41 F.3d at 80); *see also Sullivan v. LaPlante*, No. 1:03 CV 359 (OGS), 2005 WL 1972555, at *3 (N.D.N.Y. Aug. 16, 2005) ("[A]buse of criminal process is actionable under § 1983 as a denial of procedural due process." (citing *Cook*, 41 F.3d at 80)); *Dickerson v. Monroe Cnty. Sheriff's Dep't*, 114 F. Supp. 2d 187, 192 (W.D.N.Y. 2000) ("'In the criminal context, malicious abuse of process is by definition a denial of procedural due process.'" (quoting *Cook*, 41 F.3d at 80))).

### 2. Application

Plaintiff argues that the County defendants used legal process, *i.e.*, the bad check charge as well as subpoenas issued in connection with the 2004-2006 investigation, to harm plaintiff, without justification, and did so with the collateral purposes of harming plaintiff's business and extracting civil settlements for the various complaining route distributors who had claims against Conte.

#### a. Legal Process

Plaintiff's claim of malicious abuse of process regarding the bad check charge satisfies the legal process requirement. "'Bringing a defendant before a judge for arraignment satisfies the first element' of an abuse of process claim." *Cornett v. Brown*, No. 04-CV-0754 (DGT) (LB), 2006 WL

845568, at *15 (E.D.N.Y. Mar. 30, 2006) (finding the legal process element satisfied when "following his June 26 arrest, plaintiff was arraigned and subsequently released on his own recognizance" (quoting *Shain v. Ellison*, 273 F.3d 56, 68 (2d Cir. 2001))). As discussed earlier, Conte was arraigned on the bad check charge on September 7, 2005. (Pl.'s Aff. ¶ 34.) Thus, the legal process element is satisfied with respect to the bad check charge.

Defendants also used subpoenas in connection with the 2004-2006 investigation of Conte and I Media. (*See* Pl.'s Ex. BBB, FFF, LLL; County Defs. Ex. K; Pl's 1/11/10 Aff. ¶¶ 76, 82.). Subpoenas may also constitute legal process for purposes of an abuse of process claim. *See Coakley v. Jaffe*, 49 F. Supp. 2d 615, 627 (S.D.N.Y. 1999) ("[T]he Amended Complaint alleges that the defendants caused the issuance of Grand Jury subpoenas, indictments, and arrest warrants, for the improper collateral purpose of influencing the civil proceedings brought by defendant Jaffe, with the result that Jaffe won a tainted and incorrect judgment based on inadmissible evidence. These facts, if proven, would establish the three essential elements of an abuse of process claim—regularly issued process, an intent to do harm without justification, and misuse of process for a collateral purpose." (internal citations omitted)); *Lukowski v. County of Seneca*, No. 08-CV-6098, 2009 WL 467075, at *8 (W.D.N.Y. Feb. 24, 2009) (finding that plaintiffs adequately alleged an abuse of process claim when they asserted that subpoenas were not issued for a proper purpose or to obtain necessary information); *Rodrigues v. City of N.Y.*, 602 N.Y.S.2d 337, 341-42 (App. Div. 1993) (stating that there was no absolute prosecutorial immunity for issuance of subpoenas in connection with investigation

without grand jury)); *see also Morse v. Cnty. of Seneca*, 08-CV-6231, 2009 U.S. Dist. LEXIS 75973, at *10-14 (W.D.N.Y. Aug. 26, 2009) (finding that a "request" to issue subpoenas, as opposed to the actual issuance of subpoenas, did not constitute regularly issued legal process, particularly when done by an individual without the authority to issue subpoenas, because "such a 'request' is voluntary or optional and does not direct or compel any action. Accordingly, it is not 'legal process'" (citation omitted)).

Thus, the Court finds that the first element of a claim of malicious abuse of process, namely the use of legal process, is satisfied with respect to Conte's claims regarding the bad check charge and the NCDAO's 2004-2006 investigation.

b. Intent and Collateral Purpose

A claim of malicious abuse of process requires process be issued with intent to do harm without excuse or justification, for a collateral objective outside the legitimate ends of process. In evaluating these elements, the Second Circuit expressly distinguishes between a "malicious motive" and an "improper purpose"; only the latter suffices to meet the "collateral objective" prong of the abuse of process standard. *See Savino*, 331 F.3d at 77 ("In order to state a claim for abuse of process, a plaintiff must establish that the defendants had an improper purpose in instigating the action. . . . '[I]mproper motive is not enough.'" (quoting *Dean v. Kochendorfer*, 143 N.E. 229 (N.Y. 1924))); *see also Roeder v. Rogers*, 206 F. Supp. 2d 406, 414 (W.D.N.Y. 2002) (dismissing abuse of process claim on summary judgment because "malicious motive, without more, does not give rise to

[such] a cause of action" (citation and quotation marks omitted)); *Curiano v. Suozzi*, 469 N.E.2d 1324, 1326-27 (N.Y. 1984) ("A malicious motive alone . . . does not give rise to a cause of action for abuse of process."). Accordingly, to state a claim for abuse of criminal process, "it is not sufficient for a plaintiff to allege that the defendants were seeking to retaliate against him by pursuing his arrest and prosecution. Instead, he must claim that they aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution." *Savino*, 331 F.3d at 77.

Plaintiff contends that defendants had several collateral purposes in bringing the bad check charges against plaintiff and issuing subpoenas (including at least one to plaintiff) in connection with the 2004-2006 investigation of Conte and I Media. Specifically, plaintiff contends that defendants' collateral purposes were (1) to obtain a refund for complainant Cutolo; (2) to extort refunds and financial settlements for various other complainants; and (3) to ruin his business. (*See, e.g.*, Pl.'s MSJ Br. at 23-26.) The Court determines that there are disputed issues of fact with respect to this issue. In particular, Conte also asserts that, when he met with Zwicker regarding the bad check charge, Zwicker insisted that the only way the charges would be dropped would be if he paid Cutolo $2,500. (*Id.* ¶ 30.) The Court also notes that in an August 25, 2006 memo from ADA Wallace to ADA Emmons, Wallace discussed the details of the investigation of Conte, and stated that:

Following our subpoenas, the accused retained the services of attorney John Halton. Investigator Falzarano and I met with Mr. Halton who initially argued that the case was really a civil matter. After reviewing the evidence

with Mr. Halton, it appeared that the accused might be willing to make restitution to the individuals who had complained. This never materialized, however, and Mr. Halton was subsequently dismissed.

(County Defs Ex. K, NCDAO Inter-Departmental Memo, Aug. 25, 2006.) Plaintiff also submitted an affidavit in which he stated that on April 8, 2005, Falzarano served plaintiff with a subpoena. (Pl.'s 1/11/10 Aff. ¶¶ 90-97; Pl.'s Ex. LLL.) Plaintiff asserts that when Falzarano was serving the subpoena, Falzarano grabbed plaintiff's hand, applied intense pressure, and stated "I'll get you." (Pl.'s 1/11/10 Aff. ¶¶ 91-93.) Plaintiff also asserts that subpoenas were issued in an attempt to ruin his business by destroying his business relationships with existing route distributors, printers, and other business associates.

The Court concludes that genuine issues of material fact exist as to the collateral purpose and intent of the NCDAO in pursuing the bad check charge and the 2004-2006 investigation of Conte. Accepting all plaintiff's evidence as true, and drawing all reasonable inferences in his favor, there remain disputed issues of fact regarding whether the bad check prosecution was continued (even after Cutolo requested it be dropped), numerous subpoenas were issued, and alleged statements were made to various customers as part of a collateral effort to force Conte to return money to various customers and/or to destroy Conte's business. *See, e.g., Cabble v. City of N.Y.*, No. 04 CV 9413 (LTS), 2009 WL 890098, at *4 (S.D.N.Y. Mar. 30, 2009) ("[T]he New York Court of Appeals has cited the infliction of economic harm, extortion, blackmail, and

retribution as examples of the types of collateral objectives at which the abuse of process tort is aimed." (citation omitted)); *Lukowski*, 2009 WL 467075, at *8 ("Getman contends that plaintiffs have failed to allege that the subpoenas in question were not issued for a proper purpose or to obtain necessary information. Assuming the truth of the facts pleaded in the Complaint along with every favorable inference, plaintiffs have adequately plead all three elements of the abuse of process claim. The Court finds that apart from impugning defendants' motives, plaintiffs have alleged that defendants used the subpoena for anything other than obtaining testimony and documents from plaintiffs, which are the purposes for which a subpoena is used. Accordingly, these are 'collateral objectives' outside the legitimate ends of the process."); *VanZandt v. Fish & Wildlife Serv.*, 524 F. Supp. 2d 239, 246-47 (W.D.N.Y. 2007) ("The Court determines that the complaint is sufficient to allege that Kiley abused the warrant process in order to steal valuable property from Plaintiffs, property she had seen during her visit to the house in an undercover capacity. The Court finds that the factual allegations in the Third Count are sufficient to raise a right to relief above the speculative level."); *Ostroski v. Town of Southold*, 443 F. Supp. 2d 325, 341 n.6 (E.D.N.Y. 2006) ("At oral argument, counsel for plaintiff suggested that the defendant officers may have had the improper objective of attempting to deter plaintiff from filing a civil rights lawsuit. Although this would constitute a proper collateral objective and pleading such might allow a plaintiff to survive a motion to dismiss, plaintiff has failed to point to any evidence in the record that supports this theory of collateral objective for the purposes of the instant summary judgment motion."); *Granito v. Tiska*, 181 F. Supp. 2d 106, 118 (N.D.N.Y.

2001) ("Plaintiff has also alleged that the process was used for the collateral purpose of intimidating and embarrassing Plaintiff, and that it had this effect. Plaintiff alleges that his speech was chilled, and that he suffered emotional distress due to the events surrounding his arrests and prosecutions. He further alleges that he ceased to oppose the junkyard following these events. Thus, Plaintiff has put forward evidence that the purpose of the action against him was not to stop him from unlawfully trespassing, but to stifle his opposition to the junkyard. Consequently, Plaintiff has stated a claim for abuse of process and Defendant Hrazanek's motion is denied."); *cf. Doctor's Assocs., Inc. v. Weible*, 92 F.3d 108, 114 (2d Cir. 1996) ("Examples of such overt misuse during the legal proceedings include: (i) using the pleadings as leverage to coerce the payment of a debt or surrendering of property unrelated to the litigation; (ii) using unreasonable force, excessive attachment or extortionate methods to enforce a right of action; or (iii) using the process to gain a collateral advantage extraneous to the merits, *e.g.*, improper use of a subpoena." (internal citations omitted)) (applying Connecticut law). Thus, disputed issues of fact prevent the Court from granting summary judgment to either party on the malicious abuse of process claim.

### c. Immunity

In response to plaintiff's claims of malicious abuse of process, the County defendants argue that, to the extent plaintiff's claims are based on the bad check charge, they are entitled to absolute immunity. (County Defs.' Br. at 18.) However, for the reasons extensively discussed above, the County defendants are not entitled to absolute immunity for the investigation that led to the filing of the information against Conte. *See, e.g.*, *Rodrigues*, 602 N.Y.S.2d at 341 ("Defendants argue that prosecutorial activities which relate to grand jury proceedings are quasi-judicial acts absolutely immune from liability. This argument overlooks the fact that no grand jury had been convened and that defendants are alleged to have used the subpoenas for the purpose of conducting their own investigation into plaintiffs' affairs."). Moreover, even if probable cause existed, which this Court cannot determine at this juncture for the reasons discussed *supra*, probable cause is not an absolute defense to a claim of abuse of process. Probable cause, as such, is not an element of the tort of abuse of process. *See Music Ctr. S.N.C. v. Prestini Musical Instruments Corp.*, 874 F. Supp. 543, 556 (E.D.N.Y. 1995). Nor is the existence of probable cause determinative of a claim of malicious abuse of process.[23] *See Lodges 743 and 1746, Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. United Aircraft Corp.*, 534 F.2d 422, 465 n.85 (2d Cir. 1975) ("Since the Company unquestionably had probable cause to file a suit in this case, there is no allegation of malicious prosecution. Abuse of process, however, does not depend upon whether or not the action was brought without probable cause or upon the outcome of the litigation."); *VanZandt*, 524 F. Supp. 2d at 247 ("[P]rocess properly issued on probable

---

[23] At least one court has articulated the relevance of the probable cause inquiry in the context of an abuse of process claim as follows: "the absence of probable cause is probative of the lack of justification for the officers' actions and the existence of a collateral objective." *Phelps v. City of N.Y.*, No. 04 CIV. 8570 (DLC), 2006 WL 1749528, at *5 (S.D.N.Y. June 27, 2006).

cause can nonetheless be abused.").[24] This is because "process properly issued on probable cause can nonetheless be abused." *Id.* at 247.[25] The Second Circuit has stated that "'the gist of the tort' of abuse of process, [as] distinguished from malicious prosecution, 'is not commencing an action or causing process to issue without justification, but misusing or misapplying process *justified in itself* for an end other than that which it was designed to accomplish. The purpose for which the process is used, once it is issued, is the only thing of importance.'" *Weiss v. Hunna*, 312 F.2d 711, 717 (2d Cir. 1963) (emphasis added) (citing Prosser, Torts, at 667-68 (2d ed. 1955)). The County defendants do not specifically respond to Conte's claim with respect to the issuance of subpoenas during the 2004-2006 investigation. However, as discussed extensively *supra*, absolute immunity does not apply to a prosecutor's investigatory actions.

----

[24] *But see, e.g.*, *Hickey v. City of N.Y.*, No. 01 Civ. 6506 (GEL), 2004 WL 2724079, at *7 (S.D.N.Y. Nov. 29, 2004) (concluding that probable cause offers a complete defense to an abuse of process claim); *Granato v. City of N.Y.*, No. 98 Civ. 667, 1999 WL 1129611, at *7 (E.D.N.Y. Oct. 18, 1999) (probable cause an "excuse or justification" that defeats abuse of process claim).

[25] *But see Granato*, 1999 WL 1129611, at *7 ("[I]t is no less true under New York law that a showing of probable cause at the time process issued suffices also to establish 'excuse or justification' for the purposes of a defense to abuse of process."); *Berman v. Silver, Forrester & Schisano*, 549 N.Y.S.2d 125, 127 (App. Div. 1989) ("The plaintiffs have failed to demonstrate that the defendants intended to harm them by instituting the prior action. Rather, the defendants had probable cause to commence the prior action for specific performance.").

There are also factual issues regarding whether defendants are entitled to qualified immunity with respect to their actions related to the issuance of process. As discussed *supra*, even when not shielded by absolute immunity, government actors may be entitled to qualified immunity if their "conduct did not violate plaintiff's clearly established rights, or if it would have been objectively reasonable for the official to believe that his conduct did not violate plaintiff's rights." *Mandell*, 316 F.3d at 385. The constitutional right to be free from a malicious abuse of process is well established and was clearly established at the time of the alleged abuse of process in the instant case. *See Jovanovic v. City of N.Y.*, No. 04 Civ. 8437 (PAC), 2006 WL 2411541, at *12 (S.D.N.Y. Aug. 17, 2006) ("If Plaintiff is able to provide additional facts to support his abuse of process claim, then he will have adequately alleged the violation of his constitutional right to be free from malicious abuse of process, as guaranteed by the Fourteenth Amendment's procedural due process clause. This constitutional right was clearly established at the time that Bonilla arrested Jovanovic and filed charges against him in 1996."); *Phelps*, 2006 WL 1749528, at *8 ("There can be no dispute that the prohibitions against arrest without probable cause, malicious prosecution, and malicious abuse of process are clearly established under the law."); *see also Cook*, 41 F.3d at 80 (declaring, in 1994, that, "[i]n the criminal context, malicious abuse of process is 'by definition a denial of due process'" (citation omitted)). If, as alleged by plaintiff, defendants used legal process to compel plaintiff to settle with and/or refund other complainants, or to destroy plaintiff's business, and defendants acted with the intent to do harm without excuse or justification, then they will not be entitled to qualified immunity on plaintiff's abuse of process claims. Having carefully reviewed the

record in this case, the Court determines that, based on the arraignment of and issuance of subpoenas to plaintiff, there are genuine issues of disputed fact as to whether defendants attempted to use this process for an end other than that which it was designed to accomplish. Accordingly, defendants' and plaintiff's motions for summary judgment on this claim is denied.[26]

## D. First Amendment

---

[26] The Court notes that, in order to determine the availability of the qualified immunity defense in this case at trial, the Court is prepared to follow the procedures set forth by the Second Circuit in *Zellner v. Summerlin*, 494 F.3d 344, 367-68 (2d Cir. 2007). Specifically, although "the ultimate question of whether it was objectively reasonable for [defendants] to believe that [their] conduct did not violate a clearly established right, i.e., whether officers of reasonable competence could disagree as to the lawfulness of such conduct, is to be decided by the court," *id.* at 367, the jury must first "resolve[] any disputed facts that are material to the qualified immunity issue." *Id.* at 368. Further, "[t]o the extent that a particular finding of fact is essential to a determination by the court that the defendant is entitled to qualified immunity, it is the responsibility of the defendant to request that the jury be asked the pertinent question. *Id.* (citations omitted) (noting that "if the defendant does not make such a request, he is not entitled to have the court, in lieu of the jury, make the needed factual finding"). In particular, "'the jury should decide these issues on special interrogatories.'" *Id.* (quoting *Warren v. Dwyer*, 906 F.2d 70, 76 (2d Cir. 1990)). Once the jury has determined these factual issues, the Court will—if necessary—afford defendants an additional opportunity to renew their motion with respect to qualified immunity. *See, e.g.*, *id.* at 364.

Plaintiff alleges that all of the defendants deprived him of his First Amendment right to free speech and free association. Specifically, plaintiff alleges that by spreading false accusations against him, defendants caused the failure of plaintiff's publishing business, resulting in a deprivation of his First Amendment rights. The Court rejects this argument and, for the reasons set forth below, grants defendants' motions with respect to plaintiff's First Amendment claims.

### 1. Legal Standard

The Second Circuit has held that "'First Amendment rights may be violated by the chilling effect of governmental action that falls short of a direct prohibition against speech.'" *Zieper v. Metzinger*, 474 F.3d 60, 65 (2d Cir. 2007) (quoting *Aebisher v. Ryan*, 622 F.2d 651, 655 (2d Cir. 1980)). The First Amendment prohibits government officials from encouraging the suppression of speech in a manner which "can reasonably be interpreted as intimating that some form of punishment or adverse regulatory action will follow the failure to accede to the official's request." *Hammerhead Enters., Inc. v. Brezenoff*, 707 F.2d 33, 39 (2d Cir. 1983). In determining whether a particular request to suppress speech is constitutional, what matters is the "distinction between attempts to convince and attempts to coerce." *Okwedy v. Molinari*, 333 F.3d 339, 344 (2d Cir. 2003) (per curiam). "To recover on a [F]irst [A]mendment claim under § 1983, a plaintiff must demonstrate that his conduct is deserving of [F]irst [A]mendment protection and that the defendants' conduct of harassment was motivated by or substantially caused by his exercise of free speech." *Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 58 (2d Cir. 1987) (citation omitted); *see also Curley*, 268 F.3d at

73 ("Specific proof of improper motivation is required in order for plaintiff to survive summary judgment on a First Amendment retaliation claim." (citation omitted)).

## 2. Application

As a threshold matter, to the extent plaintiff alleges that defendants deprived him of a constitutional right merely by defaming him, *i.e.*, spreading false accusations of criminal wrongdoing about him and his business, such a § 1983 claim fails as a matter of law. "Defamation . . . is an issue of state law, not of federal constitutional law, and therefore provides an insufficient basis to maintain a § 1983 action." *Sadallah v. City of Utica*, 383 F.3d 34, 38 (2d Cir. 2004). As discussed in this Court's March 31, 2008 Memorandum and Order, "[e]ven palpably false statements by a government actor will not support a § 1983 claim if the only injury is to the plaintiff's reputation." *Conte*, 2008 WL 905879, at *15; *see also Paul v. Davis*, 424 U.S. 693, 712 (1976).

In any event, plaintiff's First Amendment claims fail because he has failed to point to any evidence of a causal connection between protected First Amendment activity and defendants' alleged conduct. Plaintiff alleges that defendants' investigation and prosecution of him were motivated by a desire to destroy his business and to obtain civil settlements for various route distributors. However, there is absolutely no evidence indicating, that defendants were motivated by a desire to suppress the content or views expressed in Conte's publications or that defendants' conduct was otherwise motivated by protected First Amendment

activity.[27] The mere fact that Conte happens to have been involved in the business of publishing does not by itself implicate the First Amendment in this case. *See Alexander v. United States*, 509 U.S. 544, 557 (1993) ("[C]riminal and civil sanctions having some incidental effect on First Amendment activities are subject to First Amendment scrutiny 'only where it was conduct with a significant expressive element that drew the legal remedy in the first place . . . .'" (quoting *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 706-07 (1986))); *see also Glickman v. Wileman Bros. & Elliott, Inc.*, 521 U.S. 457, 470 (1997) ("The First Amendment has never been construed to require heightened scrutiny of any financial burden that has the incidental effect of constraining the size of a firm's advertising budget. The fact that an economic regulation may indirectly lead to a reduction in a handler's individual advertising budget does not itself amount to a restriction on speech."). Accordingly, because plaintiff has failed to point to any evidence whatsoever of a causal connection between expressive activity and defendants' alleged conduct, defendants' motions for summary judgment on plaintiff's First Amendment claims are granted. *See Ferran v. Town of Nassau*, 471 F.3d 363, 370 (2d Cir. 2006) ("[N]othing in the record indicates that [plaintiffs' First Amendment activity] 'prompted or substantially caused' the Town to commit any of the acts alleged in the complaint.") (affirming summary judgment on First Amendment retaliation claim); *Curley*, 268 F.3d at 73 (rejecting conclusory allegation that defendants acted "out of mean-spiritedness and with deliberate view towards inflicting

---

[27] At oral argument, Conte conceded that he did not know "if they objected to [his] content or [him] personally," and did not argue that the defendants objected to the content of his publication.

physical and emotional injury and economic loss upon the Plaintiff because of his First Amendment protected activities") (affirming summary judgment on First Amendment retaliation claim); *see also Thomas v. Egan*, 1 F. App'x 52, 54 (2d Cir. 2001) (affirming summary judgment on First Amendment claim where plaintiff "failed to proffer evidence of defendants' motivation or that there was a causal connection between her protected conduct and defendants' actions"); *Razzano v. Cnty. of Nassau*, 599 F. Supp. 2d 345, 352 (E.D.N.Y. 2009) ("Plaintiff has failed to adequately allege . . . a causal relationship between his expressive activity and the Defendants' actions.") (granting motion to dismiss).

E. Section 1983 Conspiracy

For the reasons set forth below, defendants are entitled to summary judgment on plaintiff's § 1983 conspiracy claim.

"To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999). Because an entity cannot conspire with itself, plaintiff must show that the County defendants conspired with individuals not employed by the County. *See Varricchio v. Cnty. of Nassau*, 702 F. Supp. 2d 40, 62 (E.D.N.Y. 2010) (collecting cases). The intracorporate conspiracy doctrine posits that the officers, agents, and employees of a single corporate or municipal entity, each acting within the scope of his or her employment, are legally incapable of conspiring with each other. *See, e.g.*,

*Farbstein v. Hicksville Pub. Library*, 254 F. App'x 50, 51 (2d Cir. 2007) (affirming dismissal of conspiracy complaint "at the first step of analysis" because complaint made reference only to employees of same corporation) (citing *Herrmann v. Moore*, 576 F.2d 453, 459 (2d Cir. 1978)); *Herrmann*, 576 F.2d at 459 ("[T]here is no conspiracy [under Section 1985] if the conspiratorial conduct challenged is essentially a single act by a single corporation acting exclusively through its own . . . officers [ ] and employees, each acting within the scope of his employment."); *Rini v. Zwirn*, 886 F. Supp. 270, 292 (E.D.N.Y. 1995) ("Intracorporate immunity has also been extended to the context of conspiracies between a public entity and its employees."); *accord Cameron v. Church*, 253 F. Supp. 2d 611, 623 (S.D.N.Y. 2003); *Quinn v. Nassau Cnty. Police Dep't*, 53 F. Supp. 2d 347, 359-60 (E.D.N.Y. 1999). Therefore, in this case, plaintiff must show an agreement between the County defendants and defendants Shaska and/or Guerra to act in concert to deprive plaintiff of his First Amendment rights.[28]

_____

[28] Plaintiff does not allege any involvement by Shaska and Guerra in the alleged false arrest, malicious prosecution, or abuse of process by the County defendants. For instance, plaintiff asserts:

> The four bases of civil rights violations claimed by the plaintiff that the County defendants engaged in were violations of the plaintiff's freedom of speech and press *together* with defendants Guerra and Shaska and *separately* the plaintiff's false arrest, malicious prosecution and abuse of process claims against the County defendants that defendants Guerra and Shaska did not participate in and that the plaintiff has made clear.

(Pl.'s 4/12/10 Guerra Opp. Aff. ¶46 (emphasis

However, as discussed above, plaintiff's First Amendment claim does not survive summary judgment. Because there is no underlying constitutional violation on which to base his § 1983 conspiracy claim, plaintiff's conspiracy claim fails as a matter of law. *See Curley*, 268 F.3d at 72 ("Since plaintiff cannot establish a claim for false arrest or the use of excessive force, he may not maintain a § 1983 cause of action for conspiracy."); *Singer*, 63 F.3d at 119 ("[A]lthough the pleading of a conspiracy will enable a plaintiff to bring suit against purely private individuals, the lawsuit will stand only insofar as the plaintiff can prove the *sine qua non* of a § 1983 action: the violation of a federal right."); *see, e.g.*, *Graham v. City of Albany*, Civ. No. 08-892 (RFT), 2009 WL 4263510, at *12 (N.D.N.Y. Nov. 23, 2009) ("Although Plaintiff has alleged physical injuries that resulted from her collision with [defendant], those alleged injuries were not the result of the alleged conspiracy to cover-up his crime. Therefore, because plaintiff has not stated a valid constitutional injury as a result of the alleged conspiracy, her conspiracy claims are dismissed."). Accordingly, defendants' motions for summary judgment on plaintiff's conspiracy claim are granted, and plaintiff's motion for

summary judgment on this claim is denied.[29]

## F. Municipal Liability

Plaintiff alleges that the County is liable for the alleged constitutional violations discussed above.[30] For the reasons set forth below, the Court is unable to conclude based on the record in this case, and drawing all reasonable inferences from the evidence in plaintiff's favor, that defendants are entitled to summary judgment on plaintiff's *Monell* claim against the County with respect to plaintiff's false arrest and abuse of process claims. The denial is without prejudice to defendants renewing the motion prior to the jury's receipt of the case.

### 1. Legal Standard

#### a. Evidence of Municipal Custom or Policy

The Supreme Court expressly rejected

---

added); *see also id.* ¶ 49; Pl.'s 4/12/10 Shaska Opp. Aff. ¶¶ 32, 37.) Although plaintiff asserts several state law claims against Shaska and Guerra related to the 2004-06 NCDAO investigation, plaintiff points to no evidence indicating that Shaska and Guerra were involved in the other alleged *constitutional* violations. Thus, plaintiff cannot proceed on a conspiracy claim with respect to his false arrest or abuse of process claims because the alleged conduct was performed by employees of a single entity, Nassau County.

[29] Because the Court concludes that plaintiff's conspiracy claim fails in the absence of an underlying First Amendment violation, the Court need not address the parties' arguments regarding an agreement or lack thereof between the County defendants and Shaska and/or Guerra.

[30] To the extent plaintiff attempts to assert claims against the NCDAO itself, the Court already dismissed such claims in its Memorandum and Order dated March 31, 2008. In any event, claims against the NCDAO are generally barred by the doctrine of sovereign immunity. *See, e.g.*, *McFadden v. City of N.Y.*, No. 10-CV-1176 (RRM) (VVP), 2010 WL 1930268, at *1 (E.D.N.Y. May 11, 2010) (collecting cases); *Bankhead v. Chu*, No. 10-CV-0510 (NGG) (LB), 2010 WL 935371, at *2 (E.D.N.Y. Mar. 11, 2010). However, for the reasons discussed *infra*, plaintiff's *Monell* claim against Nassau County based on the alleged conduct of the NCDAO survives summary judgment.

liability pursuant to a theory of *respondeat superior* for purposes of § 1983 in *Monell v. Department of Social Services. See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978) ("[A] municipality cannot be held liable solely because it employs a tortfeasor-or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory."). Thus, "[a] municipality will not be held liable under § 1983 unless plaintiffs can demonstrate that the allegedly unconstitutional action of an individual law enforcement official was taken pursuant to a policy or custom officially adopted and promulgated by that [municipality's] officers." *Abreu v. City of N.Y.*, No. 04-CV-1721, 2006 U.S. Dist. LEXIS 6505, at *11 (E.D.N.Y. Feb. 22, 2006) (quotation marks omitted) (citing *Monell*, 436 U.S. at 690). However, "'the mere assertion . . . that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference.'" *Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir. 1995) (quoting *Dwares v. City of N.Y.*, 985 F.2d 94, 100 (2d Cir. 1993)). The plaintiff in a § 1983 action bears the burden of establishing municipal liability. *See Vippolis v. Vill. of Haverstraw*, 768 F.2d 40, 44 (2d Cir. 1985).

b. Policymakers

In addition to demonstrating directly that a municipality has a custom or policy that led to a constitutional violation, the Second Circuit has held that a plaintiff may demonstrate municipal liability by showing that a municipal "policymaker" violated plaintiff's constitutional rights:

Where plaintiffs allege that their rights

were deprived not as a result of the enforcement of an unconstitutional official policy or ordinance, but by the unconstitutional application of a valid policy, or by a [municipal] employee's single tortious decision or course of action, the inquiry focuses on whether the actions of the employee in question may be said to represent the conscious choices of the municipality itself. Such an action constitutes the act of the municipality and therefore provides a basis for municipal liability where it is taken by, or is attributable to, one of the [municipality's] authorized policymakers.

*Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 126 (2d Cir. 2004); *see also Gronowski v. Spencer*, 424 F.3d 285, 296 (2d Cir. 2005) ("Municipal liability may attach under § 1983 when a [municipal] policymaker takes action that violates an individual's constitutional rights."); *Davis v. Lynbrook Police Dep't*, 224 F. Supp. 2d 463, 478 (E.D.N.Y. 2002) ("A plaintiff can show a municipal custom, policy or practice by establishing that an official who is a final policymaker directly committed or commanded the constitutional violation. . . ."). Indeed, "[e]ven one episode of illegal retaliation may establish municipal liability under § 1983 if ordered by a person whose edicts or acts represent official city policy." *Gronowski*, 424 F.3d at 296; *see also Amnesty Am.*, 361 F.3d at 126 ("Thus, even a single action by a decisionmaker who 'possesses final authority to establish municipal policy with respect to the action ordered' is sufficient to implicate the municipality in the constitutional deprivation for the purposes of § 1983." (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481-82 (1986)). "Whether the official in question possessed final

policymaking authority is a legal question, which is to be answered on the basis of state law. . . . The relevant legal materials[] include state and local positive law, as well as custom or usage having the force of law." *Jeffes v. Keenan*, 208 F.3d 49, 57 (2d Cir. 2000). Specifically, "'[t]he matter of whether the official is a final policymaker under state law is to be resolved by the trial judge *before* the case is submitted to the jury.'" *Richardson v. Metro. Dist. Comm'n*, No. 3-00-CV-1062, 2003 U.S. Dist. LEXIS 12757, at *20 (D. Conn. July 23, 2003) (quoting *Jeffes*, 208 F.3d at 57).

In particular, where a municipal official "'has final authority over significant matters involving the exercise of discretion,' his choices represent government policy." *Gronowski*, 424 F.3d at 296 (quoting *Rookard v. Health & Hosps. Corp*, 710 F.2d 41, 45 (2d Cir. 1983)); *see also Diodati v. City of Little Falls*, No. 6:04-CV-446, 2007 U.S. Dist. LEXIS 4322, at *6 (N.D.N.Y. Jan. 18, 2007) ("A policymaker is an individual whose 'decisions, at the time they are made, for practical or legal reasons constitute the municipality's final decisions.'" (quoting *Anthony v. City of N.Y.*, 339 F.3d 129, 139 (2d Cir. 2003) (internal citation and quotation marks omitted)). Moreover, "the official in question need not be a municipal policymaker for all purposes. Rather, with respect to the conduct challenged, he must be responsible under state law for making policy *in that area* of the [municipality's] business." *Jeffes*, 208 F.3d at 57 (citation and quotation marks omitted) (emphasis in original). "Thus, the court must ask whether [the] governmental official [is a] final policymaker[] for the local government in a particular area, or on [the] particular issue involved in the action." *Id.* (citations and

quotation marks omitted); *see also Doe v. City of Waterbury*, 453 F. Supp. 2d 537, 543 (D. Conn. 2006) ("The critical inquiry is not whether an official *generally* has final policymaking authority; rather, the court must specifically determine whether the government official is a final policymaker with respect to the particular conduct challenged in the lawsuit.") (emphasis in original). However, "[a]lthough the official in question does not have to be a final policymaker for all purposes, but only with respect to the conduct challenged, simply exercising discretion in an area where that official is not the final policymaker under state law cannot, by itself, establish municipal liability." *Barry v. N.Y. City Police Dep't*, No. 01 Civ. 10627, 2004 U.S. Dist. LEXIS 5951, at *43 (S.D.N.Y. Apr. 7, 2004); *see also Diodati*, 2007 U.S. Dist. LEXIS 4322, at *6 ("An individual who merely has discretion to handle a particular situation is not a policymaker."); *Richardson*, 2003 U.S. Dist. LEXIS 12757, at *20 ("Mere discretion in the performance of his duties is not sufficient. However, the official need only have the power to make official policy on a particular issue."). On the other hand, where a policymaker "exceeded the bounds of the authority granted to him," his actions "cannot be fairly said to represent official policy." *Doe v. City of Waterbury*, 453 F. Supp. 2d 537, 544 (D. Conn. 2006) ("[A]lthough Giordano is generally a final policymaker for Waterbury, Giordano's specific actions in this case cannot be fairly said to represent official policy, because under state law, he exceeded the bounds of the authority granted to him.")

2. Application

(i) Nature of NCDAO's Action

Defendants argue that they cannot be

subjected to liability because the NCDAO's actions were done in a prosecutorial capacity. When a district attorney ("DA") acts in a prosecutorial capacity, defendants argue, the DA acts as an officer of the state, and thus, the County of Nassau cannot be held liable for the DA's actions because the DA is acting on behalf of the state, not the county.

District attorneys are generally considered to be local officers of their respective counties. *See Myers v. Cnty. of Orange*, 157 F.3d 66, 76 (2d Cir. 1998) (collecting cases). Thus, "where a district attorney acts as the manager of the district attorney's office, the district attorney acts as a county policymaker." *Pinaud v. Cnty. of Suffolk*, 52 F.3d 1139, 1153-54 n.14 (2d Cir. 1995) (internal quotation marks and alterations omitted). However, a county cannot be liable for the acts of a district attorney related to the decision to prosecute or not prosecute an individual. *See Myers*, 157 F.3d at 77; *Pinaud*, 52 F.3d at 1153-54 (finding no municipal liability for actions of ADA unless related to management of office or history of negligence). "When prosecuting a criminal matter, a district attorney in New York State, acting in a quasi-judicial capacity, represents the State, not the county." *Baez v. Hennessy*, 853 F.2d 73, 77 (2d Cir. 1988). Thus, "the County cannot be said to be responsible for the conduct at issue." *Id.*

However, when "a plaintiff's claims center[ ] not on decisions whether or not, and on what charges, to prosecute but rather on the administration of the district attorney's office, there can be liability against a New York county for an alleged malicious prosecution." *Pinaud*, 52 F.3d at 1153-54 n.14 (internal quotation marks and citation

omitted). Thus, "an allegation of deficiencies in the 'management of the [district attorney's] office' would appear to be necessary . . . in order for any claim of malicious prosecution against the County . . . to stand." *Id.* at 1153 (citation omitted).

A district attorney implementing policies regarding police investigative procedures is deemed to be acting as manager of the district attorney's office and, thus, as a county policymaker. *See Ryan v. City of Watertown*, No. 98-CV-0616, 1998 WL 709798, at *6 (N.D.N.Y. 1998). On the other hand, matters regarding whether to prosecute and what charges will be pursued involve the district attorney's prosecutorial powers and policy, and, thus, fall within her role as a state officer. *Id.*

As discussed in detail *supra*, with respect to absolute immunity, the evidence of the NCDAO's actions in the instant case relates to their investigation of Conte and I Media, and not prosecutorial functions. Under those circumstances, the rule that precludes *Monell* liability for municipalities with respect to prosecutorial actions does not apply.[31] The Supreme Court has "made clear that absolute immunity may not apply when a prosecutor is not acting as 'an officer of the court,' but is instead engaged in other tasks, say, investigative or administrative tasks." *See Van de Kamp v. Goldstein*, 129 S. Ct. 855, 861 (2009) (quoting *Imbler*, 424 U.S. at 431 n.33). Indeed, the Supreme Court has held "that absolute immunity does not apply when a

---

[31] As noted above, at oral argument, counsel for the County defendants acknowledged that the NCDAO defendants (except Sardo) were not acting pursuant to their prosecutorial powers, and, thus, are not entitled to absolute immunity.

prosecutor gives advice to police during a criminal investigation, when the prosecutor makes statements to the press, or when a prosecutor acts as a complaining witness in support of a warrant application." *Id.* The Second Circuit has found that investigatory activity by a DA's office subjected the County to *Monell* liability:

> In the instant case, the County was found liable not for ADA Brock's decision to prosecute Myers, but for a DA policy that directed the Port Jervis police and county ADAs to engage in investigative procedures that violated Myers' equal protection rights. Orange County's liability for the DA's managerial decision to implement the cross-complaint policy is on a par with a DA's "direct[ion to] the police to arrest and detain [plaintiff] without a warrant" *Clause H.* [*v. Cnty. of Oneida*], 626 N.Y.S.2d [933,] 935-36 [(App. Div. 1995)], a DA's 'long practice of ignoring evidence of police misconduct and sanctioning and covering up wrongdoing,' *Walker* [*v. City of N.Y.*], 974 F.3d [293,] 301 [(2d Cir. 1992)] (citing *Gentile* [*v. Cnty. of Suffolk*], 926 F.2d [142,] 152 n.5 [(2d Cir. 1991)]), and a DA's 'decision not to supervise or train ADAs on *Brady* and perjury issues,' *id.*, all of which would result in county liability. Thus, Orange County was properly found liable.

*Myers*, 157 F.3d at 77. The results of any investigation by the NCDAO into Conte and I Media were never submitted to a grand jury. Accordingly, because here, the NCDAO and its employees' activities were primarily based on investigating Conte and I Media, and no case was ever built against those entities, the Court concludes that the NCDAO's investigative actions were not prosecutorial, and, therefore, represented the actions of the County. *Cf. Warney v. Monroe Cnty.*, 587 F.3d 113, 123 (2d Cir. 2009) ("[A] prosecutor's function depends chiefly on whether there is pending or in preparation a court proceeding in which the prosecutor acts as an advocate."); *id.* at 124 ("The proper and useful focus for ascertaining the function being served by a prosecutor's act is therefore on the pendency of the court proceedings that engage a prosecutor as an advocate for the state."). Thus, the County may be subject to *Monell* liability for its actions incident to the 2004-2006 NCDAO investigation of plaintiff and I Media.

(ii) Basis for Liability

Having determined that the NCDAO was acting pursuant to its investigatory powers, and thus is subject to liability as part of the county, not state, the Court proceeds to examine whether municipal liability can be predicated on the basis of a municipal custom, policy, or practice or the actions of a policymaker.

(A) Custom, Policy, or Practice

Plaintiff has failed to point to any evidence in support of his allegation in the complaint that the County has a custom or policy of discriminating against individuals with criminal records. Instead, plaintiff's claims all focus around individual actions pertaining to the bad check charge against him and the NCDAO 2004-2006 investigation of plaintiff and I Media.

Plaintiff's primary support for his argument that there is an unconstitutional policy or

practice is that his criminal defense attorney, John Halton, a former NCDAO prosecutor, told him that it was the "practice, custom and policy of the Nassau DA instituted by District Attorney Denis Dillon himself to automatically and systematically prosecute individuals with criminal records like the plaintiff against whom complaints are filed." (Second Am. Compl. ¶ 47.) However, in his non-party deposition, Halton stated that he did not recall making that statement and that he "could[ not] see [him]self saying that." (*See* Halton Dep. 80.) Halton further testified that, as a former ADA, he never prosecuted a defendant based solely on the fact that he had a criminal record, nor was he aware of any practice, custom, or policy of the NCDAO to prosecute individuals with criminal records just because they had criminal records. (*Id.* at 82-83.) Plaintiff thus offers no other evidence in support of his assertion and asserts no evidentiary basis for admitting this statement of Halton, which is hearsay.[32] Accordingly, plaintiff's claims of municipal liability based upon evidence of a policy, practice, or custom are without merit.

---

[32] Plaintiff also cannot rely upon this Court's determinations regarding the policies or practices of the NCDAO in other cases currently before this Court. (*See* Conte Reply to County Aff. ¶ 98.) As an initial matter, plaintiff has not presented evidence in this case similar to the evidence presented in *Crews v. County of Nassau*, No. 06-2610 (JFB) (WDW) (E.D.N.Y.), the case to which plaintiff points. Moreover, any "evidence" of a policy or practice in the NCDAO in that case upon which plaintiff relies has not been presented at trial, and thus, there has not yet been any conclusive determination of the existence of such policy or practice in a court of law.

(B) Policymakers

Plaintiff argues that the County can be liable because defendants Wasilauksy and Emmons, who were ADAs, were supervisors at the NCDAO, and, therefore, were policymakers. (Conte Reply to County Aff. ¶¶ 93-97.) The question of whether a person is a municipal policymaker is a question of law for the Court. *See Frank v. Relin*, 1 F.3d 1317, 1327 (2d Cir. 1993). Municipal liability may not be based solely on the misconduct of non-supervisory employees. *See Monell*, 436 U.S. at 691. "[O]nly actions by officials relatively high up in the municipal hierarchy will produce municipal liability." *Walker*, 974 F.2d at 297.

The case law in this Circuit has often determined that ADAs are not policymakers for purposes of municipal liability. *See, e.g.*, *Weir v. City of N.Y.*, No. 05 Civ. 9268 (DFE), 2008 WL 3363129, at *7 (S.D.N.Y. Aug. 11, 2008) (holding that assistant district attorneys were not policymakers for purposes of *Monell* liability); *Longi v. Cnty. of Suffolk*, No. CV-02-5821 (SJF) (WDW), 2008 WL 858997, at *5 (E.D.N.Y. Mar. 27, 2008) (holding that investigators at district attorney's office were not policymakers for purposes of *Monell* liability) (collecting cases); *Feerick v. Sudolnik*, 816 F. Supp. 879, 886-87 (S.D.N.Y. 1993) (holding that ADAs were DA's "subordinates" and their actions in obtaining indictment were "individual exercises of judgment and did not reflect municipal policy"), *aff'd*, 2 F.3d 403 (2d Cir. 1993); *see also, e.g.*, *Peterson v. Tomaselli*, 469 F. Supp. 2d 146, 169-70 (S.D.N.Y. 2007) (holding that subordinate prosecutor was not policymaker because, even though he supervised 15-20 people, he was only alleged to have done typical prosecutor activities like negotiating

pleas, scheduling hearings, and filing affirmations in support of writs); *Belot v. Wieshaupt*, No. 96 Civ. 3005 (SS), 1997 WL 218449, at *8 (S.D.N.Y. Apr. 29, 1997) ("First, plaintiff's assertion that defendants acted as policymakers is without merit because defendants are *assistant* district attorneys, who are below the policymaking level. Only '[w]here a district attorney acts as the manager of the district attorney's office, may the district attorney be held to act as a county policymaker.'" (quoting *Walker*, 974 F.2d at 301)) (emphasis in original)). However, some of these cases suggest that the question of whether an ADA may be considered a policymaker for purposes of a municipal liability claim depends on whether that ADA has supervisory authority. *See DeJean v. Cnty. of Nassau*, No. CV-06-6317 (SJF) (AKT), 2008 WL 111187, at *4 (E.D.N.Y Jan. 8, 2008) (no *Monell* claim against ADA where no supervisory capacity was alleged); *Peterson*, 459 F. Supp. 2d at 169-70 ("While Tomaselli was a bureau chief at OSNP during the relevant time period, plaintiff has offered no evidence that he, as opposed to the Special Prosecutor in charge of the OSNP, had any policymaking role in the office, or more importantly, that the actions he undertook in plaintiff's prosecution were undertaken in his capacity as a supervisor. Indeed, it is evident that they were not. Activities such as negotiating plea agreements, scheduling hearings, and filing affirmations in support of writs are typically actions of assistant district attorneys undertaken in the prosecution of a criminal case. Such actions cannot be said to represent the actions of a policymaker responsible for a delineated policy that caused a constitutional deprivation."); *see also Feerick*, 816 F. Supp. at 886-87 (determining that ADAs were not

policymakers, but noting that "[t]he Amended Complaint itself refers to the defendants as defendant Morgenthau's 'subordinates'").

Defendant Wasilausky was Chief of the Criminal Complaint Unit at the NCDAO and was involved in the investigation of Cutolo's complaint regarding the bad check. (*See* Wasilausky Dep. at 53.) Defendant Emmons was Chief of the Consumer Frauds Bureau within the NCDAO, who received periodic reports regarding the investigation of Conte from 2004-2006. Plaintiff alleges that these individual defendants were "final decisionmakers" in their units. The Court notes, as an initial matter, that some courts within this Circuit have determined, as a matter of law, that ADAs, by virtue of their position and title, are not policymakers. However, the Court recognizes that the determination of whether an individual is a policymaker for purposes of the imposition of *Monell* liability is a fact-intensive inquiry. At this juncture, the Court lacks complete information regarding Wasilausky's and Emmons's roles at the NCDAO, including complete information regarding the extent of their supervisory capacities in general, and the extent to which these individual defendants exercised their supervisory authority in connection with the investigation and/or prosecution of Conte. Thus, the Court declines to determine, at this stage, whether Wasilausky or Emmons was a policymaker for Nassau County as a matter of law. The parties may renew their motions regarding the policymaker determination at the close of evidence. Thus, the Court denies both parties' motions for summary judgment on the issue of policymaker-based municipal liability.

## G. State Law Claims

Because this Court has original jurisdiction

over plaintiff's federal claims, the Court may also exercise supplemental jurisdiction over plaintiff's state-law claims pursuant to 28 U.S.C. § 1367. Section 1367(a) provides that, subject to the requirements of § 1367(b) and (c), district courts may exercise supplemental jurisdiction over claims that form part of the "same case or controversy" as a claim over which the court has original jurisdiction.[33] To determine whether claims form part of the "same case or controversy," the Court should ask whether the claims "'derive from a common nucleus of operative fact.'" *Achtman v. Kirby, McInerney, & Squire, LLP*, 464 F.3d 328, 335 (2d Cir. 2006) (quoting *Promisel v. First Am. Artificial Flowers Inc.*, 943 F.2d 251, 254 (2d Cir. 1991)). Here, plaintiff's state-law claims derive from a common nucleus of operative fact as his federal claims—namely, from the events surrounding his prosecution for the bad check and for the NCDAO's 2004-2006 investigation into plaintiff's allegedly fraudulent activities.

Moreover, it is proper for the Court to exercise supplemental jurisdiction over plaintiff's state-law claims against Shaska and Guerra, even though there are no remaining federal claims against them, because the Court may exercise pendent party jurisdiction when the claims against

---

[33] "[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties." 28 U.S.C. § 1367(a).

additional parties arise out of the same set of facts as the federal claims in a particular case. *See Sullivan v. Metro-North R.R.*, 179 F. Supp. 2d 2, 5-6 (D. Conn. 2001) ("We have previously observed that 28 U.S.C. § 1367(a) . . . makes pendent party jurisdiction possible where the claim in question arises out of the same set of facts that give rise to an anchoring federal question claim against another party." (quoting *Kirschner v. Klemons*, 225 F.3d 227, 239 (2d Cir. 2000))).

Plaintiff asserts state-law claims for (1) false arrest; (2) malicious prosecution; and (3) abuse of process against the County defendants. Plaintiff also asserts claims for (4) defamation; (5) injurious falsehood; (6) intentional infliction of emotional distress; and (7) tortious interference with contractual relationships against all defendants. First, the Court discusses the alleged absolute immunity defense of the County defendants, then proceeds to discuss the merits of the remaining claims in turn.

1. Absolute Immunity of County Defendants

The County defendants contend that under New York State law, a prosecutor is "immune from civil suit for official acts performed in the investigation and prosecution of criminal charges." *Rodrigues*, 602 N.Y.S.2d at 342-43 (citing *Schanbarger v. Kellogg*, 315 N.Y.S.2d 1013 (App. Div. 1970)). Thus, they argue that absolute immunity protection for prosecutors is broader under state law than under federal law. However, the County defendants overstate the rule in *Rodrigues*. Specifically, in *Rodrigues*, the court held that where the defendants were "alleged to have used subpoenas for the purpose of conducting their own investigation into plaintiffs' affairs," they were not entitled to absolute immunity. *See id.* at 341. The

court in *Rodrigues* reasoned that "the law confers no power upon the District Attorney to employ a subpoena for the purpose of conducting his own investigation [and thus] a prosecutor may not claim that he was engaged in a quasi-judicial act when he issues Grand Jury subpoenas under such circumstances." *Id.* at 342-43 (citations omitted). Similarly, in *Hirschfeld v. City of N.Y.*, 686 N.Y.S.2d 367 (App. Div. 1999), the Appellate Division, First Department, concluded that absolute immunity was warranted for the prosecutor's issuance of a subpoena when "[t]he record show[ed] that the Assistant District Attorney issued the subpoena on December 1, 1994 in good faith on the basis of the Tax Department referral, and that the Grand Jury was impanelled several days later," and "[t]here was no showing that these efforts constituted attempts by the Assistant District Attorney to conduct an investigation outside of the auspices of the Grand Jury, as in *Rodrigues*." *Id.* at 370. Thus, there are situations where, when performing an investigation outside the auspices of the grand jury, prosecutors would not be entitled to absolute immunity. Furthermore, the language in Justice Tom's concurrence in *Moore v. Dormin*, 676 N.Y.S.2d 90 (App. Div. 1998), upon which subsequent cases to assert this proposition regarding the broader protections of absolute immunity under state law rely, stated that absolute immunity applies to a prosecutor's "statements made during the initiation of a criminal investigation or during the judicial phase of a criminal proceeding," but noted that "[w]hen a Grand Jury or a court is not intended to be convened, the prosecutor is not exercising a prosecutorial function." *Id.*

at 94.[34]

Here, the investigation of Conte continued for two years, but charges relating to the alleged fraud were never filed, and a grand jury was never impaneled. The Court concludes that, after a thorough examination of the evidence submitted on summary judgment, there are disputed issues of fact regarding whether the NCDAO intended to pursue criminal charges against Conte in connection with the 2004-2006 investigation. Moreover, in the instant case, the NCDAO performed its own investigation—without the aid, assistance, or involvement of police officers—into Conte and I Media, which involved the issuance of subpoenas. As discussed *supra*, in the context of plaintiff's abuse of process claim, plaintiff has put forward sufficient evidence to create triable issues of fact regarding whether the County defendants employed regularly issued legal process with a collateral purpose.

## 2. State-Law Claims for False Arrest, Malicious Prosecution, and Malicious Abuse of Process

---

[34] Moreover, there is contrary authority to *Rodrigues* and *Schanbarger* within New York. *See Cunningham v. New York*, 422 N.Y.S.2d 497, 499 (App. Div. 1979) ("In *Schanbarger v. Kellogg*, 315 N.Y.S.2d 1013 (App. Div. 1970), this court held that the defendants therein were acting in a quasi-judicial capacity and, thus, were entitled to the defense of absolute immunity from suit. While we would reach this same conclusion today, we are of the view that the language used in that case to the effect that persons acting under an Assistant District Attorney are immune from civil suit for official acts performed by them in the investigation of a crime is no longer valid insofar as it may be interpreted as conferring absolute immunity upon those engaged in investigative actions.").

As discussed above, the analysis for state-law claims for false arrest, malicious prosecution, and malicious abuse of process are largely coextensive with the analysis for such claims under § 1983. *See Dawson v. Snow*, 356 F. App'x 526, 528 (2d Cir. 2009) ("'In analyzing § 1983 claims for unconstitutional false arrest, we have generally looked to the law of the state in which the arrest occurred.'" (quoting *Davis v. Rodriguez*, 364 F.3d 424, 433 (2d Cir. 2004))); *Johnson v. Constantellis*, 221 F. App'x 48, 50 (2d Cir. 2007) ("To demonstrate a malicious prosecution claim under Section 1983 or New York law, Johnson must show '(1) that the defendant commenced or continued a criminal proceeding against him; (2) that the proceeding was terminated in the plaintiff's favor; (3) that there was no probable cause for the proceeding; and (4) that the proceeding was instituted with malice.'" (quoting *Kinzer v. Jackson*, 316 F.3d 139, 143 (2d Cir. 2003))); *Cabble v. City of N.Y.*, No. 04 Civ. 9413 (LTS) (FM), 2010 WL 1222035, at *4 (S.D.N.Y. Mar. 29, 2010) ("The Second Circuit looks to the New York state law tort of abuse of process for the elements of this Section 1983 claim where, as here, the underlying conduct occurred in New York." (citing *Cook*, 41 F.3d at 80)).

Although claims of malicious prosecution under state law do not require a "seizure" as required by federal constitutional claims of malicious prosecution, as discussed *supra*, plaintiff's malicious prosecution claim with respect to the bad check charge fails because plaintiff cannot demonstrate favorable termination of the proceedings against him, a necessary element of a claim for malicious prosecution. *See Green v. Mattingly*, 585 F.3d 97, 103 (2d Cir. 2009) ("To state a

claim for malicious prosecution under either § 1983 or New York state law, plaintiff must allege, among other things, 'termination of the proceeding in plaintiff's favor.'" (citation omitted)). Plaintiff's claims of malicious prosecution based upon the 2004-2006 NCDAO investigation of plaintiff and I Media fail because, as discussed above, there was no initiation or continuation of criminal proceedings against plaintiff or I Media resulting from the investigation. *See Rohman v. N.Y. City Transit Auth. (NYCTA)*, 215 F.3d 208, 217 (2d Cir. 2000) ("The first element of a malicious prosecution cause of action, under state law or § 1983, is, as we have noted, that the defendant initiated a prosecution against the plaintiff." (internal quotation marks and citation omitted)).

Accordingly, as with plaintiff's claims brought under § 1983, plaintiff's claim for false arrest against defendant Wasilausky survives summary judgment. Plaintiff's claim for malicious prosecution fails under federal and state law against all defendants, and plaintiff's claim for malicious abuse of process survives summary judgment, as analyzed under both federal and state law.

### 3. State-Law Claims for Defamation, Injurious Falsehood, and Intentional Infliction of Emotional Distress Against All Defendants

Plaintiff brings state law claims against all defendants for defamation, injurious falsehood, and intentional infliction of emotional distress. The original complaint in this case was filed on August 30, 2006. A one-year statute of limitations applies to claims of defamation and intentional infliction of emotional distress brought under New York law. *See* N.Y. C.P.L.R. § 215(3); *see, e.g.*, *McKenzie v. Dow*

*Jones & Co.*, 355 F. App'x 533, 535 (2d Cir. 2009) ("Under New York law, the statute of limitations for a defamation claim is one year." (citing N.Y. C.P.L.R. § 215.3)); *Balkanli v. City of N.Y.*, No. 07-CV-2204, 2009 WL 1346736, at *2 (E.D.N.Y. May 14, 2009) ("Claims of intentional infliction of emotional distress, libel, and slander are subject to a one-year statute of limitations under New York law."); *Rock v. Mustich*, No. 08-CV-4976 (CS) (PED), 2009 WL 2391776, at *5 (S.D.N.Y. Aug. 3, 2009) (applying one-year statute of limitations for intentional infliction of emotional distress (citing *Gallagher v. Directors Guild of Am., Inc.*, 533 N.Y.S.2d 863 (1988)). Furthermore, where, as here, "plaintiff's claim for injurious falsehood relies on the same statements that form the basis of the defamation claim[, and] plaintiff's damages for the injurious falsehood claim are exactly the same as those alleged for the defamation claim," the Court will apply the one-year statute of limitations applicable to a defamation claim to the injurious falsehood claim as well. *See O'Brien v. Alexander*, 898 F. Supp. 162 (S.D.N.Y. 1995); *see also Riddell Sports Inc. v. Brooks*, 872 F. Supp. 73, 75 (S.D.N.Y. 1995) ("Counterdefendants further note that counterplaintiffs 'cannot circumvent New York's one year statute of limitations for defamation by labeling a claim one for intentional interference with economic relations, prima facie tort, or injurious falsehood, 'if, in fact, the claim seeks redress for injury to reputation.'" (quoting *Aequitron Med., Inc. v. CBS, Inc.*, No. 93 CIV. 950 (SS), 1994 WL 30414, at *8 (S.D.N.Y. Jan. 27, 1994))). The Court concludes that the basis for and damages from plaintiff's injurious falsehoods claim are the same statements that form the basis of his defamation claim. (*Compare* Second Am.

Compl. ¶¶ 172-88 (defamation claims) *with* ¶¶ 190-96 (injurious falsehood claim).) Accordingly, a one-year statute of limitations applies to plaintiff's injurious falsehood claim as well. *See Riddell Sports Inc.*, 872 F. Supp. at 75 ("Aside from agreements allegedly breached by Riddell and its subsidiaries, counterplaintiffs merely assert that, due to disparaging statements, general business opportunities and potential income were lost. The Court finds that the gravamen of counterplaintiffs' allegations, in the counterclaims at issue in the instant motion, aside from the claim for tortious interference with contractual relations, is purported injury to reputation.").

The most recent allegations relating to the claims against the County defendants for defamation, injurious falsehood, and intentional infliction of emotional distress pertain to actions performed in February through June 2005. In February 2005, Conte alleges that Falzarano stopped several route distributors on the street and told them that Conte was a fraud and a thief. (Pl.'s 1/11/10 Aff. ¶ 85; *see also* Pl.'s Ex. III.) Conte also makes claims relating to two "potential route distributors" declining to enter into a licensing agreement with Conte due to statements made to them by Michael Rudolph, a former route distributor, in March 2005. March 2005 is beyond the one-year statute of limitations for these claims. Plaintiff further alleges that he spent much of May and June 2005 "dealing with the police, the FBI, attorneys, and angry licensees." (Pl.'s 1/11/10 Aff. ¶ 87.) Nonetheless, any claims relating to May and June 2005 are still outside the statute of limitations. Finally, Conte alleges that Falzarano served the subpoena on him in April 2005. Again, even if plaintiff could assert any of these claims based on this occurrence, they

would be time barred, as plaintiff does not submit evidence suggesting that any activities of the County defendants relating to these claims occurred within the statute of limitations.

Plaintiff also brings causes of action against defendants Guerra and Shaska for defamation, injurious falsehood, and intentional infliction of emotional distress. Here, Conte has not pointed to statements (written or oral) or actions of Guerra that occurred within one year prior to the filing of the complaint in this case. Accordingly, Conte's claims for defamation, injurious falsehood, and intentional infliction of emotional distress against Guerra must fail. Similarly, plaintiff's submissions to the Court contain no allegations that Shaska has taken any actions relevant to this case since 2004. Because plaintiff has not presented any evidence of Shaska's involvement in the case—let alone evidence that would support claims of defamation, injurious falsehood, or intentional infliction of emotional distress—since 2004, these claims against Shaska are also barred by the statute of limitations.

### 4. State-Law Claims for Tortious Interference with Contractual Relationships Against All Defendants

Finally, plaintiff alleges a claim for tortious interference with contractual relationships against all defendants. Under New York law,[35] to state a tortious interference with a contract claim, a plaintiff must demonstrate the existence of a valid contract, the defendant's knowledge of the contract's existence, that the defendant intentionally procured a contract breach, and the resulting damages to the plaintiff. *See, e.g.*, *Int'l Minerals & Res., S.A. v. Pappas*, 96 F.3d 586, 595 (2d Cir. 1996); *Lama Holding Co. v. Smith Barney Inc.*, 668 N.E.2d 1370, 1375 (N.Y. 1996). "Improper intentional interference is generally evidenced by a tortfeasor 'inducing or otherwise causing [a] third person not to perform' his contractual obligations to plaintiff." *Enercomp, Inc. v. McCorhill Publ'g, Inc.*, 873 F.2d 536, 541 (2d Cir. 1989) (quoting *Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*, 406 N.E.2d 445, 447 (N.Y. 1980))). A claim for tortious interference with contract is governed by a three-year statute of limitations in New York. N.Y. C.P.L.R. § 214(4).

Plaintiff's claim for tortious interference against the County defendants and against defendant Guerra survives summary judgment, but the Court grants Shaska summary judgment on plaintiff's tortious interference claim against her.

#### a. County Defendants and Guerra

Conte alleges a claim for tortious interference with contractual relationships against the County defendants and Guerra. The Court concludes that Conte has presented sufficient evidence to present triable issues of fact regarding whether the County defendants and Guerra interfered with specific contracts between Conte and third parties.

In his affidavit, Conte alleges that Guerra and his former employee, Enid Saltus (who is not a defendant in the instant action), "began to call route distributors[, with whom Conte had contractual relationships,] whose names and telephone numbers appeared on a list

---

[35] The parties do not dispute that the substantive law of New York applies here.

[allegedly] stolen from I Media's office and they proceeded to tell them that I Media was a fraud and a scam." (Pl.'s 1/11/10 Aff. ¶ 56.) Conte submitted into evidence a complaint by Anthony Jacques dated February 27, 2004, that stated that he heard from Larry Guerra that "Mr. Conte is committing fraud and scamming people for money." (Pl.'s Ex. HH.) Conte has also submitted a complaint filed by Andrew Taub, stating that "Mr. Guerra has investigated most of these problems and informed me most of this is false on Conte's behalf." (*Id.*)[36]

There is also evidence that, at some point prior to filing a complaint with the NCDAO, Guerra also attempted to speak to representatives of Quebecor, a printing company with whom plaintiff had a business relationship, by having his wife speak with a Quebecor representative on the phone. (Shaska Decl. ¶¶ 3-4.) Guerra's wife obtained from Quebecor a copy of plaintiff's credit application, which she gave to Guerra. (*Id.* ¶¶ 3-5.) Guerra also introduced a copy of I Media's printing contract with Quebecor at the arbitration associated with Guerra's small claims court proceeding against Conte. (Pl.'s 1/11/10 Aff. ¶ 66; *see also* Pl.'s Ex. XX.)[37]

There is also evidence that Guerra was working with Wasilausky and Wallace to identify potential victims of Conte's and I Media's alleged fraud; Guerra emailed and faxed Wasilausky and Wallace names of potential complainants/victims on multiple occasions. (Pl.'s Ex. WW; *see also* Defs.' Ex. K ("Many of these new complaints appear to have come to us through one of the original complainants, a person named Lawrence Guerra. Mr. Guerra, whose wife is a New York City Detective, conducted his own investigation of the accused and reached out to several individuals with whom the accused purportedly was doing business. Based upon his personal investigation, Mr. Guerra became convinced that the accused was engaged in wrongdoing.").) He also "collected" contracts from these potential victims (*see id*), and emailed ADA Wallace with additional information and complaints regarding Conte. (*Id.*) Guerra further faxed to Wasilausky a copy of an agreement with Tribune, and noted that he had spoken with Tribune's in-house counsel regarding Conte. (*See* Pl.'s Ex. XX.) Guerra stated to Wasilausky that Conte was using the agreement "to lure in distributors to purchase more areas than they originally were contacted to purchase as well as using it to 'pitch' new recruits." (*Id.*)

Conte further alleges that in March 2005, two potential route distributors, Bob Kvietkus and Andy Jepson, who were going to sign a licensing agreement emailed him and canceled, stating that they had changed their mind after one of Conte's former associates, Bob Rudolph, spoke to them. (*See* Pl.'s Ex. JJJ.)[38]

---

[36] Although Conte also contends that he was told independently directly by numerous route distributors that Guerra had told them that he had defrauded them and stolen their money, such allegations are inadmissible hearsay. *See* Fed. R. Evid. 802. Conte offers no admissible evidence in support of these claims.

[37] While this evidence is considered by the Court in the larger context of defendant Guerra's actions, a claim of tortious interference with contractual relationships with respect to this interaction with Quebecor fails for the reasons

discussed *infra*.

[38] While Guerra's interaction with and the decision of these distributors is taken into account by the

Conte points to complaints made by other route distributors, Anthony Jacques and Andrew Taub, with the NCDAO as evidence of distributors' decisions to not do business with him, resulting from Guerra's actions. (*See* Pl.'s Ex. HH.) Plaintiff further contends that in the time that it took for him to deal with these "crippling issues," namely, the complaints regarding his alleged fraud and canceled contracts, his advertising and marketing suffered, and printing and expansion issues were put aside. (Pl.'s 1/11/10 Aff. ¶ 88.)

Conte also has submitted evidence in support of his claims that contracts that he and I Media entered into with third parties were breached as a result of the County defendants' and Guerra's actions. Specifically, Conte has presented evidence that Transcontinental Printing, the printer I Media had negotiated with and paid in full, "later reneged and on the printing agreement and refused to print for I Media causing I Media to make numerous calls to get it[s] money returned." (Pl.'s 1/11/04 Aff. ¶ 82.) Plaintiff alleges that this was the result of subpoenas it was issued on behalf of the NCDAO. (*Id.*; *see also* Pl.'s Ex. FFF.) Plaintiff further contends that, as a result, I Media was unable to print and distribute its magazine for five weeks until it was able to find a new printer. (Pl.'s 1/11/10 Aff. ¶ 82.)

Court as evidence of Guerra's actions, their failure to enter into a licensing agreement with Conte cannot be considered a breach for purposes of this claim, because, according to Conte's allegations, the contract had not yet been entered into; thus, there was no contract in existence, which is a requisite element of a claim for a claim of tortious interference with contractual relationships.

Plaintiff also alleges that Bose Sound canceled its contract and relationship with I Media due to emails by defendant Falzarano. (Pl.'s 1/11/10 Aff. ¶ 88; *see also* Pl.'s Ex. KKK.) Conte also presented evidence that, in February 2005, Falzarano stopped several of Conte's route distributors on the street and told them that Conte was a fraud and a thief. (Pl.'s 1/11/10 Aff. ¶ 85; *see also* Pl.'s Ex. III.)

Guerra submits an affidavit disputing his purpose and intent in interacting with the NCDAO. He claims that he did not conspire to ruin and destroy plaintiff's business. (Guerra 56.1 ¶ 12.) He further contends that plaintiff's business failed because his business plan was unsustainable. (*Id.* ¶ 14.) Guerra also submits evidence suggesting that plaintiff's route distributors were skeptical and distrustful of plaintiff before the time of Guerra's involvement with plaintiff. (*See* Guerra Exs. BB, CC, DD, EE.)

The Court concludes that, crediting all plaintiff's evidence, and drawing all reasonable inferences of fact in favor of plaintiff, there are disputed issues of fact regarding plaintiff's tortious interference claim against the County defendants and Guerra—specifically, whether the County defendants and Guerra knew of the existence of valid contracts between Conte/I Media and third parties, and intentionally procured breaches of those contracts by contacting the third parties and alleging that Conte was a fraud with whom they should not do business. The Court also determines that there are disputed issues of fact regarding whether, if any contracts were breached by parties doing business with Conte/I Media, the contracts were breached as a result of the County defendants' and Guerra's actions, and, if so, the extent of any damages resulting therefrom. Accordingly, the County

defendants' and Guerra's motion for summary judgment on plaintiff's claim of tortious interference with contractual relationships is denied.

### b. Shaska

On February 5, 2004, Shaska called Quebecor Printing, the printer with which Conte claimed to have contracted to print his publications. (Shaska Decl. ¶¶ 3-4.) Shaska spoke with Gabriel Sauro, a representative of Quebecor. (*Id.*) Shaska asked Sauro to provide documents relating to Quebecor's dealings with Conte; Sauro sent Shaska several documents, including a credit application that Conte had completed. Shaska provided this information to Guerra.

Other than one conversation with Sauro, there is no evidence of Shaska speaking with route distributors, whose contracts Conte alleges were breached by the alleged tortious interference. Shaska has submitted evidence supporting her contentions that individuals at the NCDAO and individuals who did business with Conte were not aware of who she was at the time of the relevant events at issue here. (*See* Shaska Exs. B-E.) As to the conversation with Sauro and Quebecor, Conte cannot establish that Shaska's conversation with Sauro resulted in the breach of an existing contract. Specifically, Conte has presented no evidence demonstrating that Quebecor's decision not to do business with Conte and I Media was due to Shaska's phone call with Sauro. Prior to doing business with Conte, Quebecor World sent Conte a quotation letter and a credit application to be filled out, along with credit references. (Saura Aff. ¶ 8.) Conte submitted the letter and application, and Quebecor employees thereafter reviewed his paperwork. According to an affidavit submitted by Sauro, "Quebecor World decided at that time not to do business with Mr. Conte and his company I Media since he did not pass our credit check." (*Id.* ¶ 11.) Specifically, "Mr. Conte's bank account at the Suffolk Federal Credit Union showed a negative balance of $2,500, and two of Mr. Conte's checks had been recently returned for insufficient funds. Moreover, the telephone number that Mr. Conte provided as Mr. Peter Grassi's telephone number, the bank manager at Suffolk Federal Credit Union turned out to not be a valid telephone number." (*Id.*¶¶ 12-13.) According to Sauro, any printing to be performed by Quebecor on behalf of I Media was conditioned upon Conte and I Media being financially sound after a financial credit check. (*Id.* ¶ 15.) Thus, "Quebecor World's decision not to do business with Anthony Conte and his company, I Media Corporation, was made prior to any contact I had with members of the [NCDAO], and was based upon the issues that Quebecor World had with Mr. Conte's credit, and his failure to respond to my attempts to resolve those issues." (*Id.* ¶ 19.) This is further supported by the letter that Sauro sent to Shaska on February 5, 2004, stating that they were "unable to move forward [with business with Conte] [due] to the fact that his credit references were extremely weak or shaky." (Shaska Ex. A.) Accordingly, the tortious interference claim against Shaska cannot survive summary judgment.

### V. CONCLUSION

In sum, the Court grants defendants' motions for summary judgment in part and denies the motions for summary judgment in part. After a thorough examination of the claims, the Court concludes that the County defendants are entitled to summary judgment

on plaintiff's claims for malicious prosecution, violation of the First Amendment, and conspiracy under § 1983. The Court also concludes that defendant Sardo is entitled to summary judgment regarding all claims alleged against her, and defendants Emmons, Wasilausky, and Falzarano are entitled to summary judgment on the federal and state-law false arrest claims. Plaintiff's federal and state-law false arrest (against defendant Wasilausky) and abuse of process (against all County defendants except Sardo) claims, as well as plaintiff's *Monell* claims against the County of Nassau, survive summary judgment due to triable issues of fact regarding those claims. Finally, with respect to plaintiff's remaining state-law claims, the Court denies the County defendants and Guerra summary judgment on plaintiff's tortious interference with contractual relationships claim, and grants summary judgment to defendant Shaska on that claim. Plaintiff's remaining state-law claims for defamation, injurious falsehood, and intentional infliction of emotional distress are barred by the statute of limitations as against all defendants. Thus, none of the federal or state-law claims against Shaska survive summary judgment. Plaintiff's motion for summary judgment is denied in its entirety.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: September 30, 2010
Central Islip, New York

\* \* \*

Plaintiff is proceeding *pro se*. The County defendants are represented by John Ciampoli, Nassau County Attorney, by Andrew R. Scott, Deputy County Attorney, One West Street, Mineola, NY 11501. Defendant Shaska is represented by Karasyk & Moschella, LLP, by James M. Moschella, 225 Broadway, 32nd Floor, New York, NY 10007. Defendant Guerra is proceeding *pro se*.