# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

_____

Nº 06-CV-4746 (JFB)(ETB)
_____

ANTHONY CONTE,

Plaintiff,

VERSUS

COUNTY OF NASSAU, ET AL.,

Defendants.

_____

**MEMORANDUM AND ORDER**
July 26, 2013
_____

Joseph F. Bianco, District Judge:

*Pro se* plaintiff Anthony Conte ("plaintiff" or "Conte") filed the instant action against the County of Nassau ("the County"), Robert Emmons ("Emmons"), Philip Wasilausky ("Wasilausky"), William Wallace ("Wallace"), Christina Sardo ("Sardo"), Michael Falzarano ("Falzarano") (collectively, the "County defendants"), Tefta Shaska ("Shaska"), and Larry Guerra ("Guerra") (collectively, "defendants"), alleging federal claims under 42 U.S.C. § 1983 for false arrest, malicious prosecution, abuse of process, violation of the First Amendment, conspiracy, and *Monell* liability against the County. Plaintiff also asserted various state-law claims.

Following discovery, both plaintiff and defendants filed motions for summary judgment with the Court. After a detailed review of the record and submissions of the parties, the Court issued a Memorandum and Order dated September 30, 2010, granting in part and denying in part defendants' motions for summary judgment and denying plaintiff's motion for summary judgment in its entirety. Pursuant to that Order, the following claims survived summary judgment: (1) plaintiff's false arrest claim against Wasilausky; (2) plaintiff's abuse of process claim against all of the County defendants except Sardo; (3) plaintiff's *Monell* claim against the County; and (4) plaintiff's tortious interference with contract claim against all of the County defendants except Sardo and Shaska.

The matter was then tried before a jury, which found that (1) Wasilausky subjected plaintiff to an unlawful arrest; (2) none of the County defendants maliciously abused process in connection with plaintiff's arrest

1

on a bad check charge or in connection with the issuance of Grand Jury subpoenas; and (3) Emmons, Wallace, and Falzarano tortiously interfered with plaintiff's contractual relationships.[1] With respect to damages, the jury awarded $500.00 in compensatory damages and $26,000.00 in punitive damages against Wasilausky in connection with plaintiff's false arrest claim. As to plaintiff's tortious interference with contract claim, the jury awarded plaintiff $3,500.00 in compensatory damages for tortious acts which took place before June 1, 2005, and $700,000.00 in compensatory damages for tortious acts which took place on or after June 1, 2005. The jury also awarded punitive damages in connection with plaintiff's tortious interference with contract claim: $60,000.00 against Emmons; $443,000.00 against Wallace; and $175,000.00 against Falzarano.

Presently before the Court are post-trial motions brought by defendants Wasilausky, Wallace, Emmons, and Falzarano. These defendants move for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b) on the basis that plaintiff has failed to establish the required elements of the false arrest and tortious interference with contract causes of action asserted against them. As to the false arrest, Wasilausky claims that he is entitled to judgment as a matter of law on the following grounds: (1) he had no personal involvement with plaintiff's arrest; (2) his actions are immune from suit (he is entitled to absolute immunity for his actions surrounding the preparation and initiation of the prosecution, and he is entitled to qualified immunity for his role in the investigation phase); and (3) the presumption of probable cause created by the existence of a valid arrest warrant

precludes plaintiff's cause of action entirely. As to the tortious interference claim, Emmons, Falzarano, and Wallace argue that they are entitled to judgment as a matter of law because there is no evidence of conduct amounting to tortious interference with contract that occurred within the applicable limitations period. Specifically, Wallace argues that the only alleged tortious conduct that occurred within the limitations period are his communications with Joseph Giaimo ("Giaimo") in the summer/early fall of 2005, but that those conversations are not the basis of a tortious interference with contract claim because, *inter alia*, (1) there is no evidence that, in speaking to Giaimo, Wallace intentionally induced route distributors to breach their contracts with plaintiff, and (2) the damage plaintiff testified to at trial is generalized reputational injury that sounds in defamation, rather than in tortious interference with contract. Moreover, Emmons and Falzarano argue that there is no evidence of any actions by them or any injury sustained prior to the expiration of the statute of limitations.

The County defendants also move for a new trial under Federal Rule of Civil Procedure 59 on the grounds that (1) the jury's verdict finding tortious interference with contract is against the weight of the evidence; (2) the jury's verdict, to the extent it is based upon defamation against representatives of a District Attorney's office during their investigation of plaintiff, is erroneous and a miscarriage of justice; (3) the jury's verdict is inconsistent because the jury found for the defendants on plaintiff's malicious abuse of process claim (the only cause of action that required a showing of malice), yet awarded punitive damages against the defendants in connection with plaintiff's other claims; and (4) the damages awarded by the jury finds no basis in the record.

---

[1] Plaintiff's *Monell* claim was dismissed as a matter of law at trial. (*See* Tr. 913-16.)

Also before the Court is plaintiff's motion for a new damages trial, made pursuant to Rule 59 of the Federal Rules of Civil Procedure. Plaintiff argues that, because he was improperly denied the opportunity to present certain evidence of general damages to the jury, he is entitled to a new trial on the issue of damages.

For the reasons that follow, the County defendants' Rule 50(b) motion is granted in its entirety – Wasilausky is entitled to judgment as a matter of law on plaintiff's false arrest claim and Emmons, Falzarano, and Wallace are entitled to judgment as a matter of law on plaintiff's tortious interference with contract claim. Accordingly, the County defendants' Rule 59 motion for a new trial is denied as moot, as is plaintiff's motion for a new trial.

## I. BACKGROUND

### A. Facts

Conte founded and created I Media, a publishing and distribution company that circulated a free, colored, glossy-covered TV guide publication to households in given zip codes. (Tr. 55-57.) The first TV guide publication that I Media released was called "TV Time Magazine." (*Id.* at 58.) The first edition of TV Time Magazine was released for the period of November 12-27, 2004. (*See* Pl.'s Ex. 130.) During the course of 2004 and 2005, I Media released approximately 15 or 16 different editions of the magazine. (Tr. 77.)

Each publication contained a centerfold shopper's guide, which featured products sold by I Media's advertising affiliates. (*Id.* at 57-58.)[2] At times, certain products were

also featured on the cover of the publication. (*Id.* at 59.) Conte anticipated that, over time, his business would profit from advertising revenues. (*Id.* at 57.)

### 1. Developing I Media and Attracting Advertisers

To fund I Media initially, Conte took out a second mortgage on his home and received loans from his wife and her family. (*Id.* at 71.) Developing I Media required (1) signing route distributors (who would purchase specific routes along which to deliver I Media's publication), and (2) finding a printer to print the publication. (*Id.* at 69.) In May of 2003, Conte accepted a quote from Walden Printing in Walden, New York. (*Id.* at 69-70.) Over the next two months, Conte signed between 20 and 30 route distributors and collected content for his publication. (*Id.* at 70.) When he called Walden Printing in the middle of June to inform them of these developments, he learned that the company "had stopped printing and [that] they were going out of business." (*Id.*) Conte was forced to begin a new search for a printer, which was time consuming. (*Id.* at 71.) Conte also engaged in discussions with Transcontinental Printing, a company based out of Montreal, Canada. (*Id.* at 626-28.) The company never entered into a contract with I Media (it merely supplied various quotations to Conte) (*id.* at 632-33, 650), nor did it print any editions of TV Time Magazine (*id.* at

---

[2] Conte testified that the affiliates were ones I Media had contracted with in 2004. (Tr. 58.) These advertising affiliates did not pay money to have ads for their products or services placed in TV Time Magazine. Instead, they paid I Media based on sales of their products or services that were generated from ads that ran in the publication. (*Id.* at 244.) Specifically, an ad in the publication would direct a consumer to Conte's website, where he or she could click on a link to a product or service of interest. The link would direct that consumer to the particular affiliate's website, where he or she could purchase the product or service desired. (*Id.* at 250.)

631).[3] Conte eventually signed a contract with Quebecor World, a printing company located in Canada, on January 9, 2004. (*Id.* at 115-16.) Despite the existence of this contract, no printing was ever done by Quebecor World. (*Id.* at 130.) Conte finally switched to Evergreen Printing in January of 2005, who he printed with approximately thirteen times. (*Id.* at 689, 1283.)

I Media had its route distributors sign home distributor agreements.[4] The contracts provided details of the route and how it was to be operated, the number of years for which the route would be in existence, information about how the route distributor would be paid, and rules and procedures of the business. (*Id.* at 72.) The contracts also contained a disclaimer indicating that because the business was new, its success could not be guaranteed, and that the route distributor would have the option to ask for a refund under certain conditions (*i.e.*, if the publication was not rolled out in a certain period of time). (*Id.* at 73.) Each route distributor paid Conte an up-front license fee associated with the particular route that they acquired. (*Id.* at 694.)[5] Conte sold between 40 and 60 of these routes in 2003. (*Id.* at 701.) Distributors were generally paid between 20 and 25 cents for each issue of TV Time Magazine that they distributed. (*Id.* at 693.) However, they did not begin getting paid until the fall of 2004 (despite the fact that they invested thousands of dollars up-front in 2003), when TV Time Magazine was first published. (*Id.* at 700-01.)

I Media created a rate card for prospective advertisers, which listed the sizes and rates of various advertising options, as well as the company's current and anticipated distribution figures. (*Id.* at 78.)[6] I Media also created advertising proposals, and sometimes full marketing campaigns, for prospective affiliates. (*Id.* at 62-63.) I Media also sometimes created and printed an advertisement for a company free of charge, "with their representation . . . that they were going to enter into a long-term contract with [I Media]." (*Id.* at 61.)

---

[3] Stuart Hubbard ("Hubbard"), a sales representative for Transcontinental Printing, testified that his Company needed, *inter alia*, "exact dates and a contract in order to order paper," but that "[t]here were several things that never really transpired." (*Id.* at 630.) Hubbard stated that his Company "never got files and [] never got money. [They] never got materials to print. There was nothing to print." (*Id.* at 634.) Hubbard explained that, "after close to a year of going back and forth with Mr. Conte" without receiving any payment, his Company got fed up. (*Id.* at 670.) Conte eventually wired money to Transcontinental Printing (even though he did not send the requisite files or sign a contract with the Company). It was immediately refunded since the Company never actually performed work for I Media. (*Id.* at 634.) When asked about this receipt of money, Hubbard testified to the following:

> After asking, negotiating, talking for six months and a missed deadline, and I will do it tomorrow, I can't – there was never anything there. And all of a sudden there was money there when there was no contract. There was nothing there. It was just – there was no preparation whatsoever.

(*Id.* at 634.)

[4] According to Conte's testimony, the contracts with route distributors were from May 2003 to April 2004, and there were later route distributor contracts from October 2004 to April 2005. (*Id.* at 859-60.)

[5] According to Conte's testimony, the license fee covered the exclusive right to distribute in a particular area, as well as the cost to I Media of acquiring route maps and household address lists for the particular route. (*Id.* at 694.)

[6] Monica Gallardo ("Gallardo"), a route distributor and employee of I Media, testified that I Media was unsuccessful in establishing its rate card because "the numbers of publications were less than the numbers that you can offer for distribution of magazines." (*Id.* at 725.)

### 2. The Bad Check Incident

Conte began having problems with one of his route distributors, Joseph Cutolo ("Cutolo"), in June of 2003. (*Id.* at 102.)[7] Cutolo was pressuring Conte for copies of the publication so that he could begin distributing along his route. At that point in time, however, the publication was nowhere near completion. (*Id.*) On or about June 17, 2003, Conte held a meeting at his house to inform I Media's route distributors about the status of publication. Conte testified that, following the meeting, Cutolo "cornered" him and "physically raised his hand and threatened me that if I didn't have the magazine going soon, that he was going to assault me, literally." (*Id.* at 103.)

Approximately one week later, Conte went to Cutolo's home and agreed to advance him money for distribution services, to "demonstrate good faith" that I Media would be distributing by July 4th. (*Id.*) Conte then wrote Cutolo a check for two weeks' worth of distribution services ($2,500). When Cutolo tried to cash the check, it was returned for insufficient funds. Cutolo filed a complaint with the Nassau County District Attorney's Office ("D.A.'s Office" or the "Office") on August 11, 2003. (*Id.* at 109, 444; *see also* Pl.'s Ex. 1, Cutolo's Complaint.)[8]

---

[7] Cutolo signed a distribution agreement with I Media on May 1, 2003. (*Id.* at 104.)

[8] In his complaint, Cutolo states the following:

> The defendant has sent E Mails threatening my business. He has taken my money for a business that I now thing doesn't [e]xist. I feel he has made up this Company to [d]efraud people. There are no Routes. He [r]effuses to give back our money. He has claimed on several occasions to be an Attorney. I have many witness [sic] to this.

(Pl.'s Ex. 1, at 2.)

Conte was directed to appear at the criminal complaint unit of the D.A.'s Office on October 9, 2003 to discuss the check situation. (Tr. 110.) He met with Rhoda Zwicker ("Zwicker"), a paralegal in the Office, and also spoke to her two or three times on the telephone following that initial meeting. Zwicker told Conte that if he did not pay Cutolo the $2,500, he would be arrested for "passing a bad check." (*Id.* at 112.)[9] On November 18, 2003, the District Court of Nassau County signed a criminal Information, in which Conte was charged with violating Section 190.05(a) of the Penal Law of the State of New York for issuing a check without sufficient funds. An arrest warrant was requested in connection with the Information. (*See* Pl.'s Ex. 22, Criminal Information.)[10] Wasilausky testified that he had signed off on approving and filing the charge. (Tr. 460.) An application for an arrest warrant in connection with the bad check charge was signed by Assistant District Attorney ("ADA") Warren Thurer, an Assistant in the Criminal Complaint Bureau at the time. (*Id.* at 461.)

The criminal information upon which Conte was arrested, and which Cutolo signed, alleges that the check Conte wrote for Cutolo was "not post-dated" (Pl.'s Ex. 22), and Wasilausky testified that Zwicker had concluded, based on her investigation, that the check was not postdated (Tr. 462). Specifically, the criminal information, which

---

[9] Wasilausky testified that it is normal practice for the Office to request that an individual who comes in on a bad check complaint "make restitution for the face of the check, as well as any bank fees with respect to that check" if the Office believes that the complaint is legitimate. (Tr. 459.)

[10] Wasilausky testified that the prosecution was initiated because "there was probable cause to file the bad check charge, and prior to filing the bad check charge, it was not resolved by restitution." (*Id.* at 468.)

Cutolo signed under oath, states the following:

> [Conte] did utter to [Cutolo] a check in the amount of $2,500.00, dated July 15, 2003, drawn on Suffolk Federal Credit Union . . . and made payable to Joe Cutolo, which check was returned for Not Sufficient Funds within 30 days. Said check was not post-dated. Bank records show that, on the date the check was issued, the account had insufficient funds.

(Pl.'s Ex. 22.)

According to Conte, the check was postdated July 5, 2003 and was labeled "standby." (Tr. 104, 108.) Conte testified that he sent Cutolo a letter dated June 21, 2003, asking him not to cash the check until July of 2003. (*Id.* at 106.) When Conte subsequently realized that he would not be ready for publication by July, he sent Cutolo a letter asking him not to deposit the check. According to Conte, despite his request to the contrary, Cutolo attempted, on two separate occasions, to deposit the check. On both occasions, Conte had a stop payment placed on the check. (*Id.* at 108.)

Cutolo also brought an action in small claims court in Suffolk County, claiming damages for money invested. (*Id.* at 821.) The lawsuit settled on June 20, 2005, when Conte paid Cutolo $3,500. (*Id.* at 822.)

### 3. Guerra's Complaint

In early 2004, Conte had problems with Larry Guerra ("Guerra"), another route distributor. Guerra wanted to purchase a distribution route in Brooklyn, New York. He agreed to pay $9,000 for those distribution rights, $4,500 in an initial down payment with the balance to be paid in early February of 2004. (*Id.* at 117.) Conte received a check for the balance of the money owed on approximately February 4th or 5th of 2004. However, when he went to cash the check, it came back to him as stopped. (*Id.* at 117-18.) He then sent Guerra a letter on February 24, 2004, demanding that Guerra make good on the $4,500 check and indicating that he would terminate the distribution contract and keep the original down payment as liquidated damages if Guerra failed to do so. (*Id.* at 118.) When Guerra refused to pay, Conte terminated his distribution agreement. (*Id.* at 119.) A host of disgruntled route distributors proceeded to call Conte demanding their money back. (*Id.* at 120.)

In March of 2004, Guerra filed a complaint in the District Court of Suffolk County. Conte and Guerra attended a hearing before the judge in that case on April 21, 2004. A few days later, the judge held in favor of I Media, allowing the company to retain the $4,500 in liquidated damages. That decision was appealed, without success. (*Id.* at 132-33.) Following this incident, Conte received many calls from disgruntled route distributors "accusing I Media of being a scam and that [Conte] was a fraud." (*Id.* at 138.)

### 4. The D.A.'s Office's Investigation of Conte and I Media

Conte also had problems with other route distributors. Amongst other things, many route distributors were disgruntled by the fact that Conte often failed to deliver the number of magazines promised.

For example, Gallardo testified that Conte often provided only 10 to 20 percent of the product promised, and that there were often weeks where he failed to provide any

copies of TV Time Magazine for distribution. (*Id.* at 726-27.) Gallardo testified that "the publications decreased from day one" – that they "started with 25,000, and [] ended up with 5,000." (*Id.* at 734.) When asked whether Conte had "built up [her] route, the number of publications for [her] to distribute every week," Gallardo responded, "That is not a conversation that I had with you, Mr. Conte." (*Id.* at 737.)[11] Gallardo further explained that "there were a lot of weeks in between [where] there were no magazines, nothing, to distribut[e]." She stated that the erratic manner in which the magazines were provided by Conte for distribution "doesn't reflect a weekly distribution," which was what her route distribution contract had promised. (*Id.* at 742-43.) Gallardo also testified that Conte "stole money from a lot of distributors." (*Id.* at 757.)[12]

According to Conte, approximately 10 to 15 distributors, mostly from Long Island, terminated their relationship with I Media following the bad check incident with Cutolo. (*Id.* at 114.) In early 2004, the D.A.'s Office received further complaints

about Conte and I Media. (*Id.* at 412.)[13] The Office subsequently lodged an investigation of Conte and I Media. Wasilausky was the head of the Criminal Complaints Unit that initiated the bad check charge against Conte. Wallace, an ADA in the Criminal Frauds Bureau, and Falzarano, an Investigator, were running the investigation. (*Id.* at 135.) The investigation of Conte and I Media was one of the cases that Emmons, the Chief of the Criminal Frauds Bureau, was supervising at the time. (*Id.* at 362-63.)

In February of 2004, the Office sent letters to various route distributors attaching a complaint form that they could use to voice dissatisfaction with Conte and/or I Media.[14] Various complaints pertaining to I Media and/or Conte were received, all signed under penalty of perjury and many containing supporting documentation. (*Id.* at 139-40, 583-84.)[15] The Office also ran federal and state criminal background checks of Conte, from which it learned that Conte was previously convicted of federal bank fraud (a charge to which Conte pled

---

[11] To be clear, Conte was questioning Gallardo directly at trial, as he was proceeding *pro se*.

[12] When Conte asked Gallardo to explain why she was upset with him, she testified to the following:

> A lot of people sold their cars, mortgaged their houses, gave [Conte] a lot of money to get a route, thinking that they could get a living. Most of these people wake up at 4 a.m. in the morning to deliver these papers for Newsday. Many of them believe it was a way out, to get paid and make more money. It was unbelievable. Even if they went there, [Conte] will never pay them for the amount of money they paid [him] to buy this route. That's why I'm upset. . . . I'm upset with you for the people.

(*Id.* at 757-58.)

[13] Emmons and Wallace testified that, in early 2004, the Office received approximately 12 complaints regarding Conte and I Media. (*Id.* at 412.)

[14] Emmons, the Chief of the Criminal Frauds Bureau, explained that when the Office receives complaints and are advised that there may be more victims, it is common practice for the Office to send letters to the potential victims informing them of their right to file a complaint. (*Id.* at 366-67.)

[15] According to Emmons, up to 46 complaints about Conte and I Media were received throughout the course of the investigation (*id.* at 395; *see also id.* at 593 (Wallace testifying that approximately 45 complaints were received between March 2004 and September 2004).) In total, these claimants alleged that Conte owed them over $30,000. (*Id.* at 602.) As an example of the type of complaints the Office received, Falzarano testified that one of the complainants indicated that when he called the printer, he learned that the real reason copies of the publication were not printed was because Conte never paid the printer (and not because the printer simply failed to do its job). (*Id.* at 290.)

guilty and was sentenced to probation, which he was later accused of violating). (*Id.* at 412, 848-51.) Emmons testified that he was unaware of this prior conviction when he initiated the investigation of Conte and I Media, but that his learning of the conviction "factored in the continuing of the investigation." (*Id.* at 412.) The Office started their criminal investigation of Conte in approximately early March of 2004. (*Id.* at 512.)

In the fall of 2004, while the DA's Office's investigation was still ongoing, Conte was working to rebuild I Media. He obtained office and storage space in Melville, New York, and entered into a contract with TV Media Inc. to provide TV listings and pagination services to I Media. (*Id.* at 143-44.) Conte testified that I Media had contracted with over 200 advertising affiliates (both retailers and service providers) by that point in time. (*Id.* at 147, 152.) I Media began publishing and distributing TV Time Magazine around Thanksgiving of 2004. (*Id.* at 153.) Conte testified that about 3.25 million copies of the magazine were printed and distributed by 72 route distributors throughout Nassau, Suffolk, and Queens Counties on Long Island between the fall of 2004 and mid-2005. (*Id.* at 194-95.) Paul Hoppe ("Hoppe"), a route distributor in Melville, Long Island, testified that he distributed approximately 6,400 magazines on a weekly basis. (*Id.* at 206.)

When asked about the Office's specific investigative efforts, Emmons testified that they issued subpoenas, assigned investigators to speak to people to get documentation, spoke to former employees of I Media and some of the publishers, and did background checks on Conte. (*Id.* at 378.) Falzarano and Wallace testified that, in connection with the investigation of I Media

and Conte, they directed investigators to make undercover phone calls to Conte attempting to buy distribution routes in order to gauge what Conte's proposals looked like and to ascertain the validity of the complaints about I Media and Conte that the Office had received. (*Id.* at 287, 514.) They also conducted interviews of the various complainants (*id.* at 298), and reached out to advertising affiliates in order to evaluate their relationships with I Media (*id.* at 340).

In regards to communications with advertising affiliates during the course of the investigation, Falzarano testified about a specific interaction he had with BMW of Oyster Bay. He went to BMW of Oyster Bay after seeing an advertisement in TV Time Magazine because he wanted to determine if the ad was legitimately placed in the publication. (*Id.* at 352.) When he entered, he overheard a man having a telephone conversation with Conte. When the man got off the phone, Falzarano asked him about BMW's relationship with Conte and I Media. The man replied that there was no relationship. He also told Falzarano that, during the previous phone call, Conte apologized and offered to remove the ad he had placed for BMW of Oyster Bay in TV Time Magazine, and indicated that he had intended to send BMW a contract for advertising in his magazine. (*Id.* at 353-54, 355-56.) On February 2, 2005, Falzarano also sent an email to Janet Clark at Bose Sound, asking her whether or not Bose has an advertising contract with I Media. (*See* Pl.'s Ex. 98.)

In conducting their investigation of Conte and I Media, members of the Office also contacted route distributors. For example, Hoppe testified that he was approached by Falzarano in February of

2005.[16] According to Hoppe, Falzarano told him that he thought I Media was fraudulently run and that Conte was a scam artist, and asked him whether he was getting paid for his distribution activities. Falzarano also told him not to tell Conte about their conversation. (Tr. 209-10.) Hoppe spoke to a bunch of route distributors after this incident, all of whom were concerned about what the impact of the D.A.'s Office's investigation would be on their jobs. (Id. at 213.)[17] The Office also reached out to I Media employees, such as Al Amorizzo, I Media's former distribution manager. (See Pl.'s Ex. 139, Report of Falzarano Interview of Amorizzo, dated May 13, 2005.) In addition, the Office attempted to contact publishers. (See Tr. 535-44 (Wallace testifying about a conversation he had with Gabriel Sauro, a senior sales representative at Quebecor World, during which Sauro told Wallace that he was suspicious of Conte and his company); id. at 550 (Wallace testifying to conversation he had with Transcontinental Printing in Newtown, Connecticut about Conte); id. at 636-37 (Hubbard, a sales representative for Transcontinental Printing, testifying about his communications with Wallace in December of 2004).)

The D.A.'s Office also served Conte with four subpoenas in 2005.[18] The first was

sent by certified mail and was inadvertently returned to the Office, the second was dated January 28, 2005, the third was dated March 3, 2005, and the last was dated April 7, 2005. (Id. at 153-54.)[19]

In March of 2005, Conte retained an attorney, John Halton ("Halton"). (Id. at 158.) Halton met with Wallace and Falzarano at the D.A.'s Office a few weeks later. According to Falzarano's testimony, at that meeting Falzarano informed Halton of the fact that he had "uncovered during internet searches that some, at least one, maybe more than one, article that were in TV Time Magazine that I had found were cut and pasted or had an origination in other magazines." (Id. at 346.) Following the meeting, Halton forwarded Conte a six-page list of route distributors that the D.A.'s Office claimed Conte owed money to. (Id. at 160-61.) Conte subsequently fired Halton. (Id. at 163.)

On April 15, 2005, Conte faxed copies of documents listed on the D.A.'s fourth subpoena to Wallace. (Id. at 166.) Conte also surrendered pursuant to the criminal Information in September of 2005. He was arraigned before a judge in the District Court of Nassau County and released on his own recognizance. (Id. at 192; 1271-72.) The D.A.'s Office gave some thought to presenting the case to a grand jury in the spring of 2005. (Id. at 601.) However, no

---

[16] One of Falzarano's reports, dated February 10, 2005, indicates that he in fact spoke to Hoppe. (See Pl.'s Ex. 97.)

[17] Hoppe's concerns did not cause him to stop working for Conte; Hoppe continued to distribute TV Time Magazine. (Tr. 219.) Hoppe also testified that he was not personally aware of any fraud or fraudulent activity going on in I Media's business operations. (Id. at 223.)

[18] Wallace testified that it is standard practice to gather as much information as possible from available sources before contacting the target of an investigation. (Id. at 595.) This is done "to preserve

the integrity of the investigation and get all of the evidence" before interviewing the target. (Id. at 596.)

[19] In connection with its investigation of Conte, the D.A.'s Office also served subpoenas on the Teacher Federal Credit Union (a bank where Conte maintained two accounts, one for I Media and one that was personal) and Suffolk Federal Credit Union. (Id. at 156.) Those subpoenas were served in 2004. Wallace testified that the records the Office received in response to those subpoenas were inconclusive, as they "didn't show a clear pattern that would suggest criminal conduct at that time." (Id. at 526.)

evidence was ever presented to a grand jury in this case. (*Id.* at 393-93 (Emmons stating that the case "was scheduled on the grand jury calendar on a repeated basis to issue subpoenas to get information," but that "no evidence was presented to the grand jury").)

Eventually, Cutolo and Conte settled the matter pending in small claims court. (*See* Pl.'s Aff. in Opp'n to the County Defs.' Rule 50 and 59 Mots. ("Pl.'s Opp'n Aff.") Ex. A, Stipulation of Settlement between Cutolo and Conte.) The matter settled for $3,500.00. (*Id.*) Cutolo accepted a new check from Conte and signed a release for the payment. (*See* Pl.'s Opp'n Aff. Ex. A, June 17, 2005 Signed Release.) In the release, Cutolo acknowledged his acceptance of a bank check dated June 17, 2005 in the amount of $3,500.00 (as "replacement in full for a post-dated check . . . issued to me by I Media Corporation on June 21, 2003 in the amount of $2,500.00 that was subsequently dishonored by I Media's bank," the remainder to serve as "consideration and fully settle[] any outstanding claims, complaints and causes of action relating to a contract between Joseph Cutolo and I Media Corporation"). (*Id.* (attaching a copy of the check dated June 17, 2005 that Cutolo received from I Media).)

Around May of 2005, a number of route distributors contacted Conte telling him that "I Media was a scam," and that he "was a fraud." (Tr. 197.) Conte testified about a specific call that he received from Larry Furnell ("Furnell"), a route distributor. According to Conte's testimony, Furnell told Conte that if he did not pay the $35,000 he owed him, he would tell Mark Harrington, a Newsday reporter, to publish a story in Newsday stating that I Media was a scam, that Conte was a fraud, and that Conte was operating a Ponzi scheme. (*Id.* at 203.) From

that point on, route sales dropped dramatically (*id.* at 202), and advertisers (*i.e.* Bose Sound) began terminating their relationships with I Media (*id.* at 230). Around the same time, I Media stopped producing new editions of TV Time Magazine. Conte testified that his last payment to a printer was made in April of 2005. (*Id.* at 1288.) He also testified that the last edition of TV Time Magazine was published in May of 2005, and that the issue was delivered by his route distributors. (*Id.* at 1287-79.) Eventually, I Media went under due to a significant lack of revenue. (*Id.* at 203-04.) Conte testified that the total loss to him, his family, and the business was well in excess of a million dollars. (*Id.* at 232.)[20]

Various route distributors brought a class action against Conte in the Supreme Court of Nassau County in the summer of 2005, alleging that Conte initiated a Ponzi scheme. (*Id.* at 796-97.) Wallace discussed the filing of this class action complaint with Giaimo, the route distributors' attorney. (*Id.* at 573.) Giaimo sent Wallace a copy of the complaint (*see* Pl.'s Ex. 162, Sept. 8, 2005 Email from Giaimo to Wallace attaching complaint), but Wallace testified that he did not work with Giaimo to create or edit the document (Tr. 573-74), nor did he discuss his Department's criminal investigation of Conte and I Media with Giaimo (*id.* at 576). When asked whether he told Giaimo that Conte was a fraud and that I Media was a scam, Wallace replied that Giaimo was the one who told him those things about Conte and I Media. (*Id.* at 574.) The route distributors' lawsuit against Conte was eventually dismissed. (*Id.* at 796-97.)

---

[20]   Specifically, Conte stated the following: "Cumulatively, the impact, both of losses to the business and me was well over a million dollars. The loss to my family personally was several hundred thousand dollars fold." (*Id.* at 232.)

In a memo dated August 25, 2006 from Wallace to Emmons, Wallace discussed the findings of the investigation against Conte and I Media. He expressed the belief that, although "the conduct of the accused is certainly suspicious, particularly when viewed in light of the number of complaints received," "it would be [a] very difficult case to prove and it ultimately may be more civil than criminal in nature." He further stated that "[t]he accused appears to have gone to great lengths to at least create the appearance that he engaged in a legitimate start-up business. While he took various amounts of money from numerous customers, it is clear that substantial efforts were put forth to actually print the publication, have it delivered." (*Id.* at 422; *see also id.* at 599-601 (Wallace testifying to all the reasons they decided to close the investigation, one being that it would be difficult to prove beyond a reasonable doubt).) In August of 2006, the D.A.'s Office circulated its final determination – that the complaints against I Media and Conte did not merit the initiation of a criminal prosecution and that the matter should be closed. (*Id.* at 284-84; *see also* Pl.'s Ex. 140.) The check charge was dismissed about eight or nine months after Conte's arraignment. (Tr. 192.)[21]

## B. Procedural History

Plaintiff filed the complaint in this action on August 30, 2006, an amended complaint on January 4, 2007, and a second amended complaint on April 4, 2007. By Memorandum and Order dated March 31, 2008, the Court granted in part and denied in part defendants' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. *See Conte v. Cnty. of Nassau*, No. 06-CV-4746 (JFB)(ETB), 2008 U.S. Dist. LEXIS 25694 (E.D.N.Y. Mar. 31, 2008). Specifically, the Court dismissed all claims against New York City and the NYPD, as well as the claims against the individual County defendants in their official capacities. The Court also dismissed plaintiff's due process, equal protection, Lanham Act, Section 1985, and Section 1986 claims. The parties then proceeded to discovery on plaintiff's remaining claims.

Plaintiff filed a motion for summary judgment against all of the defendants on January 11, 2010. The County defendants cross-moved for summary judgment on March 5, 2010, as did Shaska. Guerra also moved for summary judgment on March 12, 2013. Plaintiff submitted his oppositions to defendants' motions and replies in support of his own motion on April 20, 2010. The County defendants and Shaska filed replies in support of their motions on May 7, 2010. Plaintiff filed sur-replies in opposition to defendants' motions on May 18, 2010. The Court held oral argument on the summary judgment motions on September 8, 2010.

By Memorandum and Order dated September 30, 2010 ("September 30 Memorandum and Order"), the Court denied plaintiff's motion for summary judgment in its entirety and granted in part and denied in part defendants' motions. *See Conte v. Cnty. of Nassau*, No. 06-CV-4746 (JFB)(ETB), 2010 U.S. Dist. LEXIS 104815 (E.D.N.Y. Sept. 30, 2010). Specifically, the Court granted summary judgment in the County defendants' favor on plaintiff's claims for malicious prosecution, violation of the First Amendment, and conspiracy under Section

---

[21]   Conte also brought suit against Newsday, Consumers Warehouse, and various other defendants in this Court in September of 2006. Summary judgment was granted in defendants' favor, and the case was closed on March 15, 2013. *See Conte v. Newsday*, No. 06-CV-4859 (JFB)(ETB), 2013 U.S. Dist. LEXIS 35676 (Mar. 13, 2013).

1983. The Court also granted summary judgment in Sardo's favor on all claims alleged against her, and in Emmons', Wallace's, and Falzarano's favor on the false arrest claim. The Court additionally concluded that plaintiff's federal and state-law false arrest (against Wasilausky) and abuse of process (against all County defendants except Sardo) claims, as well as plaintiff's *Monell* claims against the County of Nassau, survive summary judgment due to triable issues of fact regarding those claims. Finally, with respect to plaintiff's state-law claims, the Court denied the County defendants and Guerra summary judgment on plaintiff's tortious interference with contractual relationships claim, and granted summary judgment to Shaska on that claim. The Court also concluded that plaintiff's remaining state-law claims for defamation, injurious falsehood, and intentional infliction of emotional distress were barred by the statute of limitations as against all defendants.

On October 4, 2010, Guerra filed a motion for reconsideration of the Court's September 30 Memorandum and Order. Conte filed a letter regarding the Court's September 30 Memorandum and Order on October 15, 2010, as well as a motion for reconsideration on December 8, 2010. The County defendants filed their motion for reconsideration on November 19, 2010. On August 5, 2011, the Court orally ruled on the motions for reconsideration, denying all motions in their entirety.

A jury trial was subsequently held (and proceeded in two phases, liability and damages) before this Court, beginning on May 21, 2012, and concluding on June 11, 2012. On June 5, 2012, the jury found that (1) Wasilausky subjected plaintiff to an unlawful arrest; (2) none of the County defendants maliciously abused process in

connection with plaintiff's arrest on a bad check charge or in connection with the issuance of Grand Jury subpoenas; and (3) Emmons, Wallace, and Falzarano (but not Wasilausky) tortiously interfered with plaintiff's contractual relationships. On June 11, 2012, the jury awarded $500.00 in compensatory damages and $26,000.00 in punitive damages against defendant Wasilausky in connection with plaintiff's false arrest claim. As to plaintiff's tortious interference with contract claim, the jury awarded plaintiff $3,500.00 in compensatory damages for tortious acts which took place before June 1, 2005, and $700,000.00 in compensatory damages for tortious acts which took place on or after June 1, 2005. The jury also awarded punitive damages in connection with plaintiff's tortious interference with contract claim: $60,000.00 against Emmons; $443,000.00 against Wallace; and $175,000.00 against Falzarano.

Following the jury's verdict, the Court set a briefing schedule for the parties' currently pending Rules 50(b) and Rule 59 motions. On June 13, 2012, plaintiff filed a letter motion for a new trial. The County defendants opposed plaintiff's motion by motion filed on August 13, 2012, and plaintiff submitted an affidavit in further support of his motion, dated August 24, 2012. The County defendants filed their motion for judgment as a matter of law and for a new trial on July 2, 2012. Plaintiff submitted an affidavit in opposition to the County defendants' motion, dated July 31, 2012, and the County defendants replied on August 13, 2012. Plaintiff also submitted a sur-reply in further opposition to the County defendants' motion, dated August 24, 2012. The Court held oral argument on September 6, 2012.

Following oral argument, the County defendants filed a letter, dated September 11, 2012, to address certain contentions made by plaintiff in his sur-reply. Plaintiff subsequently submitted letters to the Court regarding the Rules 50(b) and 59 motions on September 12 and 13, 2012, October 1, 2012 (which the County defendants opposed by letter dated October 5, 2012), and November 4, 2012. By Order dated May 29, 2013, the Court requested that the parties participate in a telephone conference to discuss supplemental briefing on the tortious interference with contract statute of limitations issue. The Court held that telephone conference on May 31, 2013, during which it set a schedule for the supplemental briefing requested. The County defendants filed a letter dated June 21, 2013, in support of its position on the indemnification issue related to the statute of limitations question. Plaintiff filed a letter in opposition, dated June 27, 2013. The Court has considered all of the party's submissions.

## II. STANDARD OF REVIEW[22]

The standard governing motions for judgment as a matter of law pursuant to Rule 50 is well-settled. A court may not properly grant judgment as a matter of law under Rule 50 against a party "unless the evidence, viewed in the light most favorable to the nonmoving party, is insufficient to permit a reasonable juror to find in his favor." *Arlio v. Lively*, 474 F.3d 46, 51 (2d Cir. 2007) (citing *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 289 (2d Cir. 1998)). Generally, a court reviewing such a motion must defer to all credibility

determinations and reasonable inferences that the jury may have drawn at trial. *See Frank Sloup & Crabs Unltd., LLC v. Loeffler*, 745 F. Supp. 2d 115, 120 (E.D.N.Y. 2010). That is, a court considering a Rule 50 motion "may not itself weigh the credibility of witnesses or consider the weight of the evidence." *Meloff v. N.Y. Life Ins. Co.*, 240 F.3d 138, 145 (2d Cir. 2001) (quoting *Galdieri-Ambrosini*, 136 F.3d at 289); *see also Playtex Prods., Inc. v. Procter & Gamble Co.*, 02 Civ. 8046 (WHP), 2004 U.S. Dist. LEXIS 14084, at *5-6 (S.D.N.Y. July 26, 2004) ("A Rule 50(b) motion cannot be granted 'if, drawing all reasonable inferences in favor of the nonmoving party and making all credibility assessments in his favor, there is sufficient evidence to permit a rational juror to find in his favor.'" (quoting *Sir Speedy, Inc. v. L&P Graphics, Inc.*, 957 F.2d 1033, 1039 (2d Cir. 1992)).

Thus, judgment as a matter of law is appropriately granted where "(1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against [it]." *Advance Pharm., Inc. v. United States*, 391 F.3d 377, 390 (2d Cir. 2004) (alterations in original) (quoting *Galdieri-Ambrosini*, 136 F.3d at 289); *see also Kinneary v. City of N.Y.*, 601 F.3d 151, 155 (2d Cir. 2010) (same); *This is Me, Inc. v. Taylor*, 157 F.3d 139, 142 (2d Cir. 1998) (stating that a court assessing a Rule 50 motion must consider whether "the evidence is such that, without weighing the credibility of witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [people] could have reached" (quoting *Cruz*

---

[22] Because, for the reasons discussed *supra*, both motions for a new trial are denied as moot, the Court addresses only the standard of review for Rule 50 motions for judgment as a matter of law.

*v. Local Union No. 3, Int'l Bd. of Elec. Workers*, 34 F.3d 1148, 1154-55 (2d Cir. 1994))). In other words, this Court may only grant defendant's Rule 50(b) motion "if it cannot find sufficient evidence supporting the jury's verdict." *Playtex Products*, 2004 U.S. Dist. LEXIS 14084, at *6; *see also Black v. Finantra Capital, Inc.*, 418 F.3d 203, 209 (2d Cir. 2005) ("A court evaluating [] a motion [for judgment as a matter of law] cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury."). For this reason, a party moving to set aside a jury verdict must clear "a high bar." *Lavin-McEleney v. Marist College*, 239 F.3d 476, 479 (2d Cir. 2001).

III.    DISCUSSION

The County defendants move for judgment as a matter of law on plaintiff's false arrest and tortious interference with contract claims. For the reasons discussed in detail below, the motion for judgment as a matter of law is granted in its entirety.[23]

A. Plaintiff's False Arrest Claim

Defendant Wasilausky seeks judgment as a matter of law on the false arrest claim on the following grounds: (1) Wasilausky had no personal involvement with the arrest; (2) there was probable cause for the arrest; and (3) Wasilausky's actions are shielded by both absolute and qualified

immunity. As set forth below, the Court agrees.

Although the Court denied summary judgment on plaintiff's false arrest claim, that decision was based upon the fact that plaintiff had alleged Wasilausky's involvement in the investigative stage of the case and in the arrest, and the record was sufficiently unclear as to Wasilausky's precise involvement in the investigation and arrest so as to preclude summary judgment on the false arrest claim. Plaintiff incorrectly asserts, in his opposition affidavit, that all of the issues now raised by Wasilausky were already decided in plaintiff's favor at the summary judgment stage. At that time, the Court simply could not make the determinations necessary for the false arrest claim, given the gaps in the evidentiary record and the allegations that were made by plaintiff. However, now, having conducted the trial, it is abundantly clear that, even construing the evidence most favorably to plaintiff, there is simply no evidence from which Wasilausky can be held liable for a false arrest and, in any event, based on the uncontroverted facts presented at trial, he is shielded from liability under the doctrines of absolute and qualified immunity. Accordingly, Wasilausky's motion for judgment as a matter of law on the false arrest claim is granted.

1. Legal Standard

In New York, the claim colloquially known as "false arrest" is a variant of the tort of false imprisonment, and courts use that tort to analyze an alleged Fourth Amendment violation in the Section 1983 context. *See Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995). To prevail, a plaintiff must prove four elements: "(1) the defendant intended to confine him; (2) the

---

[23] Because the Court grants defendants' motion for judgment as a matter of law in its entirety, the County defendants' motion for a new trial is denied moot, as is plaintiff's motion for a new damages trial. *See, e.g.*, *Monz v. Rocky Point Fire Dist.*, 853 F. Supp. 2d 277, 289 (E.D.N.Y. 2012) ("As the Court granted Defendants' motion for judgment as a matter of law, Defendants' motions for a new trial . . . or for a new trial as to damages are DENIED AS MOOT.").

plaintiff was conscious of the confinement; (3) the plaintiff did not consent to the confinement; and (4) the confinement was not otherwise privileged." *Broughton v. New York*, 37 N.Y.2d 451, 456 (1975).

### 2. Application

#### a. Personal Involvement

To state a claim for individual liability under Section 1983, "a plaintiff must demonstrate a defendant's personal involvement in the alleged [constitutional violation] in order to establish a claim against such defendant in his individual capacity." *Valenti v. Massapequa Union Free Sch. Dist.*, No. 09-CV-977 (JFB) (MLO), 2010 U.S. Dist. LEXIS 10076, at *30 (E.D.N.Y. Feb. 5, 2010) (citation omitted); *see Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); *Gill v. Mooney*, 824 F.2d 192, 196 (2d Cir. 1987) ("Absent some personal involvement by [a defendant] in the allegedly unlawful conduct of his subordinates, he cannot be held liable under section 1983." (citation omitted)). "[M]ere bald assertions and conclusions of law do not suffice." *Davis v. Cnty. of Nassau*, 355 F. Supp. 2d 668, 677 (E.D.N.Y. 2005) (citation and internal quotation marks omitted).

Although Conte alleged that ADA Wasilausky was personally involved in his bad check arrest, simply no evidence was adduced at trial from which a rational jury could find such personal involvement. During the trial, plaintiff testified that he surrendered himself for arrest at the Nassau County District Court in September 2005.

(Tr. 192; 1270-72.) After several hours at the courthouse, he was arraigned by a judge and released on his own recognizance. (*Id.* at 1271-72.) There was no testimony by plaintiff, or by Wasilausky, regarding any personal involvement of Wasilausky in the actual arrest. Instead, the uncontroverted evidence was that it was ADA Warren Thurer who signed the application for the arrest warrant in connection with the bad check charge. (*Id.* at 461.) In fact, Wasilausky testified that the standard procedure in the D.A.'s Office is that, once the misdemeanor complaint has been signed, the entire complaint and file is sent to the District Court Bureau, which is an entirely separate division from the Criminal Complaint Unit that was operated by Wasilausky at the time. (*Id.* at 508.) Wasilausky testified that he had no personal involvement with plaintiff's bad check charge once the matter was sent to the District Court Bureau, and plaintiff offered no evidence to the contrary. (*Id.* at 509.) Thus, given that there is simply no evidence that Wasilausky was involved in the arrest itself, he is entitled to judgment as a matter of law on the false arrest claim. *See, e.g.*, *Rogers v. Cartagena*, 10 Civ. 9285 (JPO), 2013 U.S. Dist. LEXIS 44950, at *12 n.4 (S.D.N.Y. Mar. 28, 2013) ("Defendants Keppler and Rinaldi, not being present, had no personal involvement in [plaintiff's] arrest, and therefore any false arrest claim, regardless of the claim's validity, necessarily fails as to them."). In any event, to the extent that plaintiff seeks to hold Wasilausky liable based upon his work in preparing for, and then filing, the arrest warrant request, such actions (as discussed below) are protected by the doctrines of absolute and qualified immunity.

### b.   Absolute Immunity

"It is by now well established that 'a state prosecuting attorney who acted within the scope of his duties in initiating and pursuing a criminal prosecution is immune from a civil suit for damages under § 1983.'" *Shmueli v. City of N.Y.*, 424 F.3d 231, 236 (2d Cir. 2005) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 410, 431 (1976)). This absolute immunity "extends to 'acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State.'" *Smith v. Garretto*, 147 F.3d 91, 94 (2d Cir. 1998) (quoting *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993)). In *Kalina v. Fletcher*, the Supreme Court emphasized that it is clear that a prosecutor's "activities in connection with the preparation and filing of . . . the information and the motion for an arrest warrant . . . are protected by absolute immunity." 522 U.S. 118, 129 (1997). The Court further explained the work of the prosecutor as an advocate in this context, which is protected by absolute immunity:

> That characterization [of work as an advocate] is appropriate for her drafting of the certification, her determination that the evidence was sufficiently strong to justify a probable-cause finding, her decision to file charges, and her presentation of the information and the motion to the court.

*Id*. at 130.[24]

Based upon the above-referenced precedent, any involvement by Wasilausky or his unit in connection with the preparation for and the filing of the warrant request, as well as Wasilausky's evaluation of the strength of the evidence in support of a probable cause determination, is entitled to absolute immunity under *Kalina*. 522 U.S. at 129. Wasilausky tesitified that he "signed off on approving and filing the [bad check] charge." (Tr. 460.) Other than this activity, which is of the type shielded by absolute immunity, there is simply no evidence of involvement by Wasilausky. The Court recognizes that, "[w]hen a district attorney functions outside his or her role as an advocate for the People, the shield of immunity is absent. Immunity does not protect those acts a prosecutor performs in administration or investigation not undertaken in preparation for judicial proceedings." *Hill*, 45 F.3d at 661. However, there is no such evidence in connection with Wasilausky, whose role was limited to his involvement in the preparation and filing of the arrest warrant request. Moreover, as noted above, Wasilausky testified that, once the misdemeanor complaint was signed by his unit, the entire complaint and file was sent to the District Court Bureau of the D.A.'s Office, and Wasilausky had no further involvement in the case after that transfer. (Tr. 508-09.) Accordingly, even construing the evidence most favorably to plaintiff, Wasilausky is entitled to absolute immunity on the false arrest claim.

### c.   Qualified Immunity

Even assuming *arguendo* that there was evidence against Wasilausky of involvement in the investigation that falls outside the scope of absolute immunity, he is protected by qualified immunity because there was, at

---

[24] The only action that was not protected by absolute immunity in *Kalina* was the prosecutor's attesting to the truth of the facts contained in the certification. *Kalina*, 522 U.S. at 130-31. Here, the facts were attested to by the complainant, Cutolo, not Wasilausky. (Pl.'s Ex. 1; Tr. 507.)

a minimum, arguable probable cause for the issuance of the arrest warrant.

### i. Legal Standard

If absolute immunity does not apply, government actors may be shielded from liability for civil damages by qualified immunity, *i.e.*, if their "conduct did not violate plaintiff's clearly established rights, or if it would have been objectively reasonable for the official to believe that his conduct did not violate plaintiff's rights." *Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 385 (2d Cir. 2003); *see also Fielding v. Tollaksen*, 257 F. App'x 400, 401 (2d Cir. 2007) ("The police officers in turn, are protected by qualified immunity if their actions do not violate clearly established law, or it was objectively reasonable for them to believe that their actions did not violate the law."). As the Second Circuit has also noted, "[t]his doctrine is said to be justified in part by the risk that the 'fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties.'" *McClellan v. Smith*, 439 F.3d 137, 147 (2d Cir. 2006) (quoting *Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999)). Thus, qualified immunity, just like absolute immunity, is not merely a defense, but rather is also "an entitlement not to stand trial or face the other burdens of litigation." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Accordingly, the availability of qualified immunity should similarly be decided by a court "at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991).

"The availability of the defense depends on whether a reasonable officer could have believed his action to be lawful, in light of clearly established law and the information he possessed." *Weyant v. Okst*, 101 F.3d 845, 858 (2d Cir. 1996) (internal alterations, citation, and quotation marks omitted). In the context of false arrest and malicious prosecution claims, an arresting officer is entitled to qualified immunity if either: (a) the arresting officer's belief that probable cause existed was objectively reasonable, or (b) officers of reasonable competence could disagree on whether the test for probable cause was met. *See Walczyk v. Rio*, 496 F.3d 139, 163 (2d Cir. 2007). The Second Circuit has defined this standard, which is often referred to as "arguable probable cause," as follows:

> Arguable probable cause exists when a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in the light of well established law. It is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause existed in the light of well established law. It is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials—like other officials who act in ways they believe to be lawful—should not be held personally liable.

*Cerrone v. Brown*, 246 F.3d 194, 203 (2d Cir. 2001) (citations and quotation marks omitted). In particular, the Second Circuit has affirmed that "'[a]rguable' probable cause should not be misunderstood to mean 'almost' probable cause . . . . If officers of reasonable competence would have to agree that the information possessed by the officer at the time of arrest did not add up to

probable cause, the fact that it came close does not immunize the officer." *Jenkins v. City of N.Y.*, 478 F.3d 76, 87 (2d Cir. 2007). Under this standard, an arresting officer is entitled to qualified immunity, as a matter of law, only "'if the undisputed facts and all permissible inferences favorable to the plaintiff show . . . that officers of reasonable competence could disagree on whether the probable cause test was met.'" *McClellan*, 439 F.3d at 147-48 (quoting *Robison v. Via*, 821 F.2d 913, 921 (2d Cir. 1987)).

Although qualified immunity typically is asserted by police officers, the qualified immunity standard of arguable probable cause also applies to prosecutors in some situations. *See Hickey v. City of N.Y.*, No. 01-CV-6506 (GEL), 2002 U.S. Dist. LEXIS 15944, at *14-15 (S.D.N.Y. Aug. 26, 2002) ("There is no question that the right not to be arrested and subjected to lengthy involuntary detention in police custody without probable cause to support the arrest is firmly established, and any reasonable police officer, let alone prosecutor, would reasonably be expected to know that." (internal citations omitted)); *Murphy v. Neuberger*, No. 94 Civ. 7421, 1996 U.S. Dist. LEXIS 11164, at *37-38 (S.D.N.Y. Aug. 6, 1996) (applying arguable probable cause standard to prosecutor's actions after determining that prosecutor was not entitled to absolute immunity).

In general, probable cause is established where "the arresting officer has 'knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested.'"[25]

*Singer*, 63 F.3d at 119 (quoting *O'Neill v. Town of Babylon*, 986 F.2d 646, 650 (2d Cir. 1993)); *see also Weyant*, 101 F.3d at 852 (citing *Dunaway v. New York*, 442 U.S. 200, 208 n.9 (1979)) (additional citations omitted). Furthermore, "[t]he validity of an arrest does not depend upon an ultimate finding of guilt or innocence." *Peterson v. Cnty. of Nassau*, 995 F. Supp. 305, 313 (E.D.N.Y. 1998) (citing *Pierson v. Ray*, 386 U.S. 547, 555 (1967), *overruled on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800 (1982)). "Rather, the court looks only to the information the arresting officer had at the time of the arrest." *Id.* (citing *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)). Moreover, a determination of probable cause is based upon the "totality of the circumstances, and 'where law enforcement authorities are cooperating in an investigation . . . , the knowledge of one is presumed shared by all.'" *Calamia v. City of N.Y.*, 879 F.2d 1025, 1032 (2d Cir. 1989) (quoting *Illinois v. Andreas*, 463 U.S. 765, 771 n.5 (1983)) (additional citations omitted); *see also Bernard*, 25 F.3d at 102 (citing *Illinois v. Gates*, 462 U.S. 213, 230 (1982)). "The question of whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers, or may require a trial if the facts are in dispute." *Weyant*, 101 F.3d at 852 (citations omitted). Where an issue of probable cause is "factual in nature," it must be presented to a jury. *Moore v. Comesanas*, 32 F.3d 670, 673 (2d Cir. 1994) (citations omitted). Furthermore, an officer who

---

[25] In New York State, "a police officer may arrest a person for . . . [a] crime when he has reasonable cause to believe that such person has committed such crime, whether in his presence or otherwise." N.Y. Crim. Proc. Law § 140.10(1)(b). "'Reasonable cause

to believe that a person has committed an offense' exists when evidence or information which appears reliable discloses facts or circumstances which are collectively of such weight and persuasiveness as to convince a person of ordinary intelligence, judgment and experience that it is reasonably likely that such offense was committed and that such person committed it." *Id.* § 70.10.

merely observes or assists in an arrest, even if he is not the "arresting officer," may be liable for failing to intercede to prevent an arrest without probable cause. *See O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir. 1988) ("A law enforcement officer has an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in his presence by other officers." (citations omitted)).

With respect to an officer's basis for probable cause, it is well-established that "[w]hen information [regarding an alleged crime] is received from a putative victim or an eyewitness, probable cause exists . . . unless the circumstances raise doubt as to the person's veracity." *Curley v. Vill. of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001) (citing *Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000) and *Singer*, 63 F.3d at 119); *see also Martinez*, 202 F.3d at 634 ("We have previously held that police officers, when making a probable cause determination, are entitled to rely on the victims' allegations that a crime has been committed."); *McKinney v. George*, 726 F.2d 1183, 1187 (7th Cir. 1984) ("If policemen arrest a person on the basis of a private citizen's complaint that if true would justify the arrest, and they reasonably believe it is true, they cannot be held liable for a violation of the Constitution merely because it later turns out that the complaint was unfounded."). Moreover, "[t]he veracity of citizen complain[an]ts who are the victims of the very crime they report to the police is assumed." *Miloslavsky v. AES Eng'g Soc'y, Inc.*, 808 F. Supp. 351, 355 (S.D.N.Y. 1992) (citing *Adams v. Williams*, 407 U.S. 143, 148 (1972), *aff'd*, 993 F.2d 1534 (2d Cir. 1993); *accord Lee v. Sandberg*, 136 F.3d 94, 103 (2d Cir. 1997) (quoting *Miloslavsky* with approval); *see also* 2 Wayne LaFave, *Search and Seizure: A Treatise On The Fourth Amendment*

§ 3.4(a), at 205 (4th ed. 2007) (noting that the Supreme Court has "proceeded as if veracity may be assumed when information comes from the victim of . . . criminal activity" (citing *Chambers v. Maroney*, 399 U.S. 42 (1970))).

ii. Analysis

Conte was arrested for issuing a bad check under New York Penal Law § 190.05. The statute provides:

> A person is guilty of issuing a bad check when . . . (a) [a]s a drawer or representative drawer, he utters a check knowing that he or his principal, as the case may be, does not have sufficient funds with the drawee to cover it, and (b) he intends or believes *at the time of utterance* that payment will be refused by the drawee upon presentation, and (c) payment is refused by the drawee upon presentation . . . .

N.Y. Penal Law § 190.05(1) (emphasis added). The statute defines "check" as "any check, draft or similar sight order for the payment of money *which is not post-dated with respect to the time of utterance*." *Id.* § 190.00(1) (emphasis added).

In the instant case, even construing the facts most favorably to plaintiff, Wasilausky is entitled to qualified immunity for any activities before the initiation of the prosecution because he had, at the very least, arguable probable cause to conclude that plaintiff was guilty of issuing a bad check. In particular, the following facts were uncontroverted at trial: (1) the D.A.'s Office's investigation of plaintiff began when the Criminal Complaint Unit received a bad check complaint from Cutolo (Tr. 444-46); (2) the Criminal Information, which

was signed under oath by Cutolo, stated that the check he had received from plaintiff was returned the first time he attempted to cash it for insufficient funds, and was returned a second time because a stop payment was placed upon it (Pl.'s Ex. 22); and (3) Cutolo stated that the check was not post-dated, and that when he called plaintiff to ask for his money back, he was screamed at (*see id.*). Cutolo's sworn statement alone was sufficient to create arguable probable cause to arrest plaintiff for the issuance of a bad check.

Plaintiff testified that he provided information to the D.A.'s Office in support of his position that the check was post-dated. Specifically, Conte put forward evidence that, at that meeting at the Office, he told Zwicker that he gave Cutolo the check on June 21, 2003, but the check was post-dated for July 5, 2003. (Tr. 112.) Conte also testified that he told Zwicker that he had informed Cutolo by telephone and by letter not to deposit the check. (*Id.* at 112-13.) Conte also gave the D.A.'s Office copies of various correspondences between him and Cutolo, including the letter dated July 1, 2003, asking Cutolo to not cash the check. (*Id.* at 110-11.) Conte also told Zwicker that he had been threatened by Cutolo and Cutolo's friend, and he played for Zwicker tapes of allegedly threatening voicemails that he received from Cutolo. (*Id.* at 111.)

As the Second Circuit has held, although a police officer is generally not required to investigate an arrestee's claim of innocence, "under some circumstances, a police officer's awareness of the facts supporting a defense can eliminate probable cause." *Jocks v. Tavernier*, 316 F.3d 128, 135 (2d Cir. 2003); *see also Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) ("[A]n officer may not disregard plainly exculpatory evidence."). Although this Court concluded

that there were "gaps in the evidentiary record in this case" that prevented this issue from being decided at summary judgment, *Conte*, 2010 U.S. Dist. LEXIS 104815, at *51, those gaps have now been filled at trial and it is clear that there was arguable probable cause for plaintiff's arrest at the time Wasiulisky's unit requested the arrest warrant and the file was sent to the District Court Bureau. As a threshold matter, Wasilausky did not recall being aware of the information plaintiff presented to Zwicker. (Tr. 457-63.) However, even if Wasilausky was aware of all the information plaintiff testified to providing to Zwicker, there was still arguable probable cause for Wasilausky to approve the filing of the criminal charge. Although plaintiff had a different version of events than that contained in Cutolo's sworn statement, there was still arguable probable cause because reasonable officers would disagree as to whether plaintiff's version of events or Cutolo's version of events should be credited at that juncture. Accordingly, Wasilausky would also be entitled to qualified immunity for any investigative conduct related to the bad check charge that was not protected by absolute immunity.[26]

---

[26] Wasilausky also argues that he is entitled to judgment as a matter of law because plaintiff's arrest was made pursuant to a valid arrest warrant. The Court notes that the arrest warrant was not produced until trial. However, the arrest warrant was issued pursuant to Section 120.10 of New York Criminal Procedure Law and, *inter alia*: (1) indicates that it was issued for plaintiff's arrest by Judge Spinola of the District Court of Nassau County on November 24, 2003; and (2) includes the criminal offense charged in the warrant and Cutolo's underlying sworn affidavit. Wasilausky argues that this valid arrest warrant created a presumption of probable cause that has not been rebutted, and thus is a complete defense as a matter of law to a false arrest claim. *See Phillips v. DeAngelis*, 571 F. Supp. 2d 347, 353 (N.D.N.Y. 2008) ("No cause of action for false arrest will lie where the arrest was effected pursuant to an arrest warrant. The proper claim in that instance is a malicious prosecution claim."

Finally, in an effort to counter the evidence of arguable probable cause, plaintiff points to evidence that, over 18 months after Wasilausky approved the request for an arrest warrant (but before Conte's arrest in September 2005), Cutolo sent a fax to Wallace (in June 2005) containing a sworn release that he had resolved the matter with plaintiff and that the July 5, 2003 check was post-dated, thus appearing to re-cant his prior sworn statement to the contrary. (Pl.'s Opp'n Aff. ¶¶ 11-14; *Id.* Ex. A (indicating that the stipulation of settlement for the matter in small claims court between Cutolo and Conte and Cutolo's signed release were sent from Cutolo to Wallace).) Thus, plaintiff argues that, given this subsequent release by Cutolo, probable cause was negated and he should not have been arrested in September 2005 in connection with the bad check charge.

As a threshold matter, the Court notes that there is absolutely no evidence that Wasilausky had any involvement with, or knowledge of, this subsequent information provided by Cutolo. In fact, to the contrary, it is uncontroverted that Cutolo spoke to Wallace in June 2005, not Wasilausky. As noted above, the uncontroverted evidence is

that Wasilausky had no involvement in the bad check charge after sending the case to the District Court Bureau in 2003. Thus, events that occurred in 2005 cannot be a basis for liability against Wasilausky for his conduct in 2003. In any event, arguable probable cause for Conte's arrest existed, even despite Cutolo's signed release, based on all of the other complaints against Conte filed with the D.A.'s Office, as well as the fact that Cutolo settled his case for more money than the 2003 check upon which his lawsuit was based was written.

\*\*\*

In sum, because the uncontroverted evidence indicates that Wasilausky was not personally involved in plaintiff's arrest, no rational jury could conclude that Wasilausky is liable on a false arrest claim. Moreover, to the extent plaintiff seeks to hold Wasilausky liable for false arrest based on his involvement in the preparation and filing of the arrest warrant request, Wasilausky's actions taken in that regard are protected by the doctrines of absolute and qualified immunity. Accordingly, Wasilausky is entitled to judgment as a matter of law on the false arrest claim.

### B. Plaintiff's Tortious Interference with Contract Claim

Defendants Emmons, Falzarano, and Wallace move for judgment as a matter of law on plaintiff's tortious interference with contract claim on the grounds that (1) because the one-year-and-ninety-day statute of limitations prescribed by New York General Municipal Law § 50-i governs plaintiff's tortious interference with contract claim, any claim based on alleged tortious conduct that occurred prior to June 1, 2005 is time barred, and (2) as to the conduct that occurred on or after June 1, 2005, plaintiff

---

(citations omitted)), *aff'd*, 331 F. App.'x 894 (2d Cir. 2009). Plaintiff contends that the warrant was simply a bench warrant for a failure to appear and that no probable cause determination was made by the issuing judge. Thus, plaintiff speculates that the warrant must have been "rubber stamped." (Pl.'s Opp'n Aff. ¶ 15.) However, apart from plaintiff's speculation, there is no reason to believe that this valid warrant – which was issued within a week of the filing of the misdemeanor information in November 2003 – should not create a presumption of probable cause that was not rebutted. Accordingly, this is an independent basis for judgment as a matter of law on the false arrest claim. However, as noted above, there are numerous other grounds that independently require judgment as a matter of law in Wasilausky's favor on the false arrest claim.

failed to present evidence at trial sufficient to establish the elements of the tort alleged. For the reasons discussed in detail below, viewing the evidence in the light most favorable to plaintiff and giving him the benefit of all reasonable inferences, the Court concludes that the evidence presented at trial is insufficient to support a rational jury's finding that defendants Emmons, Falzarano, and/or Wallace engaged in conduct amounting to tortious interference with plaintiff's contracts during the applicable limitations period. Accordingly, the motion for judgment as a matter of law on the tortious interference with contract claim is granted.

The Court notes that the applicability of the one-year-and-ninety-day statute of limitations was not discussed at summary judgment because defendants raised the defense for the first time in their motion for reconsideration of the Court's September 30 Memorandum and Order.[27] Defendants raised their statute of limitations argument

again at trial at the end of plaintiff's case (see Tr. 903-06), at which point the Court reserved decision under Rule 50(b) and stated that the Court would allow the case to go to the jury. Following the verdict, defendants re-asserted the statute of limitations defense in their Rule 50 and 59 moving papers, and the parties subsequently briefed the issue extensively. Thus, the statute of limitations defense is properly before the Court at this time and, having conducted the trial, it is clear that, even construing the evidence in the light most favorable to plaintiff, there is simply no evidence from which Emmons, Falzarano, or Wallace can be held liable for a timely tortious interference with contract.[28]

_____

[27] Accordingly, the Court, in ruling on the motion for reconsideration, explained that defendants' statute of limitations argument constituted a new theory of dismissal that could not properly be raised for the first time in a motion for reconsideration (Oral Arg. & Ruling on Mots. for Reconsideration, Aug. 5, 2011). See, e.g., Learning Annex Holdings, LLC v. Rich Global, LLC, 860 F. Supp. 2d 237, 241-42 (S.D.N.Y. 2012) ("A motion for reconsideration is not an opportunity for making arguments that could have been previously advanced . . . ."); Dart Mech. Corp. v. XL Specialty Ins., 06-CV-2457 and 06-CV-1933 (ENV MDG), 2011 U.S. Dist. LEXIS 16377, at *7 (E.D.N.Y. Feb. 17, 2011) (declining to consider argument raised in defendant's motion for reconsideration because it was "not raised in [defendant's] motion for summary judgment, and obviously could have been"). In any event, the Court held that, because the record was unclear as to whether the alleged interferences with contract and/or the injury resulting therefrom occurred within the shorter statute of limitations period, summary judgment was improper on that basis at that juncture. (Oral Arg. & Ruling on Mots. for Reconsideration.)

[28] Although the Court noted at the time that defendants' Rule 50 motion brought during trial raised substantial issues (Tr. 912-13), the Court reserved decision on all claims (except the municipal liability claim) in order to (1) be able to consider those issue after a careful review of the full record, and (2) allow Conte to have the merits of his case decided by the jury and to give him the opportunity to preserve for appeal a favorable verdict (should the jury rule in his favor, which it did on some claims). Moreover, again in an effort to preserve any verdict in light of the substantial statute of limitations issue raised at the close of the plaintiff's case by the defendants in their Rule 50 motion, the Court divided the damages issue on the verdict sheet – that is, the Court had the jury decide (on the tortious interference claim) what damages occurred before and after the date that the defendants argued was the applicable statute of limitations date. (See Id. at 1213-14 ("But in order to be able to deal with this as a District Court and as an Appellate Court, if I don't have it divided up by time, and if I said what are the damages, and if I said to them what are the damages on the interference with the contracts, and they came back with some number, and then either I ruled or the Second Circuit ruled that 50(i) applies, the verdict would be no good and it would have to be retried.").) However, this Court, having carefully reviewed the record, concludes, as discussed infra, that (notwithstanding the jury's verdict) there is no evidence of any tortious interference with contracts (or damages from such tortious conduct) within the applicable limitations period. Obviously, having

### 1. Legal Standard

Under New York law, to establish a tortious interference with contact claim, a plaintiff must prove (1) the existence of a valid contract, (2) the defendant's knowledge of the contract's existence, (3) that the defendant intentionally procured a breach of the contract, and (4) that it resulted in damages to the plaintiff. *See, e.g., Int'l Minerals & Res., S.A. v. Pappas*, 96 F.3d 586, 595 (2d Cir. 1996); *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 424 (1996). The tort has been explained as follows: "'when there is knowledge of a contract, and a competitor takes an active part in persuading a party to the contract to breach it by offering better terms or other incentives, there is an unjustifiable interference with the contract.'" *White Plains Coat & Apron Co. v. Cintas Corp.*,

---

obtained a favorable verdict, plaintiff may raise this issue, and this Court's ruling on it, with the Court of Appeals. In taking the steps it took on this issue, this Court was following the guidance of the Second Circuit articulated long ago:

> It is unfortunate that (especially after a long trial) the judge took the case from the jury. As we said in *Fratta v. Grace Line*, 2 Cir., 139 F.2d 743, 744: "We take this occasion to suggest to trial judges that, generally speaking – although there may be exceptions – it is desirable not to direct a verdict at the close of the evidence, but to reserve decision on any motion therefor and allow the jury to bring in a verdict; the trial judge may then, if he thinks it improper, set aside the verdict * * * and grant the motion, Federal Rules of Civil Procedure, rule 50(b), 28 U.S.C.A. following section 732c, with the consequence that if, on appeal, we disagree with him, we will be in a position to reinstate the verdict, thus avoiding the waste and expense of another trial."

*Lindeman v. Textron, Inc.*, 229 F.2d 273, 276 (2d Cir. 1956).

460 F.3d 281, 285 (2d Cir. 2006) (quoting *State Enter., Inc. v. Southridge Coop. Section 1, Inc.*, 18 A.D.2d 226, 227-28 (1st Dep't 1963)).

### 2. Application

#### a. Time Period Relevant to Plaintiff's Tortious Interference with Contract Claim

Defendants argue that plaintiff's tortious interference with contract claim must, given the statute of limitations applicable to such claims when they are alleged against municipalities and their employees, be based on tortious acts that occurred on or after June 1, 2005 (one year and ninety days prior to plaintiff's filing of the complaint in this action). Accordingly, defendants contend that the only evidence that the jury could have properly considered in evaluating plaintiff's claim is evidence of tortious conduct by defendants Emmons, Wallace, and/or Falzarano on or after June 1, 2005.

New York General Municipal Law § 50-i prescribes a one-year-and-ninety-day statute of limitations period for tort claims (other than wrongful death actions) asserted against a municipality. *See* N.Y. Gen. Mun. Law § 50-i (explaining that an "action or special proceeding" for tort claims brought against "a city, county, town, village, fire district or school district . . . shall be commenced within one year and ninety days after the happening of the event upon which the claim is based; except that wrongful death actions shall be commenced within two years"). Plaintiff concedes that, when asserted against a municipality, a claim for tortious interference with contract is governed by New York General Municipal Law's one-year-and-ninety-day statute of limitations. (Pl.'s Opp'n Aff. ¶ 16.) Plaintiff argues, however, that the limitations period applies only to actions maintained against a

municipality, and not to actions brought against municipality employees. (*Id.*) Accordingly, plaintiff contends that New York's three-year statute of limitations for tortious interference with contract claims governs his claims against defendants Emmons, Wallace, and Falzarano. (*Id.* ¶ 17.) The Court disagrees.

It is clear that the one-year-and-ninety-day limitations period of General Municipal Law § 50-i applies not only to claims brought against a municipality, but also to claims brought against individual defendants for conduct that a municipality would be obligated to indemnify. *See, e.g.*, *Regan v. Sullivan*, 557 F.2d 300, 305 (2d Cir. 1977) (explaining that suits against law enforcement officers employed by municipalities "were treated for statute of limitations purposes as suits against the municipalities employing them, which were governed by § 50-i," when those officers were required to be indemnified for the claims brought against them); *Int'l Shared Servs. v. Cnty. of Nassau*, 222 A.D.2d 407, 408 (2d Dep't 1995) ("It is clear that the one-year-and-90-day limitations period of General Municipal Law § 50-i and the notice of claim requirement of General Municipal Law § 50-e apply to the claims against the individual defendants only if the defendant County of Nassau is obligated to indemnify them." (citation omitted)); *Urraro v. Green*, 106 A.D.2d 567, 568 (2d Dep't 1984) (concluding that because individual defendant was acting within the scope of his employment at the time he engaged in the tortious conduct at issue, and was, therefore, entitled to be indemnified by the city for his conduct, the claim against the individual defendant was governed by General Municipal Law's one-year-and-ninety-day statute of limitations); *see also Brenner v. Heavener*, 492 F. Supp. 2d 399, 404 (S.D.N.Y. 2007) (finding notice of

claim requirements of New York General Municipal Law § 50 to be applicable to claims brought against municipal officers for "conduct by [the officers] that occurred while they were acting within the scope of their public employment and discharging official duties" because "[a]s to such claims the City would have a statutory obligation to indemnify the officers"). Thus, the shorter one-year-and-ninety-day statute of limitations governs plaintiff's tort claim against Emmons, Wallace, and Falzarano, so long as the claim is based on conduct indemnified by the County.

Pursuant to § 22-2.8(3)(a) of the Nassau County Administrative Code ("NCAC"), Nassau County

> shall indemnify and save harmless its employees[29] in the amount of any judgment including punitive or exemplary damages obtained against such employees in any state or federal court, . . . provided that the act or omission from which such judgment . . . arose, occurred while the employee was acting within the scope of his public employment or duties.

NCAC § 22-2.8(3)(a). Whether an employee was acting within the scope of public employment during the conduct at issue "shall be determined by a majority vote of a panel consisting of one member appointed

---

[29] "Employee," as used in § 22-2.8 of the Nassau County Administrative Code, means "any person holding a position by election, appointment or employment in the service of the County, whether or not compensated . . . but shall not include an independent contractor." NCAC § 22-2.8(1). Former employees of the County are included in this definition. *Id.* Accordingly, the indemnity provision of § 22-2.8 applies to actions taken by the Assistant District Attorneys named in this action.

by the Nassau County Board of Supervisors, one member appointed by the County Executive and the Director of Personnel for the County of Nassau." *Id.*

On November 28, 2006, the requisite panel of members met and determined that the acts of Emmons, Wallace, and Falzarano alleged in this lawsuit were committed while in the proper discharge of their duties and within the scope of their employment. (*See* Defs.' June 21, 2013 Letter, Ex. A, Determination of Employee Indemnification Board, at 2 (finding that the acts of all three defendants related to this lawsuit, as well as those of additional employees of the Nassau County District Attorney's Office, were committed within the scope of their public employment).)[30] Thus, under NCAC § 22-2.8(3)(a), the acts of Emmons, Wallace, and Falzarano at issue in this case are indemnified by the County and, despite plaintiff's allegations to the contrary, the shorter one-year-and-ninety-day statute of limitations period of General Municipal Law § 50-i applies to plaintiff's tortious interference with contract claim brought against those defendants.[31]

---

[30] To the extent plaintiff argues that the County's indemnification documents were not provided during discovery or trial and should, therefore, not be considered, the documents were filed in response to the Court's request for such information, made during the May 31, 2013 telephone conference, and were, therefore, timely.

[31] Plaintiff argues that this provision is inapplicable because the County Attorney has not concurred in the certification under NCAC § 22-2.8(3)(c). The fact that, under NCAC § 22-2.8(3)(c), the County Attorney must concur in the certification for payment by the County of a final judgment once it has been entered against an employee does not alter the statute of limitations analysis. The language of NCAC § 22-2.8(3)(a) indicates that the employee conduct at issue in this case is of the type that the County could indemnify, and the Indemnification Board explicitly determined that the employees would be indemnified. That is sufficient for statute of limitations purposes.

Under New York law, a tortious interference with contract claim accrues when the plaintiff sustains damages (as a result of a third party's breach of the contract that was tortiously interfered with). *See, e.g., St. John's Univ. v. Bolton*, 757 F. Supp. 2d 144, 173 (E.D.N.Y. 2010) ("Under New York law a tortious interference with contract claim accrues when the tort is completed – ordinarily when Plaintiff sustains damages." (citing *Kronos, Inc. v. AVX Corp.*, 81 N.Y.2d 90, 94 (1993))); *Cary Oil Co. v. MG Ref. & Mktg., Inc.*, 90 F. Supp. 2d 401, 419 n.106 (S.D.N.Y. 2000) ("A cause of action for tortious interference with contract accrues at the time the injury is sustained, rather than the date of defendant's alleged wrongful conduct or the date of breach." (citations omitted)). Accordingly, plaintiff's tortious interference with contract claim may be based only on evidence of tortious conduct that caused plaintiff damage on or after June 1, 2005 (one year and ninety days prior to plaintiff's filing of the complaint in this action).

Plaintiff argues that even if the one-year-and-ninety-day statute of limitations applies, pre-limitations period conduct should enter into the analysis under the continuing tort doctrine. (*See* Pl.'s Opp'n Aff. ¶ 25.)

---

A holding to the contrary would defy common sense because, under plaintiff's position, the County defendants would never be able to use the shorter statute of limitations to avoid a trial because the County Attorney's concurrence occurs only *after* final judgment has been entered.

To the extent Conte argues that the County Attorney would not have been able to certify any judgment because the claim brought against the employees is for an intentional tort, NCAC § 22-2.8(3)(a) makes clear that the County can indemnify an employee for *any* tort, including intentional torts and punitive damages arising therefrom, so long as it occurred while the employee was acting within the scope of his public employment or duties (a determination that was explicitly made by the Board of Indemnification for the employees in this case).

The continuing tort doctrine "provides that, in certain tort cases involving continuous or repeated injuries, the statute of limitations accrues upon the date of the last injury and that the plaintiff may recover for the entire period of the employer's negligence, provided that an act contributing to the claim occurs within the filing period." *Mix v. Delaware & Hudson Ry. Co., Inc.*, 345 F.3d 82, 88 (2d Cir. 2003). The Second Circuit has explained that the doctrine "is based on the idea that certain torts continually give rise to new causes of action, which can be brought notwithstanding the expiration of the limitations period for prior causes of action." *Syms v. Olin Corp.*, 408 F.3d 95, 108 (2d Cir. 2005). However, "New York's continuing tort doctrine does not extend the limitations period for any continuing pattern of tortious conduct, but rather is limited to certain recognized torts that involve continuing harm." *Bissinger v. City of N.Y.*, 06 Civ. 2325 (WHP), 2007 U.S. Dist. LEXIS 70155, at *27 n.2 (S.D.N.Y. Sept. 24, 2007) (citation and quotation marks omitted); *cf. Farid v. State*, 27 Misc. 3d 1229(A), at *9 (N.Y. Ct. Cl. 2010) (recognizing that the continuing tort doctrine applies to cases involving employer negligence, but declining to apply the doctrine to claims of medical malpractice or medical negligence); *Favara Constr., LLC v. Comptroller of City of N.Y.*, 2009 N.Y. Misc. LEXIS 6515, at *15 (N.Y. Sup. Ct., N.Y. Cnty. Jan. 6, 2010) (rejecting argument that plaintiff's injurious falsehood claim is subject to the continuing tort doctrine because plaintiff alleged no facts that would constitute a "continuing tort"). Tortious interference with contract is not a continuing tort, and so plaintiff's invocation of the continuing tort doctrine is unavailing. *See, e.g., Cantu v. Flanigan*, CV-05-3580 (DGT/RLM), 2006 U.S. Dist. LEXIS 32983, at *14 (E.D.N.Y. May 24, 2006) ("[T]ortious interference with contract is not

a continuing tort, so [plaintiff's continuing tort doctrine] argument[] cannot rescue the claim." (citing *Spinap Corp. v. Cafagno*, 302 A.D.2d 588, 588 (2d Dep't 2003) ("Since tortious interference with contract is not a continuing tort, it does not avail plaintiff to argue that [defendant] continued to solicit its customers up until the time of the filing of the complaint . . . .")) (additional citation omitted)); *see also Chevron Corp. v. Donziger*, 871 F. Supp. 2d 229, 258 (S.D.N.Y. 2012) ("Chevron's attempt to avoid the bar of the statute of limitations by asserting that any tortious interference is ongoing fails because 'tortious interference with contract is not a continuing tort.'" (quoting *Spinap Corp.*, 302 A.D.2d at 588)); *Bloomfield Building Wreckers, Inc. v. City of Troy*, 41 N.Y.2d 1102, 1103 (1977) (explaining that the wrongs alleged in the complaint – "wrongful interference with the performance of the contract" – are not continuing torts).[32]

The Court has also considered whether there is any basis for equitable tolling of the statute of limitations in this case. "Under New York law, the doctrines of equitable tolling or equitable estoppel may be invoked to defeat a statute of limitations defense when the plaintiff was induced by fraud, misrepresentations or deception to refrain from filing a timely action." *Abbas v. Dixon*, 480 F.3d 636, 642 (2d Cir. 2007) (citation and internal quotation marks omitted)); *see also Koch v. Christie's Int'l PLC*, 699 F.3d 141, 157 (2d Cir. 2012) ("Under federal

---

[32] Indeed, the only case plaintiff cites to support his theory that the continuing tort doctrine applies to his tortious interference with contract claim concerns an entirely different kind of tort claim – intentional infliction of emotional distress. (*See* Pl.'s Opp'n Aff. ¶ 25 (citing *Gonzalez v. Bratton*, 147 F. Supp. 2d 180, 194 (S.D.N.Y. 2001) (discussing applicability of the continuing tort doctrine to plaintiff's intentional infliction of emotional distress claim)).)

common law, a statute of limitations may be tolled due to the defendant's fraudulent concealment if the plaintiff establishes that: (1) the defendant wrongfully concealed material facts relating to defendant's wrongdoing; (2) the concealment prevented plaintiff's discovery of the nature of the claim within the limitations period; and (3) plaintiff exercised due diligence in pursuing the discovery of the claim during the period plaintiff seeks to have tolled." (citation and internal quotation marks omitted)). There is no allegation, nor is there any evidence tending to indicate, that the County defendants "prevented [plaintiff] from discovering his claim." *Koch*, 699 F.3d at 157. To the contrary, and as discussed *infra*, the evidence adduced at trial demonstrates that plaintiff was well aware of the purported injuries that he sustained as a result of any alleged tortious conduct that occurred prior to June 2005 immediately when those injuries occurred, and, thus, was able (but failed) to assert a timely claim for tortious interference with contract based on those injuries. "The ineluctable conclusion is that [plaintiff] failed to file his claim within the statute of limitations not due to the defendants' fraudulent concealment, but due to his own failure to exercise reasonable diligence." *Id.* Accordingly, the Court concludes that, based on the circumstances of this case, there is no basis for equitable tolling of the one-year-and-ninety-day statute of limitations applicable to plaintiff's tortious interference with contract claim.

Conte argues that defendants should be equitably estopped from raising the statute of limitations issue because they actively concealed their tortious acts, including sending letters to Conte's route distributors requesting information in connection with their investigation and asking that they not disclose the investigation to anyone. The Court finds this argument unavailing. Even

assuming *arguendo* that plaintiff may not have been aware of the letters themselves until 2009, it is uncontroverted that Conte was aware long before June 2005 of (1) the fact that the D.A.'s Office was investigating him for fraud in connection with the route distributors, and (2) that, in connection with that investigation, they were contacting route distributors and others to get information about the alleged fraud. For example, Conte testified that, at a hearing on April 21, 2003, where Mr. Guerra was accusing Conte of fraud, Guerra stated that he was contacted by a detective who was working with the Nassau County D.A.'s Office. (Tr. 137-38.) In fact, Conte had email exchanges in 2004 with Sauro of Quebecor World about this issue. (*See* Pl.'s Ex. 16 (emails between Conte and Quebecor).)[33] Similarly, in March 2005, Conte received a fax sent by ADA Wallace containing six pages of alleged victims of fraud and amounts owed to them. (Tr. 161-

---

[33] In his summary judgment submissions, Conte explained that he spent months in early 2004 trying to unsuccessfully reassure route distributors that the accusations against him were false. (*See* Pl.'s Reply Aff. in Opp'n to Summ. J. ¶ 20 ("The plaintiff was then subject to a barrage of telephone calls and e-mails from these route distributors who were extremely upset and only then demanded refunds. Many of those route distributors, including all those from Westchester County the plaintiff spoke with, told him that Mr. Guerra stated to them that the plaintiff was a fraud and a crook, that I Media was a scam, that defendant Guerra told them that his wife was a police detective and that she had accessed the plaintiff's criminal record, that she determined that all Guerra was saying to them about I Media and the plaintiff was true and that Guerra told them that he and his police detective wife were working with the NCDAO. After spending the better part of his time in February, March and April of 2004 involved in the monumental task of trying to reassure and calm his route distributors that these accusations were false, *it became clear to the plaintiff that he could not rely on and utilize the services of any of the contracted route distributors contacted by the defendants* in Westchester County." (emphasis added)).)

62.) In addition, Conte was served with multiple subpoenas for documents in early 2005. (*Id.* at 154.) Furthermore, Conte testified that one of his route distributors, Hoppe, came to him in confidence and told him, in April 2005, that he had spoken to Falzarno from the Nassau County D.A.'s Office and that he had conveyed that occurrence to other route distributors. (*See id.* at 199 ("Mr. Hoppe told me that he had spoken with Detective Investigator Mike Falzarno of the Nassau County District Attorney's office and that he had told other route distributors this.").) Hoppe also testified that he had been contacted by Falzarno and told that Conte was running a fraudulent business. He further testified that Falzarno asked him for the names of other route distributors, and that Hoppe relayed the fraud allegations about Conte and I Media to other distributors. (*Id.* at 210-11.) Conte testified that his (Conte's) conversation with Hoppe occurred before Falzarno visited Conte on April 8, 2005, at which time Falzarno allegedly said to Conte, while serving a subpoena, that he was going get him. (*Id.* at 155, 228-29.) Thus, Conte was well aware by April 2005 that the County defendants had contacted his route distributors regarding fraud allegations.[34] In short, Conte was aware of their conduct, and was aware of the alleged injury from such conduct, before June 2005, and, therefore, there is no basis for the application of the doctrine of equitable tolling or equitable estoppel.

In sum, because a one-year-and-ninety-day statute of limitations governs plaintiff's tortious interference with contract claim, that claim may be based only on tortious

conduct that caused plaintiff to sustain damages – as a result of a third-party's breach of contract – on or after June 1, 2005 (one year and ninety days prior to plaintiff's filing of the complaint in this action).

### b. Pre-June 2005 Conduct

Emmons, Falzarano, and Wallace seek judgment as a matter of law on plaintiff's tortious interference with contract claim as it relates to their pre-June 2005 conduct. The defendants claim that because any such conduct occurred outside of the one-year-and-ninety-day statute of limitations, it is not conduct upon which plaintiff's tortious interference with contract claim may be based. As discussed *supra*, a cause of action for tortious interference with contract accrues at the time the injury is sustained, rather than the date of defendant's alleged tortious conduct. *See, e.g.*, *Cary Oil Co.*, 90 F. Supp. 2d at 419 n.106. Thus, the relevant inquiry for statute of limitations purposes is the point at which plaintiff suffered injury as a result of third-party breaches of contract that were induced by the defendants' actions.

Plaintiff's tortious interference with contract claim is based on the termination of route distributor, printing vendor, and advertising affiliate contracts. (*See* Pl.'s Opp'n Aff. ¶ 24.) During the trial, plaintiff testified that his last payment to a printer was made in April of 2005. (Tr. 1288.) He also testified that the last edition of TV Time Magazine was published in May of 2005, and that his route distributors delivered this last edition of the magazine. (*Id.* at 1287-90.) There was no testimony by plaintiff, or by any other witness, regarding any continued printing or distribution of TV Time Magazine after that point in time, nor was any evidence presented that advertising affiliates continued to work with plaintiff

---

[34] Contrary to Conte's contention, knowledge of the actual letters to his route distributors was not necessary to assert the claim. In fact, Conte filed his lawsuit in 2006, long before he received those letters in discovery in 2009.

after he stopped producing publications within which advertisements for their products and/or services could run. Instead, the uncontroverted evidence at trial clearly indicates that printers had stopped printing, route distributors had stopped distributing, and advertising affiliates had stopped advertising in May of 2005. In fact, plaintiff testified that, in May of 2005, a number of route distributors contacted him to tell him that "I Media was a scam" and that he "was a fraud" (*id.* at 197), and route distributors were in the process of bringing a class action lawsuit in the Supreme Court of Nassau County, alleging that plaintiff had initiated a Ponzi scheme (*id.* at 796-97).

The uncontroverted evidence presented at trial clearly demonstrates that plaintiff sustained injury from the termination of printer, route distributor, and advertising affiliate relationships *before* June 1, 2005. Because plaintiff's injuries were sustained outside of the limitations period, any prior conduct that may have caused those injuries cannot form the basis of a timely tortious interference with contract claim. Accordingly, even viewing the evidence in the light most favorable to plaintiff, there is simply no evidence from which defendants Emmons, Falzarano, or Wallace can be held liable for tortious interference with contract based on their pre-June 2005 conduct.

The only evidence of conduct that occurred after June 1, 2005 is the discussions Wallace had with Giaimo in the late summer/early fall of 2005 about the route distributors' state court class action complaint, which is discussed in detail *infra*.[35] Thus, even construing the evidence

in the light most favorable to plaintiff, plaintiff has simply failed to prove a timely claim of tortious interference with contract against Emmons and Falzarano. Accordingly, defendants Emmons and Falzarano are entitled to judgment as a matter of law on the tortious interference with contract claim.

c. Post-June 2005 Conduct

As to Wallace's communications with Giaimo in the late summer/early fall of 2005, the County defendants argue that such conduct merely supports, if anything, a claim of defamation, and not one for tortious interference with contract. The County defendants contend that plaintiff's trial testimony pertaining to the Wallace-Giaimo discussions failed to establish the requisite elements of a tortious interference claim, and that, accordingly, plaintiff is merely improperly attempting to recast his defamation claim (a claim that had previously been dismissed by this Court prior to trial) as one for tortious interference with contract. The Court agrees.

Plaintiff's claim predicated on Wallace's communications with Giaimo is essentially that Wallace told Giaimo lies about plaintiff and his business (*i.e.*, that plaintiff was operating a Ponzi scheme) to intentionally impel route distributors to breach their contracts, causing plaintiff damage. (*See* Pl.'s Opp'n Aff. ¶¶ 45-46.) Even if the existence of valid route distributor contracts and Wallace's knowledge of them is assumed, no evidence was adduced at trial that Wallace, in speaking to Giaimo, intentionally induced route distributors to

---

[35] Indeed, in his affidavit submitted in opposition to the County defendants' Rule 50 and Rule 59 motions, plaintiff lists the acts upon which his tortious interference with contract claims are based, and the conversations between Wallace and Giaimo are the only acts in that list that occurred on or after June 1, 2005. (*See* Pl.'s Opp'n Aff. ¶ 34.)

breach those contracts with plaintiff.[36] Thus, plaintiff has failed to prove the third

requisite element of a tortious interference with contract claim – that Wallace intentionally procured a contractual breach.

As a threshold matter, there is no evidence that Wallace even made disparaging remarks about plaintiff and his business to Giaimo. At trial, Conte posed the following question to Wallace in regards to his conversations with Giaimo: "You did not – you are stating you did not tell Mr. Giamo [sic] that Mr. Conte was a fraud, that iMedia was a scam, and that they had stolen money

---

[36] As a preliminary matter, because the uncontroverted evidence is that plaintiff's I Media Corporation was dissolved at the close of 2003 (*see* County Defs.' Mot. for Reconsideration of Sept. 30 Mem. & Order Ex. A., Certificate of Dissolution), route distribution agreements signed after that date are not valid, and thus are not agreements upon which a tortious interference with contract claim may be based. At trial, plaintiff acknowledged that I Media Corporation had been dissolved by proclamation of the New York Secretary of State on December 31, 2003. (Tr. 703.) Under New York law, "[a] dissolved corporation is prohibited from carrying on new business," *Moran Enters., Inc. v. Hurst*, 66 A.D.3d 972, 975 (2d Dep't 2009) (citing N.Y. Bus. Corp. Law § 1005(a)(1)) ("A dissolved corporation is prohibited from carrying on new business and does not enjoy the right to bring suit in the courts of this state, except in the limited respects specifically permitted by statute." (citations omitted)); *see also In re C-TC 9th Ave. P'shp*, 113 F.3d 1304, 1309 (2d Cir. 1997) (explaining that a dissolved corporation is limited to activities involved in the winding up of its affairs (citing N.Y. Bus. Corp. Law § 1006(a))); *Rosenson v. Mordowitz*, 11 Civ. 6145 (JPO), 2012 U.S. Dist. LEXIS 120077, at *29 (S.D.N.Y. Aug. 23, 2012) ("Once dissolved, [] a former corporation no longer may benefit from the protections of the corporate form in New York. . . . Upon dissolution, the corporation's legal existence terminates. . . . A dissolved corporation is prohibited from carrying on new business." (citation omitted)), and various route distribution agreements entered as exhibits at trial list I Media Corporation as a contracting party and were formed after the date of I Media Corporation's dissolution (*see, e.g.*, Pl.'s Ex. 175 (route distribution agreement dated February 10, 2005); *see also* Pl.'s Ex. 164 (chart of route distributors followed by copies of many route distribution agreements, some of which were signed during 2003, others of which were signed during 2004 or 2005)). However, under New York law, a business may under certain circumstances be treated as a *de facto* corporation even if its legal charter has expired. *See, e.g.*, *Gelfman Int'l Enters. v. Miami Sun Int'l Corp.*, 05-CV-3826 (CPS)(RML), 2009 U.S. Dist. LEXIS 64274, at *22 (E.D.N.Y. June 27, 2009) ("In order to be considered a *de facto* corporation, a business 'must function as if it were a corporation and make substantial efforts to either incorporate or remedy any defects of incorporation upon their discovery.'"

(quoting *Animazing Entm't, Inc. v. Louis Lofredo Assocs.*, 88 F. Supp. 2d 265, 269 (S.D.N.Y. 2000))). At trial, plaintiff testified that he first learned about the December 31, 2003 dissolution in late 2005, and that he "tried to rectify that situation by paying back taxes, but couldn't afford it because of [his] financial situation." (Tr. 703.) Thus, plaintiff argues that, because he was operating I Media as a corporation after its dissolution and was making efforts to remedy defects of incorporation upon their discovery, I Media should be recognized as a *de facto* corporation able to contract for new business. (*See* Pl.'s Opp'n Aff. ¶¶ 40-42.) However, "[f]ailure to pay back taxes has been held to preclude consideration of a business as a *de facto* corporation," *Gelfman Int'l Enters.*, 2009 U.S. Dist. LEXIS 64274, at *23; *see also George v. Yusko*, 169 A.D.2d 865, 866-67 (3d Dep't 1991) ("When [] the corporation has been dissolved for neglecting to pay requisite franchise taxes, absent subsequent reinstatement – achievable by payment of unpaid franchise taxes, penalties and interest charges – *de facto* corporateness is usually not recognized." (internal citations omitted)); *see also Lorisa Capital Corp. v. Gallo*, 119 A.D.2d 99, 110-11 (2d Dep't 1986) ("[A] corporation's *de jure* existence is removed for the very purpose of securing compliance with the tax statute. Recognition of *de facto* status would directly subvert the effectiveness of the sanctions for franchise tax delinquency, removing all incentive for a dissolve d corporation to seek reinstatement."), and Conte testified that he was unable to pay the back taxes owed (*see* Tr. 703). Plaintiff has failed, therefore, to prove that the route distributor agreements signed after December 31, 2003 are valid. As such, he has failed to prove the first, and a necessary, element of his tortious interference with contract claim as it relates to those post- December 31, 2003 distribution agreements.

from numerous individuals?" (Tr. 574.) Wallace responded, "Mr. Giamo [sic] told me that about you." (*Id.*) At no point during the remainder of his testimony did Wallace admit to denigrating plaintiff or his business to Giaimo, and Giaimo did not testify at trial.[37] Thus, plaintiff simply failed to elicit any testimony or put forth any evidence demonstrating that Wallace propounded the falsities about plaintiff or I Media that plaintiff claims caused route distributors to breach their contracts.

In any event, even if Wallace made disparaging remarks about plaintiff and his business, there is simply no evidence that, in so doing, he intentionally prompted route distributors to breach their agreements with plaintiff. First, there is no evidence that any route distributors actually breached their agreements with plaintiff after the conversations between Wallace and Giaimo took place. Under New York law, a plaintiff must prove a breach of the contract at issue in order to make out a claim against a third party for tortious interference with that contract. *See, e.g.*, *Sokol Holdings, Inc. v. BMB Munai, Inc.*, 542 F.3d 354, 358-59 (2d Cir. 2008) ("Sokol must prove Tolmakov's breach of the Emir Contract in order to make out its claim for BMB's tortious interference with the contract . . . ."); *NBT Bancorp v. Fleet/Norstar Fin. Grp.*, 87 N.Y.2d 614, 623-24 (1996) ("Our requirement of breach promotes the integrity of contract as well as integrity of the marketplace; it signifies the

substantiality of the interest protected, and it conforms with this tort's function as a back-up remedy for breaches of contract." (citation omitted)); *Israel v. Wood Dolson Co.*, 1 N.Y.2d 116, 120 (1956) (explaining that a tortious interference with contract claim fails if the breach of the contract upon which that claim is based is not proven). Thus, plaintiff was required to prove that route distributors breached their contracts with him subsequent to Wallace's conversations with Giaimo.

However, in this case, no evidence of route distributors breaching their home distribution contracts after June of 2005 was presented at trial. To the contrary, and as discussed *supra*, I Media stopped providing route distributors with copies of TV Week Magazine to deliver back in April or May of 2005 (Tr. 1287-90 (Conte testifying that the last edition of TV Time was published in May of 2005 and that route distributors delivered that issue); *id.* at 219-20 (Hoppe testifying that he likely stopped delivering publications in late April of 2005)), thereby leaving route distributors with no ability to perform pursuant to their contracts after that date (as their performance obligation under their contracts was to distribute I Media's publications – which plaintiff was obligated to first deliver to them – to households along their routes in a timely fashion[38]). *See, e.g.*, *MHR Capital Partners LP v. Presstek, Inc.*, 12 N.Y.3d 640, 645 (2009) (explaining that a party's obligation to perform under a contract does not arise if there is an express condition precedent that was not fulfilled by the other side). Because the route distributors' obligations to perform did not

---

[37] Accordingly, plaintiff's allegation that "Wallace not only suggested and induced Mr. Giaimo to file this lawsuit based on the false representations he made to him that the plaintiff and I Media were operating a Ponzi/Pyramid scheme . . . but that he had read and tacitly approved the allegation contained in that complaint which he knew were false and were the result of statements he made to attorney Giaimo" (Pl.'s Opp'n Aff. ¶ 45), is merely speculative, and not supported by any evidence adduced at trial.

[38] (*See* Defs.' Mem. of Law in Supp. of Rule 50 and Rule 59 Mots. at 20-21 (excerpting provisions of the home distribution agreements that define the distribution obligations of the route distributors on the one hand, and the delivery obligations of I Media on the other).)

arise after May of 2005 due to plaintiff's failure to deliver new editions of TV Week Magazine, the route distributors cannot be deemed to have breached their contracts with plaintiff after that date.[39] Accordingly, the uncontroverted evidence presented at trial indicates that no route distribution agreements were breached after the communications between Wallace and Giaimo that took place in the summer/early fall of 2005.

Moreover, the evidence presented at trial indicates that Wallace's discussions with Giaimo took place after route distributors had already (1) filed numerous complaints with the D.A.'s Office claiming that plaintiff owed them money (Tr. 160-61); (2) informed plaintiff of their belief that he "was a fraud" and that "I Media was a scam" (*id.* at 197); (3) retained a lawyer to file a class action complaint against plaintiff (*see id.* at 573-74); and (4) filed their class action complaint alleging that plaintiff had initiated a Ponzi scheme (*see id.* at 573-74 (Wallace testifying to his discussions with Giaimo about Giaimo's filing of a civil class action on behalf of plaintiff's route distributors and stating that he "didn't even know of Mr. Giaimo's existence until he had already filed his suit in civil court")). Those route distributors had clearly severed their relationships with plaintiff and I Media *prior* to the Wallace and Giaimo communications. Thus, even if certain route distributors were deemed to have breached their contracts with plaintiff at some point in time, simply no evidence was presented at trial, nor was any testimony elicited, tending to indicate

that any route distributors did so as a result of Wallace's conversations with Giaimo.[40] *See Int'l Minerals & Resources, S.A. v. Bomar Resources, Inc.*, 5 F. App'x 5, 8 (2d Cir. 2001) (explaining that, in a tortious interference with contract claim, "[t]he causation required is that 'but for' the activities of the defendant, there would have been no breach of the contract" (citing *Sharma v. Skaarup Ship Mgmt. Corp.*, 916 F.2d 820, 828 (2d Cir. 1990))).

Even assuming *arguendo* that the evidence adduced at trial were sufficient to prove that Wallace, in speaking with Giaimo, intentionally induced route distributors to breach their contracts with plaintiff, plaintiff has failed to prove the

---

[39] The Court notes that the route distributors were also required to pay plaintiff money pursuant to their contractual relationship. However, because the route distributors paid all of the fees associated with their routes to plaintiff up-front (Tr. 694), their failure to distribute magazines is the only action upon which any alleged breach on their part could be based.

[40] It is clear from plaintiff's papers that his tortious interference with contract claim rests on conversations that members of the D.A.'s Office had with route distributors, advertising affiliates, and printers during the initial states of their investigation (prior to the route distributors' filing of their class action complaint in the summer of 2005). (Pl.'s Opp'n Aff. ¶ 34 (listing the "successive acts by the individual County defendants that interfered with the plaintiff's contracts with route distributors, printers and advertising affiliates," four out of five of which occurred prior to June of 2005).) However, as discussed *supra*, any injury that may have resulted from those interactions was sustained by plaintiff at a point in time that falls outside of the one-year-and-ninety-day statute of limitations, meaning that any claims based upon those communications are untimely. Plaintiff's attempt to link those pre-June 2005 occurrences to Wallace's conversations with Giaimo in the late summer/early fall of 2005, in order to make out a claim for tortious interference with route distributor contracts (*see id.* ¶ 25 ("[T]he plaintiff submits that the ongoing pattern of acts of tortious interference with contract committed by the County defendants as far back as at least 2004 should be attributable to the County itself in addition to the individual County defendants . . . .")), is simply unavailing. *See supra* (discussing the inapplicability of the continuous tort doctrine to claims for tortious interference with contract).

damages element of his tortious interference with contract claim.

As discussed *supra*, all of plaintiff's route distributors stopped delivering TV Time Magazine for him in May of 2005, before the conversations between Wallace and Giaimo took place. Moreover, by the time Wallace first spoke to Giaimo, route distributors had already retained Giaimo to file a class action complaint against plaintiff on their behalf. (Tr. 573-74 (Wallace testifying that Giaimo sent him a copy of the class action complaint when they spoke, but that he had no role in creating it); *id.* at 574 (Wallace testifying that he "didn't even know of Mr. Giaimo's existence until he had already filed his suit [on behalf of plaintiff's route distributors] in civil court").) The uncontroverted evidence is that route distributors had stopped working for plaintiff, and were even seeking legal recourse from him, prior to any of the communications between Wallace and Giaimo took place. Any injury to plaintiff that resulted from route distributors terminating their relationships with him was sustained, therefore, *prior* to Wallace's conversations with Giaimo.

Moreover, the reputational harm that plaintiff testified to at trial does not save his claim against Wallace. Plaintiff testified that, as a result of the allegations contained in the route distributors' class action complaint that were also published in newspaper and Internet articles, he "was treated like a leper by [his] business associates, and friends and neighbors didn't want to talk to [him] anymore and to this day want nothing to do with [him]." (*Id.* at 1263.) He testified that he was "mortified, embarrassed and humiliated by [the] falsehoods that were written into [the] lawsuit" (*id.* at 1264), and that his "feelings of self-worth were destroyed," he "was

placed in a bad light," and he "had severe harm done to [his] business reputation" (*id.* at 1265-66). Thus, at trial, plaintiff merely testified to the generalized reputational injury that he experienced as a result of the publicized allegations contained in the route distributors' class action complaint; plaintiff failed to prove that he was injured by breaches of route distributor agreements caused by Wallace's discussions with Giaimo. This distinction is critical, for to succeed on a tortious interference with contract claim, a plaintiff must prove that he suffered damages as a specific result of a breach of contract intentionally procured by the defendant. *See Int'l Minerals & Resources*, 5 F. App'x at 7-8 ("[A] plaintiff must allege and prove . . . damages caused by the defendant's knowing and intentional interference with [a] contract without reasonable justification." (citation and internal quotation marks omitted)). Said another way, the manner in which the injury is accomplished is germane to a tortious interference claim, unlike a defamation claim that is defined in terms of the injury sustained. *See, e.g.*, *Amaranth LLC v. J.P. Morgan Chase & Co.*, 71 A.D.3d 40, 48 (1st Dep't 2009) (explaining that a complaint sounds in defamation when a plaintiff relies on generalized reputational harm (even if it had an indirect effect on his or her ability to form business relationships), but that it sounds in tortious interference when interference with existing or prospective contracts is alleged); *Ramsay v. Mary Imogene Bassett Hosp.*, 113 A.D.2d 149, 151 (3d Dep't 1985) (explaining that "[u]nlike most torts, defamation is defined in terms of the injury, damage to reputation, and not in terms of the manner in which the injury is accomplished" (citation omitted)).[41]

---

[41] Although plaintiff also requests reconsideration of the Court's granting of summary judgment on his state law claims for defamation, intentional infliction

Plaintiff's testimony described the generalized reputational injury that he suffered, but there was no testimony or evidence presented at trial that plaintiff sustained damage as a specific result of contractual breaches induced by Wallace's conversations with Giaimo.

For all of these reasons, no rational jury could conclude that Wallace's conversations with Giaimo amounted to tortious interference with plaintiff's contracts, and as discussed *supra*, there is no other conduct upon which a timely tortious interference claim against Wallace can be based.[42] Given that there is simply no evidence that Wallace tortiously interfered with plaintiff's contracts during the applicable limitations period, he is entitled to judgment as a matter of law on the tortious interference claim.

\* \* \*

In sum, plaintiff failed to prove that Emmons, Falzarano, or Wallace tortiously interfered with his contractual relationships, causing him damage within the one-year-and-ninety-day limitations period prior to

the filing of his complaint in this action.[43] Thus, the evidence presented at trial, even when viewed in the light most favorable to plaintiff, was insufficient for a reasonable jury to find Emmons, Falzarano, and/or Wallace liable for tortious interference with contract. Accordingly, Emmons, Falzarano, and Wallace are entitled to judgment as a matter of law on plaintiff's tortious interference with contract claim.[44]

---

[43] Conte sought to introduce expert testimony, and a valuation report, that projected lost earnings at $549,000,000. (*See* Pl.'s Letter dated Dec. 15, 2009, ECF No. 392 (attaching report created by plaintiff's business valuation and loss expert).) The Court did not permit the expert to testify, or the introduction of the expert valuation, for several reasons. First, plaintiff did not disclose any experts in his list of witnesses contained within the pre-trial order and, thus, defendants did not have notice that there would be any expert testimony at trial. Second, the report of projected revenues of $549,000,000 for a start-up company that never made any profit is not admissible under New York law because it is too speculative. *See Zink v. Mark Goodson Prods., Inc.*, 261 A.D.2d 105, 106 (1st Dep't 1999); *see also Kenford Co. v. Cnty. of* Erie, 67 N.Y.2d 257, 261 (1986) ("[T]he alleged loss [of future profits] must be capable of proof with reasonable certainty. In other words, the damages may not be merely speculative, possible or imaginary, but must be reasonably certain and directly traceable to the breach, not remote or the result of other intervening causes. . . . If it is a new business seeking to recover for loss of future profits, a stricter standard is imposed for the obvious reason that there does not exist a reasonable basis of experience upon which to estimate lost profits with the requisite degree of reasonable certainty." (internal citations omitted)). Third, the plaintiff is only entitled to lost profits attributable to a particular contract that was the subject of the tortious interference. *See Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 197 (1980). Here, the expert report does not tie any damages, including lost profits, to any alleged interference with any particular contract and, thus, cannot be used as a basis for recovery on the tortious interference with contract claim.

[44] The Court notes that, although Conte sought to amend his complaint during the trial to add a claim for tortious interference with business opportunities (which plaintiff had decided prior to trial not to

---

[41] of emotional distress, and injurious falsehoods (based on Wallace's communications with Giaimo) (*see* Pl.'s Letter dated June 12, 2012, ECF No. 595), as discussed *supra*, there was no evidence at trial of any defamatory statements that were made by Wallace (or by any other defendant) within the one-year statute of limitations for these claims – namely, after August 30, 2005.

[42] To the extent plaintiff argues that the jury found damages within the relevant time period, the Court, for all of the reasons discussed *supra*, finds that determination to be irrational in light of the evidence presented at trial. Indeed, when asked at oral argument for evidence of any conduct upon which a timely tortious interference claim could be based, plaintiff referenced his continuing tort argument, in an attempt to base his claim on the pre-June 2005 conduct that, as discussed *supra*, is beyond the limitations period. (Oral Arg. on Post Trial Mots. Sept. 6, 2012.)

IV. CONCLUSION

For the reasons stated herein, the County defendants' Rule 50 motion for judgment as a matter of law is granted in its entirety – Wasilausky is entitled to judgment as a matter of law on plaintiff's false arrest claim and Emmons, Falzarano and Wallace are entitled to judgment as a matter of law on plaintiff's tortious interference with contract claim. The County defendants' Rule 59 motion for a new trial and plaintiff's Rule 59 motion for a new damages trial are denied as moot. The Clerk of the Court shall enter judgment in favor of the County defendants and close this case.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: July 26, 2013
        Central Islip, NY

***

Plaintiff is proceeding *pro se*. Defendants are represented by Andrew Reginald Scott and Sondra Meryl Toscano of the Nassau County Attorney's Office, 1 West Street, Mineola, N.Y. 11501.

---

pursue, and which the Court denied as untimely during the trial), such a claim would not overcome the statute of limitations problem because there is no evidence of any conduct by defendants within the applicable limitations period in which defendants interfered with a third party with whom plaintiff was seeking to have a business relationship.