# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

––––––––––––––––––

Nº 06-CV-4746 (JFB)(GRB)

––––––––––––––––––

ANTHONY CONTE,

Plaintiff,

VERSUS

COUNTY OF NASSAU, ET AL.,

Defendants.

––––––––––––––––––

**MEMORANDUM AND ORDER**
March 3, 2017

––––––––––––––––––

Joseph F. Bianco, District Judge:[1]

Following an unfavorable verdict resulting from a jury trial on *pro se* plaintiff Anthony Conte's claim for tortious interference with contract, defendants William Wallace, Robert Emmons, and Michael Falzarano filed a Rule 50(b) motion seeking judgment as a matter of law ("JMOL"). In addition to challenging plaintiff's claim under the statute of limitations, defendants raised five substantive arguments regarding the sufficiency of the evidence at trial and governmental immunity.

By Memorandum and Order dated July 26, 2013 (the "July 2013 Order") (ECF No. 624), this Court granted the motion on the statute of limitations ground without addressing the remaining five arguments and denied both parties' Rule 59 motions for a new trial as moot. Plaintiff appealed. The Second Circuit reversed and remanded on the tortious interference claim with instructions "to resolve that claim in further proceedings consistent

---

[1] Plaintiff's letter motion for recusal dated December 23, 2016 (ECF No. 710) is denied. Plaintiff asserts that this Court is "hopelessly and profoundly biased toward [him]" based on its previous rulings in this case. (*Id.*) The Supreme Court has stated, however, that "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Liteky v. United States*, 510 U.S. 540, 555 (1994); *see also United States v. Diaz*, 176 F.3d 52, 112 (2d Cir. 1999) ("[O]pinions formed by a judge on the basis of facts introduced or events occurring in the course of judicial proceedings do not constitute a basis for recusal unless they indicate that the judge has a deep-seated favoritism or antagonism that would make fair judgment impossible."). As plaintiff has identified no extrajudicial source as the basis for the alleged bias, *see Liteky*, 510 U.S. at 554–55, and no such basis exists, his motion for recusal is denied.

with this order." *Conte v. Cnty. of Naussau*, 596 F. App'x 1, 3 (2d Cir. 2014) [hereinafter "*Conte I*"].

On remand, the parties disputed the scope of *Conte I*. Plaintiff argued that the only issue on remand was his Rule 59 motion for a new trial on damages, while defendants argued that this Court was required to address all the arguments they made in their Rule 50 motion. By Order dated April 2, 2015 (the "April 2015 Order") (ECF No. 650), this Court interpreted *Conte I* as only requiring it to address plaintiff's Rule 59 motion based on language in *Conte I* suggesting that the Second Circuit had determined that the defendants waived their remaining Rule 50 arguments.

The defendants appealed the April 2015 Order, and the Second Circuit again vacated and remanded, holding that "it was this Court's intention that the district court consider, in the first instance, all arguments related to that claim other than the statute of limitations claim." *Conte v. Emmons*, 647 F. App'x 13, 14 (2d Cir. 2016) [hereinafter "*Conte II*"].

After considering the remaining five grounds defendants raise in their Rule 50 motion, the Court concludes that defendants are not entitled to JMOL and, therefore, denies their Rule 50(b) motion. Specifically, the Court concludes that (1) defendants waived their immunity and sufficiency of the evidence arguments by failing to raise them before the verdict, and (2) no manifest injustice will result from this Court declining to address these arguments on the merits.

## I. BACKGROUND

Familiarity with the facts is assumed. As such, this section will only summarize the procedural history relevant to defendants'

Rule 50 motion. Substantive evidence elicited during the trial relevant to specific issues will be summarized in the discussion section.

Acting *pro se*, Conte filed this action against the County of Nassau, Emmons, Wallace, Falzarano, Philip Wasilausky, Christina Sardo, Tefta Shaska, and Larry Guerra, alleging federal claims under 42 U.S.C. § 1983 for false arrest, malicious prosecution, abuse of process, violation of the First Amendment, conspiracy, and *Monell* liability against the County. Plaintiff also asserted various state law claims, including claims for false arrest, abuse of process, and tortious interference with contractual relations.

Following discovery, plaintiff and all defendants filed motions for summary judgment with the Court. In their motion, defendants extensively argued that they were entitled to absolute immunity and qualified immunity on plaintiff's federal claims for false arrest and abuse of process. (Defs.' Br. Supp. Mot. Sum. J., ECF No. 409 ("Defs.' Sum. J. Br."), at 14–22.) In a single sentence at the end of their brief, defendants also raised governmental immunity as a defense to the state law claims against Emmons, Wallace, and Falzarano, including the tortious interference with contract claim. (*See id.* at 25–26.)

After a detailed review of the record and submissions of the parties, the Court issued a Memorandum and Order dated September 30, 2010 (the "Summary Judgment Order") (ECF No. 462), granting in part and denying in part defendants' motion for summary judgment and denying plaintiff's motion for summary judgment in its entirety. In that Order, the Court disposed of the defendants' state law governmental immunity arguments with respect to Emmons, Wallace, and Falzarano, concluding that, under New York law, prosecutors are not entitled to governmental immunity "when performing an investigation outside the auspices of the grand jury," and

there were factual issues over whether the "defendants employed regularly issued legal process with a collateral purpose." (Summary Judgment Order at 40.) This rendered summary judgment on the state law claims on the grounds of governmental immunity improper. (*Id.*) Between summary judgment and the jury's verdict, defendants did not explicitly raise governmental immunity in connection with the tortious interference with contract claim. (*See, e.g.*, County Defs.' Proposed Portion of Pre-Trial Order, ECF No. 572 ("Defs.' Pre-Trial Order"), at 5; County Defs.' Proposed Jury Verdict Sheet ("Defs.' Verdict Sheet"), ECF No. 556, at 4–5.)

Pursuant to the Summary Judgment Order, the following claims survived summary judgment: (1) plaintiff's false arrest claim against Wasilausky; (2) plaintiff's abuse of process claim against all of the County defendants except Sardo; (3) plaintiff's *Monell* claim against the County; and (4) plaintiff's tortious interference with contract claim against all of the defendants except Sardo and Shaska. The matter was then tried before a jury.

At the conclusion of plaintiff's case in chief, defendants orally moved pursuant to Rule 50(a) for JMOL. (Tr. 902–08.) With respect to plaintiff's tortious interference with contract claim, defense counsel only raised a statute of limitations argument. (*See id.* at 902–05.) He then spent considerable time discussing plaintiff's claims for false arrest and abuse of process, neither of which is at issue here. (*See id.* at 905–08.) At the conclusion of his argument on an abuse of process issue, counsel remarked that he "did not fully brief that particular issue." (*Id.* at 908.)

It was at that point that the following exchange occurred:

> The Court: That is preserved for purposes of renewing it at the end of the case. Do you believe there is insufficient evidence as a whole as well?
>
> Mr. Scott: Absolutely.
>
> The Court: In your summary judgment motion, you moved both on absolute immunity [and] qualified immunity. And I assume that that is continuing as well?
>
> Mr. Scott: Yes. Thank you, Judge.

(*Id.*) Counsel did not elaborate on either of these arguments, and the Court reserved decision on the Rule 50 motion. (*Id.* at 908, 912.)

At the end of the trial, the jury found that (1) Wasilausky subjected plaintiff to an unlawful arrest; (2) none of the defendants maliciously abused process in connection with plaintiff's arrest on a bad check charge or in connection with the issuance of Grand Jury subpoenas; and (3) Emmons, Wallace, and Falzarano tortiously interfered with plaintiff's contractual relationships.[2] With respect to damages, the jury awarded $500.00 in compensatory damages and $26,000.00 in punitive damages against Wasilausky in connection with plaintiff's false arrest claim. As to plaintiff's tortious interference with contract claim, the jury awarded plaintiff $3,500.00 in compensatory damages for tortious acts that took place before June 1, 2005, and $700,000.00 in compensatory damages for tortious acts that took place on or after June 1, 2005. The jury also awarded punitive

---

[2] Plaintiff's *Monell* claim was dismissed as a matter of law at trial. (*See* Tr. at 913–16.)

damages in connection with plaintiff's tortious interference with contract claim: $60,000.00 against Emmons; $443,000.00 against Wallace; and $175,000.00 against Falzarano.

After the trial, defendants Wasilausky, Wallace, Emmons, and Falzarano[3] moved for JMOL pursuant to Federal Rule of Civil Procedure 50(b) on various grounds. As relevant here, defendants argued that (1) plaintiff's tortious interference claim was barred by the statute of limitations; (2) plaintiff failed to adduce evidence of contracts he could enforce; (3) plaintiff failed to establish defendants breached any contract; (4) plaintiff failed to establish he had suffered any economic harm; (5) plaintiff's agreements with route distributors were terminable at will, and thus could not give rise to an action; and (6) plaintiff's claim was barred by governmental immunity.[4] (*See* Defs.' Br. Supp. of Mot. J. as Matter Law, ECF No. 601-20 ("Defs.' Br."), at 10–31). Plaintiff, meanwhile, moved under Rule 59 for a new trial on damages, arguing that the Court improperly denied him the opportunity to present to the jury certain evidence of damages associated with the tortious interference with contract claim.

In its July 2013 Order, this Court granted defendants' Rule 50(b) motion—finding that Emmons, Falzarano, and Wallace were entitled to JMOL on plaintiff's tortious interference with contract claim because plaintiff failed to prove that any injury occurred within the limitations period. (July 2013 Order at 34). Because the Court vacated the jury's verdict with respect to the tortious interference with contract claim, the Court denied both parties' Rule 59 motions for new trials as moot.

On appeal, plaintiff argued, as relevant here, that this Court erred by granting the Rule 50(b) motion on his tortious interference with contract claim against Wallace, Emmons, and Falzarano and denying his Rule 59 motion for a new damages trial.[5] Defendants contested these arguments, contending that this Court's statute of limitations reasoning was correct and, in the alternative, that the Second Circuit could affirm the judgment on the basis of the other five issues raised in their Rule 50(b) motion.

On December 17, 2014, the Second Circuit vacated this Court's ruling granting JMOL (on the statute of limitations ground) in favor of Wallace, Emmons, and Falzarano in connection with Conte's claim for tortious interference with contractual relations, and remanded. *Conte I*, 596 F. App'x at 5–7. The Court held that, because the factual issues relating to the statute of limitations defense were not submitted to the jury, the defendants were not entitled to have that issue decided by the district court. *Id.* at 6. With respect to the alternative grounds raised on appeal by defendants for JMOL on the tortious interference claim, the Second Circuit "decline[d] to address" defendants' immunity or insufficiency of the evidence arguments "for the

---

[3] Hereinafter, "defendants" refers to Wallace, Emmons, and Falzarano.

[4] The Rule 50(b) motion also challenged the jury verdict on plaintiff's false arrest claim against defendant Wasilausky. This Court granted that motion, and the Second Circuit upheld that decision on appeal. *See Conte I*, 596 F. App'x at 3.

[5] Plaintiff further argued that this Court erred in dismissing his state law claims against the City of New York; dismissing on summary judgment his defamation, injurious falsehoods, and intentional infliction of emotional distress claims against Wasilausky, Emmons, Wallace, Falzarano, and Shashka; and dismissing his First Amendment claims against the County defendants on summary judgment. The Court of Appeals, however, affirmed these decisions. *See Conte I*, 596 F. App'x at 3.

first time on appeal" after noting that "defendants did not specifically articulate these grounds for reversal in their Rule 50(a) motion." *Id.* "To be entitled to judgment as a matter of law on a factual issue," the Court continued, "the movant must, at the close of the plaintiff's case, identify the specific element that the defendant contends is insufficiently supported." *Id.* (quoting *Galdieri–Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 286 (2d Cir. 1998)). With respect to the new trial motions under Rule 59, the Court determined that plaintiff was entitled to have the district court decide his new trial motion on remand. *Id.* at 6–7. With respect to the defendants' new trial motion, the Court held that "because the defendants do not raise any reason for a new trial on appeal, we see no reason to deprive [Conte] of the benefit of the jury's verdict." *Id.* at 7 (citation omitted). In closing, the Second Circuit directed this Court "to resolve that claim [*i.e.*, plaintiff's tortious interference with contract claim] in further proceedings consistent with this order." *Id.*

On remand, the parties disputed the scope of *Conte I*. Plaintiff argued that the only issue for the Court to decide was his motion for a new trial on damages, while defendants contended that the mandate required the Court to revisit their Rule 50 motion in its entirety—beyond the limitations issue that precipitated the remand.

In its April 2015 Order, this Court interpreted *Conte I* as only requiring it to address plaintiff's Rule 59 motion for a new trial.[6] It read the language in *Conte I* regarding defendants' failure to "specifically articulate these [alternative] grounds for reversal in their Rule 50(a) motion," 596 F. App'x at 6, as a holding that defendants waived their im-

munity and sufficiency of the evidence arguments "in the District Court" (April 2015 Order at 4; *see also id.* at 5 ("[T]he Second Circuit made it abundantly clear that it had reviewed the record and found those exact arguments to be waived. In other words, they could not be considered on appeal because they had been waived *in the District Court*.")). Correspondingly, this Court held that "the scope of the remand [from *Conte I* was] clearly limited to consideration of plaintiff's motion for a new trial on damages" and, therefore, declined to address defendants' remaining substantive arguments. (*Id.* at 6.)

On appeal, the Second Circuit vacated the April 2015 Order and remanded. *Conte II*, 647 F. App'x at 14. It clarified that, in *Conte I*, "it was this Court's intention that the district court consider, in the first instance, all arguments related to [the tortious interference with contract] claim other than the statute of limitations claim." *Id.* Consequently, it "remand[ed] again to give the district court the opportunity to do so." *Id.*

As such, the Court now considers defendants' Rule 50(b) motion, including the five separate arguments raised as grounds for relief that this Court previously declined to address in its April 2015 Order. For the reasons set forth below, defendants' Rule 50(b) motion is denied in its entirety.

## II. STANDARD OF REVIEW

The standard governing motions for JMOL pursuant to Rule 50 is well-settled. A court may not properly grant JMOL under Rule 50 against a party "unless the evidence, viewed in the light most favorable to the non-moving party, is insufficient to permit a reasonable juror to find in his favor." *Arlio v. Lively*, 474 F.3d 46, 51 (2d Cir. 2007) (citing

---

[6] The Court denied plaintiff's Rule 59 motion in a separate Memorandum and Order issued April 2, 2015.

(ECF No. 651.) Plaintiff appealed that decision (ECF No. 661), but has since withdrawn his appeal.

*Galdieri-Ambrosini*, 136 F.3d at 289). Generally, a court reviewing such a motion must defer to all credibility determinations and reasonable inferences that the jury may have drawn at trial. *See Frank Sloup & Crabs Un-ltd., LLC v. Loeffler*, 745 F. Supp. 2d 115, 120 (E.D.N.Y. 2010). That is, a court considering a Rule 50 motion "may not itself weigh the credibility of witnesses or consider the weight of the evidence." *Meloff v. N.Y. Life Ins. Co.*, 240 F.3d 138, 145 (2d Cir. 2001) (quoting *Galdieri-Ambrosini*, 136 F.3d at 289; *see also Playtex Prod., Inc. v. Procter & Gamble Co.*, No. 02 CIV.8046 WHP, 2004 WL 1658377, at *2 (S.D.N.Y. July 26, 2004) ("A Rule 50(b) motion cannot be granted 'if, drawing all reasonable inferences in favor of the nonmoving party and making all credibility assessments in his favor, there is sufficient evidence to permit a rational juror to find in his favor.'" (quoting *Sir Speedy, Inc. v. L&P Graphics, Inc.*, 957 F.2d 1033, 1039 (2d Cir. 1992))).

Thus, JMOL is appropriately granted where "(1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against [it]." *Advance Pharm., Inc. v. United States*, 391 F.3d 377, 390 (2d Cir. 2004) (alterations in original) (quoting *Galdieri-Ambrosini*, 136 F.3d at 289); *see also Kinneary v. City of N.Y.*, 601 F.3d 151, 155 (2d Cir. 2010) (same); *This is Me, Inc. v. Taylor*, 157 F.3d 139, 142 (2d Cir. 1998) (stating that a court assessing a Rule 50 motion must consider whether "the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [people] could have reached" (quoting *Cruz*

*v. Local Union No. 3, Int'l Bd. of Elec. Work-ers*, 34 F.3d 1148, 1154–55 (2d Cir. 1994))). In other words, this Court may only grant defendants' Rule 50(b) motion "if it cannot find sufficient evidence supporting the jury's verdict." *Playtex Products*, 2004 WL 1658377, at *2; *see also Black v. Finantra Capital, Inc.*, 418 F.3d 203, 209 (2d Cir. 2005) ("A court evaluating [] a motion [for JMOL] cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury."). For this reason, a party moving to set aside a jury verdict must clear "a high bar." *Lavin-McEleney v. Marist College*, 239 F.3d 476, 479 (2d Cir. 2001).

## III. DISCUSSION

Defendants argue that (1) they raised their governmental immunity and sufficiency of the evidence arguments in their Rule 50(a) motion and (2) even if they had not done so, JMOL is necessary to avoid a manifest injustice. For the reasons set forth below, the Court disagrees and, therefore, denies defendants' Rule 50(b) motion.

### A. Waiver

Once a case has been submitted to the jury, a motion for JMOL "may be renewed only on grounds that were specifically articulated before submission of the case to the jury." *Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 164 (2d Cir. 1998); *see also Provost v. City of Newburgh*, 262 F.3d 146, 161 (2d Cir. 2001) ("Because [defendant] did not specifically include a qualified immunity argument in his pre-verdict request for judgment as a matter of law, he could not have included such an argument in his post-verdict motion even had he attempted to do so."). The purpose of this "specificity requirement" "is to give the other party an opportunity to cure the defects in proof that might otherwise preclude him from taking the case to the jury."

*Galdieri-Ambrosini*, 136 F.3d at 286 (quoting *Baskin v. Hawley*, 807 F.2d 1120, 1134 (2d Cir. 1986)). Therefore, where a defendant arguably failed to satisfy the specificity requirement, "[t]he ultimate question is whether the motion, either of itself or in the context of the ensuing colloquy, was sufficiently specific to alert the opposing party to the supposed deficiencies in her proof." *Id.*

General arguments not tailored to a specific claim are insufficient to meet the specificity requirement. In *Piesco v. Koch*, 12 F.3d 332, 341 (2d Cir. 1993), for example, the Second Circuit held that the defendants failed to meet the specificity requirement in their Rule 50(a) motion when, at the close of the evidence, counsel simply stated, "Defendants move for a directed verdict." This statement, the Court reasoned, "plainly did not identify the issue on which defendants contended there was insufficient evidence to permit the jury to find in favor of [the plaintiff]" and, therefore, did not give the "plaintiff the adequate notice envisioned by Rule 50." *Id.* The Court reached the same conclusion in *Smith v. Lightning Bolt Products., Inc.*, 861 F.2d 363, 368 (2d Cir. 1988), where the defendant's "first motion stated simplistically that 'plaintiff has failed to make out a prima faci[e] case'; and its attorney renewed this motion with only the statement, 'I don't believe there is any evidence before this Jury of any fraud.'" Again, these motions were not "sufficiently specific to alert [the plaintiff] to [the defendants' Rule 50(b)] contentions that there was simply no proof" to support a specific element of the claim. *Id.*; *see also Am. Nat'l Fire Ins. Co. v. Mirasco, Inc.*, 451 F. Supp. 2d 576, 581 (S.D.N.Y. 2006).

Relatedly, when challenging the sufficiency of the evidence, a defendant must "identify the specific element that the defendant contends is insufficiently supported" before the case is submitted to the jury to satisfy the specificity requirement. *Galdieri-Ambrosini*, 136 F.3d at 286. In their Rule 50(a) motion in *Kirsch*, for example, the defendants "challenged the evidence of discrimination and constructive discharge . . . but they did not mention any lack of proof as to willfulness." 148 F.3d at 164. Thus, when they challenged the sufficiency of the evidence on the element of willfulness in their post-trial motion, the Second Circuit held that the "challenge was not authorized by Rule 50(b) because no JMOL motion had been made on that issue before submission of the case to the jury." *Id.*

Furthermore, where a defendant raises an argument with respect to one claim but not another, the Second Circuit has held that the defendant waived that argument with respect to the second claim. For instance, in *McCardle v. Haddad*, 131 F.3d 43, 52 (2d Cir. 1997), a case involving 42 U.S.C. § 1983 claims for unlawful stop and unlawful seizure, defense counsel argued at the close of the evidence that "on the issue of illegal *stop* . . . the evidence compels a ruling for the Defendant . . . on the issue of qualified immunity." However, "no mention whatever was made of qualified immunity with respect to the claim of illegal *search*." *Id.* After the trial, the defendant moved for JMOL on the plaintiff's unlawful search claim on the grounds of qualified immunity. *Id.* The Second Circuit determined that the "motion was improper to the extent that it sought to invoke qualified immunity because no motion for JMOL on that basis had been directed to the claim of unlawful search at trial." *Id.* In *Galdieri-Ambrosini*, by contrast, the Second Circuit concluded that the defendant adequately raised a particular argument with respect to multiple claims. 136 F.3d at 287. In that case, defense counsel made a detailed argument for JMOL prior to the verdict on the plaintiff's gender discrimination claim. *Id.* The district court then asked if the defendant's 50(a) motion "was meant to encompass

the [plaintiff's] retaliation claim," as the court "had not heard [defense] counsel include that claim." *Id.* Counsel replied, "I think that they follow. The issues are the same. There is no evidence, your Honor. I think that flows right through every cause of action." *Id.* (quoting trial transcript). The Second Circuit held that this comment rendered "the Rule 50(a) motion . . . sufficient to cover the claim of retaliation." *Id.*

Finally, while making a Rule 50(a) argument, a defendant's "explicit reference to materials and argument previously supplied to the court" can preserve those arguments for the Rule 50(b) motion. *Hudson Optical Corp. v. Cabot Safety Corp.*, 162 F.3d 1148, *1 (2d Cir. 1998) (unpublished opinion) (quoting Fed. R. Civ. P. 50, Advisory Committee Notes). In *Hudson*, for example, the Second Circuit noted that, "[i]n moving for judgment as a matter of law prior to the verdict, [the defendant] referenced its motion *in limine* (in which it had argued that the fraud claim was not viable)." *Id.* The Court, therefore, concluded that the argument was preserved for the Rule 50(b) motion. *Id.*

1. Governmental Immunity

Under this body of law, defendants' governmental immunity argument "had plainly been waived" when they raised it in their written Rule 50(b) motion after the trial. *McCardle*, 131 F.3d at 52. Defendants did not explicitly raise their state law governmental immunity argument in their Rule 50(a) motion. *See Conte I*, 596 F. App'x at 6 ("[D]efendants did not specifically articulate these grounds for reversal in their Rule 50(a) motion."). Thus, that argument was waived. *See Provost*, 262 F.3d at 161; *Kirsch*, 148 F.3d at 164.

Defendants point out that counsel responded "Yes" when, at the close of plaintiff's case, the Court asked him, "In your summary judgment motion, you moved both on absolute immunity [and] qualified immunity. And I assume that that is continuing as well?" (Tr. at 908.) They argue that, given their governmental immunity arguments at summary judgment, counsel's affirmative response to the Court's question was adequate to notify plaintiff of their governmental immunity argument with respect to his tortious interference with contract claim.

The Court disagrees. It is true that a party can preserve an argument prior to the close of evidence by making an "explicit reference to materials and argument previously supplied to the court." *Hudson Optical*, 162 F.3d 1148, *1 (quoting Fed. R. Civ. P. 50, Advisory Committee Notes). In the context of the record, however, counsel's vague, Court-prompted confirmation that he was "continuing" his immunity arguments from the summary judgment stage was not explicit enough to put plaintiff on notice that defendants were reviving their governmental immunity argument with respect to the tortious interference with contract claim. *See Galdieri-Ambrosini*, 136 F.3d at 287 ("The ultimate question is whether the motion, either of itself or in the context of the ensuing colloquy, was sufficiently specific to alert the opposing party to the supposed deficiencies in her proof.").

Specifically, the Court asked about immunity immediately after counsel delivered an argument on plaintiff's abuse of process claim. (*See* Tr. at 907–08.) Concentrating "on the third cause of action, malicious abuse of process," counsel stated that plaintiff failed to establish "any evidence of malice or an intent to destroy the plaintiff's business." (*Id.* at 907, 908.) He continued, "I did not fully brief that particular issue," and the Court responded, "That is preserved for purposes of renewing it at the end of the case." (*Id.* at 908.) It was only at this point that the questions about immunity arose. (*Id.*) No

mention was made in that moment of the tortious interference claim, as everyone involved was focused on abuse of process. (*See id.* at 907–08.) Indeed, a lengthy discussion of plaintiff's false arrest claim had occurred between the tortious interference and abuse of process arguments (*see id.* at 905–08), further divorcing the tortious interference discussion from the Court's question about immunity. Thus, in context, counsel clearly was reasserting his immunity defenses with respect to abuse of process and possibly false arrest, but certainly not tortious interference.

The procedural history of this case bolsters this reading of the record. The only time defendants raised the governmental immunity argument prior to their Rule 50(b) motion was at summary judgment. At that time, however, the argument was fairly cursory, especially with respect to tortious interference with contract. After noting that plaintiff raised state law claims including tortious interference (Defs.' Sum. J. Br. at 25), defendants summarily asserted that "Emmons, Wasilausky, Wallace, and Falzarano are also entitled to absolute immunity from suit since, under New York State Law, a prosecutor is immune from civil suit for official acts performed in the investigation and prosecution of criminal charges" (*id.* at 26 (citation omitted)). They did not elaborate on how the actions giving rise to plaintiff's tortious interference claims fell into this category at this point in their brief. Their earlier arguments concerning federal immunity, meanwhile, were restricted to plaintiff's claims for false arrest and abuse of process, which were based on different courses of conduct.[7] (*See id.*) Therefore, the logic of defendants' federal immunity arguments made with respect to

plaintiff's false arrest and abuse of process claims does not apply to his tortious interference claim. It follows that defendants' reference to these arguments from summary judgment during their oral Rule 50(a) motion was insufficient "to alert the opposing party to the supposed deficiencies in [his] proof." *Galdieri-Ambrosini*, 136 F.3d at 287.

In their proposed pre-trial order, moreover, defendants did not indicate that they would be raising governmental immunity as an affirmative defense to the tortious interference with contract claim. (*See* Defs.' Pre-Trial Order at 5 (qualified immunity raised as a defense to state law claims of false arrest and malicious abuse of process, but not tortious interference with contract).) Throughout the trial, meanwhile, counsel's oral arguments concerning immunity were restricted to the false arrest and abuse of process claims, not tortious interference. (*See, e.g.*, Tr. at 1022 (defense counsel discussing immunity in the context of the false arrest claim and the misdemeanor information); *cf. id.* at 1189–1191 (while renewing Rule 50(a) motion, immunity argument restricted to false arrest issue, and only argument on tortious interference issue concerned statute of limitations).)

In light of defendants' apparent abandonment of the immunity defense on the tortious interference claim at the time counsel made his Rule 50(a) motion, counsel's one-word answer to the Court's brief question regarding immunity cannot be interpreted as a revival of defendants' perfunctory summary judgment argument that they were entitled to governmental immunity on the tortious inter-

---

[7] Specifically, plaintiff's tortious interference with contract claim was based on defendants' statements to route distributors, printers, and advertisers that plaintiff was a scam artist and his business was fraudulently run. (*See* July 2013 Order at 8–10, 27.) His false arrest claim, by contrast, arose out of Wasilausky's arrest of plaintiff in connection with a bad check (*see id.* at 5, 14–16), and his abuse of process claim arose out of the subpoenas defendants issued to plaintiff requesting documents in connection with their investigation (*see id.* at 9).

ference claim. Instead, it can only be interpreted as, at most, a reassertion of the immunity arguments on the false arrest and abuse of process claims.

It follows that, because the Second Circuit has made clear that arguments on one claim are not enough to preserve those same arguments on another claim, defendants have not preserved their immunity argument on the tortious interference claim. *See McCardle*, 131 F.3d at 52. Unlike *Galdieri-Ambrosini*, this was not a case where counsel made an argument about why immunity should be granted on the false arrest and abuse of process claims and then added as an afterthought that the same logic applied to the tortious interference claim. *See* 136 F.3d at 287. Instead, it is much closer to *McCardle*, where counsel briefly raised qualified immunity on only one claim, and the Second Circuit deemed that the defendant waived qualified immunity on the other claim. 131 F.3d at 52. Specifically, as noted above, counsel's passing remark, at most, reasserted defendants' immunity arguments on the false arrest and abuse of process claims, rendering it inadequate to preserve their Rule 50(b) argument that they are entitled to governmental immunity on the separate tortious interference claim. *See id.* This argument, therefore, was waived.[8] *See id.*; *Provost*, 262 F.3d at 161; *Kirsch*, 148 F.3d at 164.

## 2. Sufficiency of the Evidence

The same is true for defendants' sufficiency of the evidence arguments. *See McCardle*, 131 F.3d at 52. In their Rule 50(a) motion, defendants never claimed, as they do now, that there was no evidence of valid contracts, conduct constituting tortious interference, actual breach, causation, or damages. *See Conte I*, 596 F. App'x at 6. Instead, these

arguments were raised for the first time in their initial Rule 50(b) motion. (*See* Defs.' Br. at 16–19 (no evidence of valid contracts), 19–23 (breach), 23–26 (damages), 27–29 (conduct)). As such, the Court concludes that defendants waived these arguments. *See Provost*, 262 F.3d at 161; *Kirsch*, 148 F.3d at 164.

Again, defendants argue that their colloquy with the Court at the close of plaintiff's case-in-chief adequately preserved their sufficiency of the evidence arguments. Specifically, they argue that, because counsel confirmed that he "believe[d] there [was] insufficient evidence as a whole as well," they did not waive their more specific arguments challenging the individual elements of plaintiff's tortious interference with contract claim.

The Court disagrees. At the outset, the Court finds that counsel's remark, when read in context, was a reference to his abuse of process and false arrest claims for the same reasons that his comment on immunity only applied to those claims. Even assuming, however, that counsel was challenging the sufficiency of the evidence underlying all of plaintiff's claims, it is clear from *Piesco* and *Lighting Bolt Products* that short, conclusory, and simplistic statements are not enough to preserve more detailed arguments. Counsel's statement here closely resembles the remarks in *Lightning Bolt Products*, where the attorney stated, at various times prior to the verdict, that "plaintiff has failed to make out a prima faci[e] case" and that he, the attorney, did not "believe there [was] any evidence before this Jury of any fraud." 861 F.2d at 368. Like those statements, counsel's passing, conclusory remark here was not "sufficiently specific to alert [plaintiff] to [defendants'] present contention[s]" that the evidence was insufficient to show a valid contract, conduct

---

[8] As discussed below, even if properly preserved, the Court concludes that defendants would not be entitled

to JMOL on this ground based upon the record before the Court.

constituting tortious interference, a breach, causation, or damages. *Id.* From this sole remark, plaintiff could not have discerned these more precise arguments with enough clarity "to cure the defects in proof that might otherwise preclude him from taking the case to the jury." *Galdieri-Ambrosini*, 136 F.3d at 286 (quoting *Baskin*, 807 F.2d at 1134.) Indeed, counsel's general statement here would provide even less notice than the defense attorney's detailed arguments in *Kirsch* targeting specific elements of the plaintiff's claim, which the Second Circuit nevertheless found insufficient to preserve a similar argument on a different claim. *See* 148 F.3d at 164. Therefore, the Court concludes that counsel's brief remark prior to the verdict was not specific enough to preserve defendants' Rule 50(b) sufficiency of the evidence arguments. *See Provost*, 262 F.3d at 161; *Kirsch*, 148 F.3d at 164; *Galdieri-Ambrosini*, 136 F.3d at 286.

## B. Manifest Injustice

Where, as here, a defendant fails to satisfy the specificity requirement, "JMOL may neither be granted by the district court nor upheld on appeal unless that result is required to prevent manifest injustice." *Galdieri-Ambrosini*, 136 F.3d at 287 (quoting *Cruz*, 34 F.3d at 1155). Whether to grant JMOL on the basis of a waived argument to prevent a manifest injustice is left to the court's discretion. *See Flannigan v. Vulcan Power Grp., LLC*, 642 F. App'x 46, 51 (2d Cir. 2016) ("[W]e may exercise our discretion to consider the [waived] issue if necessary to prevent manifest injustice." (citations omitted)); *Malmsteen v. Berdon, LLP*, 369 F. App'x 248, 249 (2d Cir. 2010) ("The forfeited issue *may be reached* if to ignore it would result in manifest injustice." (emphasis added) (citing *Fabri v. United Tech. Int'l, Inc.*, 387 F.3d 109, 119 (2d Cir. 2004))); *Wat Bey v. City of N.Y.*, No. 01 CIV. 09406 (AJN), 2013 WL 12082743, at *12 (S.D.N.Y. Sept. 4, 2013)

("[T]he Court could, at its discretion, review the [waived] issue . . . if doing so was required to prevent manifest injustice."). Nevertheless, "[w]here the argument presents a question of law and there is no need for additional fact-finding, and manifest injustice may arise, then exercise of this discretion is warranted." *Welch v. United Parcel Serv., Inc.*, 871 F. Supp. 2d 164, 178 (E.D.N.Y. 2012) (quoting *Malmsteen*, 369 F. App'x at 251).

The manifest injustice inquiry is fact-specific, *Protostorm, LLC v. Antonelli, Terry, Stout & Krauss, LLP*, No. 08-CV-931 PKC JO, 2015 WL 3605143, at *4 (E.D.N.Y. June 5, 2015) ("What constitutes manifest injustice turns on the specifics of each case."), and "a defendant may not merely argue that the procedural bar should be waived because they should win on the underlying motion." *Welch*, 871 F. Supp. 2d at 178. Instead, he must establish that the "jury's verdict is wholly without legal support." *Patsy's Italian Rest., Inc. v. Banas*, 658 F.3d 254, 271 (2d Cir. 2011) (quoting *Russo v. State of N.Y.*, 672 F.2d 1014, 1022 (2d Cir. 1982)). In *Russo*, for instance, the Second Circuit concluded that a jury verdict was "wholly without legal support" where the plaintiff "failed to prove one of the four essential elements of a malicious prosecution action." 672 F.2d at 1022; *see also Sojak v. Hudson Waterways Corp.*, 590 F.2d 53, 54 (2d Cir. 1978); *Oliveras v. Am. Exp. Isbrandtsen Lines, Inc.*, 431 F.2d 814, 817 (2d Cir. 1970). By contrast, where there is evidence to support each element of a claim, there is no manifest injustice when a court declines to entertain a sufficiency of the evidence argument on that claim. *See, e.g., Lore v. City of Syracuse*, 670 F.3d 127, 154 (2d Cir. 2012); *Cordius Trust v. Kummerfeld*, 331 F. App'x 810, 811 (2d Cir. 2009); *Kirsch*, 148 F.3d at 164; *Reichman v. Bonsignore, Brignati & Mazzotta P.C.*, 818 F.2d 278, 281 (2d Cir. 1987).

In addition, the Second Circuit has indicated that it "cannot find manifest injustice . . . where, had Defendants properly raised [an] issue at trial, 'it may be that Plaintiffs would have been able to present additional evidence'" on that issue. *Rivera v. City of N.Y.*, 594 F. App'x 2, 6 (2d Cir. 2014) (quoting *Kirsch*, 148 F.3d at 165) (brackets omitted). In *Rivera*, for example, the district court found the evidence insufficient to support the jury's punitive damages award even though the defendant failed to make such an argument prior to the verdict. *Id.* at 4–5. The Second Circuit held that, because the defendant failed to challenge the sufficiency of the evidence in its Rule 50(a) motion, "the district court was not permitted to reach the question of the sufficiency of the evidence, and the subsequent vacatur of the punitive damages award was an abuse of discretion." *Id.* at 6. It expressly rejected the defendant's claim that vacatur of the award was necessary to prevent manifest injustice. *Id.*; *see also In re Johns-Manville Corp.*, 759 F.3d 206, 219 (2d Cir. 2014) (consideration of arguments raised for the first time on appeal is disfavored "where those arguments were available to the parties below and they proffer no reason for their failure to raise the arguments below" (quoting *In re Nortel Networks Corp. Sec. Litig.*, 539 F.3d 129, 133 (2d Cir. 2008) (brackets omitted))); *Corsair Special Situations Fund, L.P. v. Nat'l Res.*, 595 F. App'x 40, 44 (2d Cir. 2014) ("[A] judgment in a civil case does not constitute 'manifest injustice' where the movant's arguments for relief 'were available to the [party] below and [the

party] proffer[s] no reason for [its] failure to raise the arguments.'" (quoting *Johns-Manville Corp.*, 759 at 219) (alterations in original)).

The Court declines to exercise its discretion to grant defendants' Rule 50 motion on the basis of their waived arguments.[9] First, with respect to their governmental immunity argument, the Court finds that, as with their earlier statute of limitations argument, their immunity defense raises a factual question that defendants should have submitted to the jury. In any event, plaintiff presented evidence suggesting bad faith by defendants in conducting the investigation, and the jury, by virtue of its finding of malice as to the defendants with respect to the award of punitive damages, essentially found that such bad faith existed. *See Rodrigues v. City of N.Y.*, 602 N.Y.S.2d 337, 341–43 (N.Y. App. Div. 1993) (indicating that governmental immunity does not apply where government agents acted in bad faith). Construing the evidence at trial most favorably to plaintiff, there is no basis to disturb that finding or to find that a "manifest injustice" exists with respect to the governmental immunity issue. Second, with respect to the various elements of a tortious interference claim, the Court disagrees with defendants' contention that the verdict is "wholly without legal support." *Russo*, 672 F.2d at 1022. Plaintiff presented evidence pertaining to each and every one of the elements of a tortious interference claim.[10] To the extent that defendants make a post-trial attempt to raise specific defects with respect

---

[9] As an initial matter, the Court notes that defendants argue that the "manifest injustice" standard warrants granting JMOL in their favor. Even in instances where manifest injustice has been found, however, the remedy is not JMOL, but rather a new trial during which plaintiff would have an opportunity to cure the defects that were not properly raised. *See, e.g.*, *Baskin*, 807 F.2d at 1134 ("Thus, if the party moving for judgment n.o.v. has not moved for a directed verdict, and if the court is nevertheless satisfied that justice requires that

the judgment be vacated for insufficiency of the evidence, the court should normally grant a new trial.").

[10] Although this Court initially ruled that pre-June 1, 2005 evidence regarding the tortious interference of contract claim was barred by the statute of limitations, the Second Circuit reversed that finding and, thus, the Court can analyze that evidence in determining the sufficiency of the evidence on the question of manifest injustice.

to certain proof, this Court "cannot find manifest injustice" because defendants could have "properly raised [these] issue[s] at trial," and, had they done so, plaintiff "would have been able to present additional evidence," or make other applications to the court, to address the alleged defects in proof. *Rivera*, 594 F. App'x at 6 (quoting *Kirsch*, 148 F.3d at 165). Under these circumstances, no manifest injustice will result from the Court's refusal to grant JMOL on the basis of the waived arguments and, therefore, defendants' Rule 50(b) motion is denied.

### 1. Governmental Immunity

The Second Circuit has indicated that a manifest injustice will not result from a court's refusal to entertain an immunity argument where the evidence is sufficient to prove that immunity does not apply. Specifically, in *Provost*, after concluding that a defendant had waived his qualified immunity argument by failing to raise it in his Rule 50(a) motion, the Second Circuit held that it did not need to grant the Rule 50(b) motion to prevent a manifest injustice. 262 F.3d at 162. To justify this holding, the Court reasoned that "the evidence would have reasonably supported a finding that [the defendant] acted abusively without even a belief that the arrest was justified." *Id.* Therefore, it was "doubtful that [the defendant] was entitled to qualified immunity as a matter of law." *Id.*

Echoing their argument from summary judgment, defendants claim that, under New York law, an officer is entitled to absolute immunity for the consequences of his discretionary actions "even if resulting from negligence or malice." (Defs.' Suppl. Mem. Law Supp. Rule 50 Mot., ECF No. 703 ("Defs.' Suppl. Br."), at 22 (quoting *Tango v. Tulevech*, 61 N.Y.2d 34, 40 (N.Y. 1983)).[11] They,

therefore, argue that they are immune from plaintiff's tortious interference claim because all their actions were conducted pursuant to a lawful investigation. (*See id.* at 24–25.)

As this Court made clear in its Summary Judgment Order, however, "there are situations where, when performing an investigation outside the auspices of the grand jury, prosecutors would not be entitled to absolute immunity." (Summary Judgment Order at 40 (citing *Rodrigues*, 602 N.Y.S.2d at 341–43; *Hirschfeld v. City of N.Y.*, 686 N.Y.S.2d 367, 370 (N.Y. App. Div. 1999)).) Specifically, "[w]hen a Grand Jury or a court is not intended to be convened, the prosecutor is not exercising a prosecutorial function," and therefore is not entitled to governmental immunity. (*Id.* (quoting *Moore v. Dormin*, 676 N.Y.S.2d 90, 94 (N.Y. App. Div. 1998) (Tom, J., concurring)).) In *Rodrigues*, for instance, the District Attorney's office issued numerous grand jury subpoenas to customers, suppliers, and business contacts of the plaintiff's company in connection with an investigation into his financial affairs even though no grand jury had been convened. 602 N.Y.S.2d at 339. Plaintiffs brought an abuse of process claim based on this conduct, alleging that the prosecutors "engaged in an extortion scheme to harass and destroy them." *Id.* at 340. The Appellate Division held that the prosecutors were not entitled to absolute immunity because New York law "confers no power upon the District Attorney to employ a subpoena for the purpose of conducting his own investigation." *Id.* at 342. Where "an official is acting in knowing violation of law," the court continued, "he should be made to hesitate." *Id.* at 343.

Under *Rodrigues*, moreover, governmental immunity presents a mixed question of

---

[11] Defendants also argue that there is insufficient evidence to support a finding of "bad faith," as required to overcome qualified immunity. (Defs.' Suppl. Br. at 24 n.13 (quoting *Arteaga v. State of New York*, 72 N.Y.2d 212, 216 (N.Y. 1988)).)

law and fact, as the plaintiff's factual allegation that the prosecutors issued the subpoenas in bad faith was enough to defeat the defendant's immunity argument at the motion to dismiss stage. *See id.* at 340, 342–43; *see also Jones v. Parmley,* 465 F.3d 46, 64 (2d Cir. 2006) ("Clearly, without a factual resolution of the sharply conflicting versions of these events, it is not possible to determine whether defendants are qualifiedly immune." (quoting *Simpkin v. City of Troy,* 638 N.Y.S.2d 231, 232 (N.Y. App. Div. 1996))). Thus, in the instant case, it was for the jury to decide whether defendants ever intended to convene a grand jury or whether they were conducting their "own investigation" in bad faith. *See Rodrigues,* 602 N.Y.S.2d at 342–43. The burden of proof was on the defendant to prove entitlement to governmental immunity. *See Villar v. Howard,* 28 N.Y.3d 74, 80–81 (N.Y. 2016) ("[D]efendant's argument that he is entitled to governmental immunity . . . [is] an affirmative defense on which he bears the burden of proof." (citing *Valdez v. City of New York,* 18 N.Y.3d 69, 79–80 (N.Y. 2011))); *see also Lore,* 670 F.3d at 149 ("[A] defendant has the burden of proof with respect to affirmative defenses, and qualified immunity is such a defense." (citing, *inter alia, Jules Rabin Associates, Inc. v. Landon,* 38 N.Y.2d 827, 828 (N.Y. 1976) (characterizing state law qualified immunity as "an affirmative defense"))).

As the Second Circuit made clear in *Conte I,* moreover, "to the extent that a particular finding of fact [is] essential to an affirmative defense, the defendant must . . . request that the jury be asked the pertinent question. If the movant fails to request a special interrogatory, he is not entitled to have the court, in lieu of the jury, make the needed factual finding." 596 F. App'x at 6 (brackets and citations omitted). Thus, it vacated this Court's initial ruling on the statute of limitations issue even though this Court found no evidence that the plaintiff's injuries occurred during the limitations period because findings of fact "were essential to [the] affirmative defense, [and] the defendants were not entitled to have the district court decide these facts in the first instance." *Id.*

The same is true here. As noted above, to establish their entitlement to state law governmental immunity under *Rodrigues,* defendants needed to prove that their actions were pursuant to a legitimate investigation, rather than their "own investigation." 602 N.Y.S.2d at 342. They also needed to prove that the investigation was not conducted in bad faith to establish state law qualified immunity. *See Arteaga,* 72 N.Y.2d at 216. Therefore, it was incumbent on defendants to "to request that the jury be asked the pertinent question." *Zellner v. Summerlin,* 494 F.3d 344, 368 (2d Cir. 2007); *see also Conte I,* 596 F. App'x at 6.

It is true that, with respect to the proposed verdict sheet, defendants included one question that appears to relate to the issue of immunity, and a corresponding proposed instruction. (*See* Defs.' Verdict Sheet ¶ 15; County Defs.' Proposed Jury Instructions, ECF No. 555, at 15.) They did not, however, object to the Court's Proposed Verdict Sheet (ECF No. 575), a general verdict sheet that contained no such question. (*See* Tr. at 922, 925–26 (no objection to Court's instructions or the proposed verdict sheet based on absence of immunity language on tortious interference claim during charge conference).) Because they did not object to this more general verdict form, they are "not entitled to have the district court decide . . . facts in the first instance" to resolve their affirmative defense of state law governmental and qualified immunity. *Conte I,* 596 F. App'x at 6; *see also Jarvis v. Ford Motor Co.,* 283 F.3d 33, 57 (2d Cir. 2002) ("We have previously emphasized that '[f]ailure to object to a jury instruction or the form of an interrogatory prior to the jury retiring results in a waiver of that

objection. . . . Surely litigants do not get another opportunity to assign as error an allegedly incorrect charge simply because the jury's verdict comports with the trial court's instructions.'" (quoting *Lavoie v. Pac. Press & Shear Co., a Div. of Canron Corp.*, 975 F.2d 48, 55 (2d Cir. 1992))); *Clarex Ltd. v. Natixis Sec. Americas LLC*, No. 1:12-CV-7908-GHW, 2014 WL 4276481, at *10 (S.D.N.Y. Aug. 29, 2014) ("[A] party 'may [not] rely on her submission of proposed jury instructions' which were not adopted by the district court to preserve an objection for appeal." (quoting *Caruso v. Forslund*, 47 F.3d 27, 31 (2d Cir. 1995))); *Gray v. Genlyte Grp., Inc.*, 289 F.3d 128, 134 (1st Cir. 2002) ("[E]ven if the initial *request* is made in detail, the party who seeks but did not get the instruction must object *again* after the instructions are given but before the jury retires for deliberations.").

In any event, plaintiff presented evidence to the jury to show that the conduct forming the basis of his tortious interference with contract claim occurred in the course of defendants' "own investigation" and in bad faith, rather than within the scope of a legitimate grand jury investigation. *Rodrigues*, 602 N.Y.S.2d at 342. As a threshold matter, defendants Emmons and Wallace testified that no evidence was ever presented to a grand jury. (Tr. at 392–93 (Emmons admitting that "no evidence was presented to the grand jury"); *id.* at 550 (Wallace responding "No" when asked if he "ever present[ed] the case to a grand jury").) As discussed in more detail below, plaintiff recounted an instance where, when defendant Falzarano served him a subpoena, Falzarano "grabbed my hand and started squeezing it in a crushing manner." (*Id.* at 155.) At this point, plaintiff testified that Falzarano "told me that he was going to

get me." (*Id.*) In addition, Paul Hoppe, who became a route distributor for I Media in October 2004, testified to a conversation with Falzarano where he "felt threatened" and "thought [he] was going to be subject to arrest if [he] continued to deliver the magazine or even speak to Mr. Conte." (*Id.* at 210.) Moreover, defendant Wallace testified that he spoke to attorney Joseph Giaimo about a civil class action being filed against Conte, Giaimo sent a copy of the complaint to Wallace in September 2006, and the phrase "Ponzi scheme" may have come up during their conversation.[12] (*Id.* at 573–75, 603; Ex. 162.)

In short, plaintiff's presentation of evidence was focused on showing that defendants were conducting their "own investigation" in bad faith to "harass and destroy" plaintiff's business, rather than to legitimately investigate an alleged crime. *Rodrigues*, 602 N.Y.S.2d at 340, 342. The verdict and damages award, moreover, indicates that, based upon the evidence presented, the jury did not believe the investigation was legitimate. The jury was instructed that it could impose punitive damages if it found "that the acts or omissions of the defendant were done maliciously or wantonly," with "maliciously" defined to mean "prompted by ill will or spite toward the injured person." (Tr. at 1345; *see also id.* at 1350 (applying same definition to tortious interference claim).) The verdict awarding punitive damages on the tortious interference claim, then, can reasonably be read as a factual finding by the jury that defendants' actions were "prompted by ill will or spite" toward the plaintiff. (*Id.* at 1345, 1350.) Construing the evidence most favorably to plaintiff, a rational jury could have found in plaintiff's favor on this issue and there is no basis to disturb the verdict on this

---

[12] Although that conversation took place after Conte testified that his business had ceased operation, the evidence could still be relevant on the issue of the motivation of the defendants in connection with the investigation.

ground. Thus, on the governmental immunity issue, the jury verdict is not "wholly without legal support," and no manifest injustice results from this Court's refusal to consider that argument on the merits. *Patsy's*, 658 F.3d at 271; *see also Provost*, 262 F.3d at 162.

In addition, had defendants specifically alerted plaintiff to their state law immunity arguments in their Rule 50(a) motion, "it may be that [plaintiff] would have been able to present additional evidence" on that issue. *Rivera*, 594 F. App'x at 6. For example, in his supplemental submission to this Court, plaintiff attaches a declaration from attorney Joseph Giaimo, who represented a number of the route distributors in the class action against Conte and sought information from defendant Wallace before filing the class action. In the declaration, Giaimo states, *inter alia*, that Wallace told him that, with respect to the criminal investigation of Mr. Conte and I Media, "that evidence was being presented to a grand jury" (Pl.'s Mem. Law in Opp'n to Defs.' Suppl. Mem. Law and Rule 50(b) Mot. ("Pl.'s Suppl. Br."), Ex. A ("Giaimo Decl."), ECF No. 709, at ¶ 4), which would have contradicted Wallace's trial testimony that no evidence was presented to the grand jury (Tr. 550). Thus, if defendants had specifically raised the governmental immunity argument at the close of plaintiff's case, Conte could have sought to re-open his case to call Giaimo or present additional evidence on the "bad faith" issue (such as the testimony of other route distributors contacted by Falzarano or Wallace) to attempt to overcome that motion.

In sum, this Court "cannot find manifest injustice" on the grounds of defendants' waived governmental immunity argument. *Rivera*, 594 F. App'x at 6; *see also Welch*, 871 F. Supp. 2d at 178 (reviewing waived Rule 50(b) argument is appropriate where

"there is no need for additional fact-finding"), and, in any event, the motion would fail on the merits.

### 2. Sufficiency of the Evidence

Defendants next argue that, even assuming they did not properly preserve their sufficiency of the evidence arguments, the Court should grant their motion to prevent manifest injustice. Under New York law, to establish a tortious interference with contact claim, a plaintiff must prove (1) the existence of a valid contract, (2) the defendants' knowledge of the contract's existence, (3) that the defendant intentionally procured a breach of the contract, and (4) that it resulted in damages to the plaintiff. *See Int'l Minerals & Res., S.A. v. Pappas*, 96 F.3d 586, 595 (2d Cir. 1996); *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 424 (N.Y. 1996). Defendants now argue that plaintiff failed to present sufficient evidence to prove these elements, specifically (1) the existence of a valid contract, (2) conduct amounting to tortious interference, (3) a breach or causation thereof, and (4) damages. To the extent they argue that the jury's findings with respect to these elements were wholly without support in the record, the Court disagrees. Moreover, with respect to the purported deficiencies that are the focus of defendants' post-trial motion, plaintiff could have sought to address them, if they had been specifically raised at the close of the plaintiff's case, with additional evidence or with legal applications to the Court. Thus, no manifest injustice will result if this Court refuses to grant JMOL on the basis of those deficiencies.

Conte's theory of the case was that the defendants maliciously interfered with his contractual relationships with printers, route distributors, and advertisers to destroy his business by making false and baseless allegations that he was engaged in a fraudulent scheme,

and such interference resulted in the termination of contracts with him and the destruction of his business. In connection with that theory of the case, as summarized below, Conte submitted evidence on each of the essential elements of a tortious interference claim.

With respect to the formation and termination of contracts, Conte testified to the following facts, among others: (1) he had signed 20–30 route distributor contracts in May/June 2003 (Tr. at 70), which increased to about 30–40 route distributor contracts by October 2003 (*id.* at 114); (2) when allegations of fraud surfaced in 2003, his business was substantially disrupted by termination of contracts by a number of route distributors (*id.*); (3) after obtaining a printing contract with Quebecor in January 2014 (*id.* at 128–29, 775–76; Pl.'s Ex. 51), he was able to execute contracts with 15–20 new distributors (Tr. at 115–16; 192–95); (4) Quebecor suddenly stopped dealing with him in 2004 (*id.* at 129–30), and he began having problems with route distributors terminating the agreements with him because they believed I Media was a scam (*id.* 138); (5) by about April 2004, only 6–8 distributors, out of the 40–50 with whom he had agreements, were still willing to do business with him (*id.*); (6) he proceeded to rebuild his business in fall 2004 (*id.* at 143–44); (7) Transcontinental Printing entered into an agreement in December 2004 with I Media, but then refused to do business with it (*id.* at 147–48; Pl.'s Ex. 109); (8) in spring 2005, route distributors were telling Conte that he is a fraud (Tr. at 197–98); and (9) by June 2005, I Media was "pretty much dead in the water" (*id.* at 203). In terms of evidentiary support of his testimony, Conte submitted into evidence (without objection) a summary chart (Pl.'s Ex. 104), which he testified contained a list of 72 route distributors with whom he had agreements and the amounts they paid (*id.* at 169, 194–95). Conte also introduced into evidence (without objection), the documentation that formed the basis of that summary chart. (Pl.'s Ex. 200; 196–97.) In addition, Conte submitted the following documents: (1) a standard home distributor agreement (Pl.'s Ex. 28); (2) documents from Quebecor (Pl.'s Ex. 51); and (3) a copy of a printer's agreement with Transcontinental Printers in December 2004 (Pl.'s Ex. 109; Tr. at 147).

With respect to conduct amounting to interference with his contracts by the Nassau County District Attorney's Office, Conte presented the following evidence: (1) evidence regarding 21 letters that were sent by the District Attorney's Office to route distributors in February 2004 (Tr. at 139–40; Pl.'s Ex. 5); (2) a letter from the Nassau County District Attorney's Office to Quebecor on April 27, 2004 (Tr. at 142–43; Pl.'s Ex. 86); and (3) a March 2005 document from William Wallace indicating a list of 28 victims as of October 13, 2004, and monetary amounts after their names (Tr. at 162–63; Pl.'s Ex. 151).[13] Conte also testified that, when Investigator Falzarano was serving a subpoena on Conte in April 2005, he squeezed Conte's hand "in a crushing manner" and told Conte he was "going to get [him]." (Tr. at 155.)

Conte also called Paul Hoppe, who became a route distributor for I Media in October 2004. (*Id.* at 206.) Hoppe testified that defendant Falzarano contacted him in February 2005 and said that he was investigating I Media and Conte, "that the business was fraudulently run, [and] that Anthony Conte was a scam artist." (*Id.* at 209–10.) Hoppe further testified that Falzarano made a joking statement that, the next time Hoppe would see Conte, he, Conte, would be in handcuffs. (*Id.* at 210.) Moreover, Falzarano told Hoppe

---

[13] At trial, this list was mistakenly identified as Plaintiff's Exhibit 50, but a review of the record revealed that it was actually marked and entered as Exhibit 151.

that, if he spoke to Conte about their conversation, "it would be hindering a prosecution or investigation, and that [Hoppe] could be subject to arrest." (*Id.*) Hoppe testified that, as a result of that conversation, he "felt threatened" and "thought [he] was going to be subject to arrest if [he] continued to deliver the magazine or even speak to Mr. Conte." (*Id.*) Hoppe also testified that Falzarano asked for the names of other distributors, and that Hoppe provided him with several names. (*Id.* at 211.) Mr. Hoppe further stated that he had conversations with other distributors about these allegations by Falzarano. (*Id.* at 213.) Hoppe continued his relationship with I Media until April 2005, when there were no longer any magazines to deliver. (*Id.* at 223.)

With respect to the personal involvement and knowledge of defendant Wallace, Conte established through the testimony of Wallace that: (1) he was assigned the Conte investigation in March 2004, and defendant Falzarano assisted in the investigation (*id.* at 512–13); (2) at some point, he became aware that defendant Wasilausky had sent out letters to the route distributors requesting information about I Media (*id.* at 534); (3) in or about March or April 2004, Wallace contacted Gabriel Sauro of Quebecor, a printing company in Canada, and told Sauro that his office was conducting an investigation of I Media and Conte and wanted information about their business relationship (*id.* at 534–35; Pl.'s Ex. 86); (4) in particular, Wallace told Sauro "that we were conducting an investigation that had to do with numerous complaints we had received alleging possible fraud with respect to the sale of distribution routes" (Tr. at 537); (5) Wallace knew that Conte was trying to get Quebecor to print for his firm, I Media (*id.* at 540, 546; Pl.'s Ex. 16); (6) Wallace indicated that, when he spoke to people in the investigation, he did not indicate Conte was a fraud, but rather "indicated to people that there were allegations of fraud and that we were conducting an investigation of these allegations" (Tr. at 546–47); (7) Wallace spoke to Stuart Hubbard of Transcontinental in May 2004 regarding I Media and Conte (*id.* at 550; Pl.'s Ex. 129); (8) Transcontinental cancelled the printing job with I Media in December 2004, stating it did not have "press time" (Tr. at 555); (9) Wallace sent a list of 28 victims to Conte's attorney in March 2005 (Tr. 562–63; Pl.'s Ex. 151); (10) Wallace spoke to attorney Giaimo about a civil class action being filed against Conte, Giaimo sent a copy of the complaint to Wallace in September 2006, and the phrase "Ponzi scheme" may have come up during the conversation (Tr. at 573–75, 603; Pl.'s Ex. 162); (11) the main claim in that lawsuit was that the defendant Conte "created a pyramid scheme by utilizing legally dissolved nonexisting corporations" (Tr. at 865; *see also* Pl.'s Ex. 162); and (12) Wallace knew that Investigator Falzarano had spoken to Mr. Hoppe (Tr. at 577).

With respect to the personal involvement and knowledge of defendant Emmons, Conte established the following: (1) Emmons, as Chief of the Frauds Bureau, had conversations with Falzarano and Wallace regarding the investigation, and supervised the investigative efforts (*id.* at 361–63, 378–82); Emmons told Wallace to contact the printing companies to determine if, in fact, any printing was being done by I Media (*id.* at 534–35); (2) Emmons made other suggestions to Wallace regarding investigative avenues to pursue (*id.* at 589–91; Defs.' Ex. 7); and (3) Wallace sent a memo to Emmons in August 2006, advising that, "[t]he attempts by the accused to enter into the agreements with TV listing companies and printers and the actual productions, delivery of the magazine lend at least some support to his position that TV Time and I Media were a legitimate, ongoing business and not a scam," and recommending the investigation be closed (Tr. at 422–23; Pl.'s Ex. 36).

With respect to damages, Conte testified that the alleged interference by defendants with his printers caused him to have difficulties printing and disseminating TV Time Magazine, and affected his business operations. For example, Conte testified that, when Transcontinental ceased doing business with him in late 2004, he was unable to print three or four critical issues of the magazine during the holiday season. (Tr. at 834–35.) Nevertheless, he continued to publish into April 2005. (*Id.* at 837–38.) In addition to impacting his ability to obtain printers for his publication, Conte also testified that the alleged rumors about his company being a fraud crippled his ability to maintain or add new route distributors. (*Id.* at 838.) Thus, he testified that he was forced to effectively cease operations by June 2005. (*Id.* at 203–04.) In terms of quantifying the monies he lost from the alleged interference, Conte testified he suffered losses "well over a million dollars" in terms of money that he had invested into I Media. (*Id.* at 232.) Specifically, Conte noted that he had made over $1 million in revenues from the sale of route distributors and that all that money was put back into I Media and lost when the company was forced to shut down. (*Id.* at 842–43.) To document those losses, Conte submitted a summary chart which included, among other things, a list of route distributors and the monies obtained from each. (*Id.* at 859–62; Pl.'s Exs. 164, 201.) During the damages phase of the trial, Conte submitted additional testimony and documents setting forth that he had entered 154 contracts between October 2004 and May 2005, and that I Media received a total of $1,090,772.80 from those contracts. (Tr. at 1255–57; Pl.'s Ex. 104.) Conte testified that he lost all of that income, which he devoted to create circulation for his magazine, attract advertisers, and move the business forward. (Tr. at 1257.) In addition, Conte testified as to substantial emotional distress that he suffered from the alleged interference, including the allegations of fraud. (*See, e.g.*, *id.* at 1263 ("Because of this, I received many phone calls, harassing phone calls, threatening phone calls, from route distributors who were angry and upset that I had stolen money. I was treated like a leper by my business associates, and friend[s] and neighbors didn't want to talk to me anymore and to this day want nothing to do with me."); *id.* at 1264–65 (discussing severe anxiety and depression from loss of his personal and business reputation); *id.* at 1266 ("The acts of the defendants, that became published in the newspapers and online. It destroyed my business reputation among my business associates, who will not talk to me."); *id.* at 1268 ("[B]ecause of the tortious interference with respect to the contract that took place, as I stated, my business reputation was destroyed both among my business associates as well as my route distributors and iMedia's vendors. To this day, they refuse to do business with me or return my calls.").)

Based upon the above-referenced evidence, as well as the other evidence adduced at trial, assuming all credibility issues were resolved in plaintiff's favor and all reasonable inferences were drawn in his favor, *see Arlio*, 474 F.3d at 5, it is clear that there is no basis to conclude, as is required under the manifest injustice standard, that there is no legal support for plaintiff's claim, *see Patsy's*, 658 F.3d at 271; *Russo*, 672 F.2d at 1022; *Lore*, 670 F.3d at 154; *Cordius Trust*, 331 F. App'x at 811; *Kirsch*, 148 F.3d at 164; *Reichman*, 818 F.2d at 281.

Moreover, as noted above, the Second Circuit has made clear that a court "cannot find manifest injustice . . . where, had Defendants properly raised [an] issue at trial, it may be that Plaintiffs would have been able to present additional evidence" on that issue. *Rivera*, 594 F. App'x at 6 (quoting *Kirsch*, 148 F.3d at 165) (brackets omitted). This rule

also proves dispositive on defendants' waived sufficiency of the evidence arguments. Indeed, this case demonstrates why the Second Circuit has embraced this approach. Defendants could have raised all of their sufficiency of the evidence arguments before the case was submitted to the jury, but they failed to do so, and now they "proffer no reason for [this] failure." *Johns-Manville*, 759 F.3d at 219 (quoting *Nortel Networks*, 539 F.3d at 133 (brackets omitted)). Had defendants alerted plaintiff to these arguments, he "would have been able to present additional evidence" on the issues they now raise, *Rivera*, 594 F. App'x at 6, or taken other legal steps that could have "cure[d] the defects in proof" that defendants belatedly identify, *Galdieri-Ambrosini*, 136 F.3d at 286. As the Second Circuit has emphasized,

> We have previously stated that the specificity requirement is obligatory and that its purpose is to ensure that the other party is made aware of any deficiencies in proof that may have been overlooked. Requiring a party to state specific grounds for its Rule 50(a) motion puts a party on notice of potential deficiencies in its proof before the case is submitted to the jury.

*Holmes v. United States*, 85 F.3d 956, 962 (2d Cir. 1996) (citations and brackets omitted); *see also Oliveras*, 431 F.2d at 816 ("'At the time that a motion for a directed verdict is permitted, it remains possible for the party against who the motion is directed to cure the defects in proof that might otherwise preclude him from taking the case to the jury. A motion for judgment n.o.v., without prior notice of alleged deficiencies of proof, comes too late for the possibility of cure except by way of a complete new trial. The requirement of the motion for directed verdict is thus in keeping with the spirit of the rules to avoid tactical victories at the expense of substantive interests.'" (quoting 5 Moore, Fed. Practice,

50.08 at 2359)); *Waters v. Young*, 100 F.3d 1437, 1441 (9th Cir. 1996) ("'In no event, however, should the court enter judgment against a party who has not been apprised of the materiality of the dispositive fact and been afforded an opportunity to present any available evidence bearing on that fact.'" (quoting Fed. R. Civ. P. 50 Advisory Committee's Note to 1991 Amendment)); *Villara v. City of Yonkers Police Dep't*, No. 95 CIV. 10654 (JSR), 1997 WL 399660, at *1 (S.D.N.Y. July 15, 1997) ("[B]asic principles of judicial economy require a party to raise issues of this kind in a Rule 50(a) motion, before a case is submitted to the jury, so that a Court has the opportunity to correct any material oversights at that time.").

Although defendants now raise several post-trial deficiencies to plaintiff's proof, none of those purported deficiencies were necessarily fatal and could have been addressed by plaintiff if they had been timely and specifically raised by defendants under Rule 50 at the trial. Indeed, several of plaintiff's responses to defendants' new arguments in his opposition to their Rule 50(b) motion raise factual issues that the jury could have resolved. *See Conte I*, 596 F. App'x at 6 (holding that "defendants were not entitled to have the district court decide these facts in the first instance"); *Bennett v. Britton*, 609 F. App'x 11, 13 (2d Cir. 2015) ("[T]he district court's justification for granting judgment as a matter of law—holding Bennett to his testimony and making a factual finding that it was inaccurate—was erroneous. Factual findings, such as where and how an injury occurred, are for juries."); *see also Zellner*, 494 F.3d at 368; *Kerman v. City of N.Y.*, 374 F.3d 93, 120 (2d Cir. 2004).

First, defendants pointed out that the trial evidence established that I Media had been dissolved at the time the contracts at issue were formed (*see* Tr. at 703 (plaintiff ac-

knowledging that his company had been dissolved in December 2003), and dissolved corporations cannot enter into valid contracts under New York law, *see Moran Enters., Inc. v. Hurst*, 66 A.D.3d 972, 975 (N.Y. App. Div. 2009) (citing N.Y. Bus. Corp. Law § 1005(a)(1)). Indeed, in a footnote, this Court agreed with defendants on this point in its July 2013 Order, although the Court did not consider the waiver issue that is presented by the pending motion papers. (*See* July 2013 Order at 29 n.36.) As a threshold matter, Conte contests that the company was dissolved in accordance with proper procedure under New York State law and requests an evidentiary hearing on that issue. In particular, plaintiff contends that the dissolution proclamation was invalid under New York law because the Secretary of State failed to timely publish it. (Pl.'s Suppl. Br. at 45–46).[14]

In any event, even assuming *arguendo* that the dissolution was proper, Conte could have addressed this issue in two different ways during the trial if it had been properly raised by defendants in a Rule 50 motion.[15] First, it is well settled under New York law that, if back taxes are paid by the company and the company is re-instated, transactions during the dissolution period may be retroactively validated and enforceable by the company. *See, e.g.*, *St. James Construction Corp. v. Long*, 253 A.D.2d 754, 755 (N.Y. App. Div. 1998) ("[C]ourts have held that corporate transactions which occurred during a period of dissolution are retroactively validated because the corporation's status, and its corresponding powers, rights, duties, and obligations, have been reinstated nunc pro tunc. The ability to sue is among those rights to which a corporation with active status may avail itself." (citations omitted)); *Lorisa Capital Corp. v. Gallo*, 119 A.D.2d 99, 113 (N.Y. App. Div. 1986) ("We note that should Lorisa pay its back taxes as it offered to do in its papers at Special Term, and, thus, be reinstated to de jure status nunc pro tunc, its contract entered into during the period of delinquency would be retroactively validated."); *see also S&J Mechanical Corp. v. IDI Construction Co.*, 15 Misc. 3d 1106(A), at *2–3 (N.Y. Sup.

---

[14] Under New York Tax Law Section 203-a, the tax commission may send a list to the Department of State identifying any corporations that are delinquent in their taxes. N.Y. Tax Law § 203-a(1). Upon receiving the notification,

> [t]he secretary of state shall make a proclamation under his hand and seal of office, as to the corporations whose names are included in such list as finally corrected, declaring such corporations dissolved and their charters forfeited pursuant to the provisions of this section. He shall file the original proclamation in his office and shall publish a copy thereof in the state bulletin no later than three months following receipt of the list by him.

*Id.* § 203-a(3). It is only "[u]pon the publication of such proclamation" that the corporation "shall be deemed dissolved without further legal proceedings." *Id.* § 203-a(4).

[15] Defendants raised the dissolution issue for the first time in a motion for reconsideration on the summary

judgment motion, which was procedurally improper. Moreover, although defendants' counsel elicited testimony regarding the dissolution and made arguments to the jury regarding that issue in summation, it was in the context of questioning Conte's credibility, not making any legal argument regarding the impact of dissolution on the validity of the contracts. (*See, e.g.*, Tr. 701–13; 1000–04; *see also id.* at 1078 (during summation of defendants' counsel, noting, "Now, Mr. Conte acknowledges there is no such thing as iMedia Corporation after December of 2003. But we went on into 2004, and we went on to 2005, and he still held himself out to be the vice-president of iMedia Corporation. But wait. Mr. Conte offered an explanation. He said those corporation attorneys, those attorneys who incorporated my business never told me that the corporation no longer existed.").) In other words, the suggestion was that Conte was involved in a scam because his company was dissolved. At no point during the trial did defendants' counsel make an argument to the jury, or request an instruction, regarding the inability to enforce a contract for a dissolved company.

Ct. 2007) (giving plaintiff an opportunity to pay back taxes and have company reinstated in order to overcome affirmative defense that contract had been entered when the company was dissolved). Second, during the trial, Conte could also have sought to amend his pleadings to conform to the proof. In particular, Conte could have sought to amend to modify his claim to tortious interference with business relations, which would not have required proof of a valid contract.[16] *See, e.g., Nifty Foods Corp. v. Great Atlantic & Pacific Tea Co.*, 614 F.2d 832, 837–38 (2d Cir. 1980) (considering tort claim for interference with business relations where no interference with contract claim existed because contract was void); *Catskill Development, L.L.C. v. Park Place Entertainment Corp.*, 547 F.3d 115, 132–37 (2d Cir. 2008) (same); *see also Polo Fashions, Inc. v. Fashion Assocs., Inc.*, No. 82 Civ. 4870 (CBM), 1986 WL 1176, at *2 (S.D.N.Y. Jan. 22, 1986) ("Third-party plaintiffs are correct in their assertion that a contract need not exist in order for the tort of interference with prospective economic advantage to lie."). Because these issues were not properly raised under Rule 50 during the trial by defendants, however, neither Conte

nor the Court had the ability to consider how these issues could have been addressed by plaintiff.

The same is true concerning defendants' waived arguments that the evidence was insufficient to prove conduct amounting to tortious interference. (Pl.'s Suppl. Br. at 47–48.) Specifically, plaintiff has submitted an affidavit from Giaimo in which Giaimo asserts that the claims of fraud underlying his lawsuit on behalf of the route distributors originated in the Nassau County District Attorney's Office and that he initiated the class action lawsuit against plaintiff *after* speaking with Wallace, which contradicts Wallace's testimony.[17] (Giaimo Declaration ¶¶ 3–5; *see also* Tr. at 573–74 (Wallace testifying that he "didn't even know of Mr. Giaimo's existence until he had already filed his suit in civil court").) Had defendants alerted plaintiff to their arguments, he could have called Giaimo to establish the timing of his conversation with Wallace, as well as the content of their conversation. Giaimo could also have potentially shed light on whether any route distributors breached their contracts as a result of

---

[16] The Court notes that plaintiff did seek to add such a new claim during the trial. (Tr. at 786–90.) In the Court's view, however, that request was not directed at addressing this purported defect as to the route distributors and printers that were the centerpiece of the trial, but rather would open up the case to any potential business relationship that Conte sought during his company's existence. Because the Court believed allowing a claim based upon *new* potential business relationships (such as with certain advertisers) would be prejudicial, the Court denied the motion. (*Id.* at 882–86.) If, however, it was made clear to the Court that the amendment related only to the route distributors and printers who had always been the core part of plaintiff's case, and was necessary to address this specific legal objection by defendants regarding the validity of the contracts in a Rule 50 motion, such an amendment would have been warranted in the Court's discretion under Rule 15(b)(1). Such an amendment would also have been able to address the defendants' post-trial argument that there was no interference with

the route distributors because Conte received their money, and no interference with certain printers because there was no actual contract. In other words, Conte could have argued more generally that his ongoing business relationships with the printers and route distributors were interfered with, and destroyed, whether or not there was an actual breach of an existing contract.

[17] This Court does not consider Giaimo's affidavit on the merits of the insufficiency of the evidence arguments. That is, in its discussion of defendants' sufficiency of the evidence arguments above, the Court did not take into account Giaimo's post-trial statements. Instead, the Court merely cites this affidavit as proof that, had defendants raised their sufficiency of the evidence arguments at trial, plaintiff could have offered specific evidence "to cure the defects in proof" that defendants now identify. *Galdieri-Ambrosini*, 136 F.3d at 286.

conversations with the Nassau District Attorney's Office. In particular, in his declaration, Giaimo notes:

> On July 5, 2005, I attended a meeting at a restaurant on Long Island and met a number of people, mostly I Media route distributors, many of whom became plaintiffs in the *Amorizzo* case. At that meeting I heard allegations of fraud concerning Mr. Conte and I Media. Several participants said they had spoken to members of the Nassau County District Attorney's Office where they claimed those fraud allegations originated.

(Giaimo Declaration ¶ 3.) Although that testimony would have raised hearsay issues, Conte could have used that testimony to identify other route distributors that could have been called as additional witnesses to address this alleged defect. Thus, at the very least, Giaimo's post-trial affidavit demonstrates that plaintiff could have presented additional evidence to dispute defendants' waived arguments had they timely raised them.

Similarly, with respect to the other grounds for plaintiff's tortious interference claim, plaintiff might have presented additional evidence to correct the deficiencies the defendants identify post-trial. For example, defendants suggest that there was no evidence of conduct constituting interference because, even if the interaction with Paul Hoppe was attempted interference, there was no evidence that Hoppe stopped dealing with Conte, and this was the "single instance of a route distributor, Hoppe, being approached by Falzarano." (Defs.' Suppl. Br. at 19.)

However, Hoppe testified that Falzarano asked him for the names of other distributors, which he provided. (Tr. at 211.) Hoppe also had his own conversations with other distributors about this interaction. (*Id.* at 213.) Moreover, Falzarano testified that, although he could not remember the exact number, he spoke to several route distributors. (*Id.* at 298–99.) If the jury believed Mr. Hoppe's testimony, it would not have been unreasonable for them to draw an inference from all the evidence in this case that Falzarano had similar conversations with many route distributors, and that Falzarano could reasonably foresee his allegations being shared among many route distributors. In any event, if plaintiff needed to show other conduct constituting tortious interference to overcome this argument, plaintiff could have called the printers, advertisers, and route distributors to testify as to their conversations with defendants. Likewise, to show breach and causation, these witnesses could have testified as to when and why they repudiated their contracts.

Finally, with respect to damages, plaintiff could have attempted to submit additional evidence on how the defendants' interference deprived him of the benefit of the contracts with his route distributors and printers. Moreover, some of the damages awarded by the jury also could have related to emotional distress damages, which are recoverable in certain circumstances for a tortious interference claim under New York law.[18] *See Pappas*, 96 F.3d at 597 ("With respect to damages, [o]ne who is liable to another for interference with a contract or prospective contractual relation is liable for damages for (a)

---

[18] The Court notes that, during the charge conference on the damages instructions, no objection was made to allowing the jury to consider emotional distress damages on the interference with contract claim. (Tr. 1219–38.) In fact, defendants' brief regarding damages cites the relevant case authority. (ECF No. 584.)

To the extent defendants challenge the amount of damages as excessive or against the weight of the evidence, that type of motion is available under Rule 59 of the Federal Rules of Civil Procedure. Although defendants initially made such a motion, they subsequently abandoned it.

the pecuniary loss of the benefits of the contract or the prospective relation; (b) consequential losses for which the interference is a legal cause; and (c) emotional distress or actual harm to reputation, if they are reasonably expected to result from the interference." (citations omitted)); *see also GS Plasticos Limitada v. Bureau Veritas*, 37 Misc.3d 1228(A), at *3 (N.Y. Sup. Ct. 2012) ("[T]hat GS seeks consequential damages resulting from harm to its reputation – as permitted in connection with a claim for tortious interference with contract – is insufficient to transform GS's tortious interference claim into a defamation claim." (citing *Guard Life Corp. v. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 197 (N.Y. 1980))).

In short, had defendants alerted plaintiff to the defects in proof they now identify, he may have been able to cure them. As noted, moreover, the entire purpose of Rule 50(a)'s specificity requirement "is to give the other party an opportunity to cure the defects in proof that might otherwise preclude him from taking the case to the jury." *Galdieri-Ambrosini*, 136 F.3d at 286 (quoting *Baskin*, 807 F.2d at 1134). Thus, in this case, to grant defendants' Rule 50 motion or afford them a new trial on the basis of the waived arguments, *see Russo*, 672 F.2d at 1022, would undermine the purpose of Rule 50(a), *see Kirsch*, 148 F.3d at 165; *Rivera*, 594 F. App'x at 6; *Galdieri-Ambrosini*, 136 F.3d at 286. As such, the Court "cannot find manifest injustice" here and therefore declines to exercise its discretion to grant the motion based on the waived arguments. *Rivera*, 594 F. App'x at 6 (quoting *Kirsch*, 148 F.3d at 165).

### IV. CONCLUSION

In sum, the Court concludes that (1) defendants waived their governmental immunity and insufficiency of the evidence arguments by failing to raise them with specificity in their Rule 50(a) motion, and (2) no manifest injustice will result if this Court declines to grant them JMOL or a new trial on the basis of those arguments. Therefore, the Court denies defendants' Rule 50 motion in its entirety.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: March 3, 2017
          Central Islip, NY

* * *

Plaintiff is proceeding *pro se*. Defendants are represented by Andrew Reginald Scott and Sondra Meryl Toscano of the Nassau County Attorney's Office, 1 West Street, Mineola, N.Y. 11501, as well as Eliza Mae Scheibel and Robert A. Spolzino of Wilson Elser Moskowitz Edelman & Dicker, LLP, 1133 Westchester Avenue, 3rd Floor, West Harrison, NY 10604.